**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

FRANCONIA ASSOCIATES, a
Limited Partnership, et al.,

Plaintiffs,

**File No. 97-381C**
**Judge Francis M. Allegra**

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFFS' POST-TRIAL BRIEF

---

Jeff H. Eckland
Attorney For Plaintiffs
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

Of Counsel:
William L. Roberts
Mark J. Blando
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

# TABLE OF CONTENTS

I. THE DEAL .....1

A. The Deal Between The Parties Granted Plaintiffs The Right To Convert Their Properties To Conventional Uses. ..... 2

1. The Termination Option Was Set Forth In Crystal Clear Terms. ..... 2

2. The Contracts Were Protected Against Modification By Subsequent Legislation. ..... 5

B. The Right To Convert Was The "Quid Pro Quo" For The Deal. ..... 8

C. The Government Held Out The Prepayment Right As An Inducement To Attract Owners Into The Program. .....11

D. By Government Policy, Prepayment Was Encouraged And Even Compelled. .....14

II. THE REPUDIATION .....15

A. Defendant Is Bound To Standard Contract Law Principles. .....16

B. Defendant Repudiated Plaintiffs' Contracts By Enacting Legislation Curtailing Their Original Prepayment Rights. .....17

C. Defendant's Repudiation Spawned Critical Legal Consequences. .....19

III. THE LESSER DEALS .....20

A. Plaintiffs Were Not Obligated To Continue To Deal With The Government Following Its Repudiation. .....21

B. The Prepayment Alternatives Offered By The Repudiating Legislation All Require Owners To Forfeit Their Original Contract Rights. .....24

C. Defendant's Proposed Alternatives To Unrestricted Prepayment Are Unreasonable, Economically Unsound, Or Simply Unavailable. .....26

1. The Application And Evaluation Process .....28

2. The "Incentives" .....29

3. The "Forced Sale" ....................31

4. The "G-4" Restricted Prepayment....................33

**IV. THE BREACH** ....................35

A. Defendant Failed To Perform Its Contractual Obligations. ....................36

1. Each Plaintiff Established The Date On Which Defendant Breached Its Contract. ....................36

2. Prepayment Without Restrictions Is Not An Option For Any Of The Plaintiffs. ....................39

B. Defendant's Breach Is Not Protected By The Unmistakability Doctrine. ....................42

1. The Court Is Not Bound To The Prior Erroneous Ruling In This Case Regarding The Applicability Of The Unmistakability Doctrine. ....................43

2. The Unmistakability Doctrine, Which Protects The Government Only When It Is Acting In Its Capacity As The Sovereign, Is Inapplicable Here. ....................45

**V. THE TAKING** ....................45

A. Plaintiffs' Takings Claims Are Ripe For Judicial Review. ....................46

B. Plaintiffs Hold Protected Property Interests In Their Real Estate And Their Contract Rights. ....................49

C. Applying The *Penn Central* Analysis, Plaintiffs Suffered A Taking Of Their Properties....................50

1. Character of the Government Action....................50

2. Interference with Reasonable Investment-Backed Expectations ....................50

3. Economic Impact....................51

D. The Lesser Alternatives Provided Under The Statutes Do Not Provide Plaintiffs "Just Compensation." ....................53

**VI. DAMAGES** ....................................................................................................54

A. Plaintiffs Presented A Fair And Reasonable Estimate Of Their Damages ....................................................................................................54

B. Plaintiffs' Damages Models Were Conservative And Proper For Each Claim. ....................................................................................................56

C. Plaintiffs' Models Accounted For All Appropriate Offsets. ................................60

**CONCUSION** ....................................................................................................62

## TABLE OF AUTHORITIES

**Federal Cases**

*Abdallah v. Abdallah*, 359 F.2d 170 (3d Cir. 1966) ....................37

*Acme Investment, Inc. v. Southwest Tracor, Inc.*, 105 F.3d 412 (8th Cir. 1997) ....................37

*Adams v. United States*, 42 Fed. Cl. 463 (Fed. Cl. 1998)....................45

*Apex Mining Co. v. Chicago Copper & Chemical Co.*, 306 F.2d 725, 731 (8th Cir. 1962) ....................22

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (2001) ....................54

*Brazos Elec. Power Coop., Inc. v. United States*, 52 Fed. Cl. 121, 129 (2002) ....................25

*Buere'-Co. v. United States*, 16 Cl. Ct. 42 (1988)....................47, 49

*C.J. Langenfelder & Son, Inc. v. United States*, 384 F.2d 1005 (Ct. Cl. 1967) ....................27

*California Federal Bank v. United States*, 245 F.3d 1342 (Fed. Cir. 2001)....................55

*Campfield v. Sauer*, 189 F. 576 (6th Cir. 1911) ....................21

*Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) .................... 45, 50, 51

*Churchill Chemical Corp. v. United States*, 602 F.2d 358 (Ct. Cl. 1979) ....................22

*Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001) ....................47, 48

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ....................8, 11, 45, 50, 51, 52

*Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995) ....................24

*Cienega Gardens v. United States,* 194 F.3d 1231 (Fed. Cir. 1998) ....................24

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997) ....................32

*City of Detroit v. Detroit Citizens' St. Railway*, 184 U.S. 368 (1902) ....................6

*Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943) ....................16

*Coast-to-Coast Finance Corp. v. United States*, 45 Fed. Cl. 796 (2000) ....................44

*Commonwealth Associates v. Palomar Medical Tech., Inc.*, 982 F. Supp. 205 (S.D.N.Y. 1997) ....................38

*Conoco Inc. v. United States*, 35 Fed. Cl. 309 (1996) ....................44

*Cooke v. United States*, 91 U.S. 389 (1875) ....................16

*Craft Machine Works, Inc. v. United States*, 926 F.2d 1110 (Fed. Cir. 1991) ....................6

*Devon Energy v. United States*, 45 Fed. Cl. 519 (1999) ....................47

*Duquesne Light Co. v. Barash*, 488 U.S. 299 (1989) ....................51

*Eastern Minerals International, Inc. v. United States*, 36 Fed. Cl. 541 (1996) ....................48

*Electric & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237, 416 F.2d 1345 (1969) ....................54

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ....................55

*Energy Capital Corp. v. United States*, 47 Fed. Cl. 382 (Fed. Cl. 2000) ....................22, 23, 61

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ....................51

*First Federal Lincoln Bank v. United States*, 54 Fed. Cl. 446 (2002) ....................8

*Fisher v. First Stamford Bank & Trust,* 751 F.2d 519 (2d Cir. 1984) ........................................................................ 27

*Florida Rock Industrial v. United States*, 18 F.3d 1560 (1994) ........................................ 52

*Franconia Associates v. United States*, 536 U.S. 129 (2002) .......................... 1, 16-19, 36, 40

*General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000) ........................................................................ 8, 44

*Gindes v. United States*, 740 F.2d 947 (Fed. Cir. 1984) ........................................ 43

*Glendale Federal Bank v. United States*, 43 Fed. Cl. 390 (1999) ........................................ 55

*Gould, Inc. v. United States*, 67 F.3d 925 (Fed. Cir. 1995)........................................ 43

*Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (Fed. Cl. 2002) ........................................................................ 44

*Greene v. Safeway Stores, Inc.*, 210 F.3d 1237 (10th Cir. 2000) ........................................ 38

*Hage v. United States*, 35 Fed. Cl. 147 (1996) ........................................ 48, 49

*Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420 (Fed. Cl. 2002) ........................................................................ 54

*Holland v. United States*, No. 95-524C (Fed. Cl. July 30, 2003) ........................................ 8

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001)........................................................................ 62

*Income Properties/Equity Trust, Jones v. Wal-Mart Stores, Inc.*, 33 F.3d 987 (8th Cir. 1994) ........................................................................ 19

*Kellett Aircraft Corp*, 186 F.2d 197 (3d Cir. 1950) ........................................ 22, 27

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990) ........................................ 22, 27, 28

*Kers & Co. v. ATC Commission Group, Inc.*, 9 F. Supp. 2d 1267 (D. Kan. 1998) ........................................................................ 38

*Kimberly Associates v. United States*, 261 F.3d 864 (9th Cir. 2001) ........................................................................ 44

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ....................21-28, 60

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)....................61

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)....................47

*Lynch v. United States*, 292 U.S. 571 (1934) ....................6, 16

*MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340 (1986) ....................48

*Marathon Oil Co. v. United States*, 177 F.3d 1331 (Fed. Cir. 1999) ....................7

*Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573 (Fed. Cir. 1994) ....................43, 44

*Messenger v. Anderson*, 225 U.S. 436 (1912) ....................43

*Middleton v. United States*, 175 Ct. Cl. 786 (1966)....................27

*Mindel v. Image Point Productions, Inc.*, 725 F.Supp. 189 (S.D.N.Y. 1989) ....................20

*Midwest Indus. Painting of Fla., Inc. v. United States*, 4 Cl. Ct. 124 (1983) ....................22

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)....................5, 7, 16, 18, 19, 44

*Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893) ....................53

*National Steel Corp. v. Great Lakes Towing Co.*, 574 F.2d 339 (6th Cir. 1978) ....................61

*Nobles v. Rural Community Insurance Services*, 122 F. Supp. 2d 1290 (M.D. Ala. 2000)....................6

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)....................47

*Penn Central Transport Co. v. New York City*, 438 U.S. 104 (1978) ....................46, 53

*Perry v. United States*, 294 U.S. 330 (1935) .......... 16

*Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174 (1997) .......... 19

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) .......... 26, 27

*Roehm v. Horst*, 178 U.S. 1 (1900) .......... 19

*Siller Brothers v. United States*, 655 F.2d 1039 (Ct. Cl. 1981) .......... 21

*Sinking-Fund Cases*, 99 U.S. 700 (1879) .......... 7

*Slotkin v. Citizens Casualty Co.*, 614 F.2d 301 (2d Cir. 1980) .......... 43

*Southern Cal. Fed. Sav. & Loan Ass'n*, No. 93-52C (Fed. Cl. Aug. 7, 2003) .......... 22, 27, 35, 55

*Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918) .......... 61

*Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554 (Ct. Cl. 1966) .......... 54

*Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184 (10th Cir. 1972) .......... 21

*Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997); .......... 47

*Sun Cal, Inc. v. United States*, 25 Cl. Ct. 426 (1992) .......... 27

*T.C. Bateson Constr. Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135 (1963) .......... 22

*United States v. Westlands Water District*, 134 F. Supp. 2d 1111 (E.D. Cal. 2001) .......... 44

*United States v. Winstar Corp*, 518 U.S. 839 (1996) .......... 5-7, 11, 16, 17, 62

*Venice Maid Co., Inc. v. United States*, 639 F.2d 690 (Ct. Cl. 1980) .......... 22

*Wells Fargo Bank v. United States*, 88 F.2d 1012 (Fed. Cir. 1996) .......... 55

*White v. Murtha*, 377 F.2d 428 (5th Cir. 1967) ........ 44

*Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed. Cir. 1991) ........ 53, 54

*Williamson County Reg'l Planning Commission v. Hamilton Bank*, 473 S. 172 (1985) ........ 47

*Wood v. Lovett*, 313 U.S. 362 (1941) ........ 6

*WRB Corp. v. United States*, 183 Ct.Cl. 409 (1968) ........ 54

**State Cases**

*Cain v. Grosshans & Petersen, Inc.*, 413 P.2d 98 (1966) ........ 21

*Coppola v. Marden, Orth & Hastings Co.*, 118 N.E. 499 (1917) ........ 21, 24, 25

*D'Oliveira v. Rare Hospitality Int'l, Inc.*, 2003 WL 1223854 (R. I. Super. Feb. 13, 2003) ........ 38

*Foster v. Bartolomeo*, 581 N.E.2d 1033 (Mass. App. Ct. 1991) ........ 37

*Fullington v. M. Penn Phillips*, 395 P.2d 124 (Or. 1964) ........ 37

*Green v. Smith*, 261 Cal. App. 2d 392, 398, 67 Cal. Rptr. 796 (Cal. Ct. App. 1968) ........ 27

*Lyon v. Willie*, 288 N.W.2d 884 (Iowa 1980) ........ 37

*Stanley Manly Boys' Clothes, Inc. v. Hickey*, 259 S.W. 160 (Tex. 1924) ........ 21

*Zanker Development Co. v. Cogito System Inc.*, 264 Cal. Rptr. 76 (Cal. Ct. App. 1989) ........ 27

**Other Cases**

42 Op. Att'y Gen. 417 (Dec. 29, 1969) ........ 14

**Federal Statutes and Regulations**

42 U.S.C. § 1472(b)(3) ........ 15

42 U.S.C. § 1472(c)(4) ........ 25

42 U.S.C. § 1472(c)(4)(A) .......... 18, 28, 29

42 U.S.C. § 1472(c)(4)(B) .......... 30

42 U.S.C. § 1472(c)(4)(C) .......... 30

42 U.S.C. § 1472(c)(5)(A) .......... 26, 31, 32

42 U.S.C. § 1472(c)(5)(B) .......... 26

42 U.S.C. § 1472(c)(5)(G) .......... 18, 25, 40

7 C.F.R. Pt. 1944-E, Ex. B-1 (1980) .......... 57

7 C.F.R. § 1865.2(c) (1979) .......... 14, 15

7 C.F.R. § 1866.2 (1978) .......... 18

7 C.F.R. § 1965.204 .......... 28

7 C.F.R. § 1965.206(a) .......... 28

7 C.F.R. § 1965.214(b) .......... 29

7 C.F.R. § 1965.215(c) .......... 40

7 C.F.R. Pt. 1965-E .......... 18, 26

7 C.F.R. Pt. 1965-E, Ex. A-4 .......... 26

RD Instruction 1965-E .......... 25-41

**<u>Legislative Materials</u>**

125 Cong. Rec. 18204 (1979) .......... 9

126 Cong. Rec. 22650 (1980) .......... 17

136 Cong. Rec. 26372 (1980) .......... 16

H.R. Rep. No. 100-122(I), 100th Cong., 1st Sess. at 53 (1987),
1987 U.S.C.C.A.N. .......... 9

Pub. L. No. 87-70, 75 Stat. 149 (1961) .......... 14

Pub. L. No. 87-723, 78 Stat. 670 (1962) .......... 5

Pub. L. No. 90-488, 82 Stat. 476 (1968) .......... 62

Pub. L. No. 96-153, § 503, 93 Stat. 1134 (1979) .......... 17

Pub. L. No. 96-399, § 514, 94 Stat. 1671 (1980) .......... 17

Pub. L. No. 100-242, 101 Stat. 1877 (1989) .......... 54

**<u>Treatises, Books and Articles</u>**

Belden & Wiener, HOUSING IN RURAL AMERICA (1999) .......... 14, 62

A. Corbin, *Corbin on Contracts* (1951) .......... 21

A. Corbin, *Corbin on Contracts* (Interim Edition 2002) .......... 37

1 Dobbs Law of Remedies (2d ed. 1993) .......... 61

FARNSWORTH ON CONTRACTS (1998) .......... 19

Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward A General Theory of Contractual Obligation*, 69 Va. L. Rev. 967 (1983) .......... 21

G. Karvel & M. Unger, REAL ESTATE PRINCIPLES AND PRACTICE (9th Ed. 1991) .......... 4, 57

Restatement (Second) of Contracts (1981) .......... 18, 19, 23, 27, 37, 54

Williston, S., *A Treatise on the Law of Contracts* .......... 19

18B C. Wright, et al., *Federal Practice and Procedure* (2002) .......... 44

The United States Supreme Court issued its decision in this matter on June 10, 2002, allowing the claims of all plaintiffs to go forward and remanding the case for further proceedings. *Franconia Assoc. v. United States*, 536 U.S. 129 (2002). The trial of all thirty-one plaintiffs was then held on June 16, 2003 through June 26, 2003, in Des Moines, Iowa. At the trial, plaintiffs introduced over 800 exhibits and presented the testimony of seventeen witnesses, including fourteen owners and owner representatives, two expert witnesses on damages, and one former government employee. Pursuant to the Court's Order of July 15, 2003, plaintiffs hereby respectfully submit this Post-Trial Brief.

## I. THE DEAL

*"A deal is a deal."* - Donald Stordahl (II/555)

*"That was the deal."* - Scalia, J., *Franconia Assoc.*, oral argument (4/15/02)

Plaintiffs are men, women and partnerships from across the United States who entered into a contract with the United States for mutual gain, believing that their government would carry out its end of the deal. Some plaintiffs own their properties through partnerships; some own them as individuals; one owns its property as a corporation. Some plaintiffs own multiple properties; some own only one. Some plaintiffs are Harvard-educated; some never went to college. Some are still actively involved in the real estate business; some have retired or are semi-retired. One plaintiff has learned, since the close of trial, that he is terminally ill.

Despite their differences, however, plaintiffs have at least one thing in common that brought them together in this Court: they had a deal with the United States government and the government dishonored that deal. And because they had a deal, plaintiffs were not required to accept any of the lesser deals that the government devised as supposed compensation for its wrongful conduct. These common themes resounded repeatedly throughout the course of the

trial, enforcing the fundamental principle that governs this case: defendant, like any other party to a real estate transaction, must take responsibility for its conduct in failing to live up to its contractual obligations. This unified message harmonizes the many voices heard at trial and mandates judgment in favor of plaintiffs.

### A. The Deal Between The Parties Granted Plaintiffs The Right To Convert Their Properties To Conventional Uses.

#### 1. The Termination Option Was Set Forth In Crystal Clear Terms.

The deal agreed to by the parties in this case was quite simple. Each plaintiff entered into a contract with the Farmer's Home Administration ("FmHA") of the Department of Agriculture pursuant to the Section 515 program. The contracts, reflected in a promissory note, loan agreement and mortgage, provided that the owner would construct rental housing in a rural area using funds borrowed from the FmHA. The promissory note and mortgage made each plaintiff solely responsible for repaying the full loan amount plus interest at the rate stated on the note. JSF ¶ 6 (borrower "promises to pay" principle loan amount plus interest).[1] The terms of the mortgages typically were fifty years. *See, e.g.,* JX 103, JX 104; *see also* VI/1267.[2]

The sole financial benefit inuring to plaintiffs within the confines of the program is a nominal annual fee equaling eight percent of their initial down payment. JX 103 at 5. Thus, for example, a property like Riverfront, which placed a $22,400 down payment on its property in 1974, can earn only a maximum of $1,344 per year while in the program. JX 2. Many plaintiffs

---

1 Citations herein are to the parties' Joint Stipulation of Facts ("JSF"), the parties' joint exhibits ("JX"), plaintiffs' exhibits ("PX"), defendant's exhibits ("DX"), and the trial transcript, referenced by volume and page number (*e.g.*, "II/555").

2 The contracts appeared on standard forms drafted by the agency. In a number of cases, plaintiffs negotiated special terms with the FmHA that were incorporated into the contracts. For example, Mr. Levy testified that he negotiated with the agency to include in all of the contracts signed by his partnerships a non-recourse provision. IV/1264-65, 1295; JX 51 at 2.

have been unable to obtain even this meager return for many years, as the agency maintains the right to reduce or even eliminate the annual return depending on how project finances balance out each year. JX 103 at 5 (stating that the return of "up to" eight percent can be paid out of project reserves only "[w]ith the prior consent of the Government" and only if sufficient funds will remain in the reserve account after the payment).[3] As a result, there is no guarantee that any of the plaintiffs will be able to earn even their eight percent return in any given year through the remainder of their mortgage terms.[4]

While the Section 515 program placed heavy burdens on plaintiffs with little immediate return, the contracts did not by any means require owners to stay in the program for their full fifty-year mortgage terms. *See* VI/1265-69. Instead, the contracts permitted plaintiffs to terminate their participation in the program by prepaying their mortgages at a time of their choosing (the "termination option"). *See* VI/1265-69. The right to terminate through prepayment of the loan was clearly set forth in each promissory note as follows:

> Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower.

JSF ¶ 7.[5]

---

3 *E.g.*, IV/947 (Riverfront has faced a "struggle" to obtain its annual return, given agency's refusal to grant needed rent increases); IV/876-77, 889 (Eastwood has not received its return in four out of the last five years due to investments of funds made to maintain and improve the property); IV/646 (Dogwood Glen did not receive its return for several years); V/1177 (Fox Ridge II has often failed to receive a return). Indeed, the analysis performed by defendant's expert witness Dr. Hamm on the plaintiffs' ability to obtain their annual return indicates a substantial default rate of 15-20%. *See* DX 42 at 34-35; II/470-71.

4 So long as their properties remain in the program, plaintiffs are also bound to various "regulatory covenants," including requirements regarding tenant eligibility, rent levels, and cash reserves. *E.g.,* JX 103 at 5-7. Plaintiffs are also required to submit annual budgets and other documentation and are subjected to various government reporting and oversight requirements while in the program. *Id;* III/707-11; II/617.

5 While every plaintiffs' contract included this prepayment provision, the post-1979 owners also agreed to a "twenty-year covenant" which provided that they were not permitted to raise

The fact that the prepayment right was contained in the promissory note is significant. The promissory note is considered the bedrock of any real estate transaction. This is because the promissory note is the instrument that secures the fundamental obligation of the borrower to pay back the loan. *See* G. Karvel & M. Unger, REAL ESTATE PRINCIPLES AND PRACTICE 213 (9th Ed. 1991). As David Hodges testified, a promissory note is "the fundamental cornerstone of real estate business." V/1209-10. Thus, the prepayment right was an express term of the core agreement executed by the parties for each transaction.

The right to prepay and leave the program was confirmed by several other contract provisions. For example, the right was reinforced by a "refinancing" provision, typically found in both the loan agreement and mortgage, which required plaintiffs to pay off their government loan and take on a private mortgage when financing on similar terms became available. JSF ¶ 8; JX 16 at 2; JX 17 at 3; *see also* II/508, 524-525. In addition, the loan agreement made clear that the various covenants restricting the use of the property would terminate once the loan was paid in full, in that the covenants were to remain in effect only "[s]o long as the loan obligations remain unsatisfied." *E.g.,* JX 103 at 5. Finally, the twenty-year covenant found in every post-1979 contract made clear that the owners' obligation to remain in the program was for a period of twenty years and no more. *See* JSF ¶ 12. Indeed, if the contracts in any way permitted the government to keep all owners locked in for fifty years, there would be no need to include a requirement that the post-1979 owners to stay in for twenty years.

Thus, there is only one reasonable interpretation of the parties' contracts: plaintiffs had the option to terminate their participation in the program at a time of their choosing by prepaying

---

rents for a period of twenty years after the loan was made. JSF 12. All of the post-1979 owners in this case have reached the end of their twenty-year covenants.

their mortgages. The government's obligation to release plaintiffs from the program's regulatory covenants upon prepayment was clear and unmistakable.

**2. The Contracts Were Protected Against Modification By Subsequent Legislation.**

Plaintiffs' contracts made clear that their terms, including the prepayment right, could be modified only by consent between the parties, expressed in writing. In particular, the loan agreement stated that it could be "changed by agreement between the Government and the [owner]," and that any such agreement "must be in writing." JSF ¶ 11; JX 103 at 8. Indeed, the contracts actually referred to themselves as being "contractually binding." *Id.* Nothing in the contracts granted either party the right to change the terms without the other party's consent. Any such authority would render the contracts illusory. *See United States v. Winstar Corp*, 518 U.S. 839, 921 (1996) ("*Winstar*") (government contracts should not be read in a manner that renders the government's obligations "illusory"); *see also Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 620 (2000) ("*Mobil*").

The contracts also spelled out how the applicable statutes and regulations would impact the parties' rights and obligations. With regard to legislation, the loan agreement provided that "any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations." JSF ¶ 9; JX 103 at 7. The "authorizing act of Congress" referred to in this clause is Section 515 of the National Housing Act, passed in 1962, which created the Section 515 program. Pub. L. No. 87-723, § 4(b), 78 Stat. 670, 671 (1962); *see also* JX 103 at 1 (referencing section 515(b) of the Act). The contract did not reference any prospective modifications to the statute or any other laws that might be passed in the future. *Id.* With regard to regulations, the contracts were even more explicit. Each promissory note

provided that it was "subject to the present regulations of the Farmer's Home Administration and to its future regulations *not inconsistent with the express provisions hereof*." JSF ¶ 10 (emphasis added); *see also* VI/1276-78, 1273, 1274-75.

These provisions make clear that the contracts were subject to the governing statute and regulations *as they existed when the contracts were executed* – not to any future changes in the law. *See* I/212; VI/1271-72, 1298. It has long been recognized that, absent express contractual language to the contrary, reference in a government contract to statutes or regulations results only in "incorporation of the then-current regulations," not statutes or regulations as they "change" over time. *Winstar*, 518 U.S. at 868 (1996); *accord id.* at 922 (Scalia, J., concurring); *Wood v. Lovett*, 313 U.S. 362, 369-70 (1941); *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1115 (Fed. Cir. 1991); *see also Nobles v. Rural Community Ins. Servs.*, 122 F.Supp.2d 1290, 1292, 1300 (M.D. Ala. 2000) (contract made "[s]ubject to the provisions of the Federal Crop Insurance Act and the regulations issued under that Act" construed to incorporate the terms of the statute and regulations as they existed when the contract was signed).[6] As the Supreme Court held more than 100 years ago:

> [Congress] cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into.

[6] Even where the terms of a government contract expressly make it subject to *future* regulatory and legislative changes, the government will not be permitted to work a forfeiture of the private party's investment by revoking its obligations through subsequent statutes or regulations. *Lynch v. United States*, 292 U.S. 571, 577-78 (1934) (government found liable even though contract provided that it was "subject to all amendments to the original Act, [and] to all regulations then in force or thereafter adopted"); *City of Detroit v. Detroit Citizens' St. Ry.,* 184 U.S. 368, 377-78, 384, 398 (1902) (although public contract was expressly subject to "further rules, orders or regulations," the government could not issue subsequent regulations that unilaterally revoked "material" terms of the contract or destroyed the plaintiff's investment).

*Sinking-Fund Cases*, 99 U.S. 700, 721 (1879) (concluding that Congress could not "by direct legislation vacate mortgages already made . . . nor release debts already contracted"). In short, while the government may enact laws governing the future conduct of its citizens, it cannot through legislation rewrite the terms of contracts it has already signed.

In *Marathon Oil Co. v. United States*, 177 F.3d 1331, 1337 (Fed. Cir. 1999), for example, the Federal Circuit held that a contract made "subject to" the governing statute, regulations issued pursuant to that statute, and "all other applicable statutes and regulations," was not subject to future inconsistent legislation. The Court noted that construing the contract "as incorporating all future actions, whether by statute or regulation, by one of the parties would raise serious questions about illusory contracts." *Id.* The Supreme Court agreed that the contract's reference to applicable statutes and regulations incorporated the terms of such statutes and regulations only as they existed at the time the contracts were executed. *Mobil*, 530 U.S. at 616-17. The Court observed that any other interpretation would render the contracts economically unfeasible. *Id.* ("Without some such contractual provision limiting the Government's power to impose new and different requirements, the companies would have spent $158 million to buy next to nothing.").

* * *

In sum, the terms of "the deal" provided, consistent with applicable case law, that (1) plaintiffs had the option to prepay and raise rents at any time (limited only by the now-expired 20-year covenants for the post-1979 owners), (2) the deals were contractually binding and could be changed only by written agreement between the parties, and (3) the contracts could not be modified by any contrary statutes or regulations that might be passed in the future.[7]

---

[7] As explained in part IV(C), *infra*, the unmistakability doctrine is not an issue in this case because it simply does not apply. However, the discussion in this section establishes that even if the doctrine did apply here, plaintiffs' contracts easily satisfy the requirements of the doctrine. *See Winstar*, 518 U.S. at 922 (unmistakability doctrine requires at most a clear promise to

## B. The Right To Convert Was The "Quid Pro Quo" For The Deal.

*"Well, I had plans . . . when I went into this, I wasn't looking at doing government housing for 50 years. I don't think anybody would commit themselves to something like that."*
- Phoebe Perri (II/604)

All of the plaintiffs testified that they would not have signed their contracts absent the termination option.[8] Stated otherwise, none of the plaintiffs would have entered the program if there was a possibility that they could be prohibited from leaving the program until their mortgage terms expired. *Id.* Several plaintiffs discussed the prepayment term with agency officials before signing their contracts to confirm that they would have the option to prepay. I/172, 174-75; I/185, 188; III/716; VI/1257-58; V/1101-02. A number of plaintiffs even had their contracts reviewed by attorneys before closing to ensure that they guaranteed the right to prepay. I/204-05; VI/1266; III/792; VI/1292. Clearly, plaintiffs did not enter into the Section 515 program with the vision that they and their heirs would be involved in running government-subsidized housing for fifty years. I/180; II/509-10; II/590-91; II/604.

Nor did plaintiffs sign their contracts in order to obtain a "low interest rate loan." The stated interest rates on the notes were actually at or near market rates, and the notes made the plaintiffs liable for the full amount of the mortgage at the rate stated on the note. *E.g.*, JX 104. Although government subsidies produced an effective one percent interest rate on the loans,

---

regulate in a certain fashion into the future) (Scalia, J., conc.); *Cienega Gardens v. United States*, 331 F.3d 1319, 1334 (Fed. Cir. 2003) (finding that under HUD housing program, "[t]he owners' contractual prepayment rights are such clear, unqualified rights" as the contract terms at issue in *Winstar*); *General Dynamics Corp. v. United States*, 47 Fed.Cl. 514, 546-48 (2000) (holding that the unmistakability doctrine is satisfied where the contract language is "crystal clear and lends itself to only one reasonable interpretation"). Indeed, under recent case law, a promise need not even be express to satisfy the unmistakability doctrine. *See First Fed. Lincoln Bank v. United States*, 54 Fed. Cl. 446, 456 (2002) (holding that a promise for certain regulatory treatment need not be explicit when the obligation is "subsumed" within other terms of the contract); *accord Holland v. United* States, No. 95-524C (Fed. Cl. July 30, 2003).

[8] *See* I/179, 180, 215; VI/1262; II/543, 544; II/590-91, 604; II/633, 637; IV/865, 866; IV/895; V/947, 1003; IV/1019; V/1094; V/1134-35; V/1199.

those subsidies provided no benefit to plaintiffs. *See* II/438, 441-42; VII/1561, 1567-69; VI/1262; IX/2187-88. This is because until an owner is able to prepay and leave the program, the owner's return is strictly limited to the annual fixed fee, which, as explained above, is capped at eight percent of the initial down payment. JX 103 at 5. Thus, the deal only made financial sense to plaintiffs if they could prepay and be freed of the program's restrictions when they chose to exercise their option to do so. I/179, 215; VI/1262, 1266; VI/1275-76; II/543, 554; II/590-91; II/633; IV 865-66 (Mr. Baker would "absolutely not" have entered into contracts without prepayment right); IV/895 (Mr. Wells "couldn't even think" of entering into contracts absent the right to prepay at any time); IV/947, 1004; IV/1019; V/1094; V/1134-35; V/1199.

The right to terminate was crucial from a financial standpoint also because of the tax implications of Section 515 ownership. *See* II/542-43, 545; VI/1265. While certain tax benefits initially were available under the program, those benefits ran out as each project's depreciation schedule expired. *See* 125 Cong. Rec. 18204 (1979) ("The tax advantage in this type of project looks toward a maximum term of about 10 years."). Thus, as the tax benefits of remaining in the program diminished, the incentive to leave the program increased. H.R. Rep. No. 100-122(I), 100th Cong., 1st Sess. at 53 (1987), 1987 U.S.C.C.A.N. at 3369 (noting that "the exhaustion of many tax benefits available to Section 515 participants was 'driving owners to prepay or refinance their FmHA loans'"). Mr. Donald Stordahl, for example, planned to prepay as soon as his property was fully depreciated. II/542-545. Without the right to prepay, however, plaintiffs would be trapped in the program with no remaining tax incentives, and facing the possibility of negative tax consequences for years and years into the future. Thus, the temporary nature of the tax benefits available under the program made the termination option all the more critical.

In developing their properties, plaintiffs picked locations and completed construction with an eye toward converting to market rents in the future. Mr. Morosani, for example, had numerous discussions with FmHA officials regarding his plans to install air conditioners and a brick facade at his property. I/181-82. Mr. Morosani's property was also constructed in manner that would permit conversion to condominiums in the future. *Id.* I/200-01. Similarly, Mr. Levy incorporated separate entrance-ways and decks into his building. VI/1335; III/811-12. Ms. Perri beautifully landscaped both of her properties and added balconies and patios. II/588-89; PX 611 at 9. Mr. Tucker included amenities such as central air and heating, a central TV system, and a playground. II/635.

All of the pre-1979 owners intended to prepay as soon as the time was ripe, based on their personal circumstances and market conditions. For example, Mr. Levy and Mr. Morosani each decided to prepay when the combination of prevailing interest rates, development and population growth in the community, and conventional rents in the market made conversion to market rents the most attractive. I/219, 260; VI/1282-83. Mr. Stordahl, as noted above, intended to prepay when the tax benefits expired. II/542-43; II/545. All of the post-1979 owners intended to prepay as soon as their twenty-year anniversaries arrived. *E.g.*, II/639-41; IV/865; VI/1282-83; PX 719 at 3; PX 731 at 3; II/641. Upon prepayment, plaintiffs planned to raise their rents to market levels and use the proceeds to fund their retirements, pay for their children's education, or invest in other ventures. *E.g.,* I/180, 254; II/557, 586, 627; IV/863, 895, 944, 1000-01; V/1195. Accordingly, all of the plaintiffs entered into the program with specific investment goals that could not be achieved without the option to prepay.

Thus, the right to prepay and take the properties to market in the future was truly the "quid pro quo" for plaintiffs' decision to enter into the program in the first instance.[9] The termination option was at least as critical to plaintiffs' deals as the regulatory treatment of goodwill was to the plaintiffs in the Winstar-related cases. *See Winstar*, 518 U.S. at 921; *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1348 (holding that the plaintiffs "agreed to enter the programs in reliance on prepayment as the consideration for signing" the agreements). Like the accounting treatment at issue in *Winstar*, the termination option was a critical component of the deal without which plaintiffs never would have signed their contracts.

### C. The Government Held Out The Prepayment Right As An Inducement To Attract Owners Into The Program.

The termination option was an indispensable component of the Section 515 program for the agency as well as the plaintiffs. It was the agency's view, like plaintiffs', that prepayment was critical to the proper and intended functioning of the program. At trial, plaintiffs presented the testimony of Mr. Dean Greenwalt, a former FmHA employee of sixteen years. Mr. Greenwalt's service to the agency included positions at the national office from 1976 to 1978, and from 1980 to 1985, at which time he was the Branch Chief for Multi-Family Housing Servicing. II/500-501. Mr. Greenwalt also served as the Multi-Family Housing Coordinator for California and the Chief of Rural Housing for New Mexico. II/501. In these positions, Mr. Greenwalt garnered a wealth of knowledge regarding the Section 515 program and the agency's policies and practices concerning prepayment. *Id.* II/503-505.

Mr. Greenwalt testified that encouraging the private sector to invest in the Section 515 program was an important aspect of the overall rural development picture. II/522. The program

---

[9] These fact regarding the criticality of the prepayment are undisputed, as the government did not challenge any of the plaintiffs' testimony on this key issue.

was promoted through seminars, training programs, brochures, and one-on-one discussions with potential owners. II/504-05; PX 812. Through these efforts, the agency informed owners that an important aspect of the program was the ability to prepay and get out of the program in the future. II/510 (the prepayment right "was a very important term" of the contracts). The agency also assured prospective owners that they would not be required to remain in the program for fifty years and that there would be no penalty for early prepayment. Mr. Greenwalt described the agency's discussions with potential owners as follows:

> They were concerned because they wanted to get out. Most of the properties were being developed by limited partnerships. General partners were generally much senior to me, and their concern was always what's going to happen to our property? Do we have to keep it in the program? In 50 years, we probably won't be here. Their intention was always okay, we can take it out of the program. There isn't a penalty. There isn't any additional requirements. We explained no, there wasn't.

II/509-10.

Mr. Greenwalt's testimony on the agency's marketing of the prepayment right matches the experiences of many owners who were on the other side of the table during the same time period. Mr. David Tucker, for example, first learned about the Section 515 program at one of the seminars described by Mr. Greenwalt. II/624-26. Mr. Tucker attended the 1979 National Association of Home Builders conference in Dallas, where he attended a presentation about the Section 515 program. *Id.*; PX 813. One of the speakers was Paul Conn, then the Director of the Multiple Family Housing Loan Division of the FmHA. II/626. During that presentation, Mr. Conn and the other speakers described the right to prepay and convert to market rents as a chief benefit to entering into the program. *Id.* ("Some of the speakers told about the benefits of this program, that developers could build these projects and later on prepay them and convert them to conventional rents.").

Similarly, Mr. Robert Baker learned about the program from his uncle, an employee in the agency's Virginia state office named Marian Baker, who told him that the attractiveness of the program was the right of the owner to bring the property to market after a period of time. IV/854-55, 857. A number of the plaintiffs also recall reviewing the agency brochure describing the Section 515 program, which confirmed their understanding that the loan documents permitted prepayment. PX 812; *see* I/171-72, 174-75; III/717-18; IV/858-59; V/1144. Finally, many of the owners recounted discussions with agency officials during which the agency promoted the prepayment right and assured plaintiffs that they would be able to leave the program. I/172, 174-75, 188; II/541-42; II/595; II/624-26; V/1133.

The government presented no evidence to contradict the testimony of Mr. Greenwalt and the plaintiffs regarding the agency's use of the prepayment right to induce owners to enter into the Section 515 program. The government's only fact witness, Mr. Larry Anderson, did not have any direct responsibility for prepayment-related issues until he took his current position as Director of the Office of Rental Housing Preservation in 1998.[10] VII/1578-79; II/502-503. As a result, Mr. Anderson did not provide any testimony at all related to events prior to the passage of the 1988 Legislation. In fact, Mr. Anderson identified Mr. Greenwalt as one of the three people who were the most knowledgeable about prepayment issues during the late 1970s and early 1980s, when all of the plaintiffs in this action entered into the program. VII/1643-44. The other two individuals he named are now deceased, leaving Mr. Greenwalt, by defendant's admission, as the only person alive who can speak with authority regarding the agency's prepayment policies during the relevant time period. *Id.*

---

[10] Before that time, from 1980 through 1998, Mr. Anderson worked in the Portfolio Management Division, which has no direct involvement in either loan origination or prepayment. VII/1578-79.

### D. By Government Policy, Prepayment Was Encouraged And Even Compelled.

*"We explained to them that we didn't intend for them to be a borrower for 50 years. We expected the loans to be prepaid when other credit would be available."* - Dean Greenwalt (II/508)

Mr. Greenwalt also explained that the FmHA considered itself a "lender of last resort" and thus had no intention or desire of keeping owners obligated on their loans for the full mortgage term. II/508.[11] The agency thus encouraged owners to prepay as soon as they were able. In its regulations, the agency stated that graduation of Section 515 loans to private lenders was "desirable" and that "[b]orrowers should be inspired to graduate as a mark of success in their financial affairs." 7 C.F.R. § 1865.2(c) (1979); *see also* II/508, 518. The funds obtained by the agency through prepayment could then be "relent to other borrowers" as needed. I/172-75, 188; II/508; *see also* 42 Op. Att'y Gen. 417, 419 (Dec. 29, 1969). Thus, during the time period when plaintiffs entered into the program, the agency had no more interest in keeping the properties in the program for fifty years than plaintiffs did.

In fact, the agency's prepayment policy went beyond encouragement: the agency reserved the right to compel an owner to prepay if and when commercial financing became available. II/514, 523-24. The agency's authority to mandate prepayment was pervasive, as it was set forth in the contracts, the applicable statutes and regulations, and the agency's marketing

[11] The FmHA's desire to be a "lender of last resort" in the Section 515 program was consistent with other housing programs developed in the 1960s, such as those administered by the Department of Housing and Urban Development ("HUD"), in which the government's role was limited to that of an insurer on the loan. *See* Pub. L. No. 87-70, 75 Stat. 149 (1961). The FmHA acted as a direct lender for housing developed in rural areas only because those communities traditionally had not been served by commercial lenders. *See* VII/1613 (L. Anderson testifying that "that's been our charge right from the start, is to provide credit where other credit wasn't available to address housing needs in rural areas"); Belden & Wiener, HOUSING IN RURAL AMERICA 114 (1999) (the Section 515 program "was intended to stimulate rental housing within markets and for populations not normally served by conventional lenders"). Indeed, even the FmHA acted as an insurer (rather than lender) under the closely-related 521 program. *See* JX 103 at 1. Clearly, the agency's vision for rural development at that time did not involve it remaining the lender on every property in its portfolio for decades and decades to come.

materials. Each contract included, sometimes in the loan agreement, promissory note and mortgage, a "refinancing" clause providing as follows:

> If at any time it shall appear to the Government the Borrower may be able to obtain a loan from a responsible cooperative or private credit source at reasonable rates and terms for loans for similar purposes and periods of time, Borrower will, at the Government's request, apply for and accept such loan in sufficient amount *to repay the Government*.

JSF 8 (emphasis added); JX 16 at 2; JX 17 at 3. This clause was required by law to be included in all Section 515 loans. 42 U.S.C. § 1472(b)(3); *see also* 7 C.F.R. § 1865.2(c) (1979) ("When voluntary graduation by refinancing cannot be accomplished, there is a legal basis for enforcing the refinancing provisions . . ."). The agency brochure describing the program also stated that "[w]hen the financial position of the borrower reaches the point that he can repay or refinance through a commercial lender, the loan contract provides that he shall do so." PX 812. Thus, there can be no doubt that graduation of Section 515 properties to the conventional market was a critical component of the program from the perspectives of both plaintiffs and the government.

* * *

Each plaintiff made an investment in the Section 515 program by signing a valid, mutual, binding contract with the United States. Plaintiffs had every reason to expect that they would be able to see the very purpose of their investment come to fruition upon opting to exercise their right to prepay. After all, that was the deal.

## II. THE REPUDIATION

*"Almost to the borrower was total disgust and betrayal. They felt that we had misled them somewhere along the line because they had always believed they could prepay their loan."*
- Dean Greenwalt (II/510-511)

*"I never, ever thought under any circumstance that you could change a note once it had been signed by both parties and agreed to because that's the fundamental cornerstone of real estate business, and if you can't trust a note where do you begin and leave off as to what you believe you can trust and what you can't."*
– David Hodges (V/1209-10)

Things did not work out as planned. While plaintiffs lived up to their end of the deal, defendant did not. In fact, none of the plaintiffs was able to fulfill the investment goals they developed in reliance on the termination option. This was because defendant repudiated plaintiffs' contracts by passing legislation in 1988 and 1992 that imposed extra-contractual restrictions on plaintiffs' prepayment rights.

### A. Defendant Is Bound To Standard Contract Law Principles.

*"It is the obligation of the U.S. Government to fulfill contractual agreements into which it enters, or, at a minimum, to justly compensate those parties whose contractual rights it abrogates."* - Senator Heflin, 136 Cong. Rec. 26372 (1980)

*"I thought it would be just like a normal real estate deal . . ."* - Brian Wells (IV/905)

The government's conduct in this case must be judged according to standard contract law principles. *See Mobil*, 530 U.S. at 607 ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (internal quotations and citations omitted); *accord Winstar*, 518 U.S. at 895; *Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943) ("The United States does business on business terms."); *Perry v. United States*, 294 U.S. 330, 352 (1935); *Lynch v. United States*, 292 U.S. 571 (1934); *Cooke v. United States*, 91 U.S. 389, 398 (1875) (when the United States "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there"). The Supreme Court confirmed the application of these principles to this case in its decision in this matter. *Franconia Assoc.,* 536 U.S. at 141 ("Once the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity.").

Holding the government accountable to such standards is essential to protect "the Government's own long-run interest as a reliable contracting partner in the myriad workaday

transaction of its agencies." *Winstar*, 518 U.S. at 883. By contrast, a rule "expanding the Government's opportunities for contractual abrogation" would have "the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements." *Id*. at 884. In the oral argument before the Court in this case, Justice O'Connor voiced the same concerns regarding the government's conduct here:

> [T]he Government should want to have some rules out there that would encourage it to be able to deal with people on a commercial basis in some areas. You might want to be able to buy certain things from the private sector or to engage in loan agreements. And to adopt the kind of proposal you're making discourages anyone from dealing with the Government. It's a very peculiar rule.

*Franconia Assoc. v. United States*, No. 01-455, oral argument (April 15, 2002).

### B. Defendant Repudiated Plaintiffs' Contracts By Enacting Legislation Curtailing Their Original Prepayment Rights.

*"In legal terms this is called . . . an impairment of the obligations of contract. In layman terms it is called welching. Whatever it is, it is basically unfair."*
- Congressman Butler, 126 Cong. Rec. 22650 (1980)

*"[T]o me, it looked like another welch deal . . . ."* - Robert Baker (IV/872)

There does not appear to be any dispute that the 1988 and 1992 Legislation constituted anticipatory repudiations of the pre-1979 and post-1979 contracts, respectively. [12] In its decision in this matter, the Supreme Court held that "ELIHPA effected a repudiation of the FmHA loan contracts" because it "conveyed an announcement by the Government that it would not perform

---

[12] The 1988 Legislation actually marked the second time that defendant repudiated the contracts held by the pre-1979 plaintiffs. Congress passed a law in 1979 imposing similar prepayment restrictions on all Section 515 contracts then in existence. Pub. L. No. 96-153, § 503, 93 Stat. 1134 (1979). After passing the 1979 legislation, defendant provided notice of its action to all owners in the program. PX 791-794. This led to an immediate political uproar, in response to which Congress quickly repealed the 1979 legislation through another statute passed in 1980, thereby eliminating the retroactive application of the 1979 law for all pre-1979 owners. The 1980 legislation also required new owners to agree to operate their properties as low-income housing for a minimum of 15 or 20 years, as reflected in the post-1979 contracts. Pub. L. No. 96-399, § 514, 94 Stat. 1671 (1980). Having seen the government quickly undo its wrongdoing by retracting its repudiation, plaintiffs had no reason to believe that defendant would ever attempt to repudiate the contracts again.

as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Franconia Assoc.*, 536 U.S. at 143.[13] The Court's conclusion was mandated by the straightforward application of standard contract principles:

> We comprehend no reason why an Act of Congress may not constitute a repudiation of a contract to which the United States is a party. . . . "Hence, . . . the fact that [the Government's] repudiation rested upon the enactment of a new statute makes no significant difference." *Mobil Oil,* 530 U. S. at 620; *see id.* at 619 ("[I]f legislation passed by Congress and signed by the President is not a 'statement by the obligor'" capable of triggering a repudiation, "it is difficult to imagine what would constitute such a statement.").

*Id.* at 148 (citing Restatement (Second) of Contracts § 250 (1981) (hereinafter "Restatement")).

Prior to enactment of the 1988 and 1992 Legislation (collectively, the "repudiating legislation"), plaintiffs could leave the program and raise rents by simply writing defendant a check for the remaining mortgage balance. Upon receipt of prepayment, the agency would execute the necessary releases and return the owner's security. 7 C.F.R. § 1866.2 (1978). Under the repudiating legislation, however, the agency can no longer perform as promised in the contracts. *See* JSF ¶¶ 4, 5. Among other things, no prepayment can be made unless the owner complies with the detailed procedures set forth in the statute and its implementing regulations. *See* 42 U.S.C. § 1472(c)(4)(A); 7 C.F.R. Pt. 1965-E. The prepayment scheme requires the submission of an extensive application followed by a protracted evaluation process by the agency. *See* Part III(C)(1), *infra; see also* PX 276; VI/1279; I/227-28; IV/950-51. Even if an owner decides to partake in this process, prepayment can be granted only in very narrow circumstances. *See* 42 U.S.C. § 1472(c)(5)(G)(ii); see also Part IV(A)(2), *infra*.[14]

---

[13] Although the Court's decision was addressed only to the 1988 legislation as it applied to the pre-1979 owners, there can be no dispute that the same analysis and conclusion would pertain to the 1992 legislation as applied to the post-1979 owners.

[14] The procedures and alternatives to unrestricted prepayment set forth in the repudiating legislation, and their impact on plaintiffs' claims, are discussed in detail in Part III, *infra.* The

Thus, by their very terms, the statutes renounced the government's obligation to accept prepayment without any restrictions. By passing the statutes, defendant communicated to plaintiffs that it would not perform as promised in the future when plaintiffs attempted to prepay. *Franconia Assoc.,* 536 U.S. at 143, 148; *see also Mobil*, 530 U.S. at 619, 621; *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 183 (1997) (holding that "FIRREA was essentially a legally binding forecast of a future breach"). Following the Supreme Court's ruling in this case, defendant has not denied that it has repudiated its contracts with plaintiffs.

**C. Defendant's Repudiation Spawned Critical Legal Consequences.**

There are two significant legal impacts flowing from defendant's decision to repudiate plaintiffs' contracts. First, once a party repudiates a contract, the other party has the option to either await the time for performance or file suit. *Roehm v. Horst*, 178 U.S. 1, 10 (1900) (finding it "reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done"). If the non-repudiating party decides to bring suit before the time for performance, then its decision constitutes an election to treat the repudiation as a present breach of contract. *Franconia Assoc.*, 536 U.S. at 143; FARNSWORTH ON CONTRACTS § 8.22 at 541 (1998). In this case, all plaintiffs elected to bring suit against defendant by June 25, 1997.[15]

asdf Second, once the non-repudiating party changes its position in reliance on an anticipatory repudiation (as for example by filing suit), the repudiator cannot thereafter avoid liability by attempting to retract its repudiation. Restatement § 256 & cmt. c; Williston, S., *A Treatise on the Law of Contracts* § 39:42 at 697 (4th ed. 2000) (citing *Income Properties/Equity Trust, Jones v.*

---

inability of any plaintiff to prepay without restriction under the requirements of the repudiating legislation is addressed in Part IV(A)(2), *infra.*

[15] As explained further in Part IV(A)(1), *infra*, for most of the plaintiffs, a breach actually occurred well before the date of suit. This is because most of the plaintiffs demanded performance from the government before bringing this action.

*Wal-Mart Stores, Inc.*, 33 F.3d 987 (8th Cir. 1994) and *Mindel v. Image Point Productions, Inc.*, 725 F.Supp. 189 (S.D.N.Y. 1989)). Thus, while the doctrine of anticipatory repudiation generally allows the repudiating party to retract its repudiation prior to the time for performance, the other party's election to bring suit cuts off that right. In this case, defendant obviously took no action to retract its repudiation prior to June 1997. As a result, no further action that defendant might attempt to undertake in the future, such as repeal or amendment of the repudiating legislation, could relieve the government of its contract liability. Once defendant repudiated plaintiffs' contracts, and plaintiffs elected to bring suit to recover the damages suffered as a result thereof, the government's liability for breach was sealed.

## III. THE LESSER DEALS

*". . . I believe that the government has a responsibility to make me whole again, and I believe that so firmly that I'm willing to forgo 15 cents on the dollar because I think the government owes me a dollar on the dollar."*
– Donald Stordahl (II/581-82)

At trial, the government centered its case around the various incentives and restricted prepayment options devised by Congress through the 1988 and 1992 Legislation, which allegedly were intended to fairly compensate owners for the loss of their original contract rights.[16] The various alternatives set forth in the repudiating legislation, however, would require plaintiffs to surrender their original termination option and enter into one of a variety of new deals with the government – all of which would impose new obligations or additional risks on

[16] Defendant's decision to focus so heavily on these statutory alternatives to unrestricted prepayment is surprising, given that defendant made no legal argument regarding these options in its Memorandum of Contentions of Fact and Law. Under the Court's rules at App. A, ¶ 14, defendant was required to set forth in that filing a "statement of the issues of fact and law to be resolved by the court" and a "discussion of the legal principles [defendant] contends are applicable." In addition, defendant's final expert report on damages (the only report from defendant's expert that is in evidence) makes no mention of these statutory provisions whatsoever. *See* DX 42. Defendant's belated decision to focus its case on these options calls into question the validity of its arguments.

plaintiffs. As a result, defendant's efforts to berate plaintiffs for not entering into one of these "lesser deals" fall far short, both on the facts and on the law.

### A. Plaintiffs Were Not Obligated To Continue To Deal With The Government Following Its Repudiation.

*"We want out."* – Marilyn Graham (V/1110)

Defendant's arguments regarding the alternatives to unrestricted prepayment set forth in the repudiating legislation appear to be based on the principle of mitigation of damages. While a non-breaching party generally cannot recover damages for a loss that he could have avoided by reasonable efforts, however, an injured party is not required to "exalt the interests of the defaulter to his own probable detriment." *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002). Courts are accordingly reluctant "to require parties, under the duty to mitigate, to deal further with the breaching party . . ." *Id.*;[17] *see also Stanley Manly Boys' Clothes, Inc. v. Hickey*, 259 S.W. 160, 162 (Tex. 1924) ("We doubt if any man should be required to contract a second time with one who has without cause breached a prior contract with him. A man's nature is such that he almost instinctively rebels against it."); A. Corbin, *Corbin on Contracts* § 1043 at 272 (1951) (footnote omitted) ("Courts have held that it is not necessary for the plaintiff to make another contract with the defendant who has repudiated, even though he offers terms that would result in avoiding loss.").[18]

---

[17] *Citing Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972); *Campfield v. Sauer*, 189 F. 576 (6th Cir. 1911); *Cain v. Grosshans & Petersen, Inc.*, 413 P.2d 98, 102 (1966) ("An innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement."); *Coppola v. Marden, Orth & Hastings Co.*, 118 N.E. 499 (1917) (purchaser has no duty to pay in cash when credit terms are material part of the contract); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward A General Theory of Contractual Obligation*, 69 Va. L. Rev. 967, 993 n.57 (1983).

[18] The notion that a non-breaching party need not continue to deal, for mitigation purposes, with a party in breach also finds expression in the context of reprocurement contracts in which the government bars rebidding by contractors who have defaulted on prior contracts. *See Siller Bros. v. United States*, 655 F.2d 1039, 1044 (Ct. Cl. 1981) ("Having been disqualified by totally

The Government bears the burden of proof to show that plaintiffs should have mitigated their damages in this case. *See Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990). In particular, it is up to the breaching party to show that "reasonable possibilities for mitigation existed and were ignored." *Koby*, 53 Fed. Cl. at 497 (citing *T.C. Bateson Constr. Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135, 160 (1963) and *Midwest Indus. Painting of Fla., Inc. v. United States*, 4 Cl. Ct. 124, 134 (1983)). In meeting this burden, the breaching party cannot rely on the rule of mitigation of damages "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *Id.* at 497 (citing *In re Kellett Aircraft Corp*, 186 F.2d 197, 198-99 (3d Cir. 1950) ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen") and *Apex Mining Co. v. Chicago Copper & Chemical Co.*, 306 F.2d 725, 731 (8th Cir. 1962)); *see also Southern Cal. Fed. Sav. & Loan Ass'n*, No. 93-52C, slip op. at 62 (Fed. Cl. Aug. 7, 2003) (holding that defendant, not plaintiff, bore the duty to mitigate damages where both parties were in an equal position to do so).

Defendant's burden extends not only to proving the fact that plaintiffs failed to take reasonable steps to mitigate, but also to establishing the amount of any offset allegedly due. In *Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 421 (Fed. Cl. 2000), *aff'd in part, rev'd in part, on other grounds*, 302 F.3d 1314 (Fed. Cir. 2002), for example, the government asserted

---

breaching the first contract, the plaintiff now cannot properly complain because its exclusion from bidding on the second contract may have increased the damages it must pay for its breach of the earlier one."); *Venice Maid Co., Inc. v. United States*, 639 F.2d 690, 698 (Ct. Cl. 1980) (Government did not fail to mitigate in not awarding a reprocurement contract to plaintiff after plaintiff defaulted); *Churchill Chemical Corp. v. United States*, 602 F.2d 358 (Ct. Cl. 1979) (Government did not fail to mitigate in not reinstating contract for the benefit of a breaching party and instead awarding contract to other bidder).

that the plaintiff should have mitigated the damages it suffered as a result of the government's breach of a contract related to an affordable housing program by pursuing work under a separate housing program. In addition to finding defendant's evidence on mitigation "woefully deficient," the court found that defendant failed to establish a figure for what would be the plaintiff's earnings in pursuing the other program. *Id.* at 423. The Court thus concluded that it was unable to "calculate how much Energy Capital would have gained from" the mitigation proposed by the government." *Id.* Thus, the *Energy Capital Corp.* court put the burden squarely on the defendant, not only to prove that plaintiff could have mitigated its damages, but also to show what would have been the value of the mitigation efforts.

In this case, defendant has not and cannot meet its burden. In the classic mitigation case, the victim of a breach minimizes its losses by finding *a third party* to provide or purchase the goods or services at issue as a substitute for the breaching party's failure to perform. *See Koby*, 53 Fed. Cl. at 497 (party may mitigate by "mak[ing] substitute arrangements compensating for the lack of contract performance"); Restatement § 350, cmt. c & illus. 5-8. But the mitigation suggested by defendant in this case is of a very different sort. Here, defendant proposes that plaintiff accept one of a variety of new, lesser deals *with defendant* as a substitute for the promised performance. But plaintiffs have lost faith and trust in the party that repudiated their contracts, and thus have no intention or desire to continue to deal with defendant. *E.g.*, II/594-95, 613, 620; IV/963, 981; IV/1058-60; V/1116-17, 1122; V/1209-10. Nor could they reasonably be expected to do so, given the nature and severity of the government's breach in this case. *See, e.g.,* II/572, 580; PX 621; IV/963; V/1121-22. Instead, plaintiffs took another path:

they elected to bring suit seeking damages for the government's breach. II/561, 564; III/793; IV/871; VI/1292-93.[19]

Furthermore, as demonstrated below, all of the statutory alternatives require plaintiffs to forego their original right to prepay without any restrictions. They all also pose significant risks and additional burdens on plaintiffs. Finally, defendant has not even attempted to quantify any alleged value attributable to these alternatives. Accordingly, defendant's ardent attempts to place the blame on plaintiffs for the losses that they have suffered are severely misplaced.

### B. The Prepayment Alternatives Offered By The Repudiating Legislation All Require Owners To Forfeit Their Original Contract Rights.

*"I signed a contract with the U.S. Government in 1981, and its my belief that they have reneged on that contract. I see no reason why I should do anything that requires me to jump through another government hoop in order to maintain my project."* - Donald Stordahl (II/580)

*"And according to our contract, we should not have had to go through all of these hoops to prepay our property."* - Marge Alden (IV/987)

Courts are particularly reluctant to require parties to continue to deal with a breaching party when "the breacher's alternative terms differ substantially from those of the original contract." *Koby*, 53 Fed. Cl. at 497; *see also Coppola*, 118 N.E. 499 (purchaser has no duty to pay in cash when credit terms are material part of the contract). As a result, "a plaintiff is not required to mitigate losses by 'accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract.'" *Koby*, 53

---

[19] While a few plaintiffs decided to accept incentives or prepay subject to restrictions, they did so only after learning that they could not prepay without restrictions. *E.g.*, I/245, 247; IV/898-99, 905-906. Clearly, the original intent and desire of every plaintiff was to prepay free and clear and leave the program. *See* I/179-80; VI/1262, 1266, 1275-76; II/543, 554; II/590-91; II/633, 637; IV/865-66; IV/895-96; IV/947; IV/1004, 1019; V/1094; V/1134-35. Further, the few plaintiffs who did choose to accept one of the government's prepayment alternatives did not in any way waive their claim for damages based on the breach of their original contracts. *See Cienega Gardens v. United States*, 33 Fed. Cl. 196, 208 (1995) (plaintiffs did not waive rights to pursue contract claims by entering into agreements with HUD extending affordability restrictions on their properties), *vacated on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998).

Fed. Cl. at 498 (quoting *Brazos Elec. Power Coop., Inc. v. United States*, 52 Fed. Cl. 121, 129 (2002)). In *Koby*, for example, the Court rejected an argument by the government that the plaintiff was presented with a "suitable substitute transaction" involving a second auction of the same apartment building that was involved in an earlier auction. *Id.* at 498. The Court held that because of certain key differences between the two transactions, a reasonable person would not have "embraced the offer . . . as a substitute for the performance lost when the [government] breached the original contract." *Id.* The Court also found that the plaintiff "was not obligated to risk surrendering his rights under the first contract in order to minimize defendant's damages." *Id.* at 499. Accordingly, the Court rejected the government's mitigation arguments. *Id.* at 500.

In this case, all of the statutory alternatives require plaintiffs to forego their original right to prepay without any restrictions. The 1988 and 1992 Legislation provide plaintiffs only three options that are relevant here.[20] First, the agency can offer an owner a so-called "incentive" in exchange for the owner's agreement to "extend the low-income use" of the property. 42 U.S.C. § 1472(c)(4). If the owner agrees to do so, it enters into a new contract with the agency which obligates it to keep the property in the Section 515 program for an additional twenty years. RD Instruction 1965-E, §1965.214(g) & Ex. A-1. Second, assuming that prepayment will not have an adverse impact on minorities, the agency may permit a gradual conversion to market rents whereby the owner agrees that its units will remain subject to low-income rental rates until the current tenants decide to move out. 42 U.S.C. § 1472(c)(5)(G)(ii)(I). This restriction on raising rents, known as the "G-4," continues until "the end of the remaining useful life of the project."

[20] Under the statute, an owner may be allowed to prepay without any restrictions if the agency determines, at the conclusion of its review process, that there is no longer a need for the housing and that prepayment would not work an adverse impact on minorities. *See* 42 U.S.C. § 1472(c)(5)(G). However, as explained in Part IV(A)(2), *infra*, none of the plaintiffs in this case can meet that narrow exception.

7 C.F.R. Pt. 1965-E, Ex. A-4. This option, too, requires the execution of a new agreement with the agency setting forth the new restrictions on the use of the property. RD Instruction 1965-E, §1965.214(c)(1)(ii) & Ex. G-4. Third, the agency also has the authority to permit owners to sell their properties to a non-profit organization or government entity by following a detailed valuation, marketing, and sale process. 42 U.S.C. § 1472(c)(5)(A),(B). If an offer comes in at the agency-approved price, the owner must let the property go. *Id.*

Thus, plaintiffs are unable to "mitigate" their damages without giving up their original contract rights. Under defendant's proposed alternatives, plaintiffs have to either sign a new agreement requiring them to stay in the program, sign a new agreement imposing additional restrictions on the use of the property, or submit to a process through which they risk losing their properties entirely. I/528; PX 589 at 2; PX 594; I/244, 263, 266, 280; V/1114-15, 1121-22. As a result, all of the statutory options center on compelling owners to forego the very purpose of their investments: the right to prepay without restrictions and convert to market rents. Indeed, the whole purpose of the agency's prepayment scheme is revealed by its title: the "Prepayment Prevention" program. *See* 7 C.F.R. Part 1965, Subpart E (1997); *see also* VII/1584; PX 13. Faced with these options, plaintiffs were "not required to take the economic equivalent of a Kiekegaardian leap of faith, sacrificing blindly his own interests in an effort to exalt those of the defaulting defendant." *See Koby*, 53 Fed. Cl. at 500.

**C. Defendant's Proposed Alternatives To Unrestricted Prepayment Are Unreasonable, Economically Unsound, Or Simply Unavailable.**

*"Q: Were you interested in getting out of the program by prepayment with, say, minimal or negligible government strings? A: There are no governmental minimal strings. I'm 69 years old . . . ."* – Donald Stordahl (II/570).

In attempting to mitigate damages, one need "only make those efforts that are fair and reasonable under the circumstances." *Robinson v. United States*, 305 F.3d 1330, 1332-1333

(Fed. Cir. 2002) (emphasis omitted); *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (a non-breaching party "is not required to make extraordinary efforts to ferret out the single best situation which will absolutely minimize the breaching party's damages."). A party is not under a duty to mitigate damages "by taking impractical and uneconomic steps." *C.J. Langenfelder & Son, Inc. v. United States*, 384 F.2d 1005, 1006-1007 (Ct. Cl. 1967); *accord Southern Cal. Fed.*, No. 93-52C, slip op. at 62 (holding that "the rules of mitigation do not require the non-breaching party to subject itself to the risk of additional losses") (quoting *Fisher v. First Stamford Bank & Trust,* 751 F.2d 519, 524 (2d Cir. 1984)). As the Court of Claims held:

> [A] contractor is certainly not held to a duty to "mitigate damages" or to "cooperate with the Government" – as defendant puts it – by taking impractical and uneconomic steps . . . . Such a standard would be unreasonably burdensome and unanticipated.

*C.J. Langenfelder & Son, Inc.,* 384 F.2d at 1006-1007.

Thus, it is only damages that plaintiff might have "avoided without undue risk, burden or humiliation" that are not recoverable in a breach of contract action. *Koby*, 53 Fed. Cl. at 497 (citing Restatement § 350); *Middleton v. United States*, 175 Ct. Cl. 786, 792 (1966); *Sun Cal, Inc. v. United States*, 25 Cl. Ct. 426, 432 (1992)). Moreover, "[t]he fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by plaintiff was unreasonable." *Zanker Dev. Co. v. Cogito Sys. Inc.*, 264 Cal. Rptr. 76, 79 (Cal. Ct. App. 1989) (quoting *Green v. Smith*, 261 Cal. App. 2d 392, 398, 67 Cal. Rptr. 796 (Cal. Ct. App. 1968)); *see also Koby*, 53 Fed. Cl. at 497 (reasonableness of non-repudiating party's conduct "must be judged in the light of one viewing the situation at the time the problem was presented") (quoting *Kellett,* 186 F.2d at 198). In short, "[m]itigation does not require prescience; it requires reasonableness." *Ketchikan*, 20 Cl. Ct. at 166.

As evidenced at trial, all of the statutory options that defendant touted throughout the trial are riddled with risks, new obligations, uncertainty, and the threat of additional losses.

**1. The Application And Evaluation Process**

Before having the right to be offered anything by the agency, an owner must first prepare a detailed prepayment request package. 42 U.S.C. § 1472(c)(4)(A); 7 C.F.R. § 1965.204. The agency's rules detail the materials that must be included with the owner's request, including (1) a market survey showing the rents at comparable properties, (2) a survey of local moving companies to determine the average cost for a tenant to move, (3) a projection of rents after prepayment, through the preparation of a proforma budget, taking into account various expense data and an analysis of rents at other properties in the area, (4) evidence of how the FmHA loan will be repaid, such as a refinancing letter from a private lender, (5) documentation of the owner's ability to prepay, (6) census information regarding minorities in the area, (7) the completion of various forms and certifications, and (8) other information needed by the agency to make the determinations required by its instructions. *See* RD Instr. 1965-E, Ex. B. D.

The prepayment package can be difficult and expensive to prepare, often requiring the assistance of a paid consultant. *E.g.,* I/244; III/792-93; VI/1292; III/783-84; V/1134, 1165; V/1212; IV/897-98; VI/1279; PX 276; *see also* VII/1605-1606 (L. Anderson testifying that "it is difficult to go through the preservation process. I have to be frank. It's not the easiest thing in the world."). The prepayment applications filed by some plaintiffs are more than 70 pages long. *See, e.g.*, PX 235, PX 248. Nonetheless, if the agency finds that the request is incomplete, it will reject it without further consideration. 7 C.F.R. § 1965.206(a). Thus, even getting through the first step of the process requires a substantial commitment of time and money by the owner.

Once an application is accepted, the agency's evaluation process can take years to complete. In the case of Riverfront, for example, six years passed from the time that the owner submitted a prepayment application through the time that the agency made a decision on the request. IV/963-64; PX 18; PX 68. In addition to evaluating and verifying the information submitted by the owner, the agency must develop an incentive offer for the owner's consideration. RD Instr. 1965-E, §§ 1965.206, 1965.213. To develop an incentive offer, the agency conducts a series of detailed analyses and calculations. *Id.*, Exs. D, D-1. The agency can formally make the determination as to whether an owner can prepay without restrictions only after the owner rejects the incentive offer. 7 C.F.R. § 1965.214(b). To comply with the regulatory process, agency officials must also prepare a "report on prepayment" and enter all of the relevant information regarding the request and the incentive offer on an extensive agency database called "Pre-TRAC." RD Instr. 1965-E, Ex. B; DX 58 at 54-55. Thus, regardless of what the agency's final decision may be, the process itself is so arduous and expensive that an owner cannot reasonably be expected to comply with it in order to mitigate damages.

**2. The "Incentives"**

If the owner's application is accepted, the agency's first action is to attempt to convince the owner to agree to stay in the program for twenty more years. 42 U.S.C. § 1472(c)(4)(A). While the agency is not required to provide the owner anything in return for this new commitment, it is permitted to offer one or more "incentives" to help persuade the owner to do so. *Id.* The primary incentives, and the only ones that have been offered to any of the plaintiffs, are an equity loan and an increased annual return on investment. Both of these options, however, are not much of an "incentive" for an owner who desires to leave the program:

- All of the incentives require the owner to agree to remain in the program for an additional twenty years. *Id.*

- Incredibly, once the owner's new twenty commitment has expired, the owner still is not permitted to leave the program. Instead, the owner must start at square one and go through the entire prepayment process again. VII/1675; VIII/1781.

- The availability of any incentive is subject to annual appropriations. 42 U.S.C. § 1472(c)(4)(B). As Mr. Anderson testified, "the agency has been operating under limited funds for a number of years now . . . one of the hindrances to making preservation work . . . is that we don't have the loan money, and we need loan money from other sources." VII/1603-04.

- There is no time limit as to when an incentive will be received. As a result, many owners have had to wait for years and years before funding for their incentive comes through. Mr. Morosani, for example, agreed to an incentive in 1994 and still has not received it to this day. PX 596; I/294. Ms. Perri waited five years before receiving hers. II/615-16; PX 621.

- By the agency's admission, there was "there was a lot of inconsistency" in the agency's application of the incentive process before 1998, when most of the plaintiffs intended to prepay. VII/1607.

- Perhaps most importantly, the agency has a number of means and inducements for ratcheting down the actual value of any incentive given. As a general matter, the incentive package offered to the owner must be the "least costly alternative for the Federal Government that is consistent with carrying out the purposes of" the statute. 42 U.S.C. § 1472(c)(4)(C)(ii); RD Instr. 1965-E, Ex. E, § IV(A)(2).

- More specifically, the agency will ratchet down the amount of any incentive to ensure that any resulting increase in project rents will not have a negative impact on the tenants. If, for example, rents would have to be increased in order to fund the full value of an incentive, the amount offered to the owner will be decreased to keep the project rents within comparable rents in the area. *See* VII/1610-11 (L. Anderson testimony that incentive has to "fit within comparable rents"); RD Instr. 1965-E, Ex. E. § IV(B)(2) (incentive "should assure that the project will remain financially feasible while continuing to house the tenants occupying the project at the time the incentive offer is made").

- In addition, the agency will also limit the value of an incentive to ensure that there is no increased rent overburden on any tenant. *Id.* Ex. E, § IV(A)(3) (requiring "no greater rent overburden" after incentive); *Id.,* Ex. E, § IV(C) ("NO INCENTIVE MAY BE OFFERED WHICH WILL LEAD TO DISPLACEMENT OF TENANTS . . .") (emphasis in original).

In the case of Brian Wells, the agency's internal documents vividly illustrate the extent to which an owner may be short-changed on the amount of an incentive. The maximum allowable

equity loan value determined by the agency for Fall River I, based on the agency's appraised value, was $273,635. PX 819 at 10-11. However, the amount "approved" and ultimately offered to Mr. Wells was only $176,515. *Id.* at 13. As a result, instead of receiving a 90% equity loan, he received only a 36% equity loan. PX 749; PX 819 at 12; PX 819 at 10.

### 3. The "Forced Sale"

*"I would never enter into a real estate contract without knowing the absolute price that I wanted to put on my building for sale."* – Marilyn Graham (V/1108)

If an owner rejects the agency's incentive offer, the statute provides that the agency "shall require" the owner to offer for six months to sell the property to any qualified nonprofit organization or public agency. 42 U.S.C. § 1472(c)(5)(A)(i); RD Instr. 1965-E § 1965.216 (owner who rejects incentives "will be required" to offer to sell the property). The primary defect of the forced sale process is obvious: an owner who has relied on the right to keep its property and raise its rents to market level has to face the possibility of losing its property entirely. The process is replete with other defects as well.

- In order to run the gauntlet of the forced sale process, the owner actually must agree to be bound to any sale before knowing the price. Once a value is determined through the agency-mandated appraisal process, that price becomes "binding" on the parties to the sale. 42 U.S.C. § 1472(c)(5)(A)(i). Thus, if an offer comes in at that price, the owner has no choice but to allow the property to be sold for that amount. As Mrs. Graham testified, she "would never enter a real estate contract without knowing the absolute price" beforehand. V/1108.[21]

- The owner is required to take various steps to "market and sell" the property, and must provide documentation to the agency proving that it has contacted all non-profit organizations that might be interested in making an offer. RD Instr. 1965-E, § 1965.216(b). The owner is also must pay for one of the appraisals, and half of a third appraisal if needed. *Id.* § 1965.216(a). For an owner who does not even wish to sell its property, these obligations are onerous.

[21] While the government attempted at trial to assert that an owner could "back out" of the process if it did not agree to the appraised value, it could point to no statutory or regulatory basis for this contention. VII/1692-93. Moreover, regardless of how the agency may interpret the statute, it is at the very least reasonable for an owner to avoid the process for fear that it will not be able to reject the price.

- The owner is bound to what is necessarily a subjective appraisal by two or three appraisers. *See generally Cienega Gardens v. United States*, 38 Fed. Cl. 64, 77 (1997) (appraisals at issue reflected the government appraiser's "own experience, subjective judgments, and speculative assumptions").

- There are a number of opportunities for the owner to be short-changed through the process, including the potential for double-counting. For example, the appraised is based on the value of the property "as is" and thus does not include any needed rehabilitation work. However, if it is determined that certain rehabilitation work is needed, the first source of funding for the costs of that work is the owner's equity payment. RD AN 3767 (6/28/02) (PX 836 at 4-5).

- The agency may actively assist an interested buyer, thereby increasing the likelihood that an offer will be made. RD Instr. 1965-E, §1965.217(d). The forms of assistance at the agency's disposal include loans and grants to the non-profit to enable it to purchase the property. *Id.*

- If an offer is made, there is no time limit on when the buyer must actually pay the owner. The non-profit need only make a "bona fide offer" within the six month period to obligate the owner to sell. 42 U.S.C. § 1472(c)(5)(A)(ii). An offer is considered bona fide "*even if the offer is contingent on Rural Development funding when no funding is available*." RD Instr. 1965-E, § 1965.218(a)(4) (emphasis added). Thus, a buyer could agree to purchase the property within the required time frame but then withhold payment from the owner for years and years as it awaits funding from the agency to consummate the sale.

- As a final insult to the owner, even if no buyer comes forward during the six month period, the agency still may refuse to permit the owner to prepay without restrictions. The statute only provides that if no offer is made, the agency "may" permit the owner to prepay without restrictions. 42 U.S.C. § 1472(c)(5)(A)(ii). Regardless of how the agency may apply this provision, it cannot be disputed that the agency has the statutory authority to keep the owner in the program regardless of the outcome of the forced sale process. *See* VII/1739-40.

As much as defendant may try to make the forced sale process sound like a normal real estate transaction, it is far from it. Contrary to a typical land sale where the parties negotiate a mutually agreeable sale price, the owner must agree to be bound by an appraised price before even knowing what it is. In addition, there is no guarantee that the owner will receive a fair value, no guarantee as to when the owner will receive its money, and no guarantee that the owner

will be released from the program even if no buyer comes forward. All this for an owner that has no desire to lose its property.

### 4. The "G-4" Restricted Prepayment

*"I'm doing a crap shoot on the HUD program, and I have no reason to do that."*
- Donald Stordahl (II/581)

The only remaining option under the repudiating legislation is a restricted prepayment known as the "G-4" – which is set forth in the statute as an exception to the "required" forced sale process. 42 U.S.C. § 1472(c)(5)(G)(ii)(I).[22] Under the G-4 route, an owner can prepay under certain circumstances but must agree to allow all of its current tenants to remain at the property – at the agency-mandated rents – until they voluntarily choose to move out. RD Instr. 1965-E, § 1965.215(c)(1)(ii) & Ex. G-4. While some of the plaintiffs were able to prepay subject to G-4 restrictions, it is not a feasible option for any of the other plaintiffs because it either (1) poses substantial and unacceptable financial risks, and/or (2) is simply not available.

- First and foremost, the G-4 is permitted only where the agency determines that there will be "no material affect on minorities, either at the project or in the market area" as a result of prepayment. RD Instr. 1965-E, Ex. E, § V(D); *see also id*. § II(C)(1)(h). In this case, many of the plaintiffs do not qualify for the G-4 due to the presence of minorities at their properties or in the relevant market area. I/264-65, 281; PX 591 at 7,8; II/563-64; IV/874-75; PX 103; IV/953; V/1113-14; PX 195; PX 213; PX 179.

- The only properties in this lawsuit that have been able to prepay subject to G-4 restrictions are located in Iowa. Not surprisingly, 1990 census data shows that of the eleven states where the properties in this action are located, Iowa has the second lowest concentration of minorities, at just three percent.

- Even where the G-4 is an option, its restrictions pose the threat of throwing the project into default. This is because the owner typically has to service a commercial mortgage while being unable to raise the rents on each unit until the tenant chooses to leave. As a result, the project may experience a significant cash flow problem until a sufficient number of tenants voluntarily vacate. I/269, 294-95; I/265; II/606, 612-14; III/727-28; IV/1034; VI/1289; VI/1310-11; III/771-72;

---

[22] As explained in Part IV(A)(2), *infra,* prepayment without restrictions under the repudiating legislation is not a possibility for any of the plaintiffs in this action.

V/1173-74; VI/1289. Indeed, depending on the whim of the tenants, a project could potentially go bankrupt attempting to comply with G-4 restrictions. *See id.* The risks are especially high for properties with low turnover rates. II/607.[23]

- While a few plaintiffs have been able to survive G-4 restrictions, they have been able to do so only through reliance on vouchers issued by HUD. III/742; VI/1290-91; VI/1307. Thus, the feasibility of G-4 restrictions rests on the availability of assistance from a separate government agency. *Id.*

- The HUD vouchers are subject to annual appropriations, so there is no guarantee that they will be available from one year to the next. III/746; II/581 ("A voucher is a voucher for today."); II/612. In addition, the owner must rely on their tenants taking the initiative to voluntarily travel to a HUD office and apply for the vouchers each year. II/576-78; III/771; I/294-95; III/771-72; III/742; II/576-78.

- The availability of HUD vouchers varies not only from year to year, but also from one HUD district to another. In the areas where some of the plaintiffs' properties are located, for example, there are simply no vouchers available at all. IV 954-56; IV/979; V/1219.

The only plaintiffs who have been able to run the risk of accepting G-4 restrictions are those who (1) have sufficiently low minority populations such that the option is available, (2) own a large number of properties, allowing them to run the risk of substantial losses on some of their properties, and (3) are willing to run the risks associated with voucher funding from HUD – a wholly separate agency. VI/1290-91, 1310-11, 1307; III/742, 770-72, 774-76, 777-78. While some owners were bold enough to accept G-4 restrictions, fortunate enough to have the option, and diligent enough to make it work (at least so far), the remaining plaintiffs cannot be faulted for avoiding the substantial risks of additional losses posed by the G-4 restrictions.

---

[23] The government suggests that owners could get around the G-4 restrictions by paying tenants off to leave their properties. However, this rather creative approach does not appear to be permitted by the agency's regulations or the restrictive-use agreement the owner must sign in connection with a G-4, which imposes restrictions until tenants "voluntarily" move out. RD Instr. 1965-E, Ex. G-4. Furthermore, plaintiffs are understandably hesitant to engage in the practice suggested by defendant, both from an ethical standpoint and for fear of being subject to legal challenges by tenants and tenant rights organizations.

* * *

Plaintiffs did their part to minimize the government's losses by continuing to maintain the properties and comply with the requirements of the Section 515 program, even though the government had not lived up to its end of the deal. *See Southern Cal. Fed.*, No. 93-52C, slip op. at 62 (plaintiff bank helped minimize government's losses by working to bring bank back into regulatory compliance despite government's breach, and was not required to do any more to mitigate damages). Plaintiffs could have run their properties into the ground and gotten them off their hands through foreclosure. Although plaintiffs would likely be in a better position today had they done so, they did not. But defendant argues that plaintiffs should have done much more: according to defendant, they should have agreed to surrender their right to prepay and settled for one of the lesser alternatives offered by the repudiating legislation. Defendant's expectations are unfair and unrealistic, and its arguments simply cannot be squared with the Court's precedent on mitigation of damages.

## IV. THE BREACH

*"I feel violated. I feel violated as a citizen of the United States. I trusted my government. I worked for my government. I have worked now for 30 years with my government, and then when I say, personally, I'm getting older, I need get out, they won't let me out of my original contract."* - Marilyn Graham (V/1117)

For good reason, plaintiffs were not interested in any of the "lesser deals" set out in the statutes. I/253; II/557, 559, 572, II/580; II/596, 613, 617, II/633; III/716-17, 721, 726; IV/875-76; IV/918-19, 930; IV/946, 954; IV/1030, 1061; V/1108, 1110; V/1217; VI/1284, 1287-89, 1303-06. Instead, plaintiffs were interested in enforcing their original contract rights. *Id.* Defendant, however, failed to live up to its end of the deal. As a result, plaintiffs brought this action seeking damages for defendant's breach of contract.[24]

[24] The Court requested that the parties identify which of plaintiffs' two claims should be addressed first by the Court. While plaintiffs believe that their theories of liability could be

**A. Defendant Failed To Perform Its Contractual Obligations.**

**1. Each Plaintiff Established The Date On Which Defendant Breached Its Contract.**

The Supreme Court's decision in this case is instructive on the question of when the government's legislative repudiation ripened into a breach of each plaintiff's contract. The Court held that a breach would occur "when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." *Franconia Assoc.*, 536 U.S. at 129, *see also id*. at 131 (holding that a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due"). The Supreme Court also noted that an owner could elect to treat the government's repudiation as a breach by filing suit prior to the time for performance. *Id.* Thus, for each plaintiff in this action, a breach occurred upon either the date that each

---

addressed in either order, they suggest that the Court address their contract claims first and their takings claims second. Although plaintiffs are entitled to relief on both claims, the only defense that defendant has raised to its contract liability is the unmistakability doctrine. Since that doctrine simply does not apply under the facts of this case, plaintiffs' contract claims can be readily resolved as a matter of law. Plaintiffs' takings claims, on the other hand, are more fact-intensive. In addition, in nearly every case, the damages requested under plaintiffs' contract claims exceed the amount claimed under their takings claims. As a result, if the Court finds in favor of plaintiffs on both theories of liability, plaintiffs would be awarded damages only on their contract claims. Furthermore, while plaintiffs' takings claims are primarily based on the taking of their real property interests, they also assert a taking of their contractual prepayment rights – a theory that relies on the existence of plaintiffs' contracts.

Although the recent decisions of the Federal Circuit in *Cienega Gardens* and *Chancellor Manor* (discussed in Part V, *infra*) found in favor of the owners on takings theories that are directly applicable to this case, even those cases first proceeded on a contract theory. The contract claims asserted in those cases were rejected only because the HUD owners – in contrast to the FmHA owners here – did not stand in direct privity of contract with the government. Thus, while recent precedent strongly supports plaintiffs' takings claims, those cases addressed the plaintiffs' takings claims only after disposing of their contract claims. Finally, if nothing else, plaintiffs' complaint alleges a contract claim first and asserts a taking claim as an alternative theory of liability. For all of these reasons, plaintiffs believe that it would be more practical and prudent for the Court to address their contract claims first.

plaintiff would have exercised its termination option were it not for the government's wrongful repudiation or, at the latest, on the date that this action was filed, October 27, 1998.

In addition, while the date of breach may be based on an actual request to prepay, an owner need not go through the "sham of a tender" when it is clear that the repudiating party will reject it. Under the law of anticipatory repudiation, a non-repudiating party need not tender performance at all in order to bring a claim for damages. *Acme Inv., Inc. v. Southwest Tracor*, Inc., 105 F.3d 412, 415 (8th Cir. 1997); *Foster v. Bartolomeo*, 581 N.E.2d 1033, 1035 (Mass. App. Ct. 1991) (plaintiff did not have to go through the "sham of a tender" where defendant repudiated option contract); *Lyon v. Willie*, 288 N.W.2d 884, 891 (Iowa 1980) (when the party to whom the tender would be made has repudiated the contract, the tender is a useless act); *Fullington v. M. Penn Phillips*, 395 P.2d 124, 125-26 (Or. 1964) (en banc); *see also* Restatement § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."); A. Corbin, *Corbin on Contracts* § 977 at 814 (Interim Edition 2002) ("A repudiation or other total breach by one party enables the other to get a judgment for damages or for restitution without performing acts that would otherwise have been conditions precedent."). Indeed, "the law, which is eminently practical, does not require the doing of a vain thing." *Abdallah v. Abdallah,* 359 F.2d 170, 175 (3d Cir. 1966) (demand and tender under repudiated option contract not a prerequisite to damages action).

At trial, each plaintiff established the date that defendant breached its contract.[25] In each case, the date of breach is the date that the plaintiff would have exercised its termination option

---

[25] *See* PX 584; I/218-19; PX 278, 285; III/783, 786, 787; PX 705; II/545-6, 573; PX 612; II/592; II/641, 642; PX 99; IV/867; PX 742; IV/897-900, 902, 924; PX 1; IV/947, 976; PX 111; IV/1024, 1026; PX 171; V/1098, 1106; PX 663; V/1137-38, 1166, 1167; V/1196.

had it not been for defendant's repudiation.[26] In many cases, the date of breach corresponds to a written request to prepay without restrictions. II/542; II/572; PX 705 at 3; PX 612 at 3; II/592; PX 645; PX 646; II/602-03; IV/897; PX 742; PX 663; VI/1138; VI/1168; PX 690; VI/1169; V/1212; PX 230; PX 235 at 2; PX 248 at 2; PX 261 at 2. In a number of other cases, plaintiffs did not submit a written request at the time they first intended to prepay because they knew, based on statements from agency officials and/or others, that any request would be denied under the repudiating legislation. I/229, 230, 244, 281; III/761, 766; II/552, 554, 565; PX 616; II/639-41; PX 19; PX 69; IV/950-51; IV/1010; IV/1024-26; V/1031, 1050-52; V/1101-02; V/1166-67, 1171-74.[27] In all cases where a written request was not submitted when the plaintiff first desired to prepay, the testimony and contemporaneous documents introduced at trial amply establish the date of defendant's breach.[28]

In addition, many plaintiffs initially were discouraged from submitting a formal request based on the burdensome and expensive prepayment procedures required by the agency's

---

[26] These dates were used by plaintiffs' experts to calculate the amount of damage suffered by each plaintiff. I/317-18; PX 598, Table 2 n.2. A number of plaintiffs – the post-1979 plaintiffs in particular – intended to prepay after the date that they filed suit. *E.g.*, PX 99, PX 719; PX 731. For those plaintiffs, a breach technically occurred upon the date of suit, when they elected to treat the government's repudiation as a breach. However, plaintiffs used the later date of intended prepayment to calculate damages in these instances in order to more accurately reflect the losses actually suffered by each plaintiff.

[27] A number of these plaintiffs later submitted a written request to prepay, either to restate their intentions or to learn about their other options. *E.g.,* PX 210; PX 192; PX 176. These subsequent writings confirm the plaintiffs' desire to prepay, but do not change the fact that a breach first occurred when each plaintiff would have prepaid but for the defendant's repudiation.

[28] *See, e.g., Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243 (10th Cir. 2000) (plaintiff's testimony that he would have exercised stock options on his planned retirement date established date for determining damages); *Kers & Co. v. ATC Comm'n Group, Inc.*, 9 F. Supp. 2d 1267, 1271 (D. Kan. 1998) (court accepted partnership's assertion that it would have exercised option during a profitable period); *Commonwealth Assocs. v. Palomar Med. Tech., Inc.*, 982 F. Supp. 205, 209 (S.D.N.Y. 1997) (uncontradicted testimony concerning time frame in which stock would have been sold confirmed by plaintiff's interest in "raising cash quickly"); *D'Oliveira v.*

regulations. *E.g.,* VI/1281-82; *see* Part III(C)(1), *supra.* Under those regulations, a request will not be considered unless it includes all of the required information. *See* RD Instr. 1965-E, § 1965.205(c), § 1965.206(a). Thus, a simple tender of prepayment would be pointless, in that the agency would reject the request as incomplete. *Id.* Thus, under the case law cited above, any assertion that all plaintiffs were required to endure the time and expense of submitting a complete prepayment package in accordance with the agency's regulations simply to prove their date of intended prepayment cannot pass muster.

The fact that each plaintiff would have exercised its termination option but for defendant's repudiation cannot be disputed. Under the circumstances, each plaintiff sufficiently proved – either through a formal request, other documentation, or uncontroverted testimony – the date on which defendant's liability for breach was triggered. Furthermore, each plaintiff elected to treat the government's repudiation as a breach by filing this suit in 1997. *See* Part II(C), *supra*. As a result, defendant clearly is liable to each plaintiff for breach of contract.

**2. Prepayment Without Restrictions Is Not An Option For Any Of The Plaintiffs.**

Under the repudiating legislation, none of the plaintiffs are able to prepay without restrictions. In fact, no owner in the Section 515 program can exercise its original contractual right to terminate. As the agency's internal documents confirm, the agency can no longer "just take the check" when an owner requests to prepay. PX 788 at 4, 6. Instead, the agency and the owner must comply with the detailed prepayment procedures set forth in the agency's regulations. *See* Part III(C)(1), *supra.* Thus, regardless of the outcome of the agency's evaluation process, a breach occurs when an owner attempts to prepay and the agency fails to

---

*Rare Hospitality Int'l, Inc.*, 2003 WL 1223854, *6 (R. I. Super. Feb. 13, 2003) (uncontradicted testimony and evidence established date plaintiff would have exercised options).

perform its contractual obligation to accept the prepayment forthright and release the owner from the program. *Franconia Assoc.*, 536 U.S. at 1997, 2002.

Furthermore, none of the plaintiffs in this case can satisfy the narrow exception under which the agency may, at the conclusion of its review, permit an owner to prepay without restrictions. Under the repudiating legislation, prepayment without restriction is permitted only where: (1) there is an adequate supply of safe, decent, and affordable rental housing in the area of the property where the property is located, *and* (2) housing opportunities for minorities will not be materially affected as a result of prepayment. 42 U.S.C. § 1472(c)(5)(G)(ii); 7 C.F.R. § 1965.215(c)(1)(iii). The former determination, commonly known as the "alternative housing" exception, can be made by the agency only when the agency finds, among other things, that (1) there are vacancies at the subject property, (2) there are no waiting lists for the property, (3) there are no waiting lists at other subsidized properties in the area, (4) no other subsidized properties have been built in the area in the past year and there are no plans to build any, (5) there are vacancies at other subsidized properties in the area, and (6) it does not appear that additional subsidized housing will be needed in the future. RD Instr. 1965-E, Ex. E, § V(A)(1)(a)-(f).

In analyzing the need for the housing, the agency looks only to the availability of alternative housing "in the community" in which the property is located. *Id.*, Ex. E, § V(A)(1). The "community" is, by the agency's definition, smaller than the "market area" of the property. *Id.* §1965.202 (defining "market area" as "the community in which the project is located and those outlying rural areas which are impacted by the project (excluding all other established communities)"); VII/1727. In addition, there must be at least one vacant affordable unit in that same community for every tenant that will be displaced upon prepayment. *Id.*, Ex. E, § V(A)(1); VII/1727-29. Thus, if the subject property is the only subsidized property in the community,

then the agency necessarily will find that the housing is needed and the owner cannot prepay without restrictions.

The agency has construed these requirements as prohibiting prepayment without restrictions in any case where the owner may raise rents upon prepayment. *Id.,* Ex. E, § V(C) ("The determination that prepayment may be accepted only with restrictions must be made if there is *any possibility* that rents could be increased.") (emphasis added). Thus, if the owner "will need to and/or have the option of increasing rents," the agency must impose restrictions. *Id.* Indeed, the agency's overarching standard appears to be: when in doubt, prohibit the owner from prepaying without restrictions and keep the property in the program. *See* RD Instr. 1965-E, Ex. E, § V ("IF THERE IS ANY DOUBT ABOUT THE ACCEPTABILITY OF PREPAYMENT, THE PREPAYMENT SHOULD NOT BE ACCEPTED.") (emphasis in original). In short, prepayment without restrictions is permitted under the agency's regulations only in extremely rare cases. As a result, only a tiny percentage of properties in the Section 515 portfolio are able to prepayment without restriction each year. DX 28 at 8-9.

In this case, each plaintiff established, through testimony and other evidence, that its property is needed in the community where it is located. I/281, 285, 289, 291; III/761, 766; II/552; PX 616; II/639-41; IV/874; PX 103; IV/901-02; PX 742 at 22-23; IV/957; IV/1027; V/1101-02; V/1166-67, 1171-74; V/1217-18. In some instances, the plaintiff's property is the only affordable housing property in that community, rendering it a foregone conclusion that prepayment without restrictions is not possible. II/552; IV/873, 875. In every single case where plaintiffs requested prepayment and obtained an agency determination on the alternative housing exception, the agency has found, unsurprisingly, that the exception cannot be met. PX 593; PX 103; PX 195; PX 213; PX 664; PX 666. In several cases, internal agency documents confirm the

agency's determination that plaintiffs' properties are needed in the program. PX 310; PX 320; PX 351; PX 370; PX 375; PX 391; PX 424; PX 450; PX 454; PX 471; PX 473; PX 474; PX 491; PX 495; PX 514; PX 519; PX 571.

In addition, it is beyond question that every plaintiff would have raised rents upon prepayment.[29] Indeed, if plaintiffs had no intentions or prospects of bringing their rents up to conventional levels, they would not have brought this suit. Accordingly, the undisputed need for plaintiffs' properties in the communities where they are located, and the unquestionable "possibility" that plaintiffs would have raised rents upon prepayment, leave no doubt that none of the plaintiffs are able to prepay without restrictions. Defendant failed to introduce any evidence to the contrary. While defendant pointed to the theoretical ability to prepay in some circumstances, it produced no evidence to show that any of the plaintiffs in this action could have met the rigid requirements for prepaying without restrictions. Thus, defendant breached plaintiffs' contracts by failing to perform its contractual obligation to release plaintiffs from the program's regulatory restrictions upon prepayment.

**B. Defendant's Breach Is Not Protected By The Unmistakability Doctrine.**

Significantly, defendant has raised only one defense to its contract liability in this case: the unmistakability doctrine.[30] Indeed, defendant has not denied that it breached plaintiffs'

---

[29] I/220; VI/1257-58, 1261-62; PX 309 at 6; PX 343 at 7; PX 369 at 7; PX 390 at 6; PX 449 at 6; PX 471 at 6; II/542, 572; PX 705 at 3; PX 591; PX 595; PX 612 at 8; PX 617; PX 645 at 2; II/626-27; PX 719 at 4; PX 731 at 4; IV/865-75; PX 99; IV/900, 914; PX 742 at 6; IV/946-47, 985; PX 9 at 6; PX 59 at 2; V/1204-05; V/1094, 1101, 1115; PX 176 at 4; PX 210 at 4; V/1133, 1157, 1171, 1189; PX 663; PX 690; V/1195, 1210-11, 1219; PX 235 at 8; PX 248 at 8; PX 261 at 8.

[30] In its Memorandum of Contentions of Fact and Law, the unmistakability doctrine was the only legal ground that defendant raised in defense to plaintiffs' contract claims. Defendant's discovery responses are to the same effect. *See* Defendant's Responses to Plaintiffs' Second Set of Interrogatories, ¶ 6 (referencing unmistakability doctrine as only basis for assertion that prepayment right is unenforceable); Defendant's Responses To Plaintiffs' Third Set of

contracts – it asserts only that any breach was sanctioned by the unmistakability doctrine. As a result, if this were a dispute between two private parties, there would be no question as to defendant's liability for breach. Accordingly, if the Court finds that the unmistakability doctrine does not apply, or that it has been satisfied in this case, then the only question regarding defendant's contract liability is that of damages.

**1. The Court Is Not Bound To The Prior Erroneous Ruling In This Case Regarding The Applicability Of The Unmistakability Doctrine.**

Pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC"), the Court's previous order denying plaintiffs' motion for summary judgment "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all parties." Federal courts retain the power and discretion to reconsider past judgments for a number of reasons. *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994) ("it is clear that all federal courts retain power to reconsider if they wish."); *see also Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) (law of the case not a limit on judge's power); *Slotkin v. Citizens Cas. Co.*, 614 F.2d 301, 312 (2d Cir. 1980) (doctrine "does not constitute a limitation on the court's power").

The Federal Circuit has recognized that a court should not hesitate to reconsider a previously-determined issue where controlling authority has since made a contrary decision of the law applicable to the issues, or where the earlier ruling was clearly erroneous and would work a manifest injustice. *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (citing *Gindes v. United States*, 740 F.2d 947, 950 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 1074 (1984)

---

Interrogatories ¶¶ 1, 2 (referencing arguments made in briefing on motion to dismiss as only grounds for contentions that defendant did breach and did not repudiate plaintiffs' contracts). Thus, defendant has not, and cannot now, raise any other defenses to its contract liability.

(quoting *White v. Murtha*, 377 F.2d 428, 432 (5th Cir. 1967))). Thus, an intervening change in applicable authority can provide the basis to reconsider an earlier decision. *Mendenhall*, 26 F.3d at 1582. Indeed, "[p]erhaps one of the most obvious justifications for departing from the law of the case arise when there has been an intervening change of law outside the confines of the particular case." 18B C. Wright, et al., *Federal Practice and Procedure* § 4478 at 672 (2002).

In the four years since Judge Gibson's initial decision in this matter was issued in 1999, there have been five decisions addressing the issue of whether the unmistakability doctrine applies when no sovereign act is at stake. *See Kimberly Associates v. United States*, 261 F.3d 864, 869 (9th Cir. 2001); *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 440 (Fed. Cl. 2002); *General Dynamics v. United States*, 47 Fed.Cl. 514 (2000); *Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796, 803 (2000); *United States v. Westlands Water District*, 134 F.Supp.2d 1111, 1151 (E.D. Cal. 2001). Every single one of those cases was ultimately decided in favor of plaintiffs' arguments on the applicability of the doctrine.[31] In addition, one of those cases, *Grass Valley Terrace*, involved the precise legislation and claims at issue here. Although Chief Judge Damich had previously ruled in that case that the unmistakability doctrine applied, he reconsidered and reversed his opinion in light of Judge Lydon's decision in *General Dynamics*. 47 Fed. Cl. at 440. Here, too, the Court can and should reconsider the prior decision issued in this matter and follow the current state of the law.[32]

---

[31] In a sixth case, a 1996 decision of the Court of Federal Claims that reached the same conclusion was affirmed by the Supreme Court. *Conoco Inc. v. United States*, 35 Fed. Cl. 309, 335 (1996); *see Mobil*, 530 U.S. 604.

[32] In addition, it is clear that Judge Gibson did not believe that his decision on the unmistakability doctrine mandated judgment in favor of defendant. Despite repeated requests by defendant, Judge Gibson refused to permit defendant to file an affirmative motion for summary judgment based on his prior ruling on the unmistakability doctrine, ordering that the case instead proceed promptly to trial. *See* Orders of Aug. 30, 1999 and Sept. 31, 2000.

**2. The Unmistakability Doctrine, Which Protects The Government Only When It Is Acting In Its Capacity As The Sovereign, Is Inapplicable Here.**

As plaintiffs demonstrated in their Memorandum of Contentions of Fact and Law at 21-27, the cases are nearly unanimous in holding that the unmistakability doctrine does not apply in cases where the government is not acting in its capacity as the sovereign.[33] In addition, the cases are completely unanimous in holding that the government was not acting in its capacity as the sovereign when it passed the 1988 and 1992 Legislation restricting the prepayment rights of Section 515 owners. *Id.* at 19-21. There have not been any intervening decisions addressing this purely legal issue since the parties' pre-trial filings. Accordingly, plaintiffs will not restate herein the arguments previously made on this point, which make crystal clear that the unmistakability doctrine simply does not apply here.[34] Because the government's sole defense to contract liability fails as a matter of law, plaintiffs are entitled to judgment on their claims for breach of contract.

## V. THE TAKING

The legal landscape relevant to plaintiffs' takings claims has developed dramatically since the filing of the parties' Memoranda of Contentions of Fact and Law. On June 12, 2003, the Federal Circuit issued two related cases, both of which reversed decisions of this Court dismissing takings claims asserted by similarly-situated affordable housing owners. *See Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003); *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003). Those cases presented the takings claims of owners in the

---

[33] Of the nine cases that have directly addressed the issue, only two have held to the contrary. One of those cases is the prior decision in this matter. In the other, *Adams v. United States,* 42 Fed. Cl. 463, 482 (Fed. Cl. 1998), the court emphasized the lack of certainty in its conclusion, explicitly welcoming "further clarification" on the issue.

[34] Moreover, as demonstrated by the evidence set forth in Part I, *supra*, even if the unmistakability doctrine did apply here, plaintiffs easily satisfy the requirements of the doctrine.

Section 221 and 236 housing programs administered by the Department of Housing and Urban Development ("HUD"). The owners' claims were based on the application of the 1988 Legislation (the first of the two statutes at issue here) and a subsequent statute enacted in 1990, both of which restricted their contractual rights to prepay and exit the housing programs.

In both cases, the government argued, as it does here, that (1) the owners did not hold any protected property interest in either their properties or their contractual prepayment rights, and (2) the owners lacked a reasonable investment-backed expectation that their prepayment rights would be honored by the government. And in both cases, the Federal Circuit squarely rejected the government's arguments. In *Cienega Gardens*, the court held that the evidence demonstrated that four "model plaintiffs" suffered a taking of their properties under the "*Penn Central"* test. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). With respect to the other plaintiffs in *Cienega Gardens* and the plaintiffs in *Chancellor Manor*, the court remanded the cases to the Court of Federal Claims for further proceedings.

The holdings in *Cienega Gardens* and *Chancellor Manor* are directly applicable to the facts of this case and wholly undermine defendant's challenges to plaintiffs' takings claims. In addition, these recent holdings are consistent with prior case law under the takings clause of the Fifth Amendment, as set forth in plaintiffs' pre-trial briefing. As a result, the *Cienega Gardens* and *Chancellor Manor* decisions, along with prior precedent, mandate judgment in favor of plaintiffs on their takings claims.

**A. Plaintiffs' Takings Claims Are Ripe For Judicial Review.**

A takings claim is ripe for judicial review once the property owner obtains a final agency decision applying the challenged statute or regulation to the property at issue. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). In determining

whether an agency decision is final, courts look only to whether the "initial decision-maker" has reached a conclusion as to the permissive use of the property. *Id.* at 193; *accord Devon Energy v. United States,* 45 Fed.Cl. 519, 529 (1999). In addition, an owner need not obtain an agency decision in order to ripen its takings claim where it would be futile to do so. *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) (futility exception met where "the permissible uses of the property are known to a reasonable degree of certainty"); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997) (claim is ripe when there is "no question" as to how the regulations apply to the property); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (resort to administrative procedures not required where it "would have been pointless").

In an earlier decision in the *Cienega Gardens* litigation, the Federal Circuit applied the futility exception to hold that the plaintiffs were not required to submit formal applications requesting to prepay in order to ripen their takings claims. *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001). The plaintiffs asserted that given the shortage of low-income housing in the communities where their properties were located, and the fact that they would have raised rents upon prepayment, the agency would have denied any request to prepay. *Id.* at 1246-47. The court accepted the plaintiffs' uncontroverted evidence in this regard and held that the plaintiffs' takings claims were ripe, notwithstanding the fact that none of the plaintiffs had requested to prepay under the statutes at issue. *Id.* at 1243, 1248.

Moreover, a property owner is not required to pursue alternatives it does not deem to be economically viable in order to ripen a takings claim. *Buere'-Co. v. United States*, 16 Cl. Ct. 42, 51 n.11 (1988) ("the ripeness requirement should not oblige a landowner to seek a permit for a development proposal that it does not deem economically viable and, hence, does not intend to undertake."); *Devon Energy v. United States,* 45 Fed.Cl. 519, 528-29 (1999) ("while a property

owner must seek a final determination on its permit application, he or she is not required to resort to 'piecemeal litigation or otherwise unfair procedures.'") (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 350 (1986)). In addition, a formal request is not necessary where "the procedure to acquire [the agency's consent] is so burdensome as to effectively deprive plaintiffs of their property rights." *Hage v. United States*, 35 Fed. Cl. 147, 164 (1996).

In this case, all of plaintiffs' takings claims are ripe for judicial review. Nearly every plaintiff submitted a request to prepay without restrictions under the 1988 and 1992 Legislation.[35] In no case did the agency grant any of plaintiffs' requests. In many instances, plaintiffs obtained a final agency decision denying their request based on the need for the housing and/or the impact that prepayment would have on minorities. PX 593; PX 103; PX 195; PX 213; PX 616; PX 649; PX 664; PX 666. Several other plaintiffs were instructed that if they did not accept incentives and agree to remain in the program for an additional twenty years, their requests would be "voided."[36]

All of the remaining plaintiffs either did not submit a formal prepayment application or did not pursue their application to a final decision because they knew – based on statements from the agency and their own knowledge of the relevant housing market – that their request would be denied. I/229, 230, 244, 281; III/761, 766; II/552, 554, 565; PX 616; II/639-41; PX 19; PX 69; IV/950-51; IV/1010; IV/1024-26; V/1101-02; V/1166-67, 1171-74. *See Cienega,* 265 F.3d at 1243, 1248; *Eastern Minerals Int'l, Inc. v. United States*, 36 Fed. Cl. 541, 547 (1996) (denial of

---

[35] PX 9; PX 59; PX 99; PX 165; PX 176; PX 192; PX 210; PX 235; PX 236; PX 248; PX 249; PX 261; PX 262; PX 309; PX 343; PX 369; PX 390; PX 419; PX 449; PX 471; PX 490; PX 513; PX 537; PX 550; PX 570; PX 586; PX 612; PX 645; PX 646; PX 649; PX 663; PX 690; PX 705; PX 719; PX 731; PC 740; PX 742.

[36] PX 593; PX 321; PX 346; PX 371; PX 374; PX 392; PX 396; PX 398; PX 425; PX 451; PX 492; PX 515; PX 573; PX 593; PX 617; PX 620; PX 103; PX 744; PX 746; PX 747; PX 749; PX 16; PX 66; PX 68; PX 177; PX 193; PX 211.

permit for one tract of land was sufficient to ripen takings claim on four additional tracts because additional permit applications would have been futile). Moreover, plaintiffs were not required to pursue alternatives that they did not deem to be economically viable (such as accepting incentives or prepaying subject to restrictions), or even to submit to the burdensome and expensive prepayment process, in order to ripen their takings claims. *Buere'-Co.*, 16 Cl. Ct. at 51 n.11; *Hage v. United States*, 35 Fed. Cl. 147, 164 (1996); *see* Part III(C)(1), *supra.* Thus, every plaintiff proved that their takings claims are ripe for judicial review and established the date on which a taking of their properties occurred.[37]

## B. Plaintiffs Hold Protected Property Interests In Their Real Estate And Their Contract Rights.

As plaintiffs explained in their Memorandum of Contentions of Fact and Law at 34-37, they hold property interests protected by the Fifth Amendment in both their land and buildings and their contractual right to prepay. The only facts relevant to plaintiffs' property interests are undisputed: (1) plaintiffs own their properties in fee simple, notwithstanding defendant's restrictions on their use,[38] and (2) plaintiffs held a contractual right to prepay and exit the program. Thus, plaintiffs will not repeat herein the extensive case law cited in their previous filing, which makes it clear that these interests qualify for protection under the Fifth Amendment, especially in light of the fact that defendant did not present any evidence to contradict the facts establishing plaintiffs' property interests.

---

[37] PX 593; I/241-42, 262, 284; PX 321; III/737; PX 346; PX 371; III/766-67; PX 392; PX 425; PX 451; PX 475; PX 492; PX 515; PX 553; PX 540; III/779; PX 475; PX 573; II/552, 554; PX 620; II/596, 609, 610; PX 650; PX 103; IV/873, 879, 885; PX 746; IV/906, 908, 921-24, 930, 933; PX 19; IV/960; PX 47; IV/1003-04, 1006-07, 1010; PX 69; IV/974; PX 111; IV/1024, 1026; PX 179; V1112-13, 1120; PX 195; V/1074; PX 213; V/1075; PX 664; V1138-40; PX 692; V/1171; PX 237; V/1215-16; PX 247; V/1077; PX 263; V/1078.

[38] Some plaintiffs actually purchased the properties on which their projects were built before entering into the program. *E.g.*, IV/896.

By way of supplementation, however, plaintiffs note that the recent decisions of the Federal Circuit in *Cienega* and *Chancellor* eliminate any doubt as to the validity of their property interests. In those cases, the court held that the subsidized housing owners held protected property interests in both their real estate and their contractual prepayment rights. *Cienega*, 331 F.3d at 1328-30; *Chancellor*, 331 F.3d at 902-903. In so holding, the court rejected defendant's argument that the owners' agreement to dedicate the use of their properties to the government's housing program for a period of time negated their property interests. *Id*. Thus, there can be no dispute that plaintiffs' property interests are entitled to protection under the Fifth Amendment.

### C. Applying The *Penn Central* Analysis, Plaintiffs Suffered A Taking Of Their Properties.

#### 1. Character of the Government Action

As plaintiffs demonstrated in their Memorandum of Contentions of Fact and Law at 44-45, consideration of the character of the government's action in this case strongly militates in favor of finding defendant liable for a taking of plaintiffs' properties. The decision of the Federal Circuit in *Cienega* resoundingly confirms plaintiffs arguments:

> Congress' objective in passing [the legislation restricting prepayment] – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking. The is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden.

*Cienega*, 331 F.3d at 1319. Thus, the balancing of the private and public interests at stake in this case requires that the government bear the financial burden of its decision restrict plaintiffs' use of their properties.

#### 2. Interference with Reasonable Investment-Backed Expectations

The Federal Circuit's recent decision in *Cienega* also disposes of defendant's argument that plaintiffs' takings claims are defeated by the "highly regulated" nature of the government's

housing program. The government essentially argues, as it did in *Cienega*, that because plaintiffs entered into a regulated housing program, they should have expected that the government might pass legislation abrogating their contract rights and property interests. The Federal Circuit forcefully rejected this argument:

> The government, essentially, asks us to hold that *nothing* in the Owners' private mortgage agreements has any force and effect. The government, thus, advocates a legal regime that eviscerates century-old understandings of the stable and enduring nature of contract and real property rights. . . . The government's contention is, in effect, that Congress could retroactively alter the Owners' mortgage contracts in any way it chose without any recourse for the Owners. This cannot be, and is not, the law.

331 F.3d at 1331-32; *accord Chancellor,* 331 F.3d at 904. Thus, the Federal Circuit's precedent, together with the extensive case law cited in plaintiffs' Memorandum of Contentions of Fact and Law at 37-42, dispose of the government's argument that it was unreasonable for plaintiffs to expect that the government would honor its commitment to release plaintiffs from the program upon their request. As demonstrated by the evidence set forth in Part I, *supra*, the right to prepay was in fact the *quid pro quo* for plaintiffs' agreement to enter into the Section 515 program, and was the chief inducement used by the agency to attract investors into the program.

**3. Economic Impact**

The severe economic impact of plaintiffs' being forced to remain in the Section 515 program is demonstrated by the meager returns they are receiving on their equity in their properties. This approach to measuring the economic impact was recently approved by the Federal Circuit in *Cienega*. *See* 331 F.3d at 1342-44.[39] There, the court calculated the owners'

---

[39] This approach had also been applied in earlier cases. *See Duquesne Light Co. v. Barash*, 488 U.S. 299, 308 (1989) ("If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation . . ."); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (holding that "return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks").

return on equity as of their intended prepayment dates by simply comparing the owners' equity in their properties (calculated as the market value less the mortgage balance) with their annual return for that year. 331 F.3d at 1342. Through this process, the court determined that the owners' return on equity ranged from 0.2% up to 0.6%, with an aggregate of 0.3%. *Id.* Comparing this figure to the 8.5% return that would have been generated through Fannie Mae bonds, the court further found that the owners has lost approximately 96% of their potential rate of return. *Id.* at 1343. The court concluded that such a loss was significant "even under the most conservative view." *Id.*

Plaintiffs presented a similar analysis at trial in this case. Plaintiffs established that their return on equity, as of the date of the taking, ran as low as 0.17%, with a weighted average of 0.66%. PX 831. Plaintiffs' experts also conducted a similar analysis showing that the percentage of plaintiffs' equity that was taken as a result of the government's actions ran as high as 97%, with a weighted average of 92.7%. PX 832. Both of these analyses were performed using Dr. Karvel's very conservative approach to determining the investment values of plaintiffs' properties. II/472; VI/1377-83. Plaintiffs' expert reports also establish that plaintiffs are not able to recover their initial investments in their properties absent the right to prepay. *See* PX 763 ("Figure 1" located at each Tab B); *see Florida Rock Indus. v. United States*, 18 F.3d 1560, 1567 (1994) (in analyzing the economic impact of a regulation, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored").

As in *Cienega,* the economic impact of defendant's actions is severe by any measure. Indeed, the economic impact here is much more severe than in *Cienega* in an important respect: while the prepayment restrictions at issue in *Cienega* were repealed in 1996, the plaintiffs in this case are bound to the program's restrictions through the end of their fifty-year mortgage terms.

Compounding this, plaintiffs' annual return as a percentage of their equity will continue to decrease each year as their property values increase and their mortgages are paid down. Thus, the economic impact of plaintiffs' being stranded in the Section 515 program for decades into the future will become even more severe as time passes.

**D. The Lesser Alternatives Provided Under The Statutes Do Not Provide Plaintiffs "Just Compensation."**

As with plaintiffs' contract claims, the "lesser deals" provided under the legislation do not have any impact on plaintiffs' taking claims. It is well-settled that the determination of just compensation under the Fifth Amendment is a judicial, and not a legislative, question:

> It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

*Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893).

In *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed. Cir. 1991), the Federal Circuit held that the Surface Mining Control and Reclamation Act ("SMCRA") effected a taking of the plaintiffs' ability to strip mine their land. The government argued that the SMCRA could not have been a taking because a coal exchange program provided under the statute gave the plaintiffs "something of significant value." The Federal Circuit squarely rejected this view:

> [T]he exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act, 28 U.S.C. § 1491.

*Whitney Benefits*, *Inc.*, 926 F.2d at 1175 (citing *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1560 (Fed. Cir. 1985)). The Federal Circuit also noted that "[t]o hold that mere presence of an exchange provision precludes a court from finding a taking on enactment in cases like this

one would eviscerate the constitutional just compensation guarantee." *Id.* at 1176.

As in *Whitney Benefits* and *Monongahela*, there is no basis in this case for any argument that the incentives and restricted prepayment options offered under the repudiating legislation immunize defendant for its taking of plaintiffs' properties. Indeed, while the prepayment scheme at issue in *Cienega* and *Chancellor* similarly offered owners various incentives and options, including the possibility of a sale to a non-profit organization (*see* Pub. L. 100-242, 101 Stat. 1877, § 224(b) (1989), the Federal Circuit did not even discuss those alternatives in ruling in favor of the plaintiffs. Here, too, plaintiffs were free to reject the government's proposed offers of "compensation" and instead enforce their right to obtain a judicial determination of the *just* compensation that they are due under the Fifth Amendment.

## VI. DAMAGES

### A. Plaintiffs Presented A Fair And Reasonable Estimate Of Their Damages

The "ascertainment of damages is not an exact science." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (2001); *see* Restatement § 352, cmt. a (stating that "[d]amages need not be calculable with mathematical accuracy and are often at best approximate."); *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969)) ("The ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision" in order to award damages); *id*. at 237, 416 F.2d at 1348 ("It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.") (citing *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966) and *WRB Corp. v. United States*, 183 Ct.Cl. 409, 425 (1968)); *accord Hi-Shear Tech. Corp. v. United States*, 53

Fed. Cl. 420 (Fed. Cl. 2002), *recons. denied*, 55 Fed. Cl. 418 (2003).

Thus, plaintiffs were not required to prove their damages with precision or prescience. As former Chief Judge Smith held in the first *Winstar*-related decision issued on damages:

> The Court recognizes that damages, particularly involving a thrift that entered into a 40-year contracts 18 years ago, which was breached nearly ten years ago, necessarily is not going to be found with the precision that one could determine damages resulting from the breach of a smaller more discrete contract. But this should not, and cannot defeat plaintiff's claim for damages.
>
> Put simply, the government should not be immunized from paying contract damages because the extent of both the contract and breach, and the time that has elapsed between the breach and today, makes it more difficult to calculate or conceptualize damages.

*Glendale Fed. Bank v. United States*, 43 Fed. Cl. 390, 410 (1999); *quoted in Southern Cal. Fed.*, No. 93-52C, slip op. at 64.

In addition, lost profits are a "just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement . . . if the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328 (Fed. Cir. 2002) (quoting *Wells Fargo Bank v. United States*, 88 F.2d 1012, 1022-1023 (Fed. Cir. 1996)). "Lost profits are a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." *California Fed. Bank v. United States,* 245 F.3d 1342, 1349 (Fed. Cir. 2001).

Here, plaintiffs' damages claims meet the requirements of foreseeability, certainty, causation. *See Energy Capital Corp.*, 302 F.3d at 1325; *California Fed. Bank,* 245 F.3d at 1349. Plaintiffs' damages were the direct result of defendant's failure to permit them to exercise their option to leave the program and convert their properties to conventional uses. Further, as

demonstrated below, plaintiffs have presented a fair and reasonable estimate of the amount of damages. Nothing more is required.

**B. Plaintiffs' Damages Models Were Conservative And Proper For Each Claim.**

The damages claims for each property at issue in this action under a breach of contract theory constitute a fair and reasonable, indeed conservative, estimate of the amount of profits each plaintiff has lost as a result of the government's breach. The damages calculations are based upon a damages model developed by Dr. George Karvel, the key assumptions of which have been verified as reasonable by another expert, Mr. Donald Gorowsky.

Dr. Karvel's "Lost Cash Flow Analysis," which represents plaintiffs' quantification of their breach of contract damages, employs a discounted cash flow analysis. Defendant's expert, Dr. Hamm, agrees that this is the superior method for calculating damages. IX/2058. Dr. Karvel's second damages model is entitled "Lost Investment Value Analysis" and calculates an estimate of the present value of the total investment value lost by each property due to the 1988 and/or 1992 Legislation. II/488; II/492; VI/1314. This model quantifies plaintiffs damages under their takings claims using a capitalization approach, another recognized method of real estate valuation. I/344-45; VI/1376. This model employs similar assumptions as does the discounted cash flow model. Each of the key assumptions used in these models concerning income projections, discount rates, operating expenses, and mortgage rates were intentionally fixed by Dr. Karvel at a conservative level. II/472. For example:

**<u>Income Projections</u>**:

- ☐ Dr. Karvel utilized the FmHA's note rate rents to project the rents that plaintiffs could achieve upon prepayment. *See* PX 764 at 3 n. 2. Due to the manner in which FmHA's note rate rents are calculated, they approximate market-rate rents. If anything, the note rate rents are lower than market-rate rents. As a result, Dr. Karvel used note rate rents as an "extraordinarily conservative surrogate" for market-rate rents. I/340-42; II/515, 517-18; VI/1451; IX/2190-93.

During the years that the Section 515 properties at issue in this civil action were developed (*i.e.*, from 1974-1982), the FmHA called "note rate" rents "market" rents. PX 837; 7 C.F.R. § Pt. 1944-E, Ex. B-1 (1980); *see also* I/338-39; IX/2174; PX 764 at 3 n.2. This terminology reflected the fact that the Agency would calculate "market" (or "note rate") rents in part to determine how well the property would perform after prepayment and conversion to market-rate housing. II/517-18.

Mr. Gorowsky conducted an independent rent survey to determine whether Dr. Karvel's use of note rate rents is "a reasonable proxy for market-rate rents." VII/1518. Mr. Gorowsky concluded that the FmHA note rate rent level is a conservative indicator of what the market-rate rents would be for the subject properties after conversion to market-rate rents. VII/1519-20; PX 801. The fact that the market-rate rents actually achieved by those Iowa properties that prepaid with G-4 restrictions are generally much higher than each property's note rate rent level (s*ee* PX 802; III/755, 757, 743; VII/1552) also demonstrates that note rate rent represents a reasonable, conservative estimate of post-conversion market rate rents. I/341-42; IX/2193.

☐ Dr. Karvel uses an annual 2½% projected rate of rent increase. I/331; 349; II/413. This is conservative in light of the historical experience of apartments and considering the long periods of time involved in this civil action. I/331; II/485. Many analysts employ a rate as high as 5% for projected rent increases. VI/1318-19; I/317; *see also* PX 786 at 8, 9 (illustrations of HUD fair market rent determinations using 3% annual projection factor).

☐ Dr. Karvel utilizes a 9% capitalization rate in his Lost Investment Value analyses. This rate is deemed conservative by many analysts. VI/1357. The capitalization rate of 9% is low relative to institutional grade properties, which Dr. Karvel deems to be appropriate given that small investors are more willing to invest in rural properties than institutional investors are to invest in institutional grade properties. II/469; II/489.

☐ Dr. Karvel utilizes a 5% "vacancy rate" assumption. This is a standard for this type of analysis. VI/1366; I/317. It reflects what one would reasonably expect to prevail, on average, over the long periods of time (roughly thirty (30) years) that are at issue. I/317; II/485; VI/1365; VI/1442-44; *see also*; Karvel, G. & Unger, M., REAL ESTATE PRINCIPLES AND PRACTICES 88, 106, 111, 371-73 (9th ed. 1991). This vacancy rate assumption was also validated as reasonable by Mr. Gorowsky. VI/1315; VI/1366-67; PX 814.

**Discount Rates**: Dr. Karvel uses a present value factor of 11½% for the market-rent cash flow, *i.e.*, for the projected cash streams flowing from the properties operating as market-rent housing ("the market-rent scenario"). I/330-32; II/464-65; PX 598 at 4. This rate is representative of the risk level associated with the development and ownership of conventional rental properties in rural areas. *Id.* Dr. Karvel confirmed the validity of his 11½% present value factor by

> consulting, among other things, a comprehensive database of rural properties maintained by Shenahan & Company, a real estate appraisal firm located in Minneapolis-St. Paul, Minnesota and well-recognized throughout the United States. *Id.*
>
> Dr. Karvel selects an 11% present value factor for the restricted rent scenario. I/332-33; I/348; II/464; II/490-91; PX 598 at 4. Several key factors support this. PX 3; I/332; II/471-72; VI/1262; IX/2186; IX/2195-96; I/332-33; DX 42 at 34-35; II/469-70; II/646; IX/2185-87; *see also supra* at 3 n.3. The ½ point difference in this discount rate relative to the market-rent cash flow rate reflects that the cash flow in the restricted rent scenario is slightly less risky than in the market rent scenario, but not at all risk-free. *Id.*
>
> **Operating Expenses**: The Institute of Real Estate Management ("IREM") annually publishes statistics about the operating characteristics of multi-family housing broken down by regions throughout the United States. II/486; VI/1360-61. The operating ratio of O&M expenses to effective gross income, as reported by IREM, ranges between 40 and 50 percent and has done so consistently throughout the past 30 years. II/487
>
> Dr. Karvel assumes that, upon conversion to a conventional, market-rate property, the operating expenses will remain at the same level within IREM's operating ratio range for comparable, market-rate properties located in the same region of the country. II/419-20; II/487. Mr. Gorowsky confirmed that Dr. Karvel's treatment of operating expenses is consistent with available benchmark data. VI/1314-16; VI 1360-61.
>
> **Mortgage Rates**: Dr. Karvel assumes that the plaintiffs, if permitted to prepay upon their intended prepayment dates, would have taken out 30-year, fixed-rate mortgages at prevailing market-rates applicable to their kinds of property. I/323; PX 26 at p. 4 n. 4. Dr. Karvel made certain adjustments to these rates to account for the smaller size of the properties at issue here, adding a ½% premium. I/334.
>
> Since the early 1990s, interest rates have been falling steadily. I/335. Dr. Karvel employed a decision rule in the damage models whereby, at the point when conventional mortgage interest rates drop by 1¼%, it would be appropriate to build in a mortgage refinancing. I/335; II/463; PX 26 at 4 n.5.

As the above examples demonstrate, Dr. Karvel intentionally built conservative assumptions into the methodology of his damage models. When making decisions affecting the market-rent scenario, he made decisions erring on the side minimizing damages; and when he made decisions affecting the restricted-rent scenario, he made decisions giving the benefit of the doubt to the government. *See also* II/472.

The damages models are further conservative in that they do not include any amounts for certain other damages plaintiffs have suffered:

> ☐ Plaintiffs do not claim as an element of damage the substantial sums of money deposited in the reserve accounts – money to which plaintiffs would have been entitled upon prepayment. VII/1515. Rather, Dr. Karvel conservatively assumes only that these monies could be used for such items as the closing costs payable upon prepayment of the agency's mortgage loan. VII 1501-02.
>
> ☐ Dr. Karvel assumes that the time period from the date of an intended prepayment to the beginning of the next full calendar year exhibits no income and no expenses. I/318. This convention allows for a period of conversion, during which time a property converts from restricted-rents to market-rate rents. On average, this time period approximates a period of six months. Given that income is always likely to exceed expenses, even during a period of rent-up to market-rate rents, Dr. Karvel's assumption is conservative because it results in a reduction of overall damages. I/318; DX 80; II/430-31.
>
> ☐ Dr. Karvel's models also contain no provision for the very real likelihood that certain plaintiffs would have sold their properties upon prepayment at a premium to willing buyers in arms-length transactions, or converted their properties to luxury apartments or condominium units, or made significant improvements over time. Rather, Dr. Karvel's investment value analyses assume only that the properties would achieve conservative note rate rents in their "as-is" condition. VI/1451; IX/2193.
>
> ☐ Contrary to the expectations of most reasonable investors, Dr. Karvel also does not take into account any benefits plaintiffs may have derived from reinvesting cash-flow monies in stocks, bonds, or real estate. I/324-25. Dr. Karvel's damage models thus include <u>nothing</u> for: reinvestment of any cash-flow; reinvestment of the return on initial investment received from the FmHA; reinvestment of any equity "take-out" mortgage loans upon prepayment; reinvestment of any premium sale proceeds; or reinvestment of reserve account balances. I/328; VI/1308; VII/1501-02; VII/1515.

Mr. Gorowsky also validated Dr. Karvel's damage models by analyzing various appraisals of the properties at issue. PX 834; VI/1320, 1344-45, 1358-59. These appraisals include several conducted by or for the FmHA as well as by appraisers retained by the owners. *Id.* As demonstrated at trial, the appraisals provide compelling support for the reasonableness of the assumptions and the bottom-line calculations of the Karvel models. *Id*; *see* PX 594; PX 604;

DX 35; PX 598; PX 399; PX 377; PX 361; PX 352; PX 407; PX 430; PX 438; PX 456; PX 477; PX 505; PX 497; PX 521; PX 555; PX 361; PX 542; PX 564; PX 576.

* * *

In summary, plaintiffs' damages models provide reliable, verified, and conservative estimates of their damages. All of the record evidence supports and reinforces the validity of the models and the resulting monetary claims. In stark contrast to the detailed, rigorous work by Dr. Karvel and Mr. Gorowsky, defendants' expert, Dr. Hamm, has failed to even attempt to quantify plaintiffs' damages. He has chosen instead to do nothing but lodge a multitude of unsupported criticisms against plaintiffs' models. Dr. Hamm's failure to support his many arm-chair critiques with credible evidence or analysis, and his complete failure to articulate any viable alternative method of quantifying damages, renders his opinions of little probative value. Plaintiffs have met their burden of proof and damages should be awarded accordingly.

**C. Plaintiffs' Models Accounted For All Appropriate Offsets.**

Plaintiffs' damages models incorporate the value of offsetting cash flows actually received by certain plaintiffs, such as Ms. Phoebi Perri. VI/1398-1402; VII/1554-55. Plaintiffs also accounted for the fact that certain plaintiffs prepaid subject to G-4 restrictions. VI/1401. Defendant has suggested that the damages models should also include offsets for the *potential* value of incentives and other alternatives under the repudiating legislation that are *potentially* available, but not in fact received. However, as discussed at Section III(A), *supra*, defendant bears the burden of proving the appropriateness and amount of any offsets that it alleges should be taken into account as a mitigation of damages. *See Koby*, 53 Fed. Cl. at 497. Here, defendant has failed to establish that any further offsets are due. For all the reasons set forth at Section III, *supra*, plaintiffs were not legally required to accept any of the lesser deals offered by the

breaching party, and so their damages cannot be reduced based upon any hypothetical value assigned to those never-consumated lesser deals. Further, defendant has failed to provide any competent quantification whatsoever of the supposed amount of the offsets it alleges to be due. *See Energy Capital*, 47 Fed. Cl. at 421, 423.

Defendant also asserts that plaintiffs' damages should be reduced based on any number of possible future events, such as repeal of the repudiating legislation or future prepayment activities by plaintiffs. The law is clear, however, that the Court need not consider the possibility of such speculative future events in determining the amount of plaintiffs' damages. This is so because "unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong . . ." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1373 (Fed. Cir. 2003). In this connection, Justice Holmes observed:

> The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss . . . Their claim accrued at once in the theory of the law and it does not inquire into later events.

*Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918) (fact that plaintiffs were able to pass on their damage to purchasers did not bar their recovery of overpayment from defendant); *see also* 1 Dobbs Law of Remedies § 3.8(2), at 379 (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable."); *accord Nat'l Steel Corp. v. Great Lakes Towing Co.*, 574 F.2d 339, 344 (6th Cir. 1978) ("Things which happen later and let an injured plaintiff escape some of the ultimate consequences of the wrong done him do not inure to the benefit of the defendant . . ."). Such an approach to measuring damage recognizes "the endlessness and futility of the effort to follow every transaction to its ultimate result." *Southern Pac. Co.*, 245 U.S. at

534. The Federal Circuit has expressly adopted the damage approach followed in *Southern Pac. Co.* in the context of a breach of contract action. *See Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1072 (Fed. Cir. 2001).

In this case, the potential for repeal of the legislation or future prepayment of plaintiffs' mortgages is wholly speculative, has not and cannot be reliably quantified based on the record evidence, and would, in any case, be unrelated to the Government's prior breach of contract. Accordingly, the Court need not consider the issue. Defendant has not met its burden to show either the existence or amount of any alleged offsets to the damages plaintiffs have suffered.

**CONCLUSION**

In closing, it is not only the plaintiffs who have been damaged in this case. The government has been severely damaged too. It has lost credibility and trust among a large sector of those with whom it does business. Plaintiffs invested in the Section 515 program in what was intended to be a "partnership" between the government and the private sector. *See* P.L. 90-488, 82 Stat. 476 (1968); Belden & Wiener, HOUSING IN RURAL AMERICA 114 (1999); IV/855; PX 96. Plaintiffs signed their contracts thinking that they had a solid deal, only to find out years later that the government did not believe itself to be bound to the deal.

Defendant now asks the Court to validate its view that it need not strictly adhere to its contractual obligations. If accepted, the government's position will seriously jeopardize its ability to enter into contractual engagements in the future, both in the affordable housing arena and in countless other contexts. Finding in favor in plaintiffs, therefore, will not only fairly compensate them for the losses they have suffered as a result of defendant's wrongful conduct – it will also protect "the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *See Winstar*, 518 U.S. at 883.

Dated: September 23, 2003

**Filed Electronically**

Respectfully submitted,

**s/ Jeff H. Eckland**

Jeff H. Eckland
William L. Roberts, Of Counsel
Mark J. Blando, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

M2:20572073.03