No. 97-381C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANCONIA ASSOCIATES, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant

---

# DEFENDANT'S POST-TRIAL REPLY BRIEF

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

October 27, 2003

**TABLE OF CONTENTS**

DEFENDANT'S POST-TRIAL REPLY BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. The Government's Actions Did Not Constitute a Breach of Contract . . . . . . . . . 3

A. The Contracts in Question Did Not Create an Absolute, Unfettered Prepayment Right . . . . . . . . . . . . . . . . . . . . . . 3

B. Under the Unmistakability Doctrine, the Contracts in Question Cannot Be Construed to Preclude Congress from Subjecting Prepayment to Conditions Such as Those Required by ELIHPA . . . . . . 8

1. The Unmistakability Doctrine Applies to the Contracts in Question . . . . . . . . . . . . . . . . . . . . . 9

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants . . . . . . . . . 15

3. A Surrender of the Government's Power to Amend the Applicable Statute Cannot Be Inferred from the Character of the Loan Transactions . . . . . . . . . . . . . . . 18

C. ELIHPA Did Not Repudiate the Contracts in Question . . . . . . . . . . . . 23

D. The Government's Implementation of ELIHPA Did Not Breach the Contracts . . . . . . . . . . . . . . . . . . . . . . . . 26

II. The Government's Actions Did Not Constitute an Uncompensated Taking . . . . 34

A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause . . . . . . . . . . . . . . 34

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1. Character of the Government Action . . . . . . . . . . . . . . . . . . . . 36

2. Interference with Reasonable Investment-backed Expectations . . . . . . . . . . . . . . . . . . . . . . . . 38

3. Economic Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C. The Takings Claims of Plaintiffs Who Never Submitted an Application for Prepayment Are Not Ripe . . . . . . . . . . . . 41

III. If the Government's Actions Constituted a Breach or Taking, Neither Damages Nor Just Compensation Can Be Computed Based upon the Analysis Presented by Plaintiffs . . . . . . . . . . . . . . . . 41

A. Plaintiffs' Damages and Just Compensation Analyses Are Based upon Effects That Are Not Attributable to the Government's Actions . . . . . . . . . . . . . . . . . . . . 41

B. Plaintiffs' Damages and Just Compensation Analyses Are Flawed in Other Respects . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

### FEDERAL CASES


Alaska American Lumber Co., Inc. v. United States, 25 Cl. Ct. 518 (1992) . . . . 4

Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003) . . . . 35

Christianson v. Colt Industrial Operating Corp., 486 U.S. 800 (1988) . . . . 9

Cienega Gardens v. United States, 265 F.3d 1237 (Fed. Cir. 2001) . . . . 41

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) . . . . 25, 36, 37

Croman v. United States, 44 Fed. Cl. 796 (1999) . . . . 14

Croman v. United States, 49 Fed. Cl. 776 (2001) . . . . 14

Cuyahoga Metropolitan Housing Authority v. United States, Nos. 01-46C, 01-251C, 01-416C (Fed. Cl., September 22, 2003) . . . . 9

Franconia Associates v. United States, 43 Fed. Cl. 702 (1999), aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2001), rev'd on other grounds, 536 U.S. 129 (2002) . . . . 15, 23

Franconia v. United States, 240 F.3d 1358 (Fed. Cir. 2001) . . . . 35

Franconia v. United States, 536 U.S. 129 (2002) . . . . 8, 23, 24

General Dynamics Corp. v. United States, 214 Ct. C 558 F.2d 985 (1977) . . . . 4

Gould, Inc. v. United States, 67 F.3d 925 (Fed. Cir. 1995) . . . . 9

In re Brown, 293 B.R. 865 (Bankr.W.D. Mich. 2003) . . . . 3

In re Ponzini, 277 B.R. 399 (Bankr.E.D. Ark. 2002) . . . . 3

Montana Power Co. v. United States, 8 Cl. Ct. 730 (1985) . . . . 4

Nicholson v. United States, 29 Fed. Cl. 180 (1993) . . . . 16

Parkridge Investors Ltd. Partnership v. FmHA, 13 F.3d 1192 (8th Cir. 1994) . . . . 37, 38

Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978) . . . . . . . . . . 36

Roehm v. Horst, 178 U.S. 1 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Winstar v. United States, 518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**FEDERAL STATUTES**

Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pub. L. No. 100-242, § 202(b), codified at 12 U.S.C. § 1715l note . . . . . . . . . . . . . . . 14

Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pub. L. No. 87-723, 76 Stat. 671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 1472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 1472(c) (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1472(c)(4)(A), (B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25

42 U.S.C. § 1472(c)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 1472(c)(5)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 1472(c)(5)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

42 U.S.C. § 1472(c)(5)(G)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 1472(c)(5)(G)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

42 U.S.C. § 1472(c)(5)(G)(ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

42 U.S.C. § 1472(c)(5)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1485 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1490a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FEDERAL REGULATIONS**

7 C.F.R. § 1965.215(c)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

7 C.F.R. § 1965.215(c)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 40

7 C.F.R. § 1965.215(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7 C.F.R. §1965.216 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**MISCELLANEOUS**

H.R. Conf. Rep. No. 100-426 (1987),
reprinted in 1987 U.S.C.C.A.N. 3458 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H. Rep. No. 96-154 (1979), reprinted in 1979 U.S.C.C.A.N. 2317 . . . . . . . . . . . . . . . . 12

H. Rep. No. 100-122(I) (1987), reprinted in 1987 U.S.C.C.A.N. 3317 . . . . . . . . . . . . . 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANCONIA ASSOCIATES, A Limited Partnership, et al., Plaintiffs, | ) | No. 97-381C (Judge Allegra) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

## DEFENDANT'S POST-TRIAL REPLY BRIEF

## INTRODUCTION

In our opening post-trial brief, we demonstrated that the Government's implementation of the loan prepayment provisions contained in the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), codified in relevant part at 42 U.S.C. § 1472(c) (1994), did not constitute a breach of contract or an uncompensated taking. We also demonstrated that, even if implementation of these provisions did constitute a breach or taking, neither damages nor just compensation could be computed based upon the analysis presented by plaintiffs.

Plaintiffs' opening post-trial brief asserts the opposite with regard to both of these points. Plaintiffs, however, present a distorted picture of the contract, the pertinent ELIHPA provisions, and the Government's actions. Plaintiffs contend that they possessed an absolute, unfettered contractual right to prepay the loans that they received from the Farmers Home Administration ("FmHA") pursuant to sections 515(b) and 521(a) of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a; that the enactment of ELIHPA, and the subsequent extension of its prepayment restrictions to loans made on or after December 21, 1979, see Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992), constituted a repudiation of that right; and that the Government, by failing

immediately and unconditionally to accept prepayment from plaintiffs, deprived plaintiffs of this alleged contractual right. The contract language, however, does not support a prepayment right as absolute as the right plaintiffs claim, ELIHPA did not repudiate the prepayment right actually described in the contract, and the Government's implementation of ELIHPA with respect to the plaintiffs did not violate that right.

Further, assuming that the Government's actions did violate that right and thus constituted a breach of contract or a taking, these actions did not cause damage of the kind claimed by plaintiffs. First, the trial evidence does not indicate that the Government forced any plaintiff permanently to forego prepayment and remain in the section 515 program for the remaining term of their loans; yet, with respect to most of the loans in question, plaintiffs have quantified damages and just compensation as if that were the case. Second, the Government's expert witness, William G. Hamm, demonstrated at trial that plaintiffs' damages and just compensation analyses were so methodologically flawed that they could not serve as a credible basis upon which to calculate an award. Plaintiffs' post-trial brief fails to address Dr. Hamm's critique, except simply to state that plaintiffs disagree with it.

Finally, we demonstrated in our opening post-trial brief that the claim of one plaintiff, Dublin Plaza, Inc., was time-barred years before this action was commenced. So far, plaintiffs have offered no reason why that claim should not be dismissed.

## ARGUMENT

### I. The Government's Actions Did Not Constitute a Breach of Contract

#### A. The Contracts in Question Did Not Create an Absolute, Unfettered Prepayment Right

The prepayment right claimed by plaintiffs is based upon a provision contained in the relevant promissory notes, stating: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." JX 1, ¶ 7. The phrase "at any time," however, does not necessarily mean "under any circumstances." See In re Brown, 293 B.R. 865, 870 (Bankr.W.D. Mich. 2003) ( "the statutory phrase 'at any time' [in 11 U.S.C.A. § 706(a),] does not necessarily mean 'under any circumstances'"), citing In re Ponzini,, 277 B.R. 399, 404 (Bankr.E.D. Ark. 2002). Indeed, if the provision permitting prepayment "at any time" were construed as literally and simplistically as plaintiffs urge, it would permit borrowers to prepay immediately after completion of construction and before any units have been leased. The result would be that the project would provide no affordable housing at all, even though providing affordable housing was the Government's sole purpose in making the loan.

Neither the prepayment clause in the promissory notes, nor any other provision contained in the loan documents, precludes all regulation of the prepayment process. In particular, none of these provisions states that the Government cannot take steps to protect tenants from the harm that might result from prepayment. Nothing in these provisions suggests that these steps may not include efforts to persuade the borrower voluntarily to keep the property in question in the section 515 program for a specified period of time, for example, by offering the borrower economic incentives to do so. Such efforts cannot in themselves be deemed a breach of contract;

if they were, contracts could never be modified.[1]

Further, the contract documents express no promise that, in the absence of an agreement by the borrower to keep the property in the section 515 program, the Government will not exercise its power of eminent domain in order to protect tenants from the effect of an imminent prepayment, by taking the property, transferring it to a nonprofit organization that would operate the project for the benefit of eligible tenants, and compensating the borrower by paying fair market value for the property. Likewise, the contract documents leave open the possibility of less coercive measures such as the one actually involved here: advising borrowers that if prepayment would have specified adverse effects upon tenants, and if no agreement is reached to prevent these effects, then an offer to sell the property to a public or nonprofit organization for fair market value will be required as a prerequisite to unconditional prepayment.

Obtaining borrowers' agreement to protect tenants from being harmed by prepayment, not abrogation of the prepayment option, is what Congress required in the statute. This is plain from the face of the statute. The statute states:

> (A) Agreement by borrower to extend low income use
>
> Before accepting any offer to prepay, or requesting refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into prior to December 15, 1989, the Secretary shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed.

---

[1] "Those who enter a contract may take steps at any time after its execution to modify it." General Dynamics Corp. v. United States, 214 Ct. Cl. 607, 617, 558 F.2d 985, 990 (1977); accord Alaska American Lumber Co., Inc. v. United States, 25 Cl. Ct. 518, 532 (1992); Montana Power Co. v. United States, 8 Cl. Ct. 730, 736 (1985).

> (B) Assistance available to borrower to extend low income use
>
> To the extent of amounts provided in appropriation Acts, the agreement under subparagraph (A) may provide for 1 or more of the following forms of assistance that the Secretary, after taking into account local market conditions, determines to be necessary to extend the low income use of the housing and related facilities involved:
>
> [Subsections (B)(i) through (B)(vi) list the various incentives that may be offered in order to obtain such agreements.]

* * *

42 U.S.C. § 1472(c)(4)(A), (B) (emphasis added). Section 1472(c)(5) goes on to state:

> (A) Offer to sell to nonprofit organizations and public agencies
>
> (i) In general
>
> If the Secretary determines after a reasonable period that an <u>agreement will not be entered into</u> with a borrower under paragraph (4), the Secretary shall require the borrower (except as provided in subparagraph (G)) <u>to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value</u> determined by 2 independent appraisers, one of whom shall be selected by the Secretary and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, the Secretary and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on the Secretary and the borrower.

* * *

42 U.S.C. § 1472(c)(5)(A)(i) (emphasis added). It is clear from these provisions that Congress acknowledged the continued existence of a prepayment right. If Congress had simply abrogated that right, it would have been unnecessary to seek agreements with the borrowers, and offer incentives for such agreements, to avoid prepayment. And, Congress also expressly recognized the possibility that "an agreement [might] not be entered into, " <u>i.e.</u>, that a borrower could refuse to enter into such any agreement proposed by the Government.

The legislative history confirms that such agreements were intended by Congress as an option available to owners wishing to avoid a sale. Thus, the pertinent House Conference Report states:

> The House amendment contained a provision that was not contained in the Senate bill requiring owners of projects with contracts that were entered into prior to December 21, 1979, that are no longer willing to operate rural rental housing for low income use, to sell their projects, at fair market value, to a nonprofit or public agency. The conference report contains the House provision with an amendment to make the provision effective only after the Secretary offers owners the option to extend the housing's affordability restrictions in exchange for various incentives.

H.R. Conf. Rep. No. 100-426, at 198 (1987), reprinted in 1987 U.S.C.C.A.N. 3458, 3496 (emphasis added).

Plaintiffs point to nothing in the contract documents precluding the Government from regulating the prepayment process in this manner. In their post-trial brief, plaintiffs argue that the option to terminate their participation in the section 515 program through prepayment was set forth in "crystal clear terms" in the promissory notes. Plaintiffs' Post-trial Brief 2. In fact, all that is stated in "crystal clear terms" concerning this matter is that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." JX 1, ¶ 7.[2] The contract documents do not address regulation of the prepayment process, except to state

---

[2] Plaintiffs attempt to buttress their argument by pointing to a provision in the contract documents giving the Government the right to insist upon prepayment in certain circumstances. That provision states:

> If at any time it shall appear to the Government that Borrower may be able to obtain a loan from a responsible cooperative or private credit source at reasonable rates and terms for loans for similar purposes and periods of time, Borrower will, at Government's request, apply for and accept a loan in sufficient amount to pay this

(continued...)

that the loans would be "administered subject to the limitations of the authorizing act of Congress and related regulations," JX 1, ¶ 9, and be "subject to the present regulations of [FmHA] and to its future regulations not inconsistent with the express provisions hereof." JX 1, ¶ 10. The contract documents contain no express provisions precluding the Government from seeking borrowers' agreement to not to prepay, and from regulating the prepayment process to make such efforts possible, through requirements that give the Government an opportunity to provide incentives not to exercise the prepayment option. Regulation of this kind is not "inconsistent with the express provisions" of the loan documents, including the prepayment provision itself.

Finally, although the previous opinions issued in this case by this Court and by the United States Court of Appeals for the Federal Circuit refer to the prepayment option as an "unfettered right," these courts did not hold that the loan contracts actually created such a right. These references were made not in the context of deciding what plaintiffs' contractual rights actually were, but in the context of deciding whether the action was barred by the statute of limitations, as

---

[2](...continued)
note in full.

JX 1, ¶ 8 (emphasis added), quoted in Plaintiffs' Post-trial Brief 15. Nothing in this provision, however, suggests an intent to require or encourage prepayment where the result would be the conversion of the property from affordable housing to conventional, market rent housing. The reference to "loans for similar purposes" indicates that this clause contemplates situations where the borrower is able to refinance without changing the purpose of the housing. It is quite consistent with the purpose of the section 515 program for the Government to require a borrower to refinance in such circumstances, so that the loan proceeds can be made available to another borrower who cannot provide affordable housing without a subsidized loan. This would result in an increase in the amount of affordable housing. It would have been inconsistent with the purpose of the program, however, to encourage refinancing by a borrower planning to leave the affordable housing market. Recycling loan funds in this manner would result in the Government subsidizing the growth of conventional housing while maintaining a constant, revolving inventory of low income housing. Further, the flow of low income housing into the conventional housing market would promote periodic displacement, with low income tenants having to move periodically from previously subsidized housing to newly subsidized housing. No borrower could reasonably have believed that this is what Congress or the FmHA intended.

the Government contended in its motion to dismiss. These courts assumed the allegations of the complaint to be true for purposes of determining whether dismissal was warranted based upon the statute of limitations. For the same purposes, the courts assumed that plaintiffs' contractual rights were what plaintiffs alleged them to be. The Supreme Court, in particular, was careful to describe this as an alleged obligation. The Court stated: "Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege, we reverse the Federal Circuit's judgment,"Franconia Associates v. United States, 536 U.S. 129, 133 (2002) (emphasis added); "[f]or purposes of this case, the United States agrees, it may be assumed that petitioners obtained precisely the promise they allege – a promise that permits them an unfettered right to prepay their mortgages any time over the life of the loans, " id. at 141 (emphasis added); "[t]he Federal Circuit, we are persuaded, incorrectly characterized the performance allegedly due from the Government under the promissory notes." Id. at 142 (emphasis added).

In sum, the relevant contract language does not create a prepayment right that is so absolute as to preclude regulation of the kind involved here, and the previous decisions in this case do not establish otherwise.

B. Under the Unmistakability Doctrine, the Contracts in Question Cannot Be Construed to Preclude Congress from Subjecting Prepayment to Conditions Such as Those Required by ELIHPA.

Even assuming that the contracts in question would not have permitted the FmHA to regulate the prepayment process upon its own initiative, these contracts cannot be construed to preclude Congress from mandating the protection of tenants from the effects of prepayment through legislation such as ELIHPA. As we have demonstrated, and as this Court held in denying plaintiffs' motion for summary judgment in this case, such an interpretation would be

precluded by the unmistakability doctrine. See Defendant's Post-trial Brief 19-22. Plaintiffs contend that this Court's prior ruling concerning the unmistakability doctrine was wrong[3], and that this doctrine does not apply here. Plaintiffs also contend that the contracts in question in any event contain promises that are sufficiently unmistakable to satisfy the doctrine. Both of these contention should be rejected. The unmistakability doctrine applies to the contracts in question, and preclude liability.

1. The Unmistakability Doctrine Applies to the Contracts in Question

In its recent decision in Cuyahoga Metropolitan Housing Authority v. United States, Nos. 01-46C, 01-251C, 01-416C (Fed. Cl., September 22, 2003), this Court presented a detailed analysis of the unmistakability doctrine and its origins and history in the case law. Based upon this analysis, the Court in Cuyahoga concluded that the scope of the doctrine was narrower than the Government contended it was, and that the doctrine was not applicable to the facts of that case. The scope of the unmistakability doctrine is, indeed, narrower according to the analysis in Cuyahoga than according to the analysis contained in our previous briefs in this case. We believe that our previously-stated analysis is correct. Both analyses, however, support the same result in this case. Neither the specific holding nor the broader analysis in Cuyahoga support a

[3] In our opening post-trial brief, we demonstrated that the Court's prior ruling on this issue should be followed because it was the law of the case. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988). Plaintiffs argue that the law of the case doctrine should not bar reconsideration of a prior decision "where controlling authority has since made a contrary decision of the law applicable to the issues, or where the earlier ruling was clearly erroneous and would work a manifest injustice." Plaintiffs' Post-trial Brief 43, citing Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995). None of the contrary decisions cited by plaintiffs, however, is controlling authority, and plaintiffs have not demonstrated that adhering to the Court's prior ruling concerning the unmistakability doctrine would work a manifest injustice.

rejection of the unmistakability doctrine here. The holding in Cuyahoga is inapplicable because that case is distinguishable from this one. And, the analysis contained in Cuyahoga supports the application of the unmistakability doctrine here.

In Cuyahoga, the plaintiff housing authority alleged that Government breached the terms of Housing Assistance Payments ("HAP") contracts with the Department of Housing and Urban Development ("HUD") under the Section 8 housing program, see 42 U.S.C. § 1437f, through legislation limiting the right of owners to automatic annual rent adjustments required by the HAP contracts. This Court concluded that the legislation – a 1994 amendment to section 1437f applicable to Fiscal Year 1995, and subsequent amendments applicable to subsequent years – was inconsistent with the language of the HAP contracts, because, under this legislation, owners would not receive rent adjustments in certain circumstances unless they demonstrated that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area. The Court then addressed the Government's argument that, under the unmistakability doctrine, the Government reserved the right to amend the statute in this manner. Observing that "the most unmistakable thing about the 'unmistakability doctrine' is the sheer number of unresolved questions it engenders," slip op. 16, the Court reviewed the long history of cases through which this doctrine developed, and distilled from these cases a set of principles which the Court summarized as follows:

> [A]t least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine . . . . Winstar [v. United States, 518 U.S. 839 (1996)] , as well as its progenitors and progeny, teach that the orbit of this doctrine significantly intersects that of the sovereign acts doctrine – both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government's contractual

> obligations in an effort to obtain a better deal. . . . .

Slip op. 31. Applying these principles to the facts before it, the Court held that the unmistakability doctrine was unavailable, explaining:

> In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriations measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program. . . .

Slip op. 38 (emphasis added).

In contrast to the legislation involved in Cuyahoga, the legislation involved in this case, ELIHPA, did not have either the purpose or the effect of reducing Government outlays under the section 515 program. Rather, it did the opposite. A borrower's prepayment would have eliminated the program subsidies to the borrower, thus decreasing program outlays. To the extent that ELIHPA limited borrowers' ability to prepay their loans, it ensured the continuation of program subsidies. ELIHPA and the earlier and later congressional efforts to regulate the prepayment process were aimed not at reducing program costs, but at protecting low income tenants from displacement.

Thus, in explaining the first such legislative effort (the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979)), the House Banking, Finance and Urban Affairs Committee stated:

> The Committee took these actions because it believes that the current procedures being followed by the [Agriculture] Department are in direct conflict with the intent of the statutes creating the section 514 and 515 programs. It was the clear intent of Congress that these projects be available to low and moderate income families for the entire original term of the loan. . . . In permitting prepayment and refinancing the Congress never intended that the

> basic purpose of the program be frustrated. The committee has taken care to maintain the ability of a borrower to prepay or refinance the loan; it has only acted to assure that the housing continues to be available for the important public purpose for which it was financed. Therefore, the Committee believes its actions are both responsible and compelled by an overwhelming public interest.

H. Rep. No. 96-154, at 43 (1979), reprinted in 1979 U.S.C.C.A.N. 2317, 2359 (emphasis added).

In 1987, the same House Committee discussed the developments in the intervening years which led to the adoption of the bill that became ELIHPA. The Committee stated that it "became seriously concerned about the loss of the federally assisted stock of housing to low income families, including the elderly, under programs of HUD and the U.S. Department of Agriculture." H. Rep. No. 100-122(I), at 53 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3369. The Committee identified an accelerating rate of prepayments of section 515 loans as one of the principal reasons for this loss of low-income housing, and concluded: "The facts clearly indicate to the Committee that elderly and low-income tenants have no alternative but to be thrown in the street without further action by the Congress." H. Rep. No. 100-122(I), at 54 , reprinted in 1987 U.S.C.C.A.N. at 3370 (emphasis added). This legislative history stands in sharp contrast to the legislative history quoted by the Court in Cuyahoga, slip op. 35, which expressly stated a purpose of reducing program outlays.

Finally, the purpose of ELIHPA, and the findings upon which ELIHPA was based, are stated in section 202 of the statute itself. The findings and purposes include:

> (a) FINDINGS. -- The Congress finds that –
>
> * * *
>
> (3) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 are threatened with loss as a result of the prepayment of mortgages by owners;

(4) the loss of this privately owned and federally assisted housing, which would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing, would inflict unacceptable harm on current tenants and would precipitate a grave national crisis in the supply of low income housing . . . ;

(5) the loss of this affordable housing . . . would irreparably damage hard-won progress toward such important and long-established national objectives as –

(A) providing a more adequate supply of decent, safe, and sanitary housing that is affordable to low income Americans;

(B) increasing the supply of housing affordable to low income Americans that is accessible to employment opportunities; and

(C) expanding housing opportunities for all Americans, particularly members of disadvantaged minorities;

* * *

(9) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations; and

(10) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(b) PURPOSE. -- It is the purpose of this title –

(1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance;

(2) to minimize the involuntary displacement of tenants currently residing in such housing; and

(3) to continue the partnership between all levels of government and the private sector in the production and operation of housing that is affordable to low income Americans.

Pub. L. No. 100-242, § 202(b), codified at 12 U.S.C. § 1715l note (emphasis added).

In terms of the standard articulated by this Court in Cuyahoga, it is plain from this legislative history and from the quoted statement of congressional findings and statutory purpose that ELIHPA was an effort by Congress "to protect public safety, morals or the economy;" not "an effort to obtain a better deal." Slip op. 31. Nor is this a case of "target[ing] the government's contractual obligations . . . ." Id. It is true that the property owners affected by this legislation were those who had received federally subsidized loans, not property owners generally. The socio-economic problem that confronted Congress, however, was one that existed specifically in housing owned by borrowers who had received such loans. The low income tenants threatened with displacement were not residing in unsubsidized, market-rent housing. The housing financed by federally-subsidized loans was the very housing that was leaving the affordable housing market at an accelerating pace, through prepayment.

Neither Cuyahoga nor the cases it discusses stand for the proposition that the sovereign powers protected by the unmistakability doctrine do not include the power to ensure that the poor people have decent housing.[4] Nor do these cases hold that the exercise of this power must be applied to a target broader than the source of the problem to be addressed. The fact that the

---

[4] Even protection of animal habitats has been held to constitute an exercise of sovereign power. In Croman v. United States, 44 Fed. Cl. 796 (1999), the Court held that the sovereign acts doctrine was applicable to preclude a timber purchaser's breach of contract claim for damages suffered as a result of Forest Service's suspension of timber operations when a bird species affected by the sale was listed as an endangered species. The Court subsequently reconsidered and held that the sovereign acts doctrine was not available as a defense because "the risk of 'acts of Government' was addressed and allocated by the contract . . . ." Croman v. United States, 49 Fed. Cl. 776, 782 (2001). The court did not, however, withdraw its conclusion that the Government's actions to protect the birds in question constituted sovereign acts. If sovereign power extends to protecting the habitat of birds, then it certainly extends to protecting the habitat of low income people.

source of the problem addressed by ELIHPA was the segment of the low income housing market that was abandoning that market though prepayment, and that ELIHPA addressed this source, does not mean that the enactment and implementation of ELIHPA were any less sovereign than they would have been if their target had been broader. These actions were exercises of sovereign power, and were thus subject to the unmistakability doctrine.

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants

The gist of the unmistakability doctrine is that the Government's sovereign power "'governs all contracts subject to the sovereign jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" Cuyahoga, slip op. 16, quoting Winstar, 518 U.S. at 872 (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982)). The contracts at issue here did not surrender the Government's power to amend the applicable statute, through legislation such as ELIHPA, in order to prevent displacement of tenants.

The contracts address the subject of future regulations, but not future legislation. As this Court already observed, in its previous decision applying the unmistakability doctrine in this case, the clause stating that the promissory note would be subject to "future regulations not inconsistent with the express provisions hereof" is "the only clause in the agreement that addresses the effect of future acts on the terms of the agreement. But this clause only refers to future regulations, not statutes." Franconia Associates v. United States, 43 Fed. Cl. 702, 715 (1999) (emphasis in original), aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2001), rev'd on other grounds, 536 U.S. 129 (2002).

In their post-trial brief, plaintiffs cite the above quoted clause as supporting their

contention that the agreement shielded the prepayment right from subsequent legislation, even though they concede that "the contract did not reference any prospective modifications to the statute or any other laws that might be passed in the future." Plaintiff's Post-trial Brief 5. Plaintiffs couch this statement as if it supported their position, by stating immediately thereafter, "[w]ith regard to regulation, the contracts were even more explicit," id. (emphasis added), and then citing the above quoted clause concerning "future regulations not inconsistent with the express provisions hereof." Plaintiff's Post-trial Brief 6. This phraseology, however, cannot obscure the fact that the contracts did not address future legislation at all – explicitly or implicitly – much less unmistakably surrender the Government's power to enact future legislation affecting performance of the contracts. Indeed, the presence of the provision concerning future regulations makes plaintiffs interpretation less permissible than it would be in the absence of that provision, in view of the maxim of interpretation, expressio unius est exclusio alterius – that "[w]here certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication." Nicholson v. United States, 29 Fed. Cl. 180, 196 (1993), quoting Grismore on Contracts § 105, at 164.

Thus, the contract cannot be construed to limit the applicability of future legislation to statutory terms that are "not inconsistent with the express provisions" of the promissory note. The provision concerning the applicability of legislation appears in the loan agreement, which states: "It is understood and agreed by [the borrower] that any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations . . . ." JX 1, ¶ 9. Although the agreement does not expressly state that this includes

future amendments to the authorizing statute, the agreement also does not state otherwise.[5] There is simply no unmistakable indication in the agreement that loans were to be administered only in accordance with the terms of the authorizing statute in effect at the time the loans were made, and not in accordance with the statutory terms in effect at the times during which the loans would be administered.

Even assuming, however, that the term "authorizing act of Congress" refers only to the statute in effect when the loans were made, this would only mean that the contract itself does not require compliance with future legislation, and that a failure to comply with future legislation would not constitute a breach of the contract. It would not mean that the Government surrendered its right to enact future legislation affecting contract performance, or that implementation of such future legislation would constitute a breach of the contract. For the same reason, plaintiffs miss the point when they argue that, "absent express contractual language to the contrary, reference in a government contract to statutes or regulations results only in 'incorporation of the then-current regulations,' not statutes and regulations as they 'change' over time." Plaintiffs' Post-trial Brief 6, quoting Winstar, 518 U.S. at 868.[6] Even if future legislation

---

[5] Plaintiffs argue that "the authorizing act of Congress" means "Section 515 of the National Housing Act, passed in 1962, which created the section 515 program." Plaintiffs' Post-trial Brief 5. This interpretation, however, is arbitrarily narrow. In fact, the original language of section 515, like the current language, incorporated by reference other sections of the Act, including section 502, which is codified at 42 U.S.C. § 1472. (The original text of section 515 stated: "The Secretary is authorized to make loans . . . in accordance with terms and conditions substantially identical with those specified in section 502, except that . . . ." Pub. L. No. 87-723, 76 Stat. 671.) And, these and other sections of the Act were amended numerous times, both before plaintiffs' obtained the loans in question.

[6] Additionally, neither Winstar nor the other cases cited by plaintiffs support such a broad proposition. In those cases, the courts concluded, based upon the language and context of (continued...)

is not incorporated in the contract, this does not mean that such legislation is precluded by the contract.

Plaintiffs' reliance upon a provision requiring changes to the agreement to be in writing, Plaintiffs' Post-trial Brief 5, is likewise beside the point. This case does not involve a change in the terms of the agreement. Rather, the case involves changes in the governing statute, Government actions pursuant to the new statute, and whether those actions breached the original terms of the agreement. For the same reason, plaintiffs miss the mark in arguing that contracts cannot be modified by subsequent legislation. Plaintiffs' Post-trial Brief 5-7.

3. A Surrender of the Government's Power to Amend the Applicable Statute Cannot Be Inferred from the Character of the Loan Transactions

Through the manner in which plaintiffs describe the loan transactions, plaintiffs attempt to create the illusion that the an absolute right to prepay, free of any present or future statutory or regulatory processes or preconditions, was so fundamental to the transactions that such a right must be deemed to have been unmistakably promised. This illusion cannot withstand scrutiny.

First, plaintiffs point to testimony that "they would not have signed their contracts absent the termination option. Stated otherwise, none of the plaintiffs would have entered the program if there was a possibility that they could be prohibited from leaving the program until their mortgage terms expired." Plaintiffs' Post-trial Brief 8 (footnote omitted). This testimony concerns the subjective intention of the plaintiffs in obtaining their loans – a state of mind that we had no need to disprove. The existence of this state of mind may support the conclusion that

[6](...continued)
the contracts in question, that the particular statutory and regulatory references could not properly be construed to include future statutes and regulations.

the prepayment option was a material term of the contract – which we have not disputed – but it does not compel an interpretation of the prepayment option as being absolute and immune from any interference by future legislation.[7]

Second, plaintiffs argue that they did not sign the contracts in order to obtain low interest rate loans. According to plaintiffs, the "effective one percent interest rate" resulting from Government subsidies "provided no benefit to plaintiffs," because plaintiffs' return on their initial investment was capped at eight percent until the loans were repaid. Plaintiffs' Post-trial Brief 8-9. Again, plaintiffs may have hoped for more, but an eight percent return on investment is not so inherently low as to make the prepayment option objectively critical and to justify treating it as immune from any future legislation affecting its exercise.

Further, because the section 515 loans required a much smaller equity investment from the borrower than conventional loans, plaintiffs could leverage their capital much more with a

---

[7] Further, the referenced "possibility that they could be prohibited from leaving the program until their mortgage terms expired" is irrelevant. No plaintiff has been "prohibited from leaving the program." As we have amply demonstrated, plaintiffs always could have, and still can, leave the program by offering to sell their section 515 properties to a public or nonprofit organization for fair market value. See 42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 1965.216. This would result in plaintiffs' leaving the program either through the resulting sale, or through prepayment if there were no qualified offer to purchase within 180 days. Plaintiffs also could have, and still can, prepay without restrictions, and without first offering their properties for sale, whenever housing opportunities for minorities would not be materially affected by prepayment and either tenants would not be displaced by prepayment or there is an adequate supply of affordable housing in the market area available to displaced tenants. See 42 U.S.C. § 1472(c)(5)(G)(ii); 7 C.F.R. § 1965.215(c)(1)(iii); DX 58/25. Essentially, plaintiffs have only been prevented from converting section 515 housing to conventional, market-rent housing while the housing is occupied by tenants who cannot afford to pay market rents and there is an inadequate supply of affordable housing in the market area available to displaced tenants, or housing opportunities for minorities would be materially affected, and there is a possibility of avoiding these problems at no cost to the plaintiffs through a sale of the property at fair market value to a public or nonprofit organization that would preserve the availability of the property to low-income tenants.

section 515 loan than with a conventional loan, and, in the long run, increase the value of their equity to a much greater extent with a section 515 loan. Thus, George Morosani, an owner of plaintiff Pine Needle Apartments, testified that his equity investment in Pine Needle Apartments was approximately $95,000; that he estimated his current equity in that property to be more than $1 million; and that, if he had invested the same $90,000 in a conventional project financed by a conventional loan, he would only have been able to purchase a property of approximately half the value of Pine Needle, and the value of his equity would have been approximately half of what it is now. Tr. 255:10-258:1. Pine Needle and other plaintiffs could have realized the gain from the appreciation in the value of their properties even under the ELIHPA provisions of which they complain, at least by offering to sell the properties to a public or nonprofit organization.[8] It may be that, when they entered into the loan agreements, some or all of the plaintiffs did not intend to reap their profits in this manner. The fact remains, however, that the loans provided plaintiffs with a very profitable investment opportunity even without an unfettered right to prepay. There is no basis, therefore, for plaintiffs to argue that "the deal only made financial sense . . . if they could prepay and be freed of the program's restrictions when they chose to exercise their option to do so." Plaintiffs'-trial Brief 9.

Third, plaintiffs argue that "[t]he right to terminate was crucial from a financial standpoint

[8] Mr. Morosani complained, in his testimony, that “having equity you can’t spend doesn’t do anything.” Tr. 258:8-9. This statement was apparently an allusion to the delay in his processing his request for an equity loan as an incentive to remain in the section 515 program, and/or to his understanding that he would never be permitted to prepay his loan. As we have demonstrated, however, Mr. Morosani could have drawn his equity from the project at any time by offering to sell the project to a public or nonprofit organization. Further, the fact that money cannot be withdrawn from an asset for a long period of time does not mean that the asset is not valuable.

also because of the tax implications of Section 515 ownership." Id. However, their argument, and the evidence cited to support it, only demonstrate that "certain tax benefits initially were available under the program [but] ran out as each project's depreciation schedule expired," and that, therefore, "as the tax benefits of remaining in the program diminished, the incentive to leave the program increased." Id. This does not mean, however, that section 515 loans were no longer financially advantageous after the referenced tax benefits were no longer available; it means only that the loans may have been somewhat less advantageous after these tax benefits ran out.

Finally, if the financial soundness of section 515 loans truly depended upon an unfettered right to prepay, then no rational investor would enter into such an agreement if it expressly prohibited prepayment. Yet, thousands of borrowers have entered into such agreements. Of the 17,000 projects currently in the section 515 portfolio, approximately one third are post-1989 projects, i.e., projects for which the loan contracts prohibit the borrower from prepaying their loans in full and thus leaving the program. Tr. 1624:7-12. See also JX 205/2 (example of post-1989 promissory note expressly prohibiting prepayment of the final installment of loans made to build or acquire new units). The fact that there has been a substantial market for section 515 loans lacking any prepayment option may not prove that any particular plaintiff would have entered into such a loan, but it does prove that a right to prepay these loans is not essential in order for the loans to make financial sense.

This fact also defeats plaintiffs' argument that "[t]he termination option was at least as critical to plaintiffs deals as the regulatory treatment of goodwill was to the plaintiffs in the Winstar-related cases." Plaintiffs' Post-trial Brief 11, citing Winstar, 518 U.S. at 921. The importance of the regulatory treatment of goodwill at issue in Winstar was such that, according to

the plurality opinion, "[i]t would, indeed, have been madness for respondents to have engaged in these transactions with no more protection [of that regulatory treatment] than the Government's reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed." 518 U.S. at 910. In addition to the fact that no one even suggests such dire consequences to be involved here, one simply cannot argue that it would have been madness to enter into a transaction into which thousands of investors actually did enter. Unless all of the post-1989 section 515 borrowers were mad, one cannot argue that it would have been madness for plaintiffs to enter into section 515 loans without an unfettered and absolute right to prepay.

Nor can the reasoning of the concurring opinion in Winstar be invoked here, to argue that the freedom from Government regulation concerning the prepayment option was "the very subject matter of these agreements, an essential part of the quid pro quo . . . ." 518 U.S. at 921 (emphasis added).[9] This Court has already observed in this case:

> In the case at bar, the essence of the contract was for the borrower to receive a low-interest loan in exchange for agreeing to rent the property to low-income tenants. Although the prepayment provision was a material term of the contract – it is likely that some property owners might not have entered into the agreements had the prepayment terms been less generous – it was not the reason for the agreement. By definition, a prepayment provision is not going to be the purpose of a loan. Thus, the Winstar concurrence's criteria for an unmistakable promise are not met on the facts before us.

---

[9] Plaintiffs do assert that "the right to prepay and take the properties to market in the future was truly the 'quid pro quo' for plaintiffs' decision to enter into the program in the first instance." Plaintiffs' Post-trial Brief 11. This statement, however, makes no sense. Since the significance of prepayment is that it terminates the loan and its attendant the rights and obligations, the statement amounts to a contention that plaintiffs entered into the loan contracts in order to terminate them.

Franconia, 43 Fed. Cl. at 715. Thus, the reasoning in Winstar cannot be transplanted to this case to read into the contracts an absolute and immutable right, immune from future legislation, to leave the affordable housing market through prepayment.

C. ELIHPA Did Not Repudiate the Contracts in Question

Plaintiffs assert that "In its decision in this matter, the Supreme Court held that 'ELIHPA effected a repudiation of the FmHA loan contracts because it conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages.'" Plaintiffs' Post-trial Brief 17, quoting Franconia, 536 U.S. at 143. As we have demonstrated, however, the merits of this case were not before the Supreme Court, and were not decided by that court. The question before the Supreme Court was whether the action was barred by the statute of limitations, and the Court properly assumed the allegations of the complaint to be true for purposes of deciding that question.

In the specific statement quoted by plaintiffs, the Supreme Court did not interpret the meaning of what was "represented in the promissory notes," but assumed plaintiffs' interpretation to be correct, and addressed the question whether the enactment of ELIHPA constituted an actual breach of the contract so interpreted, thus triggering the running of the statute of limitations. The Court held that it did not; that the enactment of ELIHPA was no more than a repudiation, and that the statute of limitations would did not begin to run until the Government withheld the actual performance alleged to be due: acceptance of a tender of prepayment. 536 U.S. at 142-43.

Of course, if the Government had truly promised immediately to accept all tenders of

prepayment and immediately to release the borrower from all obligations with no questions asked – without even attempting to reach an agreement with the borrower that might protect low income tenants from displacement – then the enactment of ELIHPA would have constituted a repudiation of that promise. As we have demonstrated, however, the Government's promise was not so far reaching. The right to prepay at any time does not entail a promise to accept prepayment under any circumstances.[10] Nor did the loan documents contain a promise not to revise the statute pursuant to which, according to those documents, the loans were to be administered.

As we have also demonstrated, ELIHPA did not abrogate the prepayment right itself. The statute specifically recognizes the borrowers' right to prepay, and, for this very reason, requires the agency to attempt to avoid prepayment or its adverse consequences (in cases where prepayment would have the adverse consequences specified in the statute) through agreements with borrowers. 42 U.S.C. § 1472(c)(4)(A), (B). Even where such agreements cannot be reached, the statute does not preclude prepayment. True, it requires that the borrower first to offer the project in question for sale to a public agency or nonprofit entity at fair market value. 42 U.S.C. § 1472(c)(5)(A)(i). However, such a sale, if consummated, would render prepayment moot, and if there were no qualified offer to purchase within 180 days, the borrower would be able to prepay. 42 U.S.C. § 1472(c)(5)(A)(ii). In no event does ELIHPA compel a borrower to remain subject to section 515 loan obligations.

Moreover, ELIHPA does not, on its face, prohibit the Government from accepting

---

[10] If ELIHPA had retroactively imposed a time-based prerequisite to prepayment, such as a prohibition against prepayment within less than a specified number of years after the making of the loan, this would have constituted a repudiation of a right to prepay at any time.

prepayment. See Cienega Gardens v. United States, 331 F.3d 1319, 1351 (Fed. Cir. 2003), ("Under ELIHPA . . . , the FmHA was not prohibited from accepting prepayment"). Nor does it impose new obligations upon borrowers as a prerequisite to prepayment, with one exception. Rather, the statute requires the Government to take certain steps prior to accepting prepayment. ("Before accepting any offer to prepay . . . , the Secretary shall make reasonable efforts to enter into an agreement with the borrower . . . ." 42 U.S.C. § 1472(c)(4)(A).) The only provision in ELIHPA that in any sense imposes a prerequisite upon borrowers is the provision that, "[i]f the Secretary determines after a reasonable period that an agreement will not be entered into with a borrower . . . , the Secretary shall require the borrower . . . to offer to sell the assisted housing . . . to any qualified nonprofit organization or public agency at a fair market value . . . ." 42 U.S.C. § 1472(c)(5)(A)(i). As we have demonstrated, however, the prepayment clause in the note has nothing to do with the Government's right to required a transfer of the housing in return for fair market value. The Government could have required such a transfer under its power of eminent domain, to protect tenants from displacement, even if it had first accepted prepayment. The effect upon the borrower would have been essentially the same as requiring the transfer before prepayment. Thus, neither the requirement that the Secretary attempt to reach an agreement with the borrower prior to prepayment, nor the provision concerning a sale of the housing in the absence of an agreement, can be considered a repudiation of the promissory note's prepayment provision.

Because ELIHPA did not repudiate plaintiffs' contracts, plaintiffs cannot rely upon the doctrine that, "once a party repudiates a contract, the other party has the option to either await the time for performance or file suit." Plaintiffs' Post-trial Brief 19, citing Roehm v. Horst, 178 U.S. 1, 10 (1900) . Instead, plaintiffs can file suit only if and when performance becomes due but is denied.

If there were instances in which the Government refused to accept tenders of prepayment in a manner that constituted a breach of the contract, then the affected plaintiffs would have become entitled to sue as of the time of that refusal. But, the plaintiffs who never tendered prepayment and instead claim to be suing based upon an anticipatory repudiation have no basis for suit at all.[11]

### D. The Government's Implementation of ELIHPA Did Not Breach the Contracts

For the same reasons that ELIHPA itself did not repudiate the contracts, the Government did not breach the contracts merely by complying with ELIHPA. Nor did the agency's implementing regulations, and the application of those regulations to the plaintiffs, breach the contracts. It is true that the regulations impose specific obligations upon borrowers as a prerequisite to prepayment, but, as we have established, the contracts do not preclude prerequisites that are based upon circumstances rather than time. Moreover, the prepayment prerequisites prescribed in the regulations are generally not substantive. Rather, they consist of an application process, in which the borrower must give notice to tenants of the intent to prepay, and provide the Government with information concerning the likely effect of prepayment upon tenants and other information relevant to determining what to offer the borrower as an incentive to remain in the section 515 program.

---

[11] Plaintiffs also rely upon their repudiation claim as a basis for arguing that "once the non-repudiating party changes its position in reliance on an anticipatory repudiation (as for example by filing suit), the repudiator cannot thereafter avoid liability by attempting to retract its repudiation," Plaintiffs' Post-trial Brief 19, and that, therefore, "no further action that defendant might attempt to undertake in the future, such as repeal or amendment of the repudiating legislation, could relieve the government of its contract liability." Id. at 20. However, even if this were a true repudiation case, this argument would be beside the point. We have not argued that a repeal or amendment of the statute would defeat liability. We do maintain, however, that the likelihood of these and other possible future events are very relevant to the calculation of future damages. Plaintiffs cite no authority holding otherwise.

The only substantive prerequisite, which is applicable where no agreement with the borrower is achieved, is the requirement to offer to sell the housing in question to a nonprofit organization or public agency at a fair market value." 42 U.S.C. § 1472(c)(5)(A)(i). Even assuming that, in cases where such an offer produces a sale, the resulting preemption of prepayment constitutes a technical breach, it is one that involves no economic harm to the borrower. The fair market value of a property reflects the property's expected future earnings as a conventional, market rent property. Tr. 1528:21-1531:10; 1561:5-18; 1853:15-25. Thus, a borrower who sells a property at fair market value receives the same pre-tax economic benefit as that sought through prepayment. And, in cases where such an offer does not produce a qualified purchaser within 180 days, prepayment without restrictions is permitted. In such a case, there is, at most, a brief delay in the Government's performance of the contractual obligation under plaintiffs' interpretation of the contract. In proportion to the 40 or 50 years terms of the loans in question, such a delay cannot be considered a material breach. See Cienega Gardens, 331 F.3d at 1351 (characterizing this delay as "minor and short-term"). And, in any event, none of the plaintiffs has offered to sell any of the projects in question pursuant to section 1472(c)(5)(A)(i). Therefore, whether these plaintiffs would have faced even a delay of several months if they had made such an offer is conjectural. All that is certain is that, had plaintiffs had offered to sell their projects pursuant to this section, they would either have received the appraised fair market value of the properties, or they would have been permitted to prepay their loans without restrictions.

Plaintiffs argue that, in a sale pursuant to section 1472(c)(5)(A)(i), "there is no guarantee that the owner will receive a fair value, no guarantee as to when the owner will receive its money, and no guarantee that the owner will be released from the program even if no buyer

comes forward." Plaintiffs' Post-trial Brief 32-33. To the extent that this is true, it is at least equally true that there is no guarantee concerning the fairness and timeliness of any amount an owner would receive by selling the property in an arms length transaction, or by prepaying and attempting to raise rents to market levels. A seller can be disappointed as easily by the market as by an appraisal.[12] And, if no buyer came forward, the owner would have no less of a guaranty of being released from the program than existed before Congress began to legislate concerning prepayment.[13] In fact, plaintiffs' have not even contended that the Government has declined to

---

[12] Plaintiffs' comments concerning why owners might not receive fair value are also misleading. For example, plaintiffs complain that "[t]he owner is bound to what is necessarily a subjective appraisal by two or three appraisers," and suggest that the appraisals would reflect "the government appraiser 's own experience, subjective judgments, and speculative assumptions . . . .." Plaintiffs' Post-trial Brief 32. In fact, however, the Government exerts no more control over the appraisal process than does the owner. The prescribed appraisal process calls for appraisal by two appraisers, one chosen by the owner and one by the Government (and a third appraiser chosen by the first two in case of significant disagreement), in accordance with the Uniform Standards of Professional Appraisal Practice. 42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 1965.216; Tr. 1598:12-24. Plaintiffs also state that there is a potential for "double-counting" in the appraisal process, because "the appraised [sic] is based on the value of the property 'as is' and thus does not include any needed rehabilitation work. However, if it is determined that certain rehabilitation work is needed, the first source of funding for the costs of that work is the owner's equity payment." Plaintiffs' Post-trial Brief 32. The same question was addressed in plaintiffs' cross-examination of Laurence Anderson, Director of the Office of Rental Housing Preservation, Rural Housing Service. Mr. Anderson responded that the process described by plaintiffs' counsel would indeed involve double-counting, but added: "We don't administer the program that way." Tr. 1774:22.

[13] Pointing to the statute's provision that, where there is no purchaser offer after 180 days "the Secretary may accept the offer to prepay," 42 U.S.C. § 1472(c)(5)(A)(ii) (emphasis added), plaintiffs argue that this leaves the agency with discretion whether to release the borrower from the program, and that "it cannot be disputed that the agency has the statutory authority to keep the owner in the program regardless of the outcome of the forced sale process." Plaintiffs' Post-trial Brief 32. It is plain from the context of this provision that it is not a grant of authority, but, instead, an exception to ELIHPA's restrictions concerning the acceptance of prepayment. If , in the absence of these restrictions, the loan contract requires the agency to accept prepayment, then acceptance of prepayment is not a matter of discretion. Plaintiffs also argue that under RD Instruction 1965-E, § 1965.218(a)(4), "a buyer could agree to purchase the property within the
(continued...)

accept prepayment and release borrowers from the program except as a result of this legislation. To suggest that the Government would do so without any basis in an applicable statute or regulation is groundless speculation.

Further, as we demonstrated in our opening post-trial brief, some of the plaintiffs never submitted prepayment requests, and none of the prepayment requests that were submitted, other than Dublin Plaza request, was denied outright.[14] In some instances, incentives not to prepay were offered and accepted, which obviated the need to accept or reject prepayment. In some instances, prepayment was accepted subject to restrictive use provisions, but the request to prepay did not expressly convey an intent to prepay without restrictions.[15] In some instances, a request to prepay without restrictions was arguably denied by implication, through an approval subject to the acceptance of restrictions. Such denials, however, were was subject to

[13](...continued)
required time frame but then withhold payment from the owner for years and years as it awaits funding from the agency to consummate the sale." Plaintiffs' Post-trial Brief 32. Plaintiffs, however, ignore section 1965.218(b). That section permits prepayment even when there has been a purchase offer from a nonprofit, if there has been a lack of agency funds for 15 months. Thus, while there is a possibility of a delay in either consummation of the sale or prepayment, it is certain that, within a finite period of time, the owner will be able to leave the section 515 program either through a sale or through prepayment. Finally, ELIHPA includes a funding authorization sufficient to finance the transfer of 5,000 units per fiscal year. 42 U.S.C. § 1472(c)(5)(H). As indicated in the complaint, the total number of units involved in this case is less than 1,000. And, as Mr. Anderson testified, only two or three properties per year have been offered for sale pursuant to section 1472(c)(5). Tr. 1805:18-1806:5. Thus, the potential for delay cited by plaintiffs is not significant.

[14] As we also established, Dublin Plaza's prepayment request was denied in 1987, ten years before this action was commenced. Dublin Plaza's claim, therefore, is time-barred.

[15] As we have demonstrated, agreements by plaintiffs to restrictive use provisions, either in return for incentives or as a condition of prepayment, cannot be considered involuntary merely because plaintiffs faced an undesired alternative of being required to offer their projects for sale pursuant to section 1472(c)(5)(A)(i). See Defendant's Post-trial Brief 24-25.

administrative appeal pursuant to 7 C.F.R. § 1965.215(g), and the plaintiffs did not invoke their right to appeal. Defendant's Pre-trial Brief 8-18.

Plaintiffs assert that "the date of breach is the date that the plaintiff would have exercised its termination option had it not been for defendant 's repudiation." Plaintiffs' Post-trial Brief 38-39 (emphasis added). Plaintiffs concede that "[i]n a number of. cases, plaintiffs did not submit a written request at the time they first intended to prepay," but they assert that this was because these plaintiffs "knew, based on statements from agency officials and/or others, that any request would be denied under the repudiating legislation." Id. at 39. Plaintiffs further assert that, "[i]n all cases where a written request was not submitted when the plaintiff first desired to prepay, the testimony and contemporaneous documents introduced at trial amply establish the date of defendant 's breach." Id.

Whether or not plaintiffs "would have" exercised the termination option at the times alleged, however, is irrelevant to the question of liability. Even under plaintiffs' own argument concerning repudiation, plaintiffs may treat the contract as breached when performance is actually denied, or they may treat the contract as breached as of the date suit is filed, based upon the repudiation. The authorities cited by plaintiffs do not, however, support the notion that a claim for breach may be triggered by nothing more than the plaintiffs' state of mind. To the extent that some plaintiffs may have proved that they would have demanded performance from the Government at a certain time but did not do so in the belief – even a correct belief – that performance would have been denied, all that they have proved is that their contracts would have been breached, not that their contracts were breached. Further, as we have demonstrated, Congress did not repudiate plaintiffs' contracts. Therefore, plaintiffs must establish an actual

breach; i.e., they must establish, at a minimum, that they actually attempted to prepay but were prevented by the government from doing so.

Moreover, much of the trial testimony of the plaintiffs concerning when they attempted or intended to prepay is at odds with the contemporaneous evidence. For example, plaintiffs cite the testimony of Daniel Roseliep (cited as "III/761, 766" in Plaintiffs' Post-trial Brief 38), to the effect that the owners of the properties he managed ("the Iowa properties") intended to prepay without restrictions. Yet, the prepayment request submitted for most of the Iowa properties (all of those submitted prior to 2000), expressly stated that the borrowers' intention was not to actually prepay, but to obtain ELIHPA incentives in lieu of prepayment. In the cover letter accompanying each of these requests, the borrowers stated: "[W]hen appropriate incentives in adequate amounts are offered, they will be accepted and prepayment will not occur." PX 309, 343, 369, 390, 419, 449, 471, 490, 513; Tr. 799:13-800:4, 802:13-803:13, 806:7-807:12, 843:20-844:12. Similarly, plaintiffs cite trial testimony (cited as "IV/950-51" in Plaintiffs' Post-trial Brief 38) that the owners of Riverfront Apartments and Sunrise River Apartments had intended to prepay in 1992. However, the prepayment requests for these properties were first submitted in 1994. The prepayment request for Riverfront Apartments stated: "Prepayment of the FmHA loan without restrictive provisions is one option. However, consideration would be given to an equity buy out and a continuation of the project status as is." PX 9/2 (emphasis added). The prepayment requests for Sunrise River Apartments stated: "Direct prepayment of the FmHA loan without restrictive provisions is one option we would consider. However, our preference would be an equity buy out and a continuation of the project status as is . . . ." PX 59/1 (emphasis added). Of the documents cited in plaintiffs' brief relating to these properties, one – PX 19 – accepted an

incentive offer for Riverfront while indicating an interest in prepayment without restrictions, while the other – PX 69 – rejected incentives for Sunrise River and clearly stated a desire to prepay without restrictions. Both of these documents are dated February 5, 2001. And, even after this date, the Government did not definitively preclude prepayment without restrictions for either of these properties. See Defendant's Post-trial Brief 13.

Finally, plaintiffs argue that "none of the plaintiffs in this case can satisfy the narrow exception under which the agency may, at the conclusion of its review, permit an owner to prepay without restrictions." Plaintiffs' Post-trial Brief 40. This is so, according to plaintiffs, because prepayment without restriction under this exception is permitted only where six separate criteria listed in RD Instruction 1965-E, Exhibit E, § V(A)(1)(a)-(f). The agency, however, has not applied these criteria in the manner suggested by plaintiffs. For example, according to plaintiffs, the criteria would require a finding that "there are vacancies at the subject property" and that "there are vacancies at other subsidized properties in the area . . . ." Plaintiffs' Post-trial Brief 40. As Mr. Anderson testified, however, this is not how the agency applies the criteria. Rather, even if prepayment would displace tenants, "[i]f the agency determines there is other affordable housing available in that market area, and the tenants could move there, yes, we could allow that borrower to prepay without restrictions." Tr. 1789:20-23.

Plaintiffs also overstate the evidence suggesting that these criteria could not be met. For example, plaintiffs cite Tr. 874, where an Eastwood Apartments partner testified that the agency had indicated that prepayment without restrictions could not be permitted because the agency believed the housing was needed, and PX 103, the agency letter that this witness cited as having given him that impression. In fact, however, the letter indicated that prepayment without

restrictions would be possible "if the agency can determine that housing opportunities for minorities will not be materially affected and there is no longer a need for the housing," and stated that, "[f]rom the information that was furnished and or available in the Mexico [County, Missouri] market, we do not believe that we can make such a determination." Id. The letter also stated: "If we do not hear from you within 30 days, we will assume you no longer wish to pursue prepayment, and will consider your request withdrawn." PX 103. There is no evidence that Eastwood itself provided any market information to the agency, either before or after the date of this letter. The same witness who testified about this letter, however, also testified that he believed there was an adequate supply of affordable housing in Mexico County. Tr. 879:14-20. The thrust of the evidence, therefore, is not that Eastwood could not satisfy the criteria for prepayment without restrictions, but that Eastwood failed to provide the Government with information to support a favorable finding.

In sum, the evidence falls short of proving that the Government breached its contracts with the plaintiffs. These contracts did not create an absolute right to prepay their loans and immediately and automatically be released from all loan obligations regardless of circumstances and without any regulation of the prepayment process. ELIHPA did not repudiate the prepayment right contained in the promissory notes, and the Government's implementation of the statute did not breach that right. Rather, the statute required the Government to take certain steps to ensure that prepayment would not cause tenants depending upon subsidized housing to lose their homes. These steps do not preclude prepayment; at most, they preclude plaintiffs from converting section 515 housing to conventional, market-rent housing while the housing is occupied by tenants who cannot afford to pay market rents and there is an inadequate supply of

affordable housing in the market area available to displaced tenants, or housing opportunities for minorities would be materially affected, and there is a possibility of avoiding these problems at no cost to the plaintiffs through a sale of the property at fair market value to a public or nonprofit organization that would preserve the availability of the property to low-income tenants. And, many of the plaintiffs cannot claim that they were prevented by the Government even from doing this, because they either accepted economic incentives not to prepay, or submitted prepayment applications indicating an interest in incentives rather than actual prepayment, or never attempted to prepay at all.

## II. The Government's Actions Did Not Constitute an Uncompensated Taking

### A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause

In our pre-trial memorandum and in our opening post-trial brief, we demonstrated that the rights claimed to have been infringed in this case were rights arising from contracts between plaintiffs and the Government, and that infringements of this kind are actionable only as contract claims, and not as takings claims. See Defendant's Final Memorandum of Contentions of Fact and Law 30-32; Defendant's Post-trial Brief 25-28. Plaintiffs have not addressed this point in their Post-trial brief.

Plaintiffs do make one point that is relevant to, although it does not explicitly address, our argument that the rights in question derive from plaintiffs' contracts with the Government. In support of their argument that they possess protected property interests, they state: "The only facts relevant to plaintiffs property interests are undisputed: (1) plaintiffs own their properties in fee simple, notwithstanding defendant 's restrictions on their use, and (2) plaintiffs held a contractual right to prepay and exit the program." Plaintiffs' Post-trial Brief 51 (footnote omitted). Although

the second of these interests is, on its face, an interest deriving from plaintiffs' contracts with the Government, the first is not.

This does not, however, render the Government actions at issue here actionable under the Takings Clause. These actions did not interfere with plaintiffs' use of their properties except to require adherence to the restrictions contained in the applicable loan documents. Plaintiffs agreed to comply with these restrictions as long as any portion of their loans remained unpaid. If plaintiffs possessed a right to be relieved of these restrictions by prepaying their loans, then that right was based strictly upon the terms of the promissory notes, and was thus a contract right. If the contracts required the Government to accept prepayments offered by plaintiffs under the circumstances involved here and the Government refused to do so, then the contract was breached. If the contracts did not require the Government to accept prepayment under the circumstances involved here, then there was not only no breach of contract, but also no taking. Plaintiffs' rights as owners of the properties in question did not, after all, include a right to use the property in a manner prohibited by valid and existing contracts signed by the owners.

Plaintiffs cite Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003), and Cienega Gardens, as reinforcing their point that plaintiffs possess protected property interests. We do not dispute that plaintiffs possess such interests. Plaintiffs cannot, however, rely upon these decisions to argue that the Government effected a taking of a property interest independent of the contract right alleged to have been breached, for all of the reasons stated in our opening post-trial brief, at 26-28. In particular, we note that in this case the Federal Circuit defined the property interest involved as consisting of "each appellant's contract prepayment right . . . ." Franconia, 240 F.3d at 1365. Although the Supreme Court reversed, it did not express disagreement with the Federal Circuit's definition of the property interest involved. That definition controls here. In this

case, therefore, the property interest underlying the takings claim and the contract right underlying the breach claim are one and the same. Therefore, plaintiffs cannot recover under a takings theory.

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test

Assuming that plaintiffs' takings claims are not precluded by their dependence upon their contracts with the Government, they should nevertheless be rejected. As we demonstrated in our opening post-trial brief, plaintiffs have not established a taking based upon the three factors identified by the Supreme Court in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978), for assessing whether Government regulatory action effects a taking under the Fifth Amendment. In their post-trial brief, plaintiffs argue that they have satisfied the Penn Central criteria. Plaintiffs' arguments, however, fall short of the mark.

1. Character of the Government Action

The argument contained in plaintiffs' Post-trial brief concerning the character of the Government's action in this case consists principally of a quotation from Cienega Gardens concerning the Government action in that case. Discussing the ELIHPA provisions applicable to private loans insured by HUD, the Federal Circuit stated, in the passage quoted by plaintiffs, that "'Congress' objective . . . – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden.'" Plaintiffs' Post-trial Brief 50, quoting Cienega Gardens, 331 F.3d at 1319.

In Cienega Gardens, however, the Federal Circuit distinguished the prepayment

restrictions involved in that case – applicable to private loans insured by HUD – from the restrictions applicable to FmHA loans, which are involved here, and which were held not to constitute a taking in Parkridge Investors Ltd. Partnership v. FmHA, 13 F.3d 1192 (8th Cir. 1994). The Federal Circuit stated:

> Under ELIHPA . . . , the FmHA was not prohibited from accepting prepayment; rather the FmHA could "accept prepayment only at the end of an intricate, six-month-long (or longer) procedure," and the party desiring to prepay could be forced to sell the property instead if a willing non-profit or public agency offered to buy the property at market value. Id. While this six-month delay undoubtedly caused some inconvenience to the Parkridge plaintiff, the economic effect was minor and short-term. Here, the effect was major and the deferral was for up to twenty years. . . . Moreover, the possibility of being forced to sell would actually offer ample compensation, rather than causing injury as the plaintiff suggested. . . .

331 F. 3d at 1351 (emphasis added), quoting Parkridge, 13 F.3d at 1195.

Indeed, it is difficult to see how the Government actions involved here can be characterized as "forcing some owners to keep accepting below-market rents, " Cienega Gardens, 331 F.3d at 1319, when all owners can free themselves of this burden by offering to sell their properties to a nonprofit organization or public agency at a fair market value, pursuant to 42 U.S.C. § 1472(c)(5)(A)(i). As we have demonstrated, such a course would enable the owner to either to obtain the value of the property appraised as a conventional property, or, in the absence of a purchaser, to prepay with no restrictions. If the sale were consummated, the owner could, if he wished, reinvest the proceeds in a conventional housing project, at which market rents could be charged. If there were no offer to purchase, the owner would be free to charge market rents at the same property, after prepaying the loan. In either case, the owner would not be forced to keep accepting below-market rents. And, to the extent that the sale itself may constitute a taking in

circumstances where it is required by the statute, it is nevertheless not a taking without just compensation. As the Federal Circuit recognized in Cienega Gardens, such a sale "would actually offer ample compensation . . . ." 331 F. 3d at 1351.

2. Interference with Reasonable Investment-backed Expectations

In our pre-trial memorandum, we established that plaintiffs could not have possessed a reasonable expectation that the Government would never impose any regulatory restrictions upon their ability to prepay their loans regardless of the effects that prepayment might have upon the accomplishment of the purposes of the section 515 program. In our opening post-trial brief, we demonstrated that the Federal Circuit's recent decisions in Cienega Gardens and Chancellor Manor, which rejected the Government's position concerning the investment-backed expectations of the plaintiffs in those cases, were distinguishable in several respects. Indeed, the court in Cienega Gardens noted some of these distinctions itself in the course of distinguishing Parkridge.[16]

The discussion of this issue in plaintiffs' post-trial brief contains little more than a citation to the Cienega Gardens court's rejection of what it perceived as an argument "that Congress could retroactively alter the Owners mortgage contracts in any way it chose without any recourse for the Owners," Plaintiffs' Post-trial Brief 51, and a repetition of plaintiffs' contention that "the right to prepay was in fact the quid pro quo for plaintiffs' agreement to enter into the Section 515 program . . . ." Id. We have demonstrated above that plaintiffs' "quid pro quo" argument lacks

[16] In Parkridge, the court reasoned that "it was foreseeable that the government might impair the partnership's contractual options in order to prevent the program's purposes from being foiled. Therefore, we cannot agree that Parkridge's expectation of a continued, unrestricted right to prepay was 'reasonable.'" 13 F.3d at 1198-99.

merit. And, we do not contend that Congress could retroactively alter owners' contracts "in any way it chose." We have demonstrated, however, that plaintiffs should have expected Congress to take action to protect tenants if prepayments accelerated to the point of undermining the purpose of the section 515 program and threatening low-income tenants with the loss of their homes, and they should have expected that this action might involve regulation of the prepayment process. Especially in view of the fact that the legislation in question does not bar prepayment, and allows borrowers to either obtain fair market value for their property or to prepay if fair market value cannot be obtained through a sale to a nonprofit organization, any expectation plaintiffs may have had that no such legislative change would occur cannot be considered reasonable.

3. Economic Impact

Plaintiffs' discussion of the economic impact of the Government's actions, like the lost profits and lost investment value analyses presented by plaintiffs at trial, are based upon the erroneous premise that the Government's actions have caused plaintiffs to be "bound to the program 's restrictions through the end of their fifty-year mortgage terms." Plaintiffs' Post-trial Brief 52. As we have demonstrated above and in our opening Post-trial brief, this premise is far from the truth.

First, plaintiffs have been, and still are, able to free themselves of the program's restrictions by offering their properties for sale to a public or nonprofit organization. 42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 1965.216. Second, whenever it can be established that housing opportunities for minorities would not be materially affected by prepayment and that the tenants either would not be displaced by prepayment or there is an adequate supply of affordable housing in the market area available to displaced tenants, plaintiffs can prepay without

restrictions and without any prior offer to sell to a public or nonprofit organization. 42 U.S.C. § 1472(c)(5)(G)(ii)(II); 7 C.F.R. § 1965.215(c)(1)(iii). Even assuming that these conditions did not exist when plaintiffs wanted to prepay their loans in the past, it is not reasonable to assume that these conditions will never exist until the end of plaintiffs' mortgage terms – i.e., typically, for approximately the next 30 years. Third, where housing opportunities for minorities would not be materially affected by prepayment, plaintiffs have the option of prepaying as long as they agree not to raise rents to force out current tenants. 42 U.S.C. § 1472(c)(5)(G)(ii)(I); 7 C.F.R. § 1965.215(c)(1)(ii).

Additionally, even if it were true that the Government's actions caused plaintiffs to be bound to the program 's restrictions through the end of their mortgage terms, the economic impact of this is not as great as plaintiffs describe it. Plaintiffs magnify the economic impact of these restrictions by comparing equity values and rates of return on equity with and without these restrictions. As we demonstrated in our opening post-trial brief, this approach creates the impression that almost all of the value of plaintiffs' property has been lost as a result of the restrictions, even where the decrease in the value of the project in question is relatively small. As we further demonstrated, despite the Cienega Gardens court's utilization of rates of return on equity in measuring the economic impact of the Government action in that case, this approach is not appropriate here. See Defendant's Post-Trial Brief 31-32.

Finally, the fact that plaintiffs have always had the option of selling their properties to a public or nonprofit entity for market value in itself defeats plaintiffs' economic impact argument. If plaintiffs can sell their properties for their full market value under the ELIHPA restrictions, then the restrictions have not decreased the value of the property at all and have had no adverse

economic impact upon plaintiffs. And, if plaintiffs do not succeed in their attempt to find a qualified purchaser at fair market value, then they will be permitted to prepay without restrictions, and the value of the property at that point will be the same as it would have been if there had never been any restrictions. Thus, the Government's actions cannot have caused any significant decrease in the value of plaintiffs' property. If that value has indeed decreased significantly, the decrease is largely the result of the choices made by plaintiffs.

### C. The Takings Claims of Plaintiffs Who Never Submitted an Application for Prepayment Are Not Ripe

In our opening post-trial brief, we established that there was no evidence of any prepayment application having been submitted with respect to R.C. Getty, R.C. Mo, R.C. Pierre, and R.C. Springs, Fox Ridge II, Rolling Hills, and Scenic Valley, and that, for this reason, the takings claims concerning these properties were not ripe. In their post-trial brief, plaintiffs rely principally upon Cienega Gardens v. United States, 265 F.3d 1237 (Fed. Cir. 2001), where the court held plaintiffs' claims to be ripe despite the plaintiffs' failure to request to prepay. In that case, however, the court found that the plaintiffs had made a "compelling case" based upon "uncontested facts" that application would be futile. 265 F.3d at 1248. That is not the case here.

## III. If the Government's Actions Constituted a Breach or Taking, Neither Damages Nor Just Compensation Can Be Computed Based upon the Analysis Presented by Plaintiffs

### A. Plaintiffs' Damages and Just Compensation Analyses Are Based upon Effects That Are Not Attributable to the Government's Actions

In our opening post-trial brief, we demonstrated that plaintiffs' expert testimony concerning damages and just compensation were based upon the premise that the Government's actions prevented plaintiffs from leaving the section 515 program, and that this premise was

false. Plaintiffs' post-trial brief does not address this issue. Rather, the discussion of damages contained in plaintiffs' post-trial brief focuses upon plaintiffs' contention that their experts properly estimated the loss of cash flows or investment values that would result from plaintiffs' remaining in the section 515 program for the remainder of the terms of their loans. Even if this were true, however, it would be irrelevant, because, as we have established, the Government did not prevent plaintiffs from leaving the program.

Plaintiffs complain that the ways in which plaintiffs can leave the section 515 program involve some delay and expense. This is true. They all require the submission of a prepayment application, which involves some time and expense, but plaintiffs have not offered evidence concerning this expense. If a borrower leaves the program through an offer of sale to a nonprofit organization, the sale may involve some costs, and some additional loss of potential income between the time of the offer and the time when either a sale is consummated or the borrower is permitted to prepay without restrictions because of the absence of a qualified purchaser. No plaintiff, however, has sought to leave the program in this manner. These costs of a sale, therefore, are not costs that were actually incurred, and the potential loss of market-rate rental income pending either sale or prepayment is has not been quantified. What is apparent from the evidence, however, is that any costs or lost profits likely to result from offering to sell to a nonprofit organization are minuscule compared to the losses that plaintiffs attribute to remaining in the section 515 program for the remaining term of their loans.

The only argument offered by plaintiffs relating to the alternatives available under ELIHPA and its implementing regulations is plaintiffs' argument concerning what they perceive to be a mitigation defense. Apparently proceeding upon the assumption that all of these

alternatives are merely potential means of mitigation, plaintiffs argue that this defense is unavailable because, among other things, the Government has not proved how much money plaintiffs would have saved through these alternatives, and because plaintiffs could not reasonably have been expected to resort to these alternatives.

As we noted in our opening post-trial brief, however, the choices that were available to plaintiffs implicate an issue primarily of causation, and only secondarily of mitigation. See Defendant's Post-trial brief 37, n.32. Indeed, to the extent that plaintiffs' arguments concerning mitigation are pertinent, they are pertinent to whether and how damages should be adjusted for the economic benefits of monetary incentives to remain in the program, which most plaintiffs did not accept or receive but which they could have received and still may receive. Plaintiffs' arguments concerning mitigation, however, are irrelevant to the options that the Government left available to plaintiffs to leave the section 515 program. Plaintiffs' claim is that the Government caused them to suffer economic loss as a result of restrictions that the Government imposed upon plaintiffs' ability to leave the program through prepayment. It was plaintiffs' burden to prove the losses attributable to the restrictions the Government actually imposed. The Government may have placed certain hurdles in the path of plaintiffs' departure from the program, but it did not lock the door. If placing these hurdles constituted a breach of plaintiffs' contracts, then plaintiffs might be entitled to recover damages caused by these hurdles; if these hurdles amounted to a taking, then plaintiffs' might be entitled to recover the difference in the value of their property with and without these hurdles. But, that is not what plaintiffs attempted to prove. Rather, they attempted to prove the losses caused by a non-existent prohibition against leaving the program for the remaining term of plaintiffs' loans.

In particular, the option to sell a project to a nonprofit organization or public agency for fair market value provides borrowers a definite opportunity to leave the program, with at least a very a strong probability of doing so within approximately 180 days.[17] Therefore, plaintiffs should at least have proved the difference between the value or earning potential of the properties with this option and with an unrestricted option. Plaintiffs did attempt to prove the present value of the estimated past and future income streams that the properties could produce in an unrestricted scenario, i.e., as conventional, unsubsidized projects. Plaintiffs did not, however, make any attempt to prove that this value, plus the properties' residual value, was greater than the fair market value of the properties, or that the properties' actual fair market value was greater than the value likely to be determined in the appraisal process prescribed by 7 C.F.R. § 1965.216. This means that plaintiffs have not proved any specific loss attributable to the Government's actions, regardless of whether a nonprofit organization would actually have offered fair market value for plaintiffs' projects. If such an organization would have offered to purchase a project for what its fair market value would be as a conventional property, then there is no basis for asserting that the Government's actions reduced the value or earning potential of that project. If no such organization would have offered to purchase the project for its fair market value as a conventional property, then the owner would have been able to prepay and be relieved of all program restrictions, and there is no basis for asserting that the Government's actions caused more than a

[17] As we demonstrated above in connection with the "economic impact" aspect of the takings analysis, the statute and regulations also permit prepayment under other circumstances, relating to the need for the housing and the effect of prepayment upon minorities. Even if these circumstances did not exist in the past, it is not reasonable to assume that they will never exist during the remaining term of plaintiffs' loans.

few months delay in the conversion of the property to a conventional one.[18]

B. Plaintiffs' Damages and Just Compensation Analyses Are Flawed in Other Respects

Plaintiffs' damages and just compensation estimates would be unreliable even if the Government had absolutely precluded plaintiffs from leaving the section 515 program for the remaining term of plaintiffs' loans. The Government's expert witness, Dr.. Hamm, testified that, in his opinion, neither plaintiffs' lost cash flow model nor their lost investment value model could support an award of damages or just compensation because both models had "serious conceptual methodological flaws that render their results unreliable and highly speculative." Tr. 1850:18-23. These flaws were described by Dr. Hamm in detail in his trial testimony. The major flaws are summarized in our opening post-trial brief.

Plaintiffs have failed to address Dr. Hamm's testimony. In their post-trial brief, they merely dismiss this testimony by commenting that Dr. Hamm did not "attempt to quantify plaintiffs' damages" or "articulate any viable alternative method of quantifying damages . . . ." Plaintiffs' Post-trial Brief 60. It was not the Government's burden as defendant, however, to prove either the existence or the amount of damages, or to develop and defend a methodology for proving damages. The point of Dr. Hamm's testimony was not to do these things, but to demonstrate that plaintiffs' had not met their burden of proof concerning damages.

[18] Even if it is assumed that neither a sale nor prepayment would have occurred until the end of the full 180-day period prescribed in the statute and regulations, and that plaintiffs would be entitled to recover the value of any cash flow lost as a result of the delay, and that plaintiffs' estimate of the lost cash flow is correct, this would only support an award of approximately half of the amount estimated by plaintiffs for the first year following the following the date of breach. Because this amount is the most that plaintiffs would be likely to have lost if they had pursued the sale-to-a-nonprofit option even according to plaintiffs' estimate of damages, damages should not exceed this amount even if this option is viewed as a form of mitigation as to which the Government bears the burden of proof.

Although plaintiffs' post-trial brief does not address Dr. Hamm's testimony, it contains a series of assertions aimed at demonstrating that "plaintiffs' damages models provide reliable, verified, and conservative estimates of their damages." Plaintiffs' Post-trial Brief 60. These assertions do not withstand scrutiny, largely for reasons explained by Dr. Hamm his testimony.

For example, in defense of their expert's utilization of the FmHA's note rate rents to project the rents that plaintiffs could achieve upon prepayment, plaintiffs state: "Due to the manner in which FmHA's note rate rents are calculated, they approximate market-rate rents. If anything, the note rate rents are lower than market-rate rents. As a result, Dr. Karvel used note rate rents as an 'extraordinarily conservative surrogate' for market-rate rents." Id. at 56. At most, however, the evidence cited to support this conclusion indicates only that, when plaintiffs' loans were first issued more than 20 years ago, market rents prevailing at that time were taken into consideration in establishing the note rate rents. The evidence does not indicate any relationship between note rate rents and market rents now. Indeed, the evidence indicates that the note rate rents were largely determined based upon factors specific to the loan in question and unrelated to the factors that determine market rents generally. In particular, the note rate rent was heavily influenced by prevailing mortgage interest rates. Tr. 1900:9-1903:13. These rates were at an all-time high in the 1979-82 period, when many of the loans in question were issued. As rates changed, and as the demographics of the area and conditions in local housing markets changed, any link that may have initially existed between the note-rate rents and market rents was broken. Indeed, plaintiffs' expert, Dr. Karvel, expressly conceded that the note rate rent does not fluctuate over the years with market rent. Tr. 2191:25-2192:2.

Plaintiffs assert that their other expert witness, Mr. Gorowsky, "conducted an independent rent survey to determine whether Dr. Karvel's use of note rate rents is a reasonable proxy for

market-rate rents." Plaintiffs' Post-trial Brief 57. Mr. Gorowsky conceded, however, that he made no adjustments to the so-called "comparables" that he selected in this survey, for differences in location, age, condition, unit size, and amenities – the types of adjustments that appraisers routinely make in determining a property's economic value. See Tr. 1408:1-22; 1913:20-19:15-8; JX 208/16-18.

Plaintiffs state that "[t]he operating ratio of O&M expenses to effective gross income, as reported by IREM [the Institute of Real Estate Management], ranges between 40 and 50 percent and has done so consistently throughout the past 30 years, " and that "Dr. Karvel assumes that, upon conversion to a conventional, market-rate property, the operating expenses will remain at the same level within IREM's operating ratio range for comparable, market-rate properties located in the same region of the country." Plaintiffs' Post-trial Brief 58 (emphasis added). In a similar vein, plaintiffs declare that it is "[g]iven that income is always likely to exceed expenses . . . ," Id. at 59. This assumption, however, is false on its face. If it were true, no real estate venture would ever fail; yet, many do fail.

Plaintiffs' reliance upon the cited IREM data involves a logical fallacy. It is simply illogical to conclude that a new entrant into the conventional real estate market will be able to operate with expenses limited to between 40 and 50 percent of income, based merely upon statistics indicating that viable real estate enterprises do so. One cannot even assume from such data that a new venture will earn enough income to cover expenses. The IREM data, after all, are necessarily based largely upon the experience of profitable real estate enterprises. This is so because unprofitable ventures tend to go out of business rather than perpetually lose money. The IREM data cited by plaintiffs may prove the tautology that profitable real estate enterprises generally make a profit, and even that the average profitable real estate venture keeps operating

expenses within 40 to 50 percent of income, but these data prove nothing about whether plaintiffs' projects would be profitable if they entered the conventional market.

Plaintiffs state that "[t]he capitalization rate of 9% is low relative to institutional grade properties, which Dr. Karvel deems to be appropriate given that small investors are more willing to invest in rural properties than institutional investors are to invest in institutional grade properties." Plaintiffs' Post-trial Brief 57. Dr. Karvel's deeming of this rate to be appropriate, however, depends upon an unsupported and implausible assumption that small investors do not act in their self interest and make investments that provide risk-adjusted returns well below prevailing market levels. In effect, he assumes that these investors subsidize section 515 projects by not demanding the risk premiums that other investors demand.

Plaintiffs state that they "do not claim as an element of damage the substantial sums of money deposited in the reserve accounts money to which plaintiffs would have been entitled upon prepayment." Plaintiffs' Post-trial Brief 59. In citing this as indicating a conservative approach, plaintiffs ignore the fact that reserve accounts were relied upon in Dr. Karvel's analysis to cover the cost of numerous expenses for which no allowance was otherwise made in the Karvel model, including closing costs, unusual expenses, conversion costs, and predictable renovation/repair costs. Tr. 1501:10-1502:14; 1506:14-1507:4; 1966:5-1967:22.

Because of these flaws in plaintiffs' damages analysis, as well as others described in Dr. Hamm's testimony and summarized in out opening post-trial brief, plaintiffs' damages analysis dos not provide a reliable basis upon which to award damages.

CONCLUSION

For the foregoing reasons, and for the reasons stated in the Government's opening post-trial brief, judgment should be entered in favor of the Government, dismissing plaintiffs' claims with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Shalom Brilliant
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

October 27, 2003