**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

FRANCONIA ASSOCIATES, a
Limited Partnership, et al.,

Plaintiffs,

**File No. 97-381C**
**Judge Francis M. Allegra**

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFFS' POST-TRIAL REPLY BRIEF

---

Jeff H. Eckland
Attorney For Plaintiffs
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

Of Counsel:
William L. Roberts
Mark J. Blando
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 2

ARGUMENT........................................................................................ 19

I. DEFENDANT'S ATTEMPTS TO DISCLAIM LIABILITY FOR BREACH OF CONTRACT FAIL. ........................................................ 19

A. The Court's Recent Decision In *Cuyahoga* Extinguishes Any Doubt As To The Applicability Of The Unmistakability Doctrine In This Case........................................................ 19

B. The Government's Newly-Devised "No Breach" Argument Fails. ........................................................ 22

1. Having Repudiated Plaintiffs' Contracts, Defendant Has No Room To Deny That It Breached Plaintiffs Contracts. ........................................................ 22

2. Defendant's "No Breach" Argument Cannot Be Squared With Basic Contract Law. ............................................ 24

3. The Government's Power Of Eminent Domain Is Not A License To Breach Its Contracts...................................... 25

C. The Government Severely Mischaracterizes What A "Forced Sale" Actually Entails. ........................................................ 28

II. DEFENDANT COMMITTED A TAKING OF PLAINTIFFS' PROPERTIES. ........................................................ 37

A. Plaintiffs' Takings Claims Are Independent From Their Contract Claims. ........................................................ 37

B. The Evidence Presented By Plaintiffs Establishes That Their Properties Were Taken. ........................................................ 38

C. All Of Plaintiffs' Takings Claims Are Ripe For Review. ........................ 38

III. PLAINTIFFS PROVED THEIR DAMAGES. ................................................ 39

A. Defendant's Assertion That Its Actions Were Not The Cause Of Plaintiffs' Damages Ignores The Evidence And The Law................. 39

1. Defendant's Assertion That It Did Not Cause Plaintiffs' Damages Is A Failed Mitigation Argument In Disguise................................................ 39

2. Despite Defendant's Speculation To The Contrary, Plaintiffs Are Unable To Leave The 515 Program....................... 40

3. Defendant Has Not Met Its Burden To Prove Any Offsets To Plaintiffs' Damages Beyond Those Already Incorporated By Plaintiffs. ........................................... 42

B. Defendant's Critique Of The Assumptions Supporting Plaintiffs' Damages Claims Falls Far Short. .......................................... 44

1. Contrary To The Skepticism Of Defendant's Expert, Plaintiffs Would Have Prepaid And Would Have Realized Significant Profits By Doing So. ................................. 45

2. Defendant's "Temporal Perspective" Argument Lacks Any Legal Foundation. .................................................... 47

3. Plaintiffs' Assumptions Regarding The Revenues They Would Have Realized After Prepayment Are Reasonable And Conservative. .................................................. 51

4. Plaintiffs' Assumptions Regarding The Risks and Burdens of Remaining In The 515 Program Are Reasonable And Conservative. .................................................. 63

5. Plaintiffs' Diligent Efforts To Perfect The Seventy-Four Damages Analyses Presented At Trial Are No Basis For Discrediting Their Conclusions. ................................. 65

CONCLUSION.......................................................................................... 66

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. United States*, 42 Fed. Cl. 463 (Fed. Cl. 1998) ....................19

*Associated Enterprises, Inc. v. Toltec Wastershed Improvement District*, 410 U.S. 743 (1973)....................54

*Beatty v. United States*, 168 F. Supp. 204 (Ct. Cl. 1958) ....................27

*Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ....................39

*Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) ....................36

*Christina Investment Corp. v. United States*, 40 Fed. Cl. 571 (1998) ....................41

*Christina Investment Corp.*, 40 Fed. Cl. 571 (1998) ....................41

*Cienega Gardens*, 331 F.3d 1192 (Fed. Cir. 2003) ....................26, 36

*Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001) ....................37

*Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995)....................41

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997)....................31

*Cuyahoga Metropolitan Housing Authority v. United States*, Nos. 01-46C, 01-251C, 01-416C (Fed. Cl. Sept. 22, 2003)....................20

*Devon Energy Corp. v. United States*, 45 Fed. Cl. 519 (1999)....................41

*Energy Capital Corp. v. United States*, 47 Fed. Cl. 382 (2000) ....................41, 46, 48, 49

*Franconia Associates v. United States*, 536 U.S. at 129 (2002)....................21, 22, 23

*Georgia-Pacific Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980)....................49

*Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (Fed. Cl. 2002) ....................20

*Home Savings, FSB v. United States*, 2003 WL 22357732 (Fed. Cl. 2003) ....................39

*Kimberly Associates. v. United States*, 261 F.3d 864 (9th Cir. 2001) ....................................19

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ..........................................................................38

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ...........................................................................................................................42

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64 (1999) ...................................47

*Mobil v. United States*, 530 U.S.604 (2000) ..................................................................................22

*Neely v. United States*, 285 F.2d 438 (Ct. Cl. 1961).......................................................................49

*Parkridge Investors v. FmHA*, 13 F.3d 1192 (8th Cir. 1994) ........................................................26

*Ramsey v. United States*, 101 F. Supp. 353 (Ct. Cl. 1951) ..........................................................39

*Roehm v. Horst*, 178 U.S. 1 (1900)..................................................................................................23

*Sinclair Refining Co. v. Jenkins Petroleum Processing Co.*, 289 U.S. 689 (1933).............................................................................................................................48

*Southern Cal. Federal Savings & Loan Association v. United States*, 57 Fed. Cl. 598 (2003) .............................................................................................................41

*Southern Cal. Federal Savings & Loan Associate v. United States*, No. 93-52C (Fed. Cl. Aug. 7, 2003) .........................................................................................42

*Wells Fargo Bank, NA, v. United States*, 88 F.3d 1012 (Fed. Cir. 1996)...............................39

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) ...........................................50

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)...................................................21, 24

**Federal Statutes**

7 U.S.C. § 6994 (2003)........................................................................................................41

12 U.S.C. § 4301(a)(1)...........................................................................................................27

26 U.S.C. § 42.........................................................................................................................63

42 U.S.C. § 1472(c)(4)(A) .....................................................................................................28

42 U.S.C. § 1472(c)(5)(A)(i) ....................31, 35

42 U.S.C. § 1472(c)(5)(A)(ii) ....................32, 35

7 C.F.R. § 1965.204 ....................28

7 C.F.R. § 1965.205(c) ....................28

7 C.F.R. § 1965.206(a) ....................29

7 C.F.R. § 1965.215(d)(1) ....................39

7 C.F.R. § 1965.215(f)(2) ....................30

7 C.F.R. § 1965.216 ....................30

7 C.F.R. § 1965.216(a) ....................31, 35

7 C.F.R. § 1965.216(b) ....................32

7 C.F.R. § 1965.217 ....................33

7 C.F.R. § 1965.218(a)(4) ....................33

24 C.F.R. § 248.111(h) ....................27

24 C.F.R. § 248.157 ....................27

**Legislative Materials**

H.R. Rep. No. 96-154, 96th Cong., 1st Sess. at 43 (1979), *reprinted in* 1979 U.S.C.C.A.N. at 2359 ....................46

**Books and Articles**

*Corbin on Contracts* (1964) ....................24

*Murray on Contracts* (3d ed. 1990) ....................23

Krugman, *Peddling Prosperity: Economic Sense and Nonsense in the Age of Diminished Expectations* 211-213 (W.W. Norton & Co. 1994) ....................54

Restatement (Second) of Contracts (1981)........................................................................22, 24

*Williston on Contracts* § 1337 (3d ed. 1968)....................................................................23, 24

## INTRODUCTION

The tenor of defendant's post-trial brief can be summarized as follows: even though defendant did not live up to its end of the deal, it should not be held liable to plaintiffs. In fact, defendant goes so far in attempting to deflect responsibility for its actions that it actually places the blame on plaintiffs for their losses. Defendant's view of this case, however, cannot be squared with the compelling evidence presented at trial in this matter. The evidence establishes that: (1) plaintiffs entered into mutual and binding contracts with the government containing a valuable option; (2) plaintiffs always intended to exercise that option, which was the very *quid pro quo* for the deal; (3) defendant repudiated the contracts by disabling itself from permitting plaintiffs to exercise that option; and (4) plaintiffs suffered substantial damages, in amounts proven at trial, as a result of defendant's repudiation and subsequent breach.

In its attempts to avoid liability, defendant misperceives what it means to hold a contract and what it means to breach a contract. Even apart from its alleged immunity under the unmistakability doctrine, defendant posits that it never actually breached plaintiffs' contracts because its repudiation was accompanied by certain alternatives that plaintiffs could have exercised in lieu of their original contract rights. Defendant further asserts that it cannot be held liable for breach because it could have achieved a *de facto* breach by exercising its power of eminent domain to confiscate plaintiffs' properties. The law of contracts, however, does not provide defendant the exemptions from liability that it seeks. Put simply, defendant failed to perform its contractual obligations and therefore is liable for the damages caused thereby.

Defendant's attempts to discredit plaintiffs' takings claims are similarly flawed. In fact, the two major themes that defendant presents in opposition to plaintiffs' takings claims are rehashed versions of plaintiffs' primary contract arguments. First, defendant argues that it

cannot be held liable for a taking because it proactively satisfied the Fifth Amendment by providing certain statutory alternatives to the full realization of plaintiffs' property rights. Second, similar to its unmistakability argument, defendant asserts that plaintiffs should have expected that defendant might redefine their property rights, because that is the type of thing that parties who do business with the government ought to expect. As with defendant's contract arguments, however, the law of takings does not provide defendant the refuge it seeks.

## BACKGROUND

Defendant includes in its post-trial brief a series of vignettes addressed to each of the properties at issue. *See* Def. Br. at 8-18.[1] These vignettes appear to be intended to suggest that the owners in this case might not be in the predicament they are faced with today had they participated more fully in the process created through the government's repudiation or had they challenged various agency decisions by initiating appeals. The evidence, however, stands in sharp contrast to defendant's portrayals, as detailed below.

### Timberbrook

The government chides Mr. Stordahl because he did not "challenge the opinions of the referenced FmHA officials (*i.e.,* Messrs. Martin Hoesing and Randy Hammerline) that acceptance of prepayment was unlikely . . . ." Def. Br. at 10. However, these officials specifically told Mr. Stordahl that prepayment by Timberbrook Properties (II/532) was impossible, not simply unlikely. II/552; 554; 565. Moreover, Mr. Stordahl had no basis whatsoever to disagree with the agency officials – his property was, in fact, the "only show in

[1] Citations herein are to Defendant's Post-Trial Brief ("Def. Br."); Plaintiffs' Post-Trial Brief ("Pl. Br."); Defendant's Memorandum of Contentions of Fact and Law ("Def. Mem"); Plaintiffs' Memorandum of Contentions of Fact and Law ("Pl. Mem."); the parties' Joint Stipulation of Facts ("JSF"); the parties' joint exhibits ("JX"); plaintiffs' exhibits ("PX"); defendant's exhibits ("DX"); and the trial transcript, referenced by volume and page number (*e.g.*, "II/555").

town" (II/552) and therefore was needed by the agency. II/547; 554-55; PX 705 at 3. Instead of filing a futile administrative appeal, he decided to pursue his contractual right to damages in this civil action. II/561. Thus, no evidence whatsoever exists that the agency might otherwise have granted the partnership's prepayment request if it had included an actual loan commitment letter from a bank. Indeed, the evidence shows exactly the contrary, *i.e.,* Mr. Stordahl did not finalize his outside financing (II/549) from Norwest Bank precisely because of the fact that his partnership would not be permitted to prepay. II/552.

With regard to potential incentives, Mr. Stordahl is not interested because it is not consistent with his retirement plans to accept incentives in exchange for another 20 years in the program – he wants to prepay and privatize the project to use as retirement income. II/557. Moreover, Mr. Stordahl has "absolutely" no interest in an equity loan because the cost of the required statutory submission alone can be prohibitively expensive: appraisers are costly (approximately $3,000 in 1991) and, along with other fees, can amount to significant investments of "money up front." II/556. In addition, he was told by FmHA officials that there was a long waiting period of probably five to ten years for loan funding. II/558. In short, an equity loan was ". . . really dumb. It's an absolute joke." II/558.

Moreover, Mr. Stordahl never pursued alternative avenues for getting out of the program because they were adverse to the interests of himself and his partner. For example, he was "absolutely not" interested in the forced sale proceeding because, among other things, any sale of the property would subject Mr. Stordahl and his partner to recapture taxes due to accelerated depreciation. II/557. He wants to keep the property, prepay the FmHA mortgage, and use the property's increase in rents on the conventional market to help fund his retirement. II/557.

With regard to the G-4 restricted form of prepayment, Mr. Stordahl would never consider such a prepayment because he believes that he has "a valid contract . . . which does not require me to jump through any hoop in order to take this project private." II/572. He firmly believes that, given his contract, he is not obligated to assume such risks as obtaining HUD supplied vouchers in order to make a G-4 restricted prepayment work. "[I]'m doing a crap shoot on the HUD program, and I have no reason to do that." II/581. In any event, Mr. Stordahl understood that his project would not qualify for vouchers. II/563.

Even if Mr. Stordahl qualified for the G-4 restriction, and vouchers were available at some level close to full market rate rents, and all of his tenants applied for and received such vouchers, he still would not accept the option for the simple reason that he does not want to jeopardize his ability to enforce his contractual right to full compensation in this civil action: " . . . I believe that the government has a responsibility to make one whole again, and I believe that so firmly that I'm willing to forego 15 cents on the dollar because I think the government owes me a dollar on the dollar, sir, I'm sorry." II/561; II/563-64; II/581-82.

**R.C. Getty, R.C. Mo, R.C. Pierre, R.C. Springs**

Contrary to defendant's brief, Mr. Daniel Costello attempted to prepay all four projects, R.C. Getty, R.C. Mo, R.C. Pierre, and R.C. Springs, in the summer of 1992. IV/1023. According to Mr. Costello, "[i]t seemed to be prudent to prepay and get out, and we determined that we could get higher rents, and with the balance of the mortgage and so forth, that it was attractive to do so." IV/1024. During or about June 1992, Mr. Costello met with Mr. Mark Taylor, FmHA's District Director, South Dakota (IV/1026), who informed him that his partnerships could no longer even attempt to prepay unless they complied with the requirements of the Legislation. IV/1027-31. During that meeting, Mr. Taylor told Mr. Costello that the

agency could not permit prepayment without restriction because the properties were "needed" in the Section 515 program. IV/1026-27. Mr. Costello checked with the agency over the years regarding its determination of "need" and was informed that the agency still needed his properties in the Section 515 program. IV/1027; 1031. Mr. Costello did not see any basis to disagree with the agency's determinations that sufficient alternative subsidized housing did not exist in the communities where his properties are located. IV/1034. He also learned that other owners in South Dakota had unsuccessfully attempted to prepay without restrictions. IV/1031. Mr. Costello believed that he was stuck in the Section 515 program. IV/1057.

Because his projects were compelled to remain within the program, Mr. Costello began to experience higher vacancy rates than if he had been able to convert to conventional market housing; he therefore decided to enhance his properties in order to make them more attractive. IV/1053-56. Since no bank would provide private financing for improvements while in the program (IV/1060), Mr. Costello was compelled to accept rehabilitation loans from the agency and he used them primarily for cosmetic enhancements. IV/1037.

Mr. Costello testified that he was not interested in an equity loan because "we had prepayment rights." IV/1028. Further, in light of its breach, Mr. Costello no longer trusted the government and was unwilling to accept an equity loan since it would entail "locking . . . into the program for a definite amount of time." IV/1029. The increased rate of return option was not perceived by Mr. Costello as being equitable (IV/1030-31), and he is not interested in any sale of the properties (IV/1030), least of which a forced sale to a nonprofit which would be a "bad deal." IV/1061-02. In short, Mr. Costello no longer trusted doing business with the government because it had refused to honor its contractual obligations. IV/1058-59. He chose to pursue this

civil action instead of submitting any requests pursuant to the Legislation. IV/1031; 1035; 1050-51.

**Fox Ridge II and Dublin Plaza**

The Government concedes that a letter was sent by Fox Ridge II expressing a "tentative" interest in prepayment, but asserts that no "formal prepayment request" was submitted. Def.'s Br. at 8. The agency, however, indicated during many conversations with Mr. Ronald Powers, beginning in 1992, that no prepayment without restriction could be accepted on Fox Ridge II. V/1167-68. Mr. Powers approached FmHA in 1992 to see if he could prepay without restrictions. V/1165-68. At that time, he was advised that pursuant to applicable "rules and circumstances" (V/1165), Fox Ridge II would not be able to prepay without restrictions. PX 664; V/1140; 1167. Mr. Powers submitted a written request to prepay Fox Ridge II in August 1998. PX 690; V/1168. Mr. Powers was "planning to take the project into the commercial market." V/1138. By submitting that letter, Mr. Powers sought to prepay "[f]ree and clear, without restrictions." V/1169. In response, the agency requested additional information. PX 692. The agency also stated that prepayment requests "require that certain actions be taken to ensure the affordability of housing for specified tenants for a guaranteed period of time." PX 692; V/1172.

After discussions with the agency regarding its September 2, 1998 letter, Mr. Powers understood that the agency would only permit Fox Ridge II to prepay subject to a G-4 restriction which (as the agency letter indicated) would protect "specific tenants for a guaranteed period of time." V/1171-72. Mr. Powers thus understood that, because the agency would permit prepayment only *with* restrictions, he would not be able to prepay *without* restrictions. V/1174. Mr. Powers considered the G-4 "very risky, and we didn't know if we could depend upon it in

political times and from year to year." V/1173. Mr. Powers also understood that the G-4 would create cash flow problems since rents might not be enough to pay a conventional mortgage, and as he pointed out, "[b]anks don't like that." V/1174. Mr. Powers was not interested in any alternative other than unrestricted prepayment and believed them too risky. V/1172.

In the case of Dublin Plaza, it was "very appealing" for Mr. Powers to be able to acquire ownership in the property and "take it" in the direction of building up equity with an eye toward prepayment and conversion to market-rate housing. V/1133. On November 26, 1986, the president of Dublin Plaza, Inc. advised the FmHA of the desire of the Board of Directors to pay off the agency's loan. PX 663. As was the case with Fox Ridge II, the agency stated that, pursuant to applicable "rules and circumstances" (V/1165), the owners would not be able to prepay without restrictions. PX 664; V/1140; 1167. Following Dublin Plaza, Inc.'s receipt of the agency's denial, Mr. Powers and his colleagues "were in shock that a contract entered into with the United States Government would not be honored. We were amazed that that contract could be changed without our knowledge and without our input and without our consideration." V/1141.

**Riverfront, Rolling Hills, Scenic Valley and Sunrise River**

Ms. Marge Alden and Mr. George Vitalis knew from their closing documents that they had the right to prepay without restriction and planned to do so when they "decided to retire, and certainly when 20 years were up . . ." IV/945. Thus, in 1992, Ms. Alden and Mr. Vitalis decided to exercise their right to prepay and "started asking for a way out" of the program. IV/948; PX 8. They wanted to prepay in 1992 because "our intention … over the years was to turn [the properties] into conventional apartments." III/945. To that end, Ms. Alden attended a FmHA conference in 1992 where the prepayment application procedure was discussed. IV/949. At that

conference, Ms. Alden learned from an FmHA official, Mr. Randy Hammerline, "that you could no longer get out according to your contract." IV/950-51. Rather, Ms. Alden was told that a new prepayment process existed under the Legislation. IV/950-51.

Although Ms. Alden was not at the time interested in any alternative but prepayment without restriction, the prepayment submissions for Riverfront and Sunrise River Apartments indicated a willingness to consider other options available under the Legislation. PX 9; PX 59. The requests were drafted in this manner at the Agency's suggestion. IV/950. However, two years later, on August 9, 1996, Ms. Alden expressly notified the Agency with regard to both properties that "[w]e wish to prepay immediately in accordance with our loan agreement. Our understanding is that a request to prepay is within our rights and any delays or restrictions constitute a breach of contract." PX 12; PX 64. Ms. Alden and Mr. Vitalis also learned from FmHA officials that Franconia Associates would not be permitted to prepay without restrictions on either Riverfront or Sunrise River Apartments. IV/949-50. By letters dated February 5, 2001, they confirmed this with the agency. PX 19; PX 69.

In July 1994, Lynn Slattengren, Mr. Vitalis' partner in Scenic Valley Associates (owner of Scenic Valley Apartments) learned from Ms. Sherri Engel, the FmHA's Chief Multi-Family Housing Coordinator, State of Wisconsin, that Scenic Valley would not be able to prepay without restrictions. IV/1005. Also during July 1994, Mr. Vitalis learned from FmHA Minnesota State Director, Randy Hammerline, that they would not be permitted to prepay without restrictions on Rolling Hills. IV/1009.

Ms. Alden and Mr. Vitalis were concerned that accepting incentives would jeopardize their underlying contractual rights. IV/946. For example, when they decided to accept the agency's incentive offer for Riverfront Apartments, they notified the government that "[o]ur

acceptance of your incentives offer is of course without prejudice to our rights to recover damages . . . [pursuant to] our original contract rights." PX 19. Ms. Alden also testified, "there is no one [at the agency] we can turn to have anybody deal with us on a level playing field . . . so we have a lack of trust in the system." IV/963. This lack of trust impacted any willingness to accept incentives. *Id.*

Although Ms. Alden and Mr. Vitalis initially accepted an equity loan for Riverfront, they later changed their minds because they did not believe that by charging only low-income rents for another period of 20 years the property would be capable of funding the agency's loan. IV/947; 954; PX 19. The risks associated with the incentive options were all the more significant given the fact that the incentives, in any event, "will provide little or no financial benefit to the partnerships, especially in comparison to the right to prepay without restrictions . . . ." PX 19; IV/961. Given these risks and lack of benefits, Mr. Vitalis changed the partnership's acceptance of the incentive for Riverside Apartments "to a prepayment as soon as possible . . . We . . . cannot trust that we will have anything but abuse in the future." PX 20; PX 21. The agency initially refused to permit the partnership to change its acceptance, but later permitted it to do so by handling the prepayment application as if the incentives had been rejected.[2] Quite obviously, the partnership was not interested in appealing this determination because that is the ultimate result it actually wanted. IV/965-66.

The agency letter offering a G-4 restricted prepayment for Sunrise River as the only means of prepaying the property's loan, appeared to reject the request of Ms. Alden and

---

[2] In addition to being wholly without foundation, the government's allegation that favorable action could not be taken on their requests for assistance because of "several instances of borrower non-compliance with regulatory requirements" (Def. Br. at 13), the issue is moot because plaintiffs would have prepaid in 1992 – years before any of the alleged non-compliance took place. IV/966-69.

Mr. Vitalis to prepay without restrictions. PX 77. Due to her lack of trust in the agency (IV/981), Ms. Alden wrote to the agency on December 11, 2002 and requested that it provide to her – in writing – the agency's "No Need Determination," *i.e.*, the agency's explicit determination that prepayment pursuant to a G-4 restriction was the only prepayment option available because the agency could not make the finding of "no need" required to permit prepayment without restrictions. PX 826.

By letter dated December 13, 2002, the agency informed the partners that they already had been sent a letter rejecting the possibility of any "no need" determination for Sunrise River and, therefore, any prepayment without restrictions: "a letter was sent out to you dated June 6, 2002, that stated Rural Development [FmHA] would be able to accept your prepayment <u>with</u> restrictions to protect current residents (emphasis added)." PX 827. The partnership naturally concluded that this was in fact a definitive denial of their request to prepay <u>without</u> restrictions. The partnerships did not consider appealing this or any other denial because they do not disagree with the agency's determinations that the projects are needed by the agency. *See, e.g.,* IV/957-58; 966; 976; 1006; 1010; PX 72.

**<u>Palmyra Park I and Palmyra Park II</u>**

On November 10, 1993, Ms. Phoebe Perri submitted a prepayment request for Palmyra I by letter to the FmHA in Madison, Wisconsin (PX 612 at 3; II/592) explaining her "intention [was] to pre-pay without restrictive use provision in the release documents." Contrary to the government's brief, Ms. Perri was told by the agency as early as April 1994 that she could not prepay without restrictions. II/594-95; 610. By letter dated May 23, 1995, the agency formally rejected her request to prepay without restrictions by offering her no alternative other than those specifically listed, which did not include free and clear prepayment. PX 620; II/596-97; 605;

609. On November 10, 1993, Ms. Perri also submitted a request to prepay without restriction on Palmyra II. PX 645; PX 646; II/602-03. Ms. Perri was told that FmHA wanted to keep her property within the Section 515 program. PX 616. By letter dated March 17, 1995, the agency formally denied her request to prepay without restrictions on Palmyra II. PX 650; II/603-04; 605.

It was only after these events that Ms. Perri indicated to the agency that she would be receptive to an incentive offer on both properties. PX 617; PX 649. The agency has informed Ms. Perri that prepayment without restrictions will never be available for either property. As she testified regarding Palmyra II: "I was told that there was nothing else that you're ever going to get out of the project" (II/603-04); and regarding Palmyra Park I: ". . . I was basically told, if you don't accept it [the incentive offer], you will be stuck with a dead project – they called it a 'dead project' – and you will be in this program, and there is nothing you can do about it." II/596; II/610-11.

**<u>Pine Needle</u>**

Mr. Morosani learned that unrestricted prepayment was not being allowed and he had to go through a "procedure for prepayment." I/227-28. He was told by various agency staff members that prepayment without restrictions under the agency's procedure "was not in the cards." I/244. Each time Mr. Morosani discussed prepayment with the agency, he was told "you're going to get restrictions." I/230. After submitting a prepayment request, pursuant to the 1988 Legislation, in December 1993, the FmHA confirmed in writing what it had been telling Mr. Morosani since the fall of 1991: "Per Terry Stole, no one will be allowed to prepay without having some type of restriction placed upon the release deed." PX 587; I/229. Mr. Morosani had no reason to appeal from the denial of his unrestricted prepayment request because he

concedes that the agency's fact determinations regarding the existence of minorities, both within his partnership's property and in its market area, are not subject to dispute. Consequently, he would not "have any reason to appeal" as it would be "useless." I/291-92.

Mr. Morosani concluded that he had no other option but to accept incentives because the agency "needed" his property. Thus, Mr. Morosani accepted the "one-time" incentive offer – despite its risk – in part because he wanted to avoid the "forced-sale" proceeding without having to withdraw or otherwise void his pending prepayment request. I/243. To this day, despite the passage of nearly nine (9) years, the partnership has not received any of the agency's promised incentives. I/290.

**Fall River I**

Defendant asserts that incentives were offered and accepted not to prepay on this project. Def.'s Br. at 12 In 1992, the owner of Fall River I, Mr. Brian Wells, began considering prepayment to convert to market-rate rents and to use the equity to finance another building. IV/913. During September 1994, Mr. Wells submitted a written prepayment request. IV/897. Mr. Wells requested prepayment without restriction.

Around the time Mr. Wells learned he would not be permitted to prepay without restrictions by letter dated April 3, 1995, Mr. Wells was offered incentives. PX 744; IV/903-04. The letter stated that the incentive offer "must be accepted or rejected in writing within 30 days or the prepayment request will be voided." PX 744. Since Mr. Wells understood that, if he rejected the offer, prepayment without restriction would not be an available alternative (IV/904-05; IV/921; IV/930), he accepted the incentives in a letter dated April 6, 1995. PX 745. Although the agency determined that the maximum equity loan to which Mr. Wells was entitled was $273,635 (PX 819 at 12) he actually received only $176,515 of it. PX 749. Although

extremely disappointed, Mr. Wells accepted this amount because "[a]t that point, that was all I could get." IV/924; PX 749 at 3.

**Iowa Properties**

Defendant erroneously asserts that all of the prepayment requests submitted prior to 2000 only sought to obtain incentives rather than unrestricted prepayment. Def.'s Br. at 14. Defendant's suggestion that the owners of the Iowa properties did not wish to prepay without restrictions is patently ridiculous. Indeed, no prepayment requests were filed on behalf of any Iowa project until after all Iowa projects commenced this civil action, which was filed precisely *because* of their inability to prepay without restrictions. Also contrary to the government's brief, the written prepayment requests submitted before 2000 did in fact include information regarding each alternative "on the menu," including data regarding the impact that a prepayment without restrictions would have on the tenants. E.g., PX 309 at 6; IV/834. The request for Evergreen Manor of Waukee, for example, also included an appraisal of the property "as if operated under a conventional housing concept without restrictions . . . ." PX 309 at 12 (emphasis added). Moreover, all requests included a clause stating that they included "a proforma operating budget indicating the project will be economically feasible at projected conventional rents with conventional financing." IV/834; PX 309 at 2.

The cover letters to the prepayment requests also stated that "when appropriate incentives in adequate amounts are offered, they will be accepted, and prepayment will not occur." PX 309; 419; III/732; IV/845. This language, drafted by a consultant retained by the owners, was intended to make a good impression upon the agency by not foreclosing incentives, a well-known agency goal. III/733; 845-46; IV/833. By the same token, the letters by no means

committed the partners to accept incentives, because they said only that "appropriate incentives in adequate amounts" would be accepted. PX 309.

It was shortly after the submission of these prepayment requests (five days in the cases of Evergreen Manor and Prairie Village of Grimes) that Mr. Roseliep informed the FmHA that the partnerships in fact wanted to prepay without restrictions and therefore had no interest in incentives. III/734-35; 802; IV/836; PX 311; PX 314. Contrary to the government's brief, the owners' ultimate requests to prepay subject to restrictions (*i.e.*, pursuant to the "G-4" restricted prepayment) came only after they learned that their requests to prepay <u>without</u> restrictions had been denied on the basis that the properties were "needed" in the Section 515 program. For example, with respect to Evergreen Manor, the agency formally determined (on July 20, 1998) that adequate housing was not available and the agency therefore "needed" the project. PX 310; IV/841-42. The very next day (July 21, 1998), the agency informed the partnership that it would not be permitted to prepay without restrictions. III/734-35; 802-03; 805; IV/840. Given the unavailability of unrestricted prepayment, Mr. Roseliep told the agency that the partnerships "would probably proceed with prepayment" and "deal with the G-4 restriction by means of affordable housing vouchers." IV/837; PX 314; III/801-02.

Similarly, with regard to other properties, the agency told the owners that prepayment without restrictions was not available (III/761; 766; PX 370) and the owners told the agency that it was not their intent to accept any incentives. III/762. Also, as with the other properties, the only available prepayment option was the G-4 restriction. PX 321; PX 394; PX 427. The owners stopped utilizing the G-4 restricted prepayment when they failed to obtain needed voucher funding for Greenway of Newton. III/770; VI/1291. After failing to obtain this G-4 restricted prepayment and experiencing other problems first-hand, the partnerships reassessed the

feasibility of accepting G-4 restricted prepayments on the remaining properties (VI/1291) and concluded "[t]hat the G-4 option was too risky to continue." III/778.

With regard to other alternatives under the Legislation, the general partners "never expressed an interest in obtaining" any of them. III/719. They understood that any incentive – equity loans, increased returns on investment, and/or additional rental assistance – "would commit us to remaining in the program for another 20 years, and that was not part of our strategy." III/727; VI/1287; VI/1302-03. In addition, Mr. Levy was concerned that by signing another 20-year covenant, he might weaken the partnerships' "original prepayment right." VI/1287. Moreover, regarding equity loans, the partners were concerned that funding for the loans simply was not authorized. III/790. Indeed, the FmHA informed the partnerships as early as July 1995 that funding was not available to owners "for seven to eight years . . ." PX 293; III/727. Regarding the increased return to owner, Mr. Levy and Mr. Malone also believed "that would be a very small number that was just not attractive to us." VI/1287. Finally, increased rental assistance also was not attractive to the partnerships; they had all of the rental assistance the properties required to meet tenant needs. VI/1287-88.

**Eastwood Apartments**

Mr. Robert Baker planned to prepay on the expiration of the 20-year restrictive use provision; as he testified, "there was no question about it, if the economics were right, that we would try our best to pay on the twentieth-year anniversary." IV/865. However, in a letter dated January 12, 2000, the agency stated that existing tenants "must be protected as long as they desire." PX 101; IV/872-73. Mr. Baker understood this to mean that he could not prepay without restrictions. IV/874. In a letter dated February 17, 2000, Mr. Baker responded by

stating that he desired to prepay without restrictions, but that it seemed to him that the agency had already denied that. PX 102.

The agency wrote back on February 25, 2000 and confirmed that Mr. Baker's interpretation of the agency's January 12, 2000 letter was correct, *i.e.,* the agency could offer only prepayment *with* restrictions (in the form of a G-4 prepayment). PX 103; IV/874. "The only way that our current regulations allows [sic] prepayment without some type of restrictive use provisions in the deed of release is if the agency can determine that housing opportunities for minorities will not be materially affected and there is no longer a need for the housing. From the information that was furnished and or available in the Mexico market, we do not believe that we can make such a determination."

Thus, contrary to the government's brief, market information was furnished to the agency. Moreover, Mr. Baker clarified that he agreed with the agency's finding of need for his property (because there was "not an oversupply" (IV/880)) and knew there were many minorities living in his property. IV/883. As a result, there was no reason for Mr. Baker to reply to the agency's February 25, 2000 letter; his prepayment request already had been rejected twice. Finally, Mr. Baker decided to pursue his rights in this civil action (IV/883) instead of in an administrative appeal because he knows that prepayment would create an adverse impact on minorities and that his project is needed. IV/873; 875; 885.

**Valley View Village and Dogwood Glen**

Mr. David Tucker, owner of Valley View Village and Dogwood Glen, intended to prepay on the 20-year anniversaries of his properties, *i.e.*, "around 2000, 2001," because that was when he planned to retire. II/640. In 1995, however, Mr. Tucker learned that prepayments were not being accepted from an FmHA official, Gary Shoemaker. II/639-40. Despite Mr. Shoemaker's

statement that nothing could be done to prepay his loans (II/640-41), Mr. Tucker nonetheless submitted prepayment applications for both properties in October 1999. PX 719; PX 731. Mr. Tucker requested in those applications prepayment "without restrictions" (PX 719 at 3; PX 731 at 3) upon their respective 20-year anniversaries (II/641), *i.e.*, January 2000 and April 2002. PX 727 at 2 n.2; PX 717 at 2 n.2. Contrary to the government's brief, Tucker re-sent copies of his original prepayment requests to the agency on two separate occasions. PX 715 at 1 and 13. The agency finally wrote back (as it had done with Mr. Powers) and stated that actions must "be taken to ensure the affordability of housing for specified tenants for a guaranteed period of time." PX 715 at 2. Like Mr. Powers, Mr. Tucker interprets this to mean that he will never be permitted to prepay without restrictions. II/644.

Mr. Tucker testified that he is not interested in any other alternative under the Legislation: for example, he would never offer the properties for sale to a non-profit because he intends to keep them (II/633) and he is not interested in the G-4 restricted form of prepayment because in Osage County, where both of his properties are located, "there is a ridiculously low number of vouchers, I think seven or eight for the entire county. . ." III/698. Rather than pursuing these alternatives, or any unwanted incentive (which would require that he agree to additional 20-year restrictive use periods), Mr. Tucker pursued this civil action. II/644-45.

**<u>Beechwood, Deer Run, and Pine Tree</u>**

Mr. David Hodges viewed the Section 515 program as means to support his retirement and according to the "deal" (V/1196) he made with the District Director, Mr. Hodges intended to prepay his three properties on their respective 20-year anniversaries. By letters dated December 3, 2001, the agency informed Mr. Hodges that he would not be permitted to prepay any of the three properties without restrictions. PX 237 at 2; PX 247 at 2; PX 263 at 2. Thus, any criticism

that Mr. Hodges' prepayment requests were in some respect incomplete is moot, because even if he had addressed them he still would not have been eligible for unrestricted prepayment since he did not qualify for unrestricted prepayments. In any event, the government's criticisms that Mr. Hodges' bank was unaware that existing tenants would be unable to pay higher rents in the absence of rental assistance simply misses the mark because private bank proformas are based upon projected market-rate rents paid by tenants who move into the properties after prepayment.

With regard to other alternatives under the Legislation, such as incentives, Mr. Hodges was never interested in them "because I really wanted to prepay . . ." (V/1209) and further testified, "I had no interest in them." V/1211. Mr. Hodges also is not interested in the forced-sale proceeding because he wants to keep the properties after prepayment and eventually raise the rents. V/1217. Nor would Mr. Hodges have qualified for a G-4 because, as he testified, there were no vouchers available, as confirmed by FmHA official James Fowler. V/1219.

**Casa Grande I, Casa Grande II, and Rancho Verde**

In June 1993, Mrs. Marilyn Graham met with FmHA official Tony Humbach to discuss prepayment. V/1099-100. During that meeting, Mr. Humbach told her that prepayment would not be allowed. *Id.* "His main reason [was that] the government won't allow you to do that because we need that housing." V/1101-02. Following a request for prepayment, Mrs. Graham learned that prepayment could be made – if at all – only pursuant to new FmHA regulations. IV/1101-02. Mrs. Graham prepared prepayment packages in 1997, but never submitted them. V/1110-11. She was concerned that to do so would be futile, in light of what she had been told by the agency, and she feared that any prepayment request might jeopardize her underlying contract rights. V/1114-15; V/1121-22. Mrs. Graham eventually submitted prepayment requests on February 2, 2003, which were denied on April 23, 2003. PX 179. Mrs. Graham has no

interest in pursuing any administrative appeal of these denials. Instead of pursuing a futile appeal, she decided to enforce her existing contractual rights in this civil action: "rather than to fight with [them] on another level, I decided to fight in federal court." V/1121.

Mrs. Graham testified that she was never interested in incentives because she viewed them as "a very poor business deal." V/1106; 1107-08. Due to the agency's refusal to honor the original terms of her contract, Mrs. Graham lost trust in the agency and this impacted her decision not to accept incentives; as she stated, "they lied to me once. Why am I going to believe them now. . . [t]hey changed the rules so I'm not listening to anymore rules they might have." V/1122. Mrs. Graham also testified that she was not interested in the forced-sale proceeding because she "would never enter into a real estate contract without knowing the absolute price that [she] wanted to put on [her] building for sale." V/1108. She also considered the forced-sale proceeding to be "just risk taking." *Id.* She also was concerned that she would get stuck in the forced-sale proceeding if she submitted her prepayment request package. V/1110. This fear was underscored for her in a letter dated April 23, 2003, wherein she learned, "you are required to offer to sell the project to a non-profit." PX 179.

## ARGUMENT

### I. DEFENDANT'S ATTEMPTS TO DISCLAIM LIABILITY FOR BREACH OF CONTRACT FAIL.

#### A. The Court's Recent Decision In *Cuyahoga* Extinguishes Any Doubt As To The Applicability Of The Unmistakability Doctrine In This Case.

The government's lead argument in its post-trial brief – as it has been throughout this litigation – is that regardless of whether it breached plaintiffs' contracts, it is immune from liability thanks to the unmistakability doctrine. As plaintiffs explained in detail in their prior briefing, however, that doctrine simply is not available to the government under the facts of this

case. The government does not deny that its actions do not qualify as "sovereign acts" for purposes of the sovereign acts defense. *See Adams v. United States*, 42 Fed. Cl. 463, 479-80 (Fed. Cl. 1998); *accord Kimberly Associates. v. United States*, 261 F.3d 864, 869-70 (9th Cir. 2001); *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 441-43 (Fed. Cl. 2002). As a result, the law is clear that the unmistakability doctrine is not available as a defense to the government either. *See* Pl. Bf., Part IV; Pl. Mem. at 21-27.

Plaintiffs' prior arguments regarding the unmistakability doctrine are resoundingly confirmed by the Court's recent decision in *Cuyahoga Metro. Hous. Auth. v. United States*, Nos. 01-46C, 01-251C, 01-416C (Fed. Cl. Sept. 22, 2003) ("*Cuyahoga*"). In that case, the Court traced the roots of the doctrine to its Constitutional underpinnings and analyzed nearly every decision ever issued under the unmistakability doctrine and the sovereign acts defense going back to the early 1800s. Based on this extensive review, the Court concluded that "the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine." *Cuyahoga*, slip op. at 31; *see also id.* at 24 ("[W]here, for example, the challenged legislation represents a bald 'repudiation' of a contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal – the unmistakability doctrine will avail the government naught.").

In reaching this holding, the Court found that there was "no logical limit" to the government's desired interpretation of the doctrine, which "would transform the unmistakability doctrine from a shield to a meat axe that would allow the Congress to reserve the choicest portions of the government's contracts and discard the rest." *Id.* at 33. As one example directly relevant to this case, the Court noted that "if those willing to offer goods or services under a given program were . . . eligible to leave the program, Congress cold simply extend the

agreements already in force . . . ." *Id.* at 34. The Court also observed the dire consequences that could result if the government's view of the doctrine were to prevail:

> . . . private parties should not have to guard against the possibility that the government would target essential provisions of their contract for later unilateral revision, thereby obtaining a second promise from the government not to do what it should not do in the first instance. . . . One can only speculate what would happen in the marketplace if prominently displayed in every contract were a provision explicitly indicating that the government reserved the right to change unilaterally any provision subsequently deemed by the Congress or executive agency to be unduly expensive or otherwise ill-advised.

*Id.* at 34 n.35.

The impact of *Cuyahoga* on this case is clear. As noted above and in plaintiffs' prior briefing, the courts have unanimously held that the government action at issue in this case does not qualify as a sovereign act. Pl. Mem. at 19-21. The government does not assert otherwise. As a result, there is no exercise of sovereign power for the unmistakability doctrine to protect here. *See Cuyahoga*, slip op. at 31 n.33 (concluding that "the unmistakability doctrine protects only certain forms of legislation, *to wit*, those truly invoking 'sovereign powers'"). Accordingly, the government's liability for breach must be adjudged according to the same standard contract principles that apply in disputes between private parties. *See Winstar*, 518 U.S. at 895; *Franconia Assoc.,* 536 U.S. at 141; *see also Cuyahoga*, slip op. at 31 ("neither [the unmistakability doctrine or the sovereign acts defense] applies when the Congress instead targets the government's contractual obligations in an effort to get a better deal").[3]

**B. The Government's Newly-Devised "No Breach" Argument Fails.**

[3] Given the analysis in *Cuyahoga*, it is unnecessary, in order to find the government liable for breach, for the Court to delve into issues such as the materiality of the prepayment right and the context of the parties' contractual arrangement. *See* Pl. Br., Part I. Those facts would be relevant to contract liability only if the unmistakability doctrine did apply in this case. However, those same facts still are relevant to plaintiffs' takings claims (and the reasonableness of their investment-backed expectations in particular) and, to some extent, plaintiffs' damages. *See* Part II(B)(2); Part III(B), *infra*.

Defendant presents in its brief, for the first time in this litigation, an alternative "no breach" argument. Defendant asserts that, regardless of whether the unmistakability doctrine applies, plaintiffs' contracts were not breached because the prepayment restrictions set forth in the repudiating legislation "presented plaintiffs with a set of options which, taken as a whole, were consistent with the prepayment clause contained in the promissory notes." Def. Br. at 22. Thus, the government now argues that *even under standard contract law,* its actions do not constitute a breach.[4]

1. *Having Repudiated Plaintiffs' Contracts, Defendant Has No Room To Deny That It Breached Plaintiffs Contracts.*

Defendant concedes that the prepayment restrictions set forth in the repudiating legislation constitute a repudiation of plaintiffs' contracts. The Supreme Court so held and the government has not disputed the Court's holding. *See Franconia Assoc.*, 536 U.S. at 143 (holding that the 1988 legislation "effected a repudiation of the FmHA loan contracts" because it "conveyed an announcement by the Government that *it would not perform as represented* in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages") (emphasis added). But defendant nonetheless argues that the very same prepayment restrictions that repudiated plaintiffs' contracts could not have effected a breach.

[4] It is telling that the government is raising this argument for the very first time after trial. As plaintiffs noted in their Post-Trial Brief, defendant gave no indication, in its Contentions of Fact and Law, its prior briefing, or its discovery responses, that it would raise any defense to contract liability other than the unmistakability doctrine. Pl. Br. at 42 n.30; *see also* Rules of the U.S. Court of Federal Claims, App. A, ¶ 14 (requiring parties to set forth in their Memorandum of Contentions of Fact and Law a "statement of the issues of fact and law to be resolved by the court" and a "discussion of the legal principles [defendant] contends are applicable"). Defendant's newly devised argument should be seen for what it is: a last-ditch effort to avoid contract liability in the face of its weakening arguments regarding the unmistakability doctrine.

A repudiation is defined as a "statement by the obligor to the obligee indicating that the obligor *will commit a breach* that would of itself give the obligee a claim for damages for total breach." Restatement (Second) of Contracts § 250 (emphasis added); *quoted in Franconia*, 536 U.S. at 143; *Mobil,* 530 U.S. at 608; *see also* Black's Law Dictionary 1306 (7th ed. 1999) ("repudiation" defined as "words or actions that indicate an intention not to perform the contract in the future; a threatened breach of contract"); *Murray on Contracts* § 109(C) (3d ed. 1990) (statement of "intention not to perform except on conditions going beyond the contract" constitutes a repudiation). Thus, once a repudiation occurs, it is generally only a matter of time before that repudiation ripens into a breach. In particular, a repudiating party becomes liable for breach when the non-repudiating party either (1) files suit, or (2) demands performance under the contract. Pl. Br. at 19; *Franconia*, 536 U.S. at 143; *Roehm v. Horst*, 178 U.S. 1, 10 (1900) (finding it "reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done"); *Williston on Contracts* § 1337 (3d ed. 1968).

In this case, all plaintiffs brought suit on June 25, 1997, and many demanded performance from the government prior to that date. Pl. Br. at 19. Defendant did not by June 1997, nor at any time thereafter, retract its repudiation. As a result, defendant now stands liable for breach of contract. Indeed, if the prepayment restrictions set forth in the repudiating legislation did not amount to a breach of contract, as defendant argues, then those same restrictions would not have amounted to a repudiation. But the Supreme Court clearly held otherwise. Accordingly, it is incongruous for defendant to concede that it repudiated plaintiffs' contracts but then deny that any breach occurred.

*2. Defendant's "No Breach" Argument Cannot Be Squared With Basic Contract Law.*

Defendant's newly-devised argument also attempts to redefine the meaning of a breach of contract. The crux of defendant's argument is that the prepayment restrictions imposed by the repudiating legislation are not sufficiently egregious to amount to a breach of contract due to the various options to unrestricted prepayment set forth in the repudiating legislation. A breach of contract, however, is a failure to perform as promised. Restatement (Second) of Contracts § 237 cmt. a (breach of contract defined as a "failure of performance"); *see also Williston on Contracts* § 2027B; *Corbin on Contracts* 923 (1964); Gifis, LAW DICTIONARY 54 (3d ed. 1991) (defining "breach" as "a party's failure to perform some contracted-for or agreed-upon act"). Thus, it is not a defense to contract liability to state that the breaching party, in failing to perform, gave the victim of the breach certain options in place of the promised performance.[5]

Plaintiffs' contracts granted them the right to prepay without any restrictions. Under the repudiating legislation, the government was disabled from honoring this option. Thus, under common law of contracts, this case becomes one of impossibility of performance. *Winstar*, 518 U.S. at 920-21 ("Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions . . . .") (Scalia, J. concurring). As this Court held in *Cuyahoga*, slip op. at 33, where the government targets particular contracts, "the general rule regarding impossibility of performance applies and, to the extent the government renders its own performance impossible, it is liable." Here, too, the government's actions in making its performance impossible renders it liable for breach.

While the government suggests that "prepayment" is still permitted under the repudiating legislation, that is a misnomer. The only "prepayment" that is possible under the current regime

[5] To the extent that defendant asserts that plaintiffs could have minimized their damages by accepting one of the lesser alternatives provided by the repudiating legislation, that goes to

is either (1) prepayment subject to severe restrictions on the use of the property (the "G-4" option), (2) prepayment under a narrow exception that none of the plaintiffs can satisfy (the "no need" exception), or (3) the possibility of prepayment following the agency's "forced sale" process. Apart from the defects and risks that these paltry options present (*see* Pl. Br. at 26-34), they differ markedly from the prepayment option set forth in plaintiffs' contracts. Indeed, the agency itself refers to its prepayment regime as "Prepayment Prevention." *See* 7 C.F.R. Part 1965, Subpart E; *see also* VII/1584; PX 13.

Thus, no matter what the result of the agency's procedures may be, the fact remains that performance under the original contract is simply not a possibility for any of the plaintiffs. Accordingly, defendant cannot avoid liability for breach by pointing to its proposed substitute performance. Just as a deal is a deal, a breach is a breach. As this Court has recently observed, "*pacta sunt servanda.*" *See Cuyahoga*, slip op. at 38.

*3. The Government's Power Of Eminent Domain Is Not A License To Breach Its Contracts.*

As an ancillary to its newly-devised "no breach" argument, the government introduces another novel and unprecedented theory: what may be termed the "we could have confiscated your property so you should be glad that all we did was breach your contract" defense. The government asserts that because it could have exercised its power of eminent domain to condemn plaintiffs' properties, the fact that it "did provide plaintiffs with additional options should not make it more liable than it would have been otherwise." Def. Br. at 24. The government points to no authority, in the law of contracts, the law of takings, or otherwise, to support this unprecedented theory. Indeed, there is none.

---

mitigation of damages (which was fully addressed in Part III of plaintiffs' post-trial brief), not to whether there was a breach in the first instance.

The government's argument also muddles the requirements for establishing a breach of contract with the requirements for a taking claim. The question of whether a breach occurred looks to whether the government failed to perform its contract obligations; not to whether it could have achieved a similar result through the exercise of one of its sovereign powers. *See supra* at 20-21. Regardless of what result the government might have achieved by exercising its power of eminent domain over plaintiffs' properties, that power does not in any way allow the government to escape its contract liability. *Cf. Cuyahoga*, slip op. at 34 (explaining that some government actions, while constituting a taking of property, also amount to a breach of contract). Further, defendant's argument, if accepted, would grant the government limitless powers to dishonor its contractual obligations. The government could always avoid undesirable contracts by simply exercising its power of eminent domain to take the property interests contained within the contract. *Cf. id.* at 33 (noting that there was "no logical limit" to the government's view of its ability to pass legislation relieving itself of its contractual obligations). In short, the government is once again seeking an exemption from the contract law that applies between private parties.

In propounding this new theory, defendant also attempts to distinguish the FmHA prepayment scheme from the HUD scheme at issue in *Cienega Gardens*, 331 F.3d 1192 (Fed. Cir. 2003). In finding the government liable for a taking in that case, the Federal Circuit observed that the Eighth Circuit had held in *Parkridge Investors v. FmHA*, 13 F.3d 1192 (8th Cir. 1994) that the FmHA scheme does not prohibit owners from prepaying, and at worst requires owners to sell their properties at a fair market value. *See* 331 F.3d at 1351. The excerpts from *Cienega Gardens* and *Parkridge* that defendant points to, however, were directed to the owners' takings claims, and not to any contract claims. In addition, the Federal Circuit did not make any

independent findings as to the nature of the FmHA prepayment scheme, but simply quoted the decision of the Eighth Circuit – whose decisions are of course not binding on this Court.

More fundamentally, defendant's attempt to distinguish the HUD and FmHA prepayment schemes rests on a false premise. While defendant suggests that FmHA owners are in a much better position because they can sell their properties to a non-profit organization for an alleged fair market value, the HUD regulations provide precisely that option as well. *To wit*, the HUD prepayment scheme includes a "voluntary sale" provision, pursuant to which an owner has the option to sell its property to a qualified purchaser. 24 C.F.R. § 248.157. The sale price is determined through a process that virtually mirrors the FmHA process: two independent appraisers are retained to value the property, and a third appraiser is brought in if the first two cannot agree on a value. 12 U.S.C. § 4301(a)(1). In determining the value, described as the "transfer preservation value," the appraisers are required to "assume conversion of the project to the highest and best use for the property." 24 C.F.R. § 248.111(h). Thus, under the HUD appraisal process, the property can be valued as an unsubsidized property (as in the FmHA process), or at even higher value, depending on what the appraisers determine the "highest and best" use of the property to be. *Id.* Thus, in asserting that FmHA owners stand in a superior position to the HUD owners who prevailed in *Cienega Gardens*, defendant has not bothered to actually compare the two prepayment schemes.[6]

### C. The Government Severely Mischaracterizes What A "Forced Sale" Actually Entails.

---

[6] The Government's reference to *Beatty v. United States*, 168 F. Supp. 204 (Ct. Cl. 1958) is also misplaced. *Beatty* was a takings case that addressed the property owner's claims that it acted under duress from the government in deciding to sell its properties. Thus, it is difficult to comprehend what relevance *Beatty* has to plaintiffs' contract claims. Indeed, defendant's continued reliance on takings cases in support of its "no breach" argument confirms its unwillingness to stand accountable to standard contract principles.

The centerpiece of the government's case now appears to be the agency's forced sale process. The government argues that under that process, plaintiffs could have obtained a full fair market value for their properties in just six month's time, or even been permitted to prepay without any restrictions.[7] As plaintiffs explained in their Post-Trial Brief, however, that is far from the case. *See* Pl. Br., Part III(C)(3) (noting that "the owner must agree to be bound by an appraised price before even knowing what it is" while "there is no guarantee that the owner will receive a fair value, no guarantee as to when the owner will receive its money, and no guarantee that the owner will be released from the program even if no buyer comes forward"). The primary reason an owner would be deterred from the forced sale process is that it would be required to run the risk of losing a property it has maintained with an eye toward converting to market rents. *Id.* But it is also very revealing to closely examine, step by step, what an owner would actually have to go through in order to sell its property through the agency's procedures.[8]

Even assuming that an owner wants to do a forced sale, it cannot simply notify the agency of its desire and let the "six month" process begin. Far from it. Before having the right to anything from the agency, the owner first has to submit a prepayment application meeting all of the agency's requirements. 42 U.S.C. § 1472(c)(4)(A); 7 C.F.R. § 1965.204; RD Instr. 1965-E, Ex. B. D; *see also* Pl. Br., Part III(C)(1) (detailing the information and documents required for an application to be considered complete). The agency cannot take any action under its

---

[7] The government relies on this procedure repeatedly through its brief, in support of its arguments as to (1) whether there has been a breach, (2) whether there has been a taking, (3) whether defendant caused the damages sought by plaintiffs, and (4) the calculation of plaintiffs' damages. See Def. Br. at 22, 28, 36, 37 n.32.

[8] The illustration set forth in this section flows directly from the terms of the agency's regulations and the experiences of various plaintiffs in this case, as exhibited by the numerous citations herein to the agency's regulations and the evidence presented at trial. Those citations demonstrate that this illustration is not only a realistic and factual account of the agency's sale process, but in fact a conservative depiction of the process.

regulations unless and until a complete package is submitted. 7 C.F.R. § 1965.205(c). It might take the owner a year or more and substantial fees paid to a consultant to compile and submit all of the information needed to satisfy the agency's requirements. *E.g.,* IV/896-97 (Mr. Wells first considered prepayment and had an appraisal done in 1992, then hired a consultant, and then submitted a complete prepayment application in September 1994); V/1212; VI/1279; PX 276; *see also* VII/1605-1606. The agency must reject the application without further consideration if any of the required components are missing or incomplete. 7 C.F.R. § 1965.206(a).

Once the agency is satisfied that the application is complete, it then prepares an incentives offer. The agency is required to attempt to persuade the owner to remain in the program for twenty more years in exchange for incentives before taking any other action, even if the owner has no interest in incentives and would rather jump ahead to the sale process. Further, in order to develop the offer, the agency must perform an array of tasks, including determining the value of the property, evaluating budget information, and obtaining and analyzing information regarding comparable rents in the area. The tenants also must be notified of the owner's intention to prepay and provided at least thirty days to submit comments to the agency. Once the agency develops an incentive offer and presents it to the owner, the owner will be given thirty days to accept or reject the offer. I/243; II/609; III/738; IV/874; IV/904.

If the owner rejects the incentives offer, the agency will then determine whether the owner can meet the requirements for prepaying without restrictions. This involves a detailed analysis of the need for the housing in the community where it is located, the impact that prepayment would have on minorities, and whether the owner would increase rents upon prepayment. Each of these inquiries requires the agency to analyze a number of factors and study a wide range of information, including both the materials submitted by the owner and the

agency's own data. *See* RD Instr. 1965-E, Ex. E, § V(A)(1)(a)-(f) (factors for need determination); *Id.,* Ex. E, § V(C) (factors for determining whether rents would increase); *Id.*, Ex. E, §§ II(C)(1)(h), V(D) (factors for determination of impact on minorities). The impact on minorities inquiry also requires the input of the local Civil Rights Officer. PX 789 at 11.

If the agency determines that the narrow criteria for prepaying without restrictions cannot be satisfied, it will then notify the owner that it will be "required" to offer the property up for sale. 7 C.F.R. § 1965.216. Thus, the forced sale process can begin only after all of the agency's procedures regarding review of the application, development of an incentives offer, and determination of the need for the property have been completed. The agency has at least 180 days, or roughly six months, within which to complete all of these steps. RD Inst. 1965-E, § 1965.205(c) (owners seeking to prepay "must submit a complete prepayment request . . . at least 180 days in advance of the anticipated prepayment date") (emphasis in original); *see also id.* § 1965.215(f)(2) (allowing for this period to be shortened or extended in certain circumstances).

So, assuming that an owner first intended to prepay in September 1992, prepared an application and submitted it in July 1993, and presented a final application in September 1993 after receiving a request for additional information from the agency, it would be at least March 1994 before the agency's internal review process is completed.[9] Thus, it is likely to be at least a

[9] The assumption that the agency would actually meet the 180-day time frame is a conservative one. The evidence shows that in practice, the agency often takes much longer than 180 days to complete it review. Mr. Morosani waited more than eleven months after his application was submitted before even receiving an incentives offer, and Ms. Perri waited thirteen and fifteen months, respectively, before receiving incentives offers on her two properties. PX 585, 586, 590 & 593 (Pine Needle); PX 612 & 617 (Palmyra Park I); PX 646, 647 & 650 (Palmyra Park II). The Riverfront and Sunrise River plaintiffs waited six years after applying to prepay before receiving an incentives offer from the agency, due to confusion within the agency regarding the owner's request. PX 9, 10 & 18 (Riverfront); PX 58, 61, 66 & 68 (Sunrise River). Mr. Tucker waited for over two years on each of his properties before receiving any response to his requests, as the agency apparently overlooked or misplaced his applications.

year and a half after the owner first decided to prepay before the owner would even have the option to consider the agency's sale process.

Assuming that the owner decides to go ahead with a sale, then the real roller coaster ride begins. First, the property is valued by two independent appraisers. 7 C.F.R. § 1965.216(a). The owner must pay for the services of one of these appraisers. *Id.* The appraisers have sixty days to complete their work. *Id.* If the two appraisers do not happen to arrive at the same number, the regulations provide another thirty days for the parties to attempt to agree on a value. *Id.* If they are unable to do so, a third appraiser will be brought in to conduct a third appraisal, which will be binding. *Id.* The owner must pay for half of the cost of the third appraisal. *Id.* The third appraiser is given sixty days after being selected to complete his or her work, but there is no time limit within which the appraiser must be selected. *Id.*

While the various appraisers involved in the process are instructed to value the property without regard to its income restrictions (*see id.*), there is no guarantee that it will be a price that the owner will agree with – let alone a price that the owner ever would have agreed to through a sale on the open market. The owner has no control over the valuation of the property, and is bound by whatever price is determined through the appraisal process. 42 U.S.C. § 1472(c)(5)(A)(i). Further, as this Court has noted, appraisals are necessarily subjective, reflecting the experiences and speculative assumptions of the appraiser. *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 77 (1997).

---

II/642-43; PX 719 & 715 (Dogwood Glen); II/627; PX 731 & 715 (Valley View). There is no penalty imposed on the agency for failing to meet the 180-day time limit. In addition, an owner's only recourse against agency delays would be to file an appeal or lawsuit under the Administrative Procedures Act challenging the agency's failure to comply with its time limits, both of which would likely be dismissed for lack of an appealable final decision.

In addition, the property is appraised "as is," and not as it has the potential "to be" on the market as a conventional property. *See generally* RD Inst. 1922-B. In other words, the property is valued as it exists having been maintained subject to limitations on how much revenue the property generates, and without regard to how valuable it would be if upgraded or converted through the increased returns that would be earned through unrestricted rents. An owner interested in selling the property on the open market, by contrast, could invest in various upgrades that would make the property more attractive to potential purchasers, thereby increasing the value prior to any sale. Thus, while the property theoretically is valued without regard to its income restrictions, it is also valued without regard to the opportunities the owner would have in a market transaction to maximize the value.

After a price is finally determined through the appraisal process, the owner must prepare to place the property up for sale. Before putting it on the market, the owner first must obtain a list of eligible buyers from the agency and call every entity on the list. 7 C.F.R. § 1965.216(b). Only then is the six month period actually triggered. Thus, while the sale period is six months long, it may be years before that six-month clock begins to tick. Taking the example of the owner described above, who initially desired to prepay in September 1992 and received a final decision from the agency in March 1994, it could easily take another six months, until September 1994, for the various appraisals to be prepared and harmonized and for the owner to prepare to put the property up for sale. Thus, by the time that the ensuing "six month" period ends, in March 1995, the owner would have been waiting for two and a half years.

The owner also has to commit additional time and money to the sale process prior to and during these six months. For example, the owner is required to take steps to "market and sell" the property, such as identifying and contacting all non-profit organizations who are potential

purchasers. 7 C.F.R. § 1965.216(b). The owner also must identify and market the property to organizations on a national scale for at least sixty days if no local buyers are found in the first sixty days. *Id.* § 1965.216(b)(3)(ii). During the six-month period, any qualified purchaser can obtain the property by making a "bona fide offer." 42 U.S.C. § 1472(c)(5)(A)(ii). Thus, if an offer comes in, the owner must agree to let the property go, and let it go at the previously determined price. *Id.* Importantly, a "bona fide offer" does not equate to a "bona fide purchase." *See id.*; 7 C.F.R. § 1965.218(a)(4). After an offer is made, there is no telling when the owner will actually receive a payment.

After one or more offers are received, the agency will review the qualifications of the offerors and prioritize the offers. 7 C.F.R. §§ 1965.216(c),(d). Then, once an option to purchase is signed, the offeror must file an extensive application so that the agency can determine the eligibility of the offeror and the feasibility of the transfer. *Id.* § 1965.217; *see also id.* § 1965.65(f) (describing contents of application). There is no time limit within which the agency must complete this review. In addition, if the agency determines that the offeror is not eligible, the offeror has the right to appeal. *Id.* § 1965.217(b). The transfer also must be approved by the national office. *Id.* § 1965.217(c). Thus, even after an offer is made, it may be at least another six months before the transaction is approved by the agency.

Then comes more waiting. The payment often will have to await the funding of a loan or other assistance from the agency to the purchaser. Obviously, few non-profit organizations or government entities can afford to purchase an apartment complex from their own funds. As a result, the agency has a variety of mechanisms at its disposal to assist interested buyers,

including loans and grants. 7 C.F.R. § 1965.217(d); VII/1600.[10] There is no time limit, however, within which a loan or grant to the purchaser must be funded. As with the funding of equity loans, the agency's budgetary constraints can translate into years of delays before a loan or grant is funded. As plaintiffs proved at trial, Mr. Wells waited over seven and a half years for his equity loan to come through (PX 745, 758-761), Ms. Perri waited more than five years (PX 619, 640), and Mr. Morosani has been waiting almost nine years and running (PX 594).[11]

Thus, it would be reasonable, and in fact quite forgiving to the agency, to assume that an owner might have to wait two years for the agency to fund a loan to the prospective purchaser. Turning again to the owner who initially intended to prepay in September 1992 and eventually completed the six-month forced sale period in March 1995, it would take at least another six months, until September 1995 – with or without an appeal by the purchaser – for the agency to review the prospective purchaser's application, make an eligibility determination, exhaust any appeals by the purchaser, and approve the transfer. Then, assuming that the funding for the loan to the purchaser came through two years later, it would be September 1997 by the time that the owner realizes any income from a forced sale – a full *five years* after the owner would have simply prepaid and left the program had its original contract rights been upheld.

The bona fide nature of the offer, and the owner's obligation to sell, will remain intact regardless of how long it takes for the necessary funding to come through. RD Instr. 1965-E, §

---

[10] As plaintiffs proved at trial, all of their properties are needed in their communities – which is why none of them was permitted to prepay without restriction under the agency's "no need" exception. As a result, it is highly likely that if any of the owners submitted to the forced sale process, the agency would provide the assistance necessary to ensure that a sale would go through. This would subject plaintiffs to the funding delays described above.

[11] This comparison is appropriate, as the agency's own documents and testimony demonstrate that the agency treats incentive equity loans and loans to purchasers in the forced sale process as one in the same. *See* PX 788 at 14 (prepayment flowchart prepared by agency equating the

1965.218(a)(4) (an offer is bona fide, and the owner is obligated to sell "even if the offer is contingent on Rural Development funding *when no funding is available*") (emphasis added). By the time the owner above receives payment in September 1997, the appraisal would already be three years old. However, the owner has no right to adjust the sale price to account for any increase in value during the time that the owner has been waiting for the payment to arrive. *See* 42 U.S.C. § 1472(c)(5)(A)(i) (previously appraised value is "binding" on the parties to the sale); 7 C.F.R. § 1965.216(a) (same); VII/1600 (same).

That is still not the end of the story, though. In the unlikely scenario that no offer is made, the agency would be well within its statutory authority to inform the owner that it would have to remain in the program until the end of its mortgage term anyway. 42 U.S.C. § 1472(c)(5)(A)(ii) (agency "may" accept prepayment if no offers are made). While defendant asserts that it has not in the past exercised its authority in this manner, defendant admitted at trial, under cross-examination, that such authority exists. VII/1739-40. Thus, any owner would reasonably be dissuaded from participating in the forced sale process simply because it might invest substantial time and money over a period of years only to be told, even after no offers have been made, that the agency will not accept its request to prepay without restrictions.

Thus, while the government suggests that an owner would simply have to sit tight for six months and then either obtain the full fair market value of the property or be permitted to prepay without restrictions, the agency's procedures and practices involve a far different scenario. An owner realistically could have to wait five years or more, while incurring numerous expenses, only to obtain a value below what it would have received through an arms-length market transaction. Even if no buyer comes forward, there is no guarantee that the agency will permit

---

funding of an equity loan with the funding of a loan to a non-profit in connection with a forced

the owner to leave the program. Indeed, the defects and uncertainty inherent in the process are proven by the mere fact that, in the history of the program, very few owners have actually consummated a forced sale through the agency's procedures. *See* VII/1726. In summary, an owner who decides to partake in what the government touts as a "no-lose proposition" (*see* VI/1306) actually stands to lose a great deal.

## II. DEFENDANT COMMITTED A TAKING OF PLAINTIFFS' PROPERTIES.

### A. Plaintiffs' Takings Claims Are Independent From Their Contract Claims.

After arguing that it should be exempted from contract liability based on its power of eminent domain, the government asserts that plaintiffs cannot maintain a takings claims because their rights arise from a contract. Stated otherwise, the government claims that plaintiffs' taking claim is really a contract claim at heart, but any such contract claim cannot survive in light of the government's authority to commit a taking. While the government attempts to have it both ways, the fact of the matter is that it is liable for both a breach of contract and a taking of plaintiffs' properties. *See Cuyahoga*, slip op. at 34 (explaining that where the government unilaterally extends agreements entered into under a regulated program, the government's action can constitute both a taking of property and a breach of contract).

As plaintiffs explained in the post-trial brief, the Federal Circuit's recent decisions in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) and *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) erase any doubt as to whether plaintiffs can maintain takings claims independent from their contract claims. Pl. Br. at 49-50. Those cases confirm that plaintiffs hold protected property interests in both their real estate interest and their contract rights. *Id.* Defendant is unable to distinguish *Cienega* and *Chancellor* in any

---

sale); VII/1600 (referring to loan to non-profit in forced sale process as an "equity loan").

meaningful way. For example, the fact that the government acted as an insurer on the loans, rather than a lender, had no impact on the court's analysis of the property interests at issue. Further, defendant's strained analysis of the alleged inconsistency between those cases and the Supreme Court's decision in this matter, and its attempt to elevate the Federal Circuit's decision in this matter over the Supreme Court decision that reversed it, do nothing to save it from takings liability in this case. Having engaged in conduct that resulted in both a breach of plaintiffs' contracts and a taking of their properties, defendant is in no position to force plaintiffs into an election of remedies.

### B. The Evidence Presented By Plaintiffs Establishes That Their Properties Were Taken.

As plaintiffs detailed in their post-trial brief, the evidence presented at trial established all of the elements for asserting a taking under the *Penn Central* test. Pl. Br. at 50-54. Plaintiffs will not restate the relevant evidence and case law here. The government's post-trial brief relies primarily on further invalid attempts to distinguish the Federal Circuit's decisions in *Cienega* and *Chancellor*, and continued reliance on the various alternatives set forth in the legislation at issue. As plaintiffs previously explained, the government cannot avoid takings liability by attempting to fix a property owner's right to compensation in the very statute that effects the taking. Pl. Br. at 53-54. Further, as explained above, defendant severely mischaracterizes what a forced sale under the agency's procedure actually entails. Clearly, neither the forced sale procedure nor the other alternatives to the unfettered exercise of plaintiffs' property rights constitute "just compensation" under the Fifth Amendment.

### C. All Of Plaintiffs' Takings Claims Are Ripe For Review.

Plaintiffs also explained in their post-trial brief that all of the plaintiffs' takings claims are ripe for judicial review. Pl. Br. at 46-49. That evidence is further buttressed by the vignettes

describing each property above. The plaintiffs identified in defendant's brief as having unripe takings claims all presented evidence more than sufficient to satisfy the Federal Circuit's decision in *Cienega Gardens v. United States*, 265 F.3d 1237(Fed. Cir. 2001). Indeed, while some of the plaintiffs in *Cienega* offered no more than affidavits stating that there was a shortage of housing in their area, plaintiffs here presented testimony and corroborating evidence, all subject to cross-examination by the government, proving that it would have been futile for them to attempt to prepay.

## III. PLAINTIFFS PROVED THEIR DAMAGES.

### A. Defendant's Assertion That Its Actions Were Not The Cause Of Plaintiffs' Damages Ignores The Evidence And The Law.

#### *1. Defendant's Assertion That It Did Not Cause Plaintiffs' Damages Is A Failed Mitigation Argument In Disguise.*

Not surprisingly, the government disclaims any responsibility for the damages suffered by plaintiffs. Somewhat surprising, however, is defendant's choice of who is to blame for plaintiffs' losses. Defendant points the finger at plaintiffs, asserting that they could have avoided their losses had they agreed to one of the "lesser deals" set forth in the repudiating legislation. Defendant concludes that because it provided these statutory alternatives to plaintiffs upon repudiating their contracts, it cannot be held to have caused plaintiffs' damages.

The government's causation argument is atypical. The government does not assert that plaintiffs' damages were caused by some third party or outside force. Nor does the government deny that plaintiffs are losing money, and will continue to lose money, as a result of remaining in the 515 program. Instead, the government contends that plaintiffs' damages would have been lessened had plaintiffs elected to accept one of the alternatives to unrestricted prepayment set forth in the statute. This is no more than a hidden mitigation argument: an assertion that

plaintiffs should have taken certain steps that, according to defendant, would have decreased their damages. As plaintiffs established in their post-trial brief, however, the doctrine of mitigation of damages provides no support for defendant's arguments. *See* Pl. Br., Part III.[12]

The proper standard for establishing causation looks to whether the defendant's breach was a "substantial factor" factor in causing the plaintiff's damages, and whether the damages flowed "inevitably and naturally" from the breach. *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001); *Ramsey v. United States*, 101 F. Supp. 353 (Ct. Cl. 1951). In this case, there is no question that plaintiffs' lost profits were directly caused by defendant's breach. The damages sought by plaintiffs – the income that they would have earned by prepaying their properties and raising their rents to market levels – clearly "would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." *See Wells Fargo Bank, NA, v. United States*, 88 F.3d 1012, 1023 (Fed. Cir. 1996). Thus, "there is nothing remote or consequential" about plaintiffs' damages. *See Home Savings, FSB v. United States*, 2003 WL 22357732, *34 (Fed. Cl. 2003).

*2. Despite Defendant's Speculation To The Contrary, Plaintiffs Are Unable To Leave The 515 Program.*

Defendant again clings to the notion that plaintiffs might have been permitted to prepay without restrictions had they only tried harder. As plaintiffs proved at trial, however, none of

---

12 At trial, the Court recognized that defendant appeared to be focusing much of its case on the issue of mitigation of damages. V/1082. After the Court focused defendant's attention on its decision in *Koby v. United States*, 53 Fed. Cl. 493 (2002), however, defendant changed its tack and framed the issue in its post-trial brief as one of causation, rather than mitigation. Defendant has relegated its mitigation argument to a passing footnote reference, which states that the statutory alternatives to unfettered prepayment presents "as issue primarily of causation, and secondarily of mitigation." Def. Br. at 37, n.32.

them are able to prepay without restrictions. *See* Pl. Br., Part IV(A)(2).[13] In response, defendant offers only speculation, rather than countervailing evidence. Defendant made no attempt to prove, for example, that any of the properties would have been able to meet the "no need" exception – despite the fact that it would have any such evidence in its possession if it existed. *See, e.g.,* PX 821 at 21 (noting that the agency officials at each servicing office generally know whether there is a need for each of the properties within their jurisdiction). Thus, defendant's supposition that plaintiffs remain in the program only because they have not tried hard enough to get out rings hollow.

In addition, the government's reliance on statistics regarding the number of properties that have been able to prepay without restrictions over the years belies its argument. The government's documents show that of the thousands of properties in the 515 program that are currently eligible to prepay, only 118 have been able to prepay without restrictions in the past four years. DX 57 at 8. In 2002, for example, there were 3,772 properties in the agency's portfolio that were eligible to prepay (*i.e.*, properties without any remaining restrictive-use provisions). DX 28 at 9-10. Of those properties, only 32, or 0.85%, were able to prepay

[13] While defendant asserts (incorrectly) that none of the plaintiffs' prepayment requests other than Dublin Plaza were denied "outright" (*see* Def. Br. at 9), the key fact is none of the plaintiffs' requests were accepted "outright." In addition, the evidence shows that for at least seventeen additional properties, the agency made a formal written determination that the property is needed in the community where it is located. PX 103; PX 179; PX 195; PX 213; PX 237; PX 247; PX 263; PX 310; PX 351; PX 370; PX 391; PX 424; PX 450; PX 471; PX 491; PX 514; PX 591. For all of the other properties, plaintiffs presented evidence showing that they cannot prepay without restrictions under the agency's regulations because (1) there exists a need for their properties in the communities in which they are located, (2) plaintiffs would raise their rents upon prepayment, and/or (3) there would be an adverse impact on minorities if prepayment occurred. Pl. Br., Part IV(A)(2) at 41-42. Further, a number of plaintiffs have not received a formal need determination only because the agency failed to comply with its own regulations, which require the agency to notify the owner whether it can prepay within fifteen days after the owner rejects an incentives offer. 7 C.F.R. § 1965.215(d)(1); *see* PX 21; PX 69; PX 476.

without restrictions that year. DX 57 at 8. Thus, an attrition rate of less than 1% per year makes prepayment without restrictions a "remote possibility" indeed. *See* Def. Br. at 38.

Finally, defendant asserts that some plaintiffs might have been permitted to prepay without restriction had they appealed the agency's denials. Def. Br. at 9. However, defendant points to no credible evidence suggesting the agency's determinations were wrong with respect to any of the properties. Plaintiffs similarly found no fault with the agency's factual determinations that there remains a need for their housing and/or that prepayment would adversely impact minorities. IV/885-886. Thus, defendant chastises plaintiffs for failing to bring what would have been frivolous agency appeals.[14]

3. *Defendant Has Not Met Its Burden To Prove Any Offsets To Plaintiffs' Damages Beyond Those Already Incorporated By Plaintiffs.*

Defendant also asserts, in broad fashion, that it should not be held liable for damages that, in its view, could have been avoided had plaintiffs opted to prepay subject to restrictions or accepted incentives to remain in the program. Def. Br. at 38, 47. However, the burden rests with defendant to prove any such offsets. *See Southern Cal. Fed. Sav. & Loan Ass'n v. United States*,

[14] Moreover, plaintiffs were not required to bring agency appeals as a prerequisite for filing suit. With respect to plaintiffs' contract claims, exhaustion is not required where "no administrative procedure exists by which plaintiffs might obtain the relief which they seek, *i.e.*, damages for the alleged loss of an unrestricted prepayment right." *Cienega Gardens v. United States*, 33 Fed. Cl. 196, 207 (1995), *vacated on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998). Similarly, plaintiffs were not required to challenge the agency's decisions through an administrative appeal prior to bringing their takings claims. *Christina Inv. Corp. v. United States*, 40 Fed. Cl. 571, 578 (1998) (holding that "a property owner is not required [to] exhaust remedies directed at reversing the government denial in order to bring a takings claim"); *see also Devon Energy Corp. v. United States*, 45 Fed. Cl. 519, 529 (1999). Indeed, a property owner bringing a taking claim "must concede the validity of the government action that is the subject of his claim." *Christina Inv. Corp.*, 40 Fed. Cl. at 578 n.3. Further, in many cases, the agency failed to provide plaintiffs written notice of their appeal rights. 7 U.S.C. § 6994 (2003) ("Not later than 10 working days after an adverse decision is made that affects the participant, the Secretary shall provide the participant with written notice of such adverse decision and the rights

57 Fed. Cl. 598, 639 (2003) ("The government has the burden of proving offsets, and it has not proven that any offset is appropriate in this case."); *see also Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 421 (2000), *aff'd in part, rev'd in part, on other grounds*, 302 F.3d 1314 (Fed. Cir. 2002) (government had burden to establish both the duty to mitigate and the amount of any resulting offset to damages). In this case, defendant's evidence proves neither its entitlement to, nor the amount of, any further offsets to plaintiffs' damages. Indeed, defendant has made no effort whatsoever to quantify the value that allegedly should be attributed to these alternatives.

As plaintiffs explained at trial and in their post-trial brief, they have already accounted for all appropriate offsets. In particular, plaintiffs' experts provided offsets for (1) the increased annual return received by Palmyra Park II, R.C. Pierre and R.C. Springs (VI/1398; 1400-02; VII/1488; 1515-16; 1542; 1555), and (2) the prepayments subject to G-4 restrictions made by certain of the Iowa properties. Defendant apparently has no quarrel with plaintiffs' calculation of these offsets. However, defendant asserts that offsets should be imposed even in cases where plaintiffs did not request or receive them. This, of course, makes no sense from an economic standpoint or a legal standpoint. If an alleged benefit has not actually been obtained, it obviously provides no economic advantage to the injured party. Likewise, the law of damages permits offsets only for benefits *actually received* by the injured party. *See LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1371 (Fed. Cir. 2003); *Southern Cal. Fed. Sav. & Loan Assoc. v. United States,* No. 93-52C (Fed. Cl. Aug. 7, 2003), slip op. at 61.[15] In short, defendant's attempt

---

available to the participant under this subchapter or other law for the review of such adverse decision.").

[15] The only instance in which the law permits a reduction in damages based on benefits not actually received arises where the injured party failed to take reasonable steps to mitigate its damages. However, as plaintiffs explained in their post-trial brief, the doctrine of mitigation of damages does not apply under the facts of this case. Defendant's *de minimis* reliance on the doctrine confirms this.

to obtain a credit for something it never provided, and that plaintiffs never received, is counterintuitive.

Further, plaintiffs' experts appropriately did not include any offset or other adjustments for the additional loans received by certain plaintiffs, *i.e.*, the equity loans received by Ms. Perri and Mr. Wells and the rehabilitation loans received for R.C. Pierre and R.C. Springs. These loans do not provide any benefit that plaintiffs would not have been able to obtain by exercising their right to prepay. Indeed, an equity loan only permits an owner to *borrow against* its equity in the property, with the obligation to pay it back with interest. VI/1398; VII/1488. But that very equity would have *belonged to* the owner outright if permitted to prepay. By the same token, each plaintiff could have, upon prepayment, taken out its equity in the property through a loan (*i.e.*, a private equity loan). *See* II/604-605, 610-11; IV/912-913; VI/1308; IX/2188. Dr. Karvel's model nonetheless conservatively assumes that upon prepayment, each plaintiff would take out a private loan in an amount no greater than that required to pay off its government mortgage. I/327; VI/1396, 1399; VII/1487-91. Thus, it would be fundamentally inconsistent to incorporate into the model an offset for a government equity loan when the model does not assume that any plaintiff would have taken out a private equity loan if permitted to prepay.[16] VI/1396-99; VII/1488, 1490; II/604-05, 610-11; IV/913.

### B. Defendant's Critique Of The Assumptions Supporting Plaintiffs' Damages Claims Falls Far Short.

[16] Furthermore, some of the subsequent loans received by plaintiffs actually would have increased damages if taken into account. The rehabilitation loans obtained by Mr. Costello on R.C. Pierre and R.C. Springs, for example, would result in greater losses, due to a combination of the increased term of the mortgage restrictions, the balloon payments associated with the new loans, and the fact that loan proceeds were restricted to the projects which were in turn restricted in the program. PX 140; PX 153-155; IV/1038. To remain consistent and accurate, however, Dr. Karvel did not include adjustments for any subsequent loans received by plaintiffs, whether they would have resulted in an increase or decrease to damages. VI/1398; VII/1388.

1. *Contrary To The Skepticism Of Defendant's Expert, Plaintiffs Would Have Prepaid And Would Have Realized Significant Profits By Doing So.*

Defendant's expert opines that plaintiffs' experts improperly assumed that prepayment would be "in the money" for each of the plaintiffs. Def. Br. at 39. Plaintiffs' experts, however, made no such assumption. On the contrary, Dr. Karvel applied his model to each property in a neutral and consistent manner and calculated the amount of damages that each plaintiff suffered. Thus, plaintiffs' experts did not presume that prepayment would have been profitable; they proved it. The fact that prepayment would have been "in the money" upon each plaintiffs' intended prepayment date is also confirmed by a plethora of evidence presented at trial.[17] Indeed, the notion that an owner earning $3,500 a year in the program on an entire apartment building would not be able to do better on the open market is both illogical and rather patronizing.[18]

---

[17] *See, e.g.,* V/1210 (Hodges) ("...I had 100 units ...conventionally financed at significantly more rental levels with a waiting list of over a year, so there was no doubt in my mind that I would have no problem converting those to conventional units."); III/781 (Roseliep) (market rents earned on units converted under G-4 provided indicator of rents achievable at other properties); III/765 (Roseliep) ("The project is feasible in a conventional market and conversion to conventional housing is a sound financial decision for the borrower, and prepayment is a real possibility.") (quoting from an internal agency document, PX 370); II/645 (Tucker) (note rate rent projections are reasonable "[b]ased upon current knowledge of the market conditions in the area and on my own research"); IV/1024-1025 (Costello) (owner would have prepaid in 1992 based on the excellent market conditions and low vacancies in the area at the time); IV/914-15 (Wells) ("If I was allowed to prepay it like I was supposed to have been, that Fall River Meadows would be a very valuable piece of property being on the lake consisting of two acres, being across from a private park." 612 at 42 and 43); IV/900-903 & PX 742 at 31 and 32 (Wells) (market study submitted with prepayment request demonstrated that property would be successful on the conventional market). Further, every witness testified that they would have raised rents upon prepayment (Pl. Br. at 42), that they entered into the program with the specific intention of exercising the termination option and raising rents when it made the most sense financially (Pl. Br. at 10), and that the ability to earn market rents upon prepayment was in fact the very *quid pro quo* for the deal (Pl. Br. at 8).

[18] The average return on investment earned by the plaintiffs in this case is $3,433, and none of that return is guaranteed in any given year. Twenty-two of the plaintiffs earn an annual income of below $3,000, and only six earn above $5,000. *See* PX 763, Tab A, Table 2.

The agency's documents and testimony confirm, rather than disprove, that prepayment would have been a profitable business decision for plaintiffs. VIII/1593 (testimony of L. Anderson that, based on evidence presented at trial, it appears that plaintiffs would increase rents upon prepayment); VII/1601 (testimony of L. Anderson that nine out of ten properties in the 515 program would be more valuable on the market than they are in the program); PX 817 at 11 (Pre-TRAC documents showing that Riverfront Apartments is worth $320,000 in the program and $719,536 on the market); PX 819 (Pre-TRAC documents showing that Fall River is worth $300,000 in the program and $485,594 on the market). In fact, according to the agency's rules, it would not have approved any of the loans at issue unless it first determined that the properties would be feasible on commercial market. *See* 1965-E, Exh. E, ¶ I.D.1 ("preliminary action" to be taken on prepayment request includes "[d]etermine whether the project is feasible in the conventional market, and if so, to what degree"); *see also* IV/1660-61.

Defendant offers no specific evidence to suggest that prepayment would have been a financial mistake for any of the properties.[19] Instead, defendant primarily relies on a GAO report which concluded that prepayment would be disadvantageous for certain types of section 515 properties. That report, of course, says nothing about the properties at issue in this case, and thus does little to rebut the specific evidence presented by plaintiffs. Further, to the extent that defendant believes that government reports describing the section FmHA portfolio generally are probative, it should be noted that previous reports issued by the GAO have reached far different

[19] The one exception is Dublin Plaza, for which defendant points to a letter prepared by a property manager who opined that the property would not be successful on the conventional market. DX 1. However, the owner of that property, Mr. Ron Powers, explained during his testimony that the property manager's conclusions were mistaken. V/1182-3. Defendant offered no proof of the actual market conditions around Dublin Plaza, or any other property for that matter, to challenge plaintiffs' evidence.

conclusions regarding the likelihood of prepayment on section 515 properties.[20] Indeed, the very impetus for the enactment of the repudiating legislation was the fact that so many owners were reaping the benefits of prepaying and converting to market rents. *See* H.R. Rep. No. 96-154, 96th Cong., 1st Sess. at 43 (1979), *reprinted in* 1979 U.S.C.C.A.N. at 2359; Belden & Wiener, HOUSING IN RURAL AMERICA 116-18 (1999).[21]

*2. Defendant's "Temporal Perspective" Argument Lacks Any Legal Foundation.*

Defendant suggests that plaintiffs' breach of contract damages calculations are flawed because plaintiffs have discounted their lost profits to the date of trial, rather than to the defendant's expert's preferred date of the breach (which in some cases occurred several years before trial). Defendant thus asserts that plaintiffs have used the wrong "temporal perspective" for calculating damages.

Like defendant's unmistakability and mitigation arguments, this "temporal perspective" argument stands in direct opposition to the precedent of this Court and the Federal Circuit. In

[20] *See Rural Rental Housing: Cost Information on FmHA's Section 515 Program and Other Housing Options*, GAO, B-227452, at p. 86 (Aug. 1987) (noting a Congressional Budget Office estimate that approximately 70% of the 515 loans issued in 1983 would prepay after twenty years); *Rental Housing: Potential Reduction in the Privately Owned and Federally Assisted Inventory*, GAO, at p. 27 (June 1986) (estimating potential reduction in FmHA portfolio); *Rural Rental Housing: Impact of Section 515 Loan Prepayments on Tenants and Housing Availability*, GAO, at pp. 30-35 (February 1988) (analyzing potential for future Section 515 prepayments and noting that ability to raise rents and proximity to cities of 50,000 or more indicates a likelihood of prepayment).

[21] Defendant also presents in its brief a chart showing that some owners did not submit a formal prepayment application under the agency's regulations, while others submitted a request years after their intended prepayment date. Def. Br. at 40-41. However, defendant offers nothing to challenge the specific evidence presented by plaintiffs regarding the date that they would have exercised their prepayment option but for defendant's repudiation. *See* Pl. Br. at 37-38. Thus, defendant's chart does nothing that discredits plaintiffs' evidence as to their intended prepayment dates. In addition, given the time and expense involved in the agency's prepayment procedures, it is not surprising that some owners declined to partake in the process.

actions before the Court of Federal Claims, discounting of lost profits that, absent the breach, would have accrued on an ongoing basis is required "only when the Plaintiff is recovering money it would have earned after the date of judgment," *i.e.*, only for *future* damages. *Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 416 (2000), *aff'd in relevant part*, 302 F.2d 1314 (Fed. Cir. 2002). "[P]ost-breach damages prior to the date of judgment <u>are</u> <u>not</u> <u>discounted</u>, and future damages (as of the date of judgment) are discounted by the rate of return on 'conservative investment instruments.'" (emphasis added) *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 108-109 (1999), *vacated on other grounds*, 317 F.3d 1363 (Fed. Cir. 2003).

In *Energy Capital,* now-Chief Judge Damich considered the same "ex-ante" discounting argument that defendant asserts here. Judge Damich rejected it in favor of the approach plaintiffs have followed, namely, discounting only future damages to the date of trial, or "ex-post" discounting. *Id.* at 415. In so holding, Judge Damich reviewed prior cases and found that the Court repeatedly has refused to discount ongoing lost profits damages to a date earlier than the date of trial or judgment. *Id.* (citing, *inter alia, LaSalle*, 45 Fed. Cl. at 108-109; *Northern Helix Co. v. United States*, 634 F.2d 557, 564 (Ct. Cl. 1980)). The Court took note that "some jurisdictions call for discounting to the date of breach when prejudgment interest is also awarded." 47 Fed. Cl. at 416. However, in the Court of Federal Claims, where no prejudgment interest is available on breach on contract claims, "this Court is not aware of any cases in the Federal Circuit that require discounting to the date of breach. Accordingly, this Court understands *LaSalle* to say that discounting, to the date of judgment, is appropriate for those damages that would have been earned in the future when viewed from the perspective of the date of judgment." *Id.* at 417. Judge Damich further noted, "Discounting is based on the premise that a dollar possessed today is worth more than a dollar paid tomorrow. When the Plaintiff is not

seeking 'tomorrow's dollars,' discounting is not necessary because the Plaintiff will not receive a windfall." *Id.* at 416, n.40.

Defendant argues that the rule of *LaSalle* and *Energy Capital* should be limited to cases where the lost profits accrue "over the course of the contract," rather than accruing on an ongoing basis as a result of the government's breach of the contract's early termination/prepayment provision. Such an argument cannot withstand scrutiny. All of the reasons that support the rule of *LaSalle* and *Energy Capital* apply with full force here. That the breached term happens to be a termination/prepayment term, as opposed to some other contract term, is irrelevant to the matter of discounting lost profits. *See Energy Capital*, 47 Fed. Cl. at 416, n. 39 (describing the relevant factor as whether "plaintiff would have earned money after the date of judgment.") Accordingly, as in *LaSalle* and *Energy Capital*, only plaintiff's *future* lost profits should be discounted. Since plaintiffs' *past* lost profits (those suffered between breach and trial or judgment) are a matter of historical fact, "discounting is not necessary because the Plaintiff will not receive a windfall." *Energy Capital*, 47 Fed. Cl. at 416 n.40.

Defendant, finally, suggests that awarding plaintiffs their past lost profits without a discount somehow underestimates plaintiffs' risk, and thus overestimates their actual loss. Def. Br. at 42, n.37. Instead, defendant suggests that one must do a valuation of expected cash flows "from the perspective" of the time of the breach. *Id.* This means, according to defendant's expert, that the Court should *ignore* events after the breach and "attempt to gauge what the expectations were" of risk and return at the time of the breach. IX/2050-51. This argument is a reformulation of the same "ex-ante" approach explicitly rejected in *Energy Capital, supra*. Further, it ignores the plethora of cases (in breach of contract, patent infringement, and other areas) recognizing that consideration of actual, historical events is the best way to determine a

victim's actual loss. As the Supreme Court held in *Sinclair Refining Co. v. Jenkins Petroleum Processing Co.*, 289 U.S. 689, 697 (1933):

> The law will make the best appraisal that it can, summoning to its service whatever aids it can command. At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvements, and the probable increase of efficiency or saving of expense. This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. *Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages and forbids us to look within.*

This Court's predecessor followed the Supreme Court's lead in *Neely v. United States*, 285 F.2d 438, 443 (Ct. Cl. 1961). There, the plaintiff sued for breach of a government contract to allow the plaintiff to mine coal on government land. The court reversed the trial commissioner's award of damages based on the estimated value of the plaintiff's lease before and after the breach; instead, it held that the profits actually realized by the party whom the government allowed to mine the land after the breach was "the best available proof on which to base an estimate of plaintiff's loss." *See also Georgia-Pacific Corp. v. United States*, 640 F.2d 328, 337 n.5 (Ct. Cl. 1980) (approving of the use of subsequent events in estimating damages, and noting that "the law should express 'a judgment from experience as against a judgment from speculation.'").

Moreover, defendant's proposed discounting would indisputably skew a damages award *below* plaintiff's actual loss. Under defendant's proposed method, as plaintiffs understand it, the court would discount all lost profits (past and future) back to a point years before trial, but then (for statutory reasons) not allow any offset for the time value of money (*i.e.*, prejudgment interest) that even defendant's expert agrees is an indisputable economic loss to plaintiffs.

IX/2043. The absurdity of that approach was implicitly recognized by both Judge Damich and the Federal Circuit in *Energy Capital,* 47 Fed. Cl. at 416-417, *aff'd,* 302 F.2d at 1314.

*3. Plaintiffs' Assumptions Regarding The Revenues They Would Have Realized After Prepayment Are Reasonable And Conservative.*

Defendant reiterates a number of Dr. Hamm's challenges to the assumptions made by Dr. Karvel in calculating the revenues that plaintiffs would have earned after converting to market rents. In general, Dr. Hamm's criticisms reflect his lack of knowledge and experience in the area of real estate. Dr. Karvel has dedicated his entire career to the study of real estate. He is currently the distinguished chair of real estate at St. Thomas University, he has written countless books, articles, and papers on a variety of real estate topics, including a leading text, and he has testified as an expert in dozens of real estate cases. PX 763 at Tab A. Dr. Hamm, by contrast, has never published any articles, has never taught any courses, and has never testified as an expert on real estate valuation. VIII/1844-45; DX 40. It is noteworthy that while Dr. Hamm has significantly more experience in the area of banking than real estate, his opinions on thrift issues were called into serious question and ultimately given "little weight" in a recent *Winstar*-related case. *See Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 575 & Evidence Appendix J (2003). Thus, Dr. Karvel's testimony on the reasonableness of his assumptions and projections is entitled to significantly more weight than Dr. Hamm's criticisms.

Rent Projections: Dr. Hamm opines that plaintiffs' reliance on "note rate rents" is suspect because those rents bear no connection to the market. However, plaintiffs established at trial that note rent rents bear a number of significant relationships to the market.

The "note rate" rent is calculated pursuant to FmHA Instruction 1930-C, Exhibit H-1 (PX 764; 2176-77), and represents the maximum level or "upper limit" of rent that low-income tenants can pay while residing at a property participating in the Section 515 program. II/515-17.

The calculation of note rate rents is much like the concept of "pencilling-out": an owner calculates whether or not a property, or prospective property, will "break-even" given certain levels of projected rental rates, expenses, and debt financing. Thus, although the note rate rent constitutes a rent "ceiling" for low-income tenants (I/340, II/516), at the same time it serves, in some respects, as a "floor" to the conventional or market-rate rent that a Section 515 property would need to achieve in order to survive in the conventional market. II/515; II/517-18; IX/2190.

Much in the manner that owners engage in "pencilling-out" analyses during the pre-development phase of conventional properties to determine their commercial feasibility before committing to construction financing, the FmHA would establish note rate rents during the "pre-application stage with the initial budgets" submitted by loan applicants. II/516; IX/2178. While serving as the FmHA's Multi-Family Coordinator for the State of California, for example, Mr. Greenwalt would ensure that a Section 515 property's note rate rent was high enough such that, upon graduation after prepayment, the property "stood a reasonable chance of succeeding in the marketplace." II/517-18. In addition, the Agency used note rate rents to project income levels incorporated into appraisals using the capitalization approach. II/515; IX/2178. This was also part of the Agency's conventional feasibility analysis. II/515.[22]

[22] During the "pre-application stage," certain plaintiffs engaged in their own "pencilling-out" analyses to determine whether their projects would be feasible in the conventional market. They wanted to verify that the prospective property's note rate rent would approximate, at the very least, the low end of the market-rate rent structure. Mr. David Tucker, for example, was repeatedly warned by the Agency that, if his property was not approved by the Agency after final inspection, he would be required to operate it as a conventional, market-rate property. PX 729 at 2; PX 724 at 4; II/630. Thus, Mr. Tucker took great care to ensure that, if the Agency did not approve his property for participation in the program, his rents would be competitive in the conventional market. II/630-31.

Mr. Greenwalt and other FmHA officials would not authorize the development of any Section 515 project the note rate rent of which was too much higher than the prevailing conventional market-rate rents in the community. I/340; II/516. Mr. Greenwalt did not want to over-step the bounds of the Section 515 program by authorizing the development of affordable housing with rent levels that were so high that they would take away conventional tenants from market-rate housing. II/516-17; IX/2190. The Agency therefore also used note rate rents as an indicator of the low end of the conventional segment of the market. *Id.*

Due to the manner in which note rate rents were calculated, they came very close to comprising market-rate rents themselves at the time they were first calculated. IX/2192. However, the method by which they are calculated entails that they would not likely exceed the market-rate level of rents. I/340. If anything, the note rate rents start out lower than market-rate rents. I/340. Dr. Karvel believes that, for the vast majority of properties in this civil action, note rate rents are likely to have been consistently below the level of prevailing market-rate rents in the areas in which those projects are located, at the time of their inception. I/342. As a result, Dr. Karvel determined that it would be reasonable to use note rate rents as "a very conservative surrogate" for market-rate rents. I/341-42; IX/2193; VII/1518-60.

Dr. Karvel also testified that note rate rents constitute a reasonable surrogate for market-rate rents because the note rate represents that level of rent which certain low-income tenants already pay, or nearly pay, while residing at properties operating *within* the Section 515 program. I/342-343. Certain studies also have shown that such rent levels are within reach of those low-income tenants capable of reallocating a higher percentage of their income towards housing. (Andrew M. Sullivan, URBAN ECONOMICS (1990) at 390) Thus, using note rate rents as

a proxy for market-rate rents entails that the viability of a property need not depend entirely upon attracting a new tenant base.

During the years that the Section 515 properties at issue in this civil action were developed (*i.e.*, from 1974-1982), the FmHA called "note rate" rents "market rate" rents. I/338-39; IX/2174; PX 764 at 3 n.2. This terminology reflected the fact that the Agency would calculate "market rate" (or "note rate") rents in part to determine how well the property would perform after prepayment and conversion to market-rate housing. II/517-18. The FmHA began calling its calculated "market rate" rents "note rate" rents during the late 1980s. I/338-39; IX/2174-77; PX 764 at 3 n.2; PX 837. The Agency's current instructions reflect the fact that "note rate" rents were once called "market rate" rents, and are in fact calculated in the same manner in which "market rate" rents were calculated. PX 764 at 3 n.2; PX 837; IX/2176-77; II/515-517.

Finally, plaintiffs established at trial that the note rate rents relied on by Dr. Karvel are almost universally lower than every other possible surrogate for market rents, including: (1) the comparable properties analyzed by Mr. Gorowsky (PX 801; PX 763, Tab D), (2) the actual market rents that have been achieved at the Iowa properties that have prepaid subject to G-4 restrictions (PX 802), (3) the "fair market rents" issued by HUD (PX 801; PX 763, Tab D),[23] and (4) the comparable rents identified in the agency's Pre-TRAC database (PX 817 at 10; PX 819 at 9).[24] Thus, if plaintiffs had used any one of these other substitutes for market rent, their damages

---

23 HUD's fair market rents are calculated at 40% of the range of rents in area and are intended to be "low enough to serve as many low-income families as possible." PX 786 at 2. Thus, the HUD rents, which exceed the note rate rent in nearly every case, are designed to be at the low end of market rents.

24 The Pre-TRAC information is particularly helpful because it reflects the agency's own estimate of market rents. Plaintiffs received Pre-TRAC documents showing comparable rent information for only two properties, Sunrise River and Fall River I. *Id.* Both showed that

would have increased substantially. In short, plaintiffs' rent projections not only have a direct relationship to the market, they are also uniformly lower than the other possible surrogates for market rents.

Elasticity of Demand: Dr. Hamm also asserts that if plaintiffs prepaid and converted to market rents, the increased supply of market housing in the area would impact rent levels. However, Dr. Hamm cites no authority, legal, economic or otherwise, supporting his theory on the elasticity of housing. Indeed, existing authority supports the conclusion that the demand for housing is inelastic. *See* Paul Krugman, *Peddling Prosperity: Economic Sense and Nonsense in the Age of Diminished Expectations* 211-213 (W.W. Norton & Co. 1994); *see also Associated Enters., Inc. v. Toltec Wastershed Improvement Dist*., 410 U.S. 743, 751 n.3 (1973) (Douglas, J., dissenting) (noting that "the demand for rental housing is price inelastic" in urban areas and "there is no reason why it may not also be true in rural areas, as well"). Given Dr. Hamm's limited knowledge regarding real estate, his unsupported opinion on elasticity is not persuasive.

Operating and Maintenance ("O&M") Expenses: The government wrongly asserts that plaintiffs' estimates of operating expenses "involve inconsistencies" or are "arbitrary." (*See* Def.'s Br. at 46.) However, the operating ratio of O&M expenses to effective gross income, as reported by IREM, ranges between 40 and 50 percent and has done so consistently throughout the past 30 years. II/487. During his analysis of the FmHA budget forms, Dr. Karvel examined the data reported on the standard FmHA 1930-7 forms in relation to what he knows about the normal operating ratio calculated and reported by IREM. II/487.

---

plaintiffs' estimates are well below what the agency considers to be the market rent for those properties. *E.g., compare* PX 817 at 10 (market rents for Sunrise River are $485 (1BR) and $525 (2BR)) *with* PX 763 at 33 (plaintiffs projected rents are $392 (1BR) and $422 (2BR)).

Dr. Karvel assumed that, upon conversion from an affordable housing property to a conventional, market-rate property, certain O&M expenses taken from any given Section 515 property's budget form might increase, and some might decrease. I/320-21; II/420-21; II/426. In the aggregate, however, these expenses – when compared with the property's effective gross income as projected by Dr. Karvel's damage models – should remain roughly within IREM's operating ratio range for comparable, market-rate properties located in the same region of the country. II/419-20; II/487.

If, upon examination of the O&M expenses from any given property's budget form, Dr. Karvel determined that the IREM operating ratio was too high, he would make certain adjustments, if warranted, to various expense items and adjust those that are not appropriately included in an O&M budget (*e.g.*, capital expenditures). II/415-16; II/487. On the other hand, in the event that the aggregate O&M expenses from any given property's budget form was compatible with IREM's operating ratio, and if otherwise comfortable that he had a reasonable representation of that property's aggregate O&M expenses, Dr. Karvel would use the budget's aggregate figure even though certain individual line item figures might seem relatively high or low for a market-rate property. II/419-20; II/426-27; II/430; II/487-88.

Mr. Gorowsky verified the reasonability of the O&M expenses projected by Dr. Karvel for each property at issue here, in part by comparing them against the various benchmark data compiled by IREM. VI/1315-16; VI/1360-61. Mr. Gorowsky performed two general analyses regarding O&M expenses. First, he compared the operating ratio of expenses to effective gross income for each of the 37 subject properties, as if they were operating as market-rate housing, to the operating ratios as reported in a 1999 IREM report for properties similar to those at issue here. II/487; VI/1362. He discovered that, for virtually every one of the subject properties other

than the Iowa properties, the operating ratio calculated with Dr. Karvel's projections is equal to or higher than the IREM reported ratio. VI/1362. Thus, Dr. Karvel's projected expenses for the subject properties are generally higher than the expenses reported by IREM. VI/1363. The Iowa properties were much closer to the IREM data in part because they all were managed by Heartland Management Company and enjoyed certain economies of scale regarding management fees and other O&M expenses. VI/1363. The second analysis regarding O&M expenses conducted by Mr. Gorowsky involved the post-1979 subject properties. VI/1364. He compared Dr. Karvel's projected O&M expenses for each property for the years 1998, 1999, 2000, and 2001 – to the actual O&M expenses for each property for those years. VI/1364-65; PX 763 at 31.1, Tab E. He concluded that Dr. Karvel's projected O&M expenses were reasonable and slightly conservative. VI/1365.

Further supporting this methodology, and as set forth at trial, the level of expenses for Pine Needle Apartments in 1993, used by Dr. Karvel as the base year for projecting the property's expenses year-to-year, is supported by the McNeill Appraisal. For example, the operating ratio of actual expenses to effective gross income for Pine Needle Apartments in calendar year 1993 is approximately 41.5% (I/370), *i.e.*, above the maximum end of the range of 35% to 40% identified by Mr. McNeill as typical for properties comparable to Pine Needle Apartments. PX 604 at 14; I/241; I/370.

The actual level of O&M expenses for Pine Needle Apartments for calendar year 2002 also supports Dr. Karvel's methodology for projecting expenses. Upon review of the property's actual budget for calendar year 2002 (FmHA Standard Form 1930-7; DX 56), Mr. Morosani noted that capital expenses were commingled with O&M expenses, which is not appropriate for

an operational budget. I/275-77.[25] Upon review of the same 2002 budget (DX 56), Dr. Karvel noted that the operating ratio of expenses to effective gross income (which, as calculated from the figures on the form, constitutes 72%), was well beyond the range of the approximate 40-50% IREM operating ratio. II/428-30. For this reason, the 2002 O&M figure would not be acceptable to use in the damage model. II/428; II/432.

Dr. Karvel applied the same methodology (I/320-21; II/419-21; II/426, 487) for analyzing budget forms that he used for all properties – including the 1995 budget form for Pine Needle Apartments – to the 2002 budget form for Pine Needle Apartments (II/428). He concluded that the following items, including capital expenses, would need to be pulled out from the $144,151 on the 2002 form (DX 56) in order to arrive at a true O&M expense figure appropriate for an operations budget for a conventional property: (i) $19,892 in "Furniture and Fixtures Replacement" (as that is a capital expenditure rather than an operating expense) (II/415-16); (ii) $33,559 in "Management Fees" (although this 17½% fee may be appropriate for an FmHA property it is much too high for a market-rate property, which typically runs from 4% to 5% of net rental income (II/474; III/712-13; VI/1374) or, in this case, $12,998) (II/416-17); and (iii) $1,600 in "Legal Expenses" and $1,200 in "Office Supplies" (both of which are encompassed within management fees in a market-rate property) (II/417). Upon making the appropriate adjustments to the form's figure of $144,151, Dr. Karvel arrived at a total O&M expense figure of about $100,000 for 2002, less than the $104,000 projected for the same year pursuant to Dr. Karvel's model. II/414; II/418.

---

25 The total expense figure of $144,000 in the budget, therefore, does not accurately reflect the property's O&M expenses because it includes such significant capital expense items as "Furniture and Fixtures Replacement." I/275-76.

Pursuant to his methodology (I/320-21; II/419-21; II/426, 487), Dr. Karvel had not been required to make similar types of adjustments to the 1995 budget form and figures for Pine Needle Apartments because (i) the property's aggregate O&M expenses for 1995 were consistent with the IREM operating ratio that he would normally expect to find for market-rate properties located in the same region of the country (II/426-27; II/429); and (ii) the individual line item amounts on the 1995 form (such as those for management fees (II/424) and furniture replacements (II/419)) were not as incompatible with market-rate property O&M expenses as were those items listed on the property's form for 2002. II/419-27. Dr. Karvel would not have relied on the data from the property's 1995 form if the aggregate amount of O&M expenses had fallen outside of the normal expected range of O&M expenses for this type of market-rent property. II/430.

This methodology is also supported when considering the Timberbrook I Apartments. That is, Mr. Stordahl's prepayment submission of August 1992 contains an FmHA projected 1992 budget form reflecting a level of market-rate O&M expenses that supports Dr. Karvel's methodology of forecasting expenses. PX 705 at 5; I/320-21; II/419-21; II/426, 487. Pursuant to Mr. Hoesing's instructions for completing the form (PX 704 at 2; II/548; II/549), the total rent receipts figure (at line 18: $91,565) incorporates a 5% vacancy factor. PX 705 at 5. After adding laundry income (line 10: $1,500), and subtracting the O&M expenses (line 2: $47,850), one obtains a Net Operating Income figure of $45,215. PX 705 at 5. This figure favorably compares with Dr. Karvel's projected NOI, for the same year, of $45,738. PX 707 at 2. Moreover, Dr. Karvel's projected operating ratio for Timberbrook I operating as a market-rate property, is 54%, a bit higher than the normal IREM range. PX 707 at 2 ($47,850 ÷ $88,574 = 0.54).

The level of O&M expenses reflected in the 1992 column of the "Projected Income and Expense/Timberbrook I" submission prepared by Mr. Stordahl for, but never presented to, Norwest Bank, also supports Dr. Karvel's methodology for projecting expenses. PX 706 at 2; I/320-21; II/419-21; II/426, 487. Unlike the 1992 projected budget form contained in Mr. Stordahl's prepayment request, which incorporated a 5% vacancy rate assumption, this projection assumes a 20% vacancy rate because "this is a projection for the bank, which is altogether different from the projection for Farmer's Home." II/549. After adjusting the figures for a 5% vacancy (which yields a net rental income of $91,565), adding laundry income ($1,500), and subtracting the O&M expenses ($47,850, *i.e.*, $75,057 less $27,207 for Loan Amortization [not "authorization"]), one obtains the same Net Operating Income figure of $45,215 as before. PX 706 at 2. This figure was achieved despite use of the inflated figure for property taxes appearing in Mr. Stordahl's projections. PX 706 at 2.

<u>Management Fees</u>: The government is also wrong when it asserts that plaintiffs assumptions regarding management fees are incorrect. For example, Mr. Gorowsky testified that he analyzed the Iowa G-4 properties to determine whether their management fees increased or decreased after the G-4 prepayment start date and discovered that the management fees went down, both in dollars and in percent, after conversion, to approximately 5 to 5½% of the effective gross income. VI/1374.

The application of the mid-point of Mr. Roseliep's range of 4-6% of effective gross income (III/712-13), *i.e.*, 5%, to the said effective gross income figures projected by Dr. Karvel's damage model for each Iowa property, results in aggregate management fees of $94,812 being incurred by the Iowa properties if they had been operating as market-rate housing during the year in question. Pl. Ex. 328 at 2; 352 at 2; 377 at 2; 399 at 2; 430 at 2; 456 at 2; 477 at 2; 497 at 2;

521 at 2; 541 at 2; 554 at 2; 563 at 2; 575 at 2. The aggregate management fees reported for the same year on the standard FmHA 1930-7 budget form for each Iowa property, however, is $120,537. Pl. Ex. 330, 354, 379; 401; 432; 458; 479; 499; 523; 543; 556; 577.

The decrease in fees upon conversion to market-rate housing is largely due to the fact that the high degree of documentation and bureaucratic oversight unique to the Section 515 program is eliminated upon prepayment. For example, the submission of the following reports and documentation required in the Section 515 program are not required for conventional housing: physical inspection forms; audits; certification of tenant selection; and budget submissions. III/707-11.

Property Taxes: Mr. Gorowsky also testified that when he analyzed the Iowa G-4 properties to determine whether property taxes increased or decreased after the G-4 prepayment start date, he concluded that, during the time period that the properties are restricted, the property tax appraisal analysis is performed as if the properties at issue are operating as market-rate housing. VI/1374-1375; VI/1457. Thus, the appraisal methodology does not change after conversion to market-rate housing, and it has not changed with respect to the Iowa G-4 properties during the G-4 transition period. VI/1375. Mr. Gorowsky also discovered that Messrs. Levy and Roseliep have appealed property tax assessments on restricted-rent properties on the ground that they were assessed as if they were worth market value, when in fact they are worth much less. VI/1457-58. These appeals have not been successful. VI/1458.

Dr. Karvel's methodology takes into account property taxes and allows for variability. For example, with respect to Timberbrook I, Dr. Karvel's projected market-rate NOI is close to that projected by Mr. Stordahl even though Mr. Stordahl projected an increase of property taxes following conversion from a budgeted amount of $6,000 for 1990 (PX 709 at 2, line 22) to

$12,700 in 1992 (PX 705 at 6, line 22). Even assuming that this 1992 property tax projection is reasonably accurate, these forms substantiate Dr. Karvel's methodology of recognizing that, although individual expense items (such as property taxes) might increase or decrease upon conversion, the O&M expenses are accurate in the aggregate if they fall within a normal IREM operating ratio. I/320-21; II/419-21; 426; 487.

Discount Rate: Dr, Hamm disputes Dr. Karvel's use of an 11½ % present value factor for the market-rent cash flows. *See* I/330-32; II/464-65; PX 598 at 4. However, as Dr. Karvel testified, this rate is representative of the risk level associated with the development and ownership of conventional rental properties in rural areas. I/331-32; I/466-68. It also is consistent with the 9% capitalization rate employed by Dr. Karvel combined with his 2½% assumed growth or inflation rate (9+2½=11½%). I/330-31; II/433-34; II/466; II/489-90. Dr. Karvel also confirmed the validity of his 11½% present value factor by consulting certain information unique to rural properties, including a comprehensive database of rural properties maintained by Shenahan & Company, a real estate appraisal firm located in Minneapolis-St. Paul, Minnesota and well-recognized throughout the United States. I/331-32; II/468-69; IX/2181-83.

While Dr. Hamm believes that a higher discount rate is appropriate based on his analysis of "noninstitutional-grade" properties in the Korpacz report, Dr. Karvel testified that the discount rates associated with "institutional-grade" and "noninstitutional-grade" properties reported in the Korpacz Report are simpily not relevant to rural rental housing. II/468-69; IX/2179-83. Mr. Peter Korpacz concurs with Dr. Karvel's opinion. IX/2182. "The Korpacz report in no way addresses the issue of what discount rates or capitalization rates would be for 12 to 40 or 48 units in rural communities scattered throughout the United States. That's an entirely different market

with different characteristics." IX/2180. Given Dr. Karvel's superior experience and knowledge regarding real estate matters, and rural real estate in particular, his opinion as the appropriate discount rate is entitled to significantly more weight than Dr. Hamm's.

*4. Plaintiffs' Assumptions Regarding The Risks and Burdens of Remaining In The 515 Program Are Reasonable And Conservative.*

Defendant asserts that plaintiffs overstate the risks of property ownership within the Section 515 program. However, several factors support Dr. Karvel's use of an 11% discount rate. First, the income received by an owner while a property is being operated within the confines of the Section 515 restricted-rent program is limited to a maximum of an eight percent annual return on the owner's initial equity. For the properties in this civil action, these sums of money primarily range from $1,344 to $7,663, per year (with a low of $918 and an high of $10,928) and average $3,433 per property. Such small sums of money are not attractive to investors, according to Dr. Karvel, particularly given that they are required to assume the responsibility for managing apartment buildings and the obligation to pay-off large mortgage loans; they therefore demand a premium rate of return. I/332; II/471-72; III/707-11; VI/1262; IX/2186. In addition, the eight percent return is not guaranteed, and will be granted by the agency only when the project finances allow for it. I/332-33; II/470-71; IV/947; IV/876-77, 889; IV/646; V/1177. Indeed, an analysis performed by Dr. Hamm on the plaintiffs' ability to obtain their annual return indicates a substantial default rate of 15-20%. *See* DX 42 at 34-35; II/470-71.

The risk levels for the properties at issue here operated within the market-rate scenario, as compared to within the restricted-rent scenario, are relatively commensurate with one another, by virtue of the fact that many of the factors involved – *e.g.*, location, demographics, inflation, etc. – are the same irrespective of whether the properties remain affordable or convert to market-rate housing properties. II/469-70. In addition, irrespective of whether they are operated within the

market-rent or the restricted-rent scenario, the properties rely upon high occupancy rates to ensure stable income levels. II/646. To the extent that subsidized housing generally exhibits slightly higher occupancy rates than conventional housing, subsidized housing is properly assigned a slightly lower risk factor for purposes of assessing discount rates. II/469; II/472.

Dr. Hamm's reliance on the fact that some investors are still entering into the Section 515 program even after the elimination of the prepayment request reflects only his lack of knowledge regarding the nature and history of the program. In 1986, when Congress enacted the first moratorium preventing prepayment, it also created the Low Income Housing Tax Credit program as part of the Tax Reform Act of 1986. *See* 26 U.S.C. § 42. The program offers private developers incentives to build low-income rental housing in the form of tax credits which can be used to reduce their tax liability, or be sold to others in order to reduce their tax liability, in exchange for meeting certain "affordability requirements." *See* Martin D. Abravanel & Jennifer E. H. Johnson, *The Low-Income Housing Tax Credit Program: A National Survey of Property Owners* (Office of Policy Development and Research, U.S. Department of Housing and Urban Development, Oct. 29, 1999).[26] Thus, the inducement for owners to enter the 515 program after the elimination of the prepayment right was not the possibility of an eight percent annual return, as Dr. Hamm presumes, but rather the availability of tax credits. IV/1040, 1047 (testimony of

[26] In brief, the program works as follows: each year, state and local allocating agencies (normally housing finance agencies) receive an allocation of tax credits from the Internal Revenue Service. States use previously established guidelines to distribute these tax credits among developers who have submitted development plans to the housing agency for low-income rental housing. *See id.* at 3. Developers can then use these tax credits in a number of ways in order to decrease the costs of their projects. For instance, they can reduce their organization's tax liability for a 10-year period, they can sell some or all of the tax credits directly to investors, or they can sell the credits through so-called "syndicators" who act as intermediaries between developers and investors and who "create a marketplace" in which investors can purchase "pooled" tax credits from a variety of sources or from one person. *See id.* at 4-5.

Mr. Costello that while the benefit of the program pre-ELIHPA was the right to prepay and go conventional at a later date," the benefit of the program post-ELIHPA is the ability "get our profits up front" through the use of tax credits).

5. *Plaintiffs' Diligent Efforts To Perfect The Seventy-Four Damages Analyses Presented At Trial Are No Basis For Discrediting Their Conclusions.*

Defendant contends that plaintiffs' damages models should be disregarded because they have been revised over time. Interestingly, defendant does not identify any errors in plaintiffs' existing models, but asserts that the prior corrections indicate a likelihood of further errors. In fact, none of the corrections that plaintiffs made in the months leading up to trial were identified by defendant. Plaintiffs discovered the errors and promptly corrected them in a continuing effort to ensure the accuracy of their damages calculations.

In addition, the number and nature of corrections made were not out of the ordinary given the number of analyses performed and the tight time frame in which they were completed. There are 37 properties at issue, each with unique characteristics. Each property asserts a contract claim and a takings claim, for a total of 74 separate analyses and 713 pages of calculations and tables. PX 763. The analyses for all of the pre-1979 properties (29 of the 37 properties at issue) were prepared on a tight schedule, as the case moved quickly to trial following the reinstatement of those claims by the Supreme Court in June 2002. Importantly, plaintiffs' efforts were hampered by defendant's failure to timely produce requested budget and loan amortization forms needed for plaintiffs' experts to prepare their analyses. *See* Plaintiffs' Motion to Compel, Exs. A-F. Thus, under the circumstances, plaintiffs' efforts to ensure the accuracy of the damages models presented at trial make their analyses more reliable, rather than less reliable.

## CONCLUSION

For the reasons set forth above and in plaintiffs' post-trial brief, and based upon the evidence presented at trial, plaintiffs respectfully request that the Court enter judgment in their favor on their claims for breach of contract and a Fifth Amendment taking of their properties.

Dated: October 27, 2003

**Filed Electronically**

Respectfully submitted,

**s/ Jeff H. Eckland**

William L. Roberts, Of Counsel
Mark J. Blando, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

M2:20579391.05