IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANCONIA ASSOCIATES, a Limited Partnership, et al., Plaintiffs, | ) | File No. 97-381C Judge Francis M. Allegra |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | **PLAINTIFFS' STATUS REPORT IN RESPONSE TO THE COURT'S ORDER OF MARCH 5, 2004** |

In its Order of March 5, 2004, the Court requested that the parties attempt to enter into a stipulation regarding the information identified by defendant in its motion for leave to supplement the record based upon certain post-trial events. The parties have attempted to prepare the requested stipulation, but have not been able to agree upon the terms of any such filing. As a result, the parties agreed to file separate statements in response to the Court's Order. Accordingly, plaintiffs respectfully submit this Status Report setting forth their position as to how the information cited by defendant should be admitted into the record, if at all, and the weight that information should be afforded in the absence of an evidentiary hearing.

**BACKGROUND**

The trial of this matter was held in May 2003. During the trial, Ms. Marge Alden and Mr. George Vitalis testified at length regarding Riverfront Apartments and Sunrise River Apartments, two of the properties at issue in this case. Trial Tr. 936-1012. Prior to the time of the trial – and in fact before discovery had concluded – the agency had accelerated the loans on both properties and threatened to foreclose if the loans were not paid in full. *See*

Declaration of M. Alden to Plaintiffs' Opposition to Motion for Leave to Supplement Record, Ex. A (letters of December 31, 2002, declaring the entire indebtedness on both loans "immediately due and payable"). Mr. Vitalis and Ms. Alden anticipated that the partnership would lose its ownership rights during the foreclosure proceeding.

The predicate facts concerning the agency's threatened foreclosure were introduced by plaintiffs at trial. *See* Trial Tr. at 967-69. Defendant, however, declined to introduce any evidence or elicit any testimony from plaintiffs' witnesses regarding these events. Damages models calculating the losses suffered by each of these two properties as a result of defendant's actions were then introduced through plaintiffs' experts and admitted into evidence. PX 26 at 8; PX 27; PX 79 at 9; PX 80.

The parties then engaged in post-trial briefing through October 27, 2003. Thereafter, on December 4, 2003, defendant moved to supplement the record based upon certain events that occurred following the close of the trial. In particular, defendant sought permission to introduce into evidence certain documents purporting to show that the mortgage loans on Riverfront and Sunrise River properties were prepaid on October 20, 2003 and July 25, 2003, respectively. Plaintiffs opposed the motion on January 15, 2004, asserting that the documents should not be put into the record, and defendant replied on January 22, 2004. The Court then issued an Order on March 5, 2004 requesting that the parties attempt to enter into a stipulation regarding the new information offered by defendant.

## DISCUSSION

Should the record in this case be supplemented with the information cited by defendant, at least three major issues must be addressed by the Court in determining what weight, if any, that information should be afforded: (1) the relevance of that information to

defendant's liability for breach of contract; (2) the relevance of that information to plaintiffs' damages calculations for the two properties at issue; and (3) whether the information can be afforded any weight in the absence of an evidentiary hearing. Each of these issues is addressed below.

**A. The Government's New "Evidence" Is Irrelevant To Its Liability For Breaching Plaintiffs' Contracts.**

The law is well-established that, when faced with the prospect of large liabilities for damages at trial, repudiating parties may not suddenly "change their minds," correct their wayward ways by belatedly performing their original obligations, and thereby become immune from the consequences of their wrongful conduct. For example, while the doctrine of anticipatory repudiation generally allows the repudiating party to retract its repudiation prior to the time for performance, the other party's election to bring suit cuts off that right. *See* Plaintiffs' Post-Trial Brief at 19-20. In this case, the Supreme Court's decision makes clear that the Congressional legislation at issue in our case should be treated as classic repudiating conduct. *Franconia Assoc. v. United States*, 536 U.S. 129, 143, 148 (2002).

Since defendant took no action to retract its repudiation prior to the commencement of this civil action in June 1997, no further action by defendant could relieve it of its contract liability. Once an owner has filed suit, not even the Congressional repeal of the repudiating legislation could deprive that owner of its right to compensation from the government. Thus, there can be no doubt that the information cited by defendant has no relevance to the question of defendant's liability for breach of contract. Indeed, defendant does not appear to assert otherwise.

**B. The Government's New "Evidence" Is Irrelevant To The Computation of Plaintiffs' Damages.**

Defendant's primary motivation for introducing the documents at issue appears to be an effort to impugn the credibility of the damages analyses prepared for the two properties at issue. However, for both fact-based and legal reasons, the information defendant cites does not have any impact on the damages to which plaintiff Franconia Associates is entitled for these two properties.

*1. The Facts Concerning The Properties At Issue Are Still Unfolding.*

Defendant hopes to have the Court conclude that the Riverfront and Sunrise River properties are free from the restrictions of the 515 program, and that their right to any future damages should be curtailed. However, the future of these properties remains unsettled. Indeed, one of the projects at issue currently is subject to a court order temporarily prohibiting it from increasing rents. *Vitalis v. Alden,* No. CT-04-000178, slip op. at 2 (Minn. Dist. Ct., March 16, 2004). Case law is replete with examples of affordable housing owners who improperly have been permitted to prepay their mortgage loans, only to be forced back into their respective affordable housing programs after lengthy litigation brought by such entities as tenant-rights organizations. *See, e.g., Alder Terrace v. United States,* 161 F.3d 1372 (Fed. Cir. 1998). Here, too, there can be no certainty as to whether the agency's decision to direct the owners to prepay will not be successfully challenged in court.

The uncertainty as to what will happen to these properties in the months and years to come is further attenuated by the unresolved issues regarding whether the agency's actions contravened the foreclosure procedures required by the applicable regulations. As plaintiffs previously explained, the agency's regulations permit an owner to leave the Section 515

program through acceleration of its account only in instances where the agency determines that the property is no longer needed in the program. *See* Plaintiffs' Opposition to Motion for Leave to Supplement Record at 8-11; 7 C.F.R. § 155.15(d)(2)(v). Had the agency's required procedures been followed, the properties at issue would have been put up for sale and likely would have been purchased by either the agency or a third party subject to continuing affordability restrictions. *Id.*

It remains a mystery why, after thwarting plaintiff Franconia Associates' attempts to prepay for over a decade, agency employees suddenly ordered Ms. Alden to prepay without restrictions following the trial in this matter.[1] As discussed in the supporting Declaration of Ms. Alden, plaintiff Franconia Associates believes that the Agency deliberately permitted it to prepay said loans in an attempt to jeopardize its right to recover compensatory damages in this action. Declaration of Marge Alden at ¶ 8. Thus, without the opportunity to explore the issues concerning the agency's motivations for its actions and whether it violated applicable regulations, the cited information cannot be afforded any serious consideration. If, for example, it can be established that the government has attempted to manufacture evidence in an attempt to lessen plaintiffs' damages, certainly that evidence could not be relied upon by the Court.

In sum, given the ambiguities concerning what will ultimately happen to these properties, and the unresolved questions surrounding the agency's peculiar actions in this case, defendant's attempt to question the validity of plaintiffs' damages analyses must fail.

---

[1] If provided the opportunity, plaintiffs would establish that foreclosure proceedings brought by the agency are very rare, and those that result in unrestricted prepayments by owners who have unsuccessfully tried to prepay for over ten years even more rare.

Indeed, it is precisely because of such uncertainties as to future events that the law recognizes "the endlessness and futility of the effort to follow every transaction to its ultimate result." *Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534 (1918); *Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060, 1072 (Fed. Cir. 2001).

*2. Defendant Bears The Risk Of Any Uncertainties Caused By Its Repudiating Conduct.*

Under standard legal principles, a defendant is presumed to have assumed the risk of its own improper conduct. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264 (1946). Certainly, plaintiffs are not required to face damage offsets when faced by events that, at least temporarily, appear to move in their favor. Taking such offsets into account would inappropriately shoulder plaintiffs with additional risks which may occur even further in the future, when under the circumstances it is equitable only for the defendant to bear the risk of its own wrongful conduct.

Moreover, the post-trial evidence concerning the prepayment of the Riverfront and Sunrise River properties reflects "unrelated events" and "remote consequences" of the breach of plaintiffs' contracts, and as such cannot in any way reduce the liability of the wrongdoer for its wrong. As the Federal Circuit recently observed in *LaSalle Talman Bank, F.S.B. v. U.S.*, 317 F.3d 1363, 1366 (Fed. Cir. 2003), "mitigation is limited to actions reasonably *directly related to the breach* and its proximate consequences." (emphasis added). This view is consistent with the general approach of the law not to involve itself in the speculative enterprise of valuing future contingencies, whether they are favorable to the plaintiff or not:

"[The law] does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss." *Hughes Communications Galaxy, Inc. v. U.S.*, 271 F.3d 1060, 1072 (2001).[2]

In this case, the government's decision to compel prepayment of the loans on Riverfront and Sunrise River Apartments is not a consequence related – let alone "directly" related – to the government's breach. Indeed, this decision constitutes activity that is *directly contrary* to the government's initial breach, which was to reject plaintiffs' attempt to exercise their contractual right of prepayment. It cannot be said that the recent decision concerning Riverfront and Sunrise River in any way grew out of the government's decision to restrict prepayments through its repudiating legislation or its subsequent breach. Thus, such revelations are nothing short of useless for evidentiary purposes as they pertain to damages.

The government's request to inject evidence of future events is merely an attempt to demonstrate some kind of perceived "imprecision" or uncertainty regarding plaintiffs' damages models. However, even if the supposed imprecision introduced by such attempts could deemed to be material – which it cannot – defendant still cannot realize any benefit in the form of an offset to plaintiffs' damages because, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman*, 317 F.3d at 1374; *see also Commercial Federal Bank, F.S.B. v. U.S.*, 59 Fed. Cl. 338, 351 (2004). Any

---

[2] The court in *Hughes Communications Galaxy*, referencing the Supreme Court's decision *in Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918), alluded to the danger of such speculations in the antitrust context, noting that "calculating pass-through damages reductions would present 'the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." (citing *Hanover Shoe, Inc. v. United States*, 392 U.S. 481, 493 (1968)). In this case, any attempt to calculate future offsets would involve similar speculation as to events that have not yet unfolded.

attempt, therefore, to "muddy the waters" respecting damages issues simply cannot inure to the benefit of defendant. *See Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 244 F. Supp. 2d 1250, 1261 (D. Kansas 2003) (citing E. Allen Farnsworth, *Contracts* § 12.15 at 922 (2d ed. 1990)) ("As the breaching party, defendants 'should not be permitted to reap advantage from [their] own wrong by insisting on proof which by reason of [their] breach is unobtainable."); *see also Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) ("it is axiomatic that a party cannot benefit from its own breach.")

Finally, even purportedly "direct" benefits received by a plaintiff due to defendant's wrong will not be offset where such supposed benefits "occur[] after the time of valuation of the plaintiff's loss," *i.e.*, after the May 2003 trial of this matter. *See* 1 Dobbs Law of Remedies § 3.8(2), at 377 (explaining exceptions to "credits" for direct benefits received in tort context and observing that such credits generally correlate to measuring benefits in contract cases). The application of any other rule in this context would force the Court to hold the record open indefinitely in order to account for every imaginable factual development – whether large or small or favorable or unfavorable to the plaintiff – in the future, assess its value, and modify damages accordingly. This cannot be, and fortunately is not, what the law requires.

**C. Absent A Full Evidentiary Hearing, The Government's New "Evidence" Cannot Be Afforded Any Weight.**

In determining whether to reopen a trial court record to consider additional evidence, courts consider the following factors: (1) the moving party must show diligence or justification for failure to discover and present the proposed evidence during the ordinary course of the trial; (2) the moving party must be prepared to state specifically what the

additional evidence would be; (3) the proffered evidence and testimony which would result from granting the motion must not be merely cumulative; and (4) there must be a substantial showing that the proposed evidence could materially affect the findings and the outcome of the case. *Wertz v. United States*, 2 Cl. Ct. 45, 55-56 (1983). The "essential criterion" is whether "substantial injustice would occur if the motion were not allowed and the evidence continued to be excluded." *Id.* at 56.

Following these standards, trial courts have not hesitated to limit or deny requests to reopen the evidentiary record. *See, e.g., id.* at 54-57 (following trial, denying plaintiff's motion to reopen proof despite allegations of deceit, evasiveness, and untruthful testimony and interrogatories); *Cunningham v. United States*, 217 Ct. Cl. 665, 665 (1978) (denying defendant's cross-motion to reopen record in order to introduce further evidence concerning mitigation of damages); *see also Vaizburd v. United States,* 57 Fed. Cl. 221, 222 (2003) (following trial and motion to reopen record to include new information, allowing reopening of record for the "limited purpose" of including recent photographs offered by plaintiff but denying motion to reopen in all other respects).

Here, defendant has not even attempted to satisfy the stringent requirements for reopening the record to introduce new evidence after the conclusion of the trial. Nor has defendant requested a hearing in which to offer the proposed new evidence, as parties typically do in these cases. *See Wertz,* 2 Cl. Ct. at 54.[3] Instead, defendant asks the Court to simply accept the proffered materials at face value. Absent a formal proceeding, however,

---

[3] It is unquestionably within the trial court's discretion to order that such proceedings take place. *Shanteau*, 220 Ct. Cl. 645, 645 (1979) (trial judge best able to determine what additional information and proceedings may be necessary before motion can be decided).

defendant cannot even lay a foundation for the documents at issue to be admitted into evidence. At the same time, as discussed in Plaintiffs' Opposition to Motion for Leave to Supplement Record, the untimely death of a key witness for plaintiffs makes it problematic that any evidentiary hearing could be completed in a meaningful way.

Under the circumstances presented by defendant's motion, the Court has the options of excluding defendant's proposed evidence entirely or simply providing it very little weight. *Cf. Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 575 & Evidence Appendix J (2003) (expert opinions offered by defendant afforded "little weight" by Court in rendering its decision). In the absence of any further discovery and evidentiary hearings where these facts and documents can be evaluated and subjected to cross-examination, plaintiffs submit that the new, post-trial "evidence" offered by defendant, if accepted at all, should be accorded very little evidentiary weight in the Court's deliberations.

Dated: April 29, 2004

**Filed Electronically**

Respectfully submitted,

**s/ Jeff H. Eckland**

Mark J. Blando, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

M2:20621475.02