**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FRANCONIA ASSOCIATES,<br>a Limited Partnership, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **File No. 97-381C**<br>**Judge Francis M. Allegra** |

**DECLARATION OF MARGE ALDEN**

I, Marge Alden, declare as follows:

1. I am a general partner of, and the managing agent for, plaintiff Franconia Associates, a Limited Partnership, the owner of various properties including the following Section 515 properties at issue in the above-captioned lawsuit: (i) Riverfront Apartments and (ii) Sunrise River Apartments. I make this Declaration in response to the Court's Order filed May 24, 2004 and in relation to defendant's Motion For Leave To Supplement Record filed December 3, 2003. All facts stated herein are based upon my personal knowledge and belief.

2. My struggles with the Minnesota State Office of Rural Development concerning the Riverfront and Sunrise River properties are far from over. Neither one of those properties is, at this time, free from the restrictions of the Section 515 program. In addition, pending the outcome of several pending and potential lawsuits concerning those properties and other likely developments, there remains a significant risk that I will never be able to be get out of the program and raise the rents to market levels – at least not until the full original mortgage terms on those properties expire.

3. I find myself today in the paradoxical position of having to contest the very foundation for the Agency's decision to foreclose on the properties. This is because the foreclosure proceedings brought by the Agency on these two properties – during which Franconia Associates was suddenly permitted to prepay after over a decade's worth of unsuccessful attempts to prepay (see Exhibit RR) – were grounded upon the false premise that I was a poor managing agent who failed to follow applicable regulations.

4. My position constitutes a true Catch-22. If I succeed in proving my worth as a manager, I very possibly will never be able to operate these two properties as market-rate properties because the Agency will not have any justification for forcing these properties out of the Section 515 Program. On the other hand, if the Agency's findings of mismanagement are permitted to stand, I run the risk that I may actually lose possession altogether of these and other properties, both subsidized and conventional.

5. I therefore have decided to vindicate my reputation for fine management, in part because I am proud of my professional reputation. In addition, if I am successful in reclaiming my reputation, I will at the very least be able to retain ownership of these two properties (albeit within the parameters of the Section 515 Program) and re-acquire my right to serve as managing agent for many other Section 515 property owners for whom I am no longer eligible to manage.

6. I have found myself compelled to contest the Agency's misrepresentations about my management in numerous actual or prospective lawsuits concerning these properties.

7. One action in which I have been forced to defend my management practices is Vitalis v. Alden, No. CT-04-000178 (Minn. Dist. Ct.), brought against me by Mr. Adam Vitalis, the son of my deceased partner, Mr. George Vitalis. Among other things, Adam's lawsuit seeks to divest me of any ownership interest in Riverfront Apartments and Sunrise River Apartments. His attempts to take over the properties are based, in large part, on allegations regarding my management of the properties. Thus, I will be compelled in that action to defend my management of the properties within the Section 515 Program.

8. As part of his efforts to take over the properties, Adam has also represented to the tenants that, should he acquire sole ownership of the properties, he would continue to maintain them as affordable housing projects within the Section 515 Program. This of course presents further uncertainty as to whether the properties will ever be fully released from the program.

9. Another legal proceeding in which I am obliged to defend my management practices is the civil action brought against me by the State of Minnesota, State of Minnesota v. Alden, No. C5-04-819 (Minn. Dist. Ct.). Among other things, this action notes that Franconia Associates was permitted to prepay because of my allegedly improper management practices.

10. Yet another potential suit in which I would vindicate my management practices would be an action against the United States for the discrimination and harassment by Agency employees working within the Agency's Minnesota Offices. (See ¶ 20 below). I am also considering a claim arising from the Agency's imposition of managerial requirements inconsistent with the partnership's contracts and the Agency's

regulations. I actually have been encouraged to file such an action by officials in the Agency's National Office. (Exhibit QQ.) The purpose of such a lawsuit would be to prohibit the Agency from further damaging my business by impugning my management practices. I also want to re-establish my right to manage those Section 515 properties that the Agency has precluded me from managing.

11. In all of these proceedings, I will challenge the agency's criticisms of my management. I also intend to establish that the agency's findings – which gave rise to the foreclosure process – were based on years of unfair and discriminatory conduct, rather than any valid concerns as to my abilities. Numerous examples of the agency's treatment of me, which I would raise in these proceedings, are set forth below in ¶ 20.

12. I realize that if I succeed in establishing, in any one of these actions, that the properties were properly managed in compliance with the Agency's regulations under my watch, the entire predicate for the Agency's decision to foreclose on the properties would disappear. For the reasons set forth above, however, I feel that I have no choice but to defend my actions – even if the end result is that the Agency reverses its decision to demand prepayment of the properties.

13. I also have reason to believe that there will be suits brought by tenants and tenants' rights organizations challenging the Agency's decision to permit prepayment of these properties in the first place. (See also ¶¶ 28-30 below.) There is no doubt that most tenants will be displaced if I am ever able to be fully freed from the restrictions of the Section 515 program. The Agency confirmed several times, throughout my earlier attempts to prepay, that the affordable housing provided by the properties is needed in the communities where they are located. As a result, I fear that the Agency's acceptance of

my partnership's prepayments are likely to be challenged in court and eventually overturned.

14. Indeed, both George Vitalis and I, along with other owners, have always understood that if the Agency carried through with its threats to accelerate the loans and pursue foreclosure, we would lose possession of the properties. In particular, we understood that because the properties were needed in the program, any foreclosure would result in the properties being auctioned off to a non-profit organization or bought up by the Agency itself. I know of other owners who have been foreclosed upon, and their experiences mirror this understanding of how the Agency's foreclosure process is supposed to work.

15. I recently located certain documents from the Agency which confirm my understanding that the Agency did not follow its own rules in this case. In response to a Freedom of Information Act request, I obtained an e-mail dated February 22, 2002 from Bonnie Smith to Lenee Hoffman (both Rural Development employees) discussing the prospective acceleration and foreclosure on the properties. Ms. Smith states that if tenants will be displaced as a result of any prepayment made in connection with the foreclosure, "the owner must list the project for sale to a non-profit during the acceleration period." (Exhibit R.)

16. After reviewing this document, I attempted to contact Ms. Smith on June 8, 2004 to ask whether any Administrative Notices (ANs) or other materials were available that would explain the procedures described in her e-mail. (See Exhibit WW.) Her office responded later that day by forwarding to me, as an attachment to my request, two ANs issued by the agency. The earlier of these, AN 3365 (Oct. 20, 1997) outlines

the options available to the Agency in dealing with "troubled" properties. These options include foreclosing on the property and permitting a conveyance of the property to another owner. The AN also states that payment in full of the mortgage is an option only in the event that "it is determined that the project is no longer needed to meet the objectives of the program." (Id. at USDA fax page 13.) The AN also details the procedures to be followed for transfers of the property and determining the amount the Government will bid at a foreclosure sale. (Id. at USDA fax pages 13-14.)

17. The other AN provided to me by the Agency, AN 3574 (Sept. 26, 2000) confirms that if a property subject to foreclosure is "needed," the Agency's rules will not permit the owners to prepay and keep their properties through the foreclosure process. This AN explains that a "major cornerstone" of the Agency's evaluation of "troubled" properties is "***need***." (Id. at USDA fax page 2; emphasis in original.) Similar to the AN described above, this AN outlines the options available to the Agency in dealing with such properties, including transfer to another owner, sale of the property, and foreclosure. (Id. at USDA fax page 6.) The AN then confirms that "[p]ayment in full" of the mortgage is an option only "after the preservation process of RD Instruction 1965-E [the Agency's prepayment rules] has been followed and appropriate restrictive use provisions, if any, are signed." (Id.) Finally, the AN states that "when a foreclosure process is initiated, further payments from the borrower will not be accepted." (Id.)

18. These documents confirm the understandings that I and the other owners have always held, *i.e.*, that if the Agency carried through with its threats to foreclose on the properties: (1) the Agency's prepayment rules would apply and we would not be able to get out without restrictions given the Agency's earlier findings that the properties were

needed, and (2) the properties would be put up for sale through the foreclosure process, resulting in our loss of the properties.

19. Thus, it remains a mystery why the Agency went around its usual procedures in this case. I have reason to believe, however, that the agency may have done so in an effort to jeopardize my right to obtain damages in this case. While I realize that this may sound somewhat far-fetched, it must be seen in the context of the years of bad blood and mistreatment I have endured over the past several years.

20. The misconduct by Agency officials to which I refer above (see ¶¶ 10, 11, 19) includes the following:

(a) Ms. Jackie Goodnough, the head of Multi-Family Housing in Minnesota, blocked Franconia Associates and other Section 515 owners throughout Minnesota from communicating with the Agency's State Director in Minnesota. (Ms. Jackie Goodnough is the same person as Ms. Jackie J. Morris (her maiden name), who executed the Declaration of Jackie J. Morris, dated December 3, 2003, in support of the Government's Motion For Leave To Supplement Record; Exhibit QQ.) (Exhibits N, O, S, T, U, V.)

(b) Ms Jackie Goodnough also has been particularly successful in convincing the Agency's Waite Park, Minnesota office to follow her interpretation of various Agency regulations, even if her interpretation conflicts with that of the National Office. (Exhibits OO, QQ.)

(c) Mr. James Merrick, an official located in the Agency's Waite Park, Minnesota office, has told me on many occasions that the Agency "is a good old boy's organization," that there is no place for female management in Minnesota, and that I would be run out of business throughout the state. (Exhibits I, M, Q, V, AA, DD.) Mr. Merrick began singling out my company and discriminating against it in various ways, including imposing very costly requirements for submission of information and documentation not required from other management companies. (Exhibits B, H, I, O, V.)

(d) Certain officials from the Agency's National Office sent a civil rights team to Minnesota. Agency staff letters were found to be discriminatory. An ultimate finding of the possibility of some project discrimination was found. (Exhibit M.)

(e) Mr. Merrick represented to me, during November 1996, that he did not request the OIG audit of my management company. (Exhibit D.) However, the record is quite clear that Mr. Merrick was instrumental to the initiation of that audit. (Exhibits C, I.)

(f) Mr. Randal Hemmerlin, a future State Director in the Agency's Minnesota Office, wrote on the letter in which Mr. Merrick stated he did not request the OIG audit that he (*i.e.,* Mr. Hemmerlin) "never gave the go ahead to send." (Exhibit D.)

(g) Mr. Hemmerlin also wrote on a complaint made by Mr. Merrick about one of my company's billing practices: "Discussed w/Merrick and told him to put this whole thing away. No issue." (Exhibit G.)

(h) When Mr. Hemmerlin or other Agency officials would not do Mr. Merrick's bidding, he would direct other Agency employees not to approve my company's annual reports and budgets, management agent contracts, and rent increase requests. (Exhibits A, B, D, Q, Z, BB, CC, DD, OO.) On one occasion, the Agency refused to approve one of my budgets, only to turn around and approve the very same budget -- with no changes whatsoever -- following its re-submission by the managing agent who replaced me. (Exhibit FF.) I also complied with all Identity of Interest Requirements ("IOI"), including the submission of all appropriate IOI forms. (Exhibit C, BB, EE.)

(i) I have been faulted for failing to comply with certain OIG interpretations of Agency regulations of which I had no knowledge, even though I was in compliance with the Agency's own interpretation of its regulations, of which I was aware. (Exhibits K, P.) In short, I have been caught in the middle of the differences among the Agency's various Minnesota offices, the National Office, and the OIG. (Exhibits E, F, K, V, GG, HH, OO.)

(j) The Agency's Minnesota Office absolved me of all culpability flowing from conflicts between various sets of government regulations and their interpretations, and I paid a total of $367.69 to close out and settle the audit's recommended penalty of $17,235. (Exhibits E, F, H, I, J, K, N.) I even paid extra to avoid future repercussions by Jim Merrick. (Exhibits H, I.)

(k) Despite this closing out and settlement of the OIG audit, Ms. Jackie Goodnough insisted years later that I pay the full amount of $17,235. If I failed to do so, Ms. Goodnough threatened me and my company with suspension and debarment. (Exhibits K, N, O.) No such suspension or debarment proceeding was ever actually filed against me.

(l) At the behest of Ms. Jackie Goodnough, all owners for whom I managed Section 515 properties were threatened with foreclosure actions if they did not remove me as their manager. (Exhibits K, O, Q, Y, Z.) With the exception of Franconia Associates' properties, I have lost my management contracts with all of these properties. (Exhibits K, O, W, X, AA, FF.)

21. Given this history, I have good reasons for concluding that the Agency's failure to follow the proper procedures in this case was motivated by a desire to undercut my claims in this lawsuit. (See Exhibit RR.)

22. Other factors further support this conclusion. For example, I find the timing of the Agency's actions very suspicious. The Agency had decided well before the trial of this matter that it would initiate foreclosure proceedings on the properties. (Exhibits R, II.) Thus, during the trial of this matter in June 2003, both my partner, Mr. George Vitalis (now deceased), and I were concerned that Agency allegations of mismanagement would be somehow used to "disqualify" the partnership from invoking the contractual right to prepay its mortgage loans. The Agency had, in fact, disqualified the partnership from obtaining certain incentives as a result of my alleged mismanagement. Mr. Vitalis believed that the partnership had been "set up" for foreclosure actions. (Exhibit II.)

23. The government's allegations of mismanagement did not commence until after the time we would have prepaid if we could have prepaid (i.e., 1992). Therefore, these allegations never would have arisen but for the Government's breach of contract at

issue in this lawsuit. Nonetheless, we were concerned that the Agency's unfounded charges of mismanagement could be used to justify a foreclosure sale of the properties, resulting in our loss of ownership of the properties. (Exhibit L.)

24. At trial, therefore, Mr. Vitalis and I testified that there were no grounds for the Agency's charges of mismanagement. To our surprise, the government lawyers made no attempt to cross-examine us on this topic. They also carefully avoided raising the subject of my management practices and the foreclosure proceedings in any way during the trial.

25. In another series of legal proceedings, the Agency also avoided discussing the foreclosure proceedings. In January 2003, Mr. Vitalis and I filed administrative actions relating to the two foreclosure actions. (Exhibit JJ.) However, the Agency failed and refused to address our concerns about the foreclosure proceedings at two mediation sessions held before the beginning of the Franconia Associates trial on June 16, 2003. Indeed, after many delays (Exhibits KK, LL, MM, NN) Agency representatives walked out of two mediation sessions, once on January 24, 2003 (Exhibit QQ) and again on May 12, 2003. (Exhibit PP.)

26. It was then only after the trial of this matter was closed, and after Mr. Vitalis and I no longer had an opportunity to testify in Court, that the Agency took the questionable actions at issue here. Those very actions are now being used by the Government in an effort to question our right to be compensated for the damages suffered as a result of the Government's failure to honor our contracts back in 1992, when we attempted to prepay.

27. To summarize, the current status and future of the Riverfront and Sunrise River Apartments remain completely in flux. In the meantime, I remain subject to restrictions on my ability to raise rents on both properties. Other recent developments cast further uncertainty as to whether I will ever be able to do so.

28. For example, the HOME Line tenant advocacy group in Minnesota already has caused quite a stir with tenants residing at Riverfront Apartments and Sunrise River Apartments. (Exhibits SS, TT, UU.) Indeed, I understand that the lawsuit filed against me by the State of Minnesota resulted largely from the activities of HOME Line.

29. Although the State of Minnesota's lawsuit currently deals with short-term rent issues, HOME Line has alerted the Riverfront tenants "not to pay any [rent] increase of more than 5% prior to December 2004...." (Exhibit VV.) Moreover, HOME Line currently is operating under the misapprehension that Franconia Associates was permitted to prepay because it "fell behind on its mortgage payments" and "the USDA declared a default...." (Exhibit VV.) On the contrary, Franconia Associates has never had a late payment in the entire history of these properties.

30. I have reason to believe that HOME Line or other tenant advocacy groups currently are investigating the question whether the foreclosure actions were justified by my alleged mismanagement, and therefore whether Franconia Associates was properly permitted to prepay. The vigor with which HOME Line has contested my attempts to raise rents so far gives me no confidence that I will be able to raise rents at any time in the future. As my deceased partner so aptly phrased it: "It is real unfortunate that we cannot trust the future." (Exhibit L.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2004 in Taylors Falls, MN

Marge Alden

Lisa Corgard

LISA CORGARD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2005