**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

FRANCONIA ASSOCIATES, a
Limited Partnership, et al.,

Plaintiffs,

**File No. 97-381C**
**Judge Francis M. Allegra**

v.

THE UNITED STATES,

Defendant.

---

# INDEX OF EXHIBITS TO DECLARATION OF MARGE ALDEN

---

| | **Exhibit** |
|---|---|
| Declaration of Marge Alden with the following attached exhibits: | |
| Letter dated June 29, 1992 | A |
| Letter dated April 29, 1993 | B |
| Memorandum dated July 6, 1994 | C |
| Letter dated November 21, 1996 | D |
| Memorandum dated December 16, 1996 | E |
| Memorandum dated January 2, 1997 | F |
| Memorandum dated January 6, 1997 and attachment | G |
| Letter dated February 18, 1998 | H |
| Letter dated February 18, 1998 | I |
| Letter dated March 24, 1998 | J |

| | |
|---|---|
| Letter dated January 14, 2001 | K |
| Letter dated July 18, 2001 | L |
| Letter dated September 13, 2001 | M |
| Fax dated December 20, 2001 | N |
| Fax dated December 28, 2001 | O |
| Fax dated January 14, 2002 | P |
| Fax dated February 21, 2002 | Q |
| E-mail dated February 22, 2002 | R |
| Letter dated March 15, 2002 | S |
| Memorandum dated March 26, 2002 | T |
| Letter dated March 27, 2002 | U |
| Letter dated April 11, 2002 | V |
| Fax dated April 23, 2002 | W |
| Fax dated May 28, 2002 | X |
| Fax dated May 28, 2002 | Y |
| Fax dated May 31, 2002 | Z |
| Fax dated July 24, 2002 | AA |
| Fax dated July 26, 2002 | BB |
| Fax dated July 29, 2002 | CC |
| Fax dated July 29, 2002 | DD |
| Letter dated July 30, 2002 | EE |
| Fax dated August 28, 2002 | FF |

| | |
|---|---|
| Letter dated September 23, 2002 | GG |
| Letter dated September 23, 2002 | HH |
| Fax dated January 2, 2003 | II |
| Letter dated January 24, 2003 | JJ |
| Notice of Mediation Session and Appointment of Mediator dated March 20, 2003 | KK |
| Notice of Mediation Session and Appointment of Mediator dated March 27, 2003 | LL |
| Notice of Mediation Session and Appointment of Mediator dated April 7, 2003 | MM |
| Notice of Mediation Session and Appointment of Mediator dated April 9, 2003 | NN |
| Letter dated May 1, 2003 | OO |
| E-mail dated May 19, 2003 | PP |
| Fax dated July 17, 2003 | QQ |
| Fax dated October 16, 2003 | RR |
| Letter dated November 10, 2003 | SS |
| Letter dated November 10, 2003 | TT |
| Fax dated November 11, 2003 | UU |
| Letter dated November 13, 2003 | VV |
| Fax dated June 8, 2004 Including Responsive Administrative Notices (Ans) from Rural Development | WW |

Dated: June 18, 2004

**Filed Electronically**

Respectfully submitted,

**s/ Jeff H. Eckland**

Mark J. Blando, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

M2:20634689.01

Croix Management Company

Box 226
344 Bench Street
Taylors Falls, Minnesota 55084
612-465-6841
Metro 462-7770
Fax 612-465-3080

June 29, 1992

Mr. Randy Hemmerlin
FmHA Rural Housing
410 Farm Credit Building
375 Jackson Street
St. Paul, MN 55101-1853

Dear Randy:

Approval of the annual reports and rent increases for our three projects in the IV district has to be addressed.

At our meeting in January you said to work with the St. Cloud office to appease Jim Merrick's concerns. I have provided him with schedules of local business charges which conclude our internal maintenance is more cost effective. I have reviewed and logged maintenance from 1988 to the present and the schedules show our projects maintenance costs are less in all projects than the FmHA average costs.

The inspection reports and energy audit reports speak of how well maintained our buildings are. The energy auditor even recommended our system to FmHA and suggested we speak at meetings to explain the procedure to other managers.

Your construction analyst visited one of our buildings and commented about the excellent condition for our older building. He was shocked at the district office's suggestion of changing to individual external maintenance by crisis.

Wisconsin FmHA just inspected our properties in June. The FmHA inspector had not been on site previously and couldn't say enough about the condition of our building. He gave us a superior rating in our maintenance system.

I have discussed maintenance procedures with a couple other State FmHA personnel and our system is very acceptable. I am going down to the Rural Rental Housing Association meeting in Texas in July and I will check out their procedure criteria at that time.

At our meeting when you, Joe, Bill and Jim reviewed our records, everything anyone asked for was already documented and presented. No one at the meeting could say what else was needed or expressed any problem. It was even mentioned that FmHA doesn't get calls and complaints from our tenants.

**EXHIBIT A**

I think this whole issue is being blown out of proportion. I briefly discussed with you similar problems relayed from Florida. I have since spoke with three management companies also having mountains made out of non-issues.

Please forward a complete maintenance system design with implementable procedure including preventative, crisis and on going maintenance that is approved by MN FmHA, compatible with the loan agreements, including Federal regulations outlining control, and is cost effective, or approve our existing system with or without specific modification.

Our system has a track record for being economical(below FmHA average maintenance expense), extending the life of buildings by preventative maintenance, keeping happy tenants and a well kept building. Isn't the goal of this program to offer good affordable housing to lower income citizens rather than increase costs by playing bureaucratic games?

To hold up budgets and rent increases jeapardizes the projects financial viability, the owners right to their draw and the tenants right to a well maintained facility.

Please contact me if you want to schedule a meeting to discuss this further or I will look forward to the annual reports being approved.

In my May 6, 1992 letter I requested a review of the workers compensation addition to the management fee. I have been receiving a lot of calls on this from owners. Randy, please call and advise me of the status.

I look forward to hearing from you.

Sincerely,

Marge

Marge Alden

MA/jm

CC: Bill Slininger
Jim Merrick

Croix Management Company

Box 226
344 Bench Street
Taylors Falls, Minnesota 55084
612-465-6841
Metro 462-7770
Fax 612-465-3080

April 29, 1993

Bill Slininger
FARMERS HOME ADMINISTRATION
DISTRICT OFFICE
110 S. 2nd St., Suite 120
Waite Park, MN 56387-1300

Dear Bill:

There is no format established for your request for maintenance bids. Per several conversations with District IV FmHA district does not want to stipulate specifically what information they require.

Our management company has been singled out by the district as the only one in the state that is being required to research and provide this documentation for you.

As stated in your letters, approval of the projects annual budgets are being withheld until you receive whatever you want though it is not a management requirement mandated in the 1930-C.

Despite this blatant discrimination I have made an honest attempt to provide you with what I can only guess will satisfy this extra ordinary demand.

I am forwarding 72 individual job bids. I have categorized them according to 14 of the most common necessary procedure in projects. This 7 page summary along with 72 bid sheets constitutes the entire report.

I look forward to promptly receiving the approval annual reports.

Sincerely,

Marge

Marge Alden

MA:ry

EXHIBIT B

United States Department of Agriculture

Farmers Home Administration

Marketplace of Waite Park
110 South Second Street
Suite 120
Waite Park, MN 56387-1300
612-255-9111
(FAX) 612-255-1455

July 6, 1994

Subject: Identity of Interest - Waste and Abuse

To: State Director, FmHA

ATTN: Multi-Family Housing

In reviewing management plans submitted by Croix Management, I see there is still an Identity of Interest between management, the owner and supplying entity or services. I have written to Marge Alden, asking that all appropriate IOI forms be completed for all parties involved, and that the IOI's be fully described and justified. A copy of the letter is attached for your review.

This brings back into the spotlight findings of our supervisory visit to the Franconia projects on September 18 and 24, 1991. At that time it became evident that management was adding a 5% surcharge to the cost of materials supplied to the project through Croix Management Company. Additionally, Croix Management, was billing the projects for maintenance and repairs over and above that amount included in caretaking and the management fee.

These billings were at the excessively high rate of \$30/hr. for travel and time, plus mileage at \$.21/mile, to do such things as: install traverse rods (1.5 hrs), pick up stain samples (.5 hrs), install water heater elements (3 hrs), set up and help pressure wash a building (5.5 hrs), inspecting apartments and grounds (5.5 hrs), replace toilet stool (3 hrs), covering laundry vents with screens and replace kitchen faucets (4 hrs), measure, purchase lumber and begin cutting hand rails (4 hrs), stain handrails (4.5 hrs), install handrails (30 hrs), read meters (.5 hrs), repair venting in attic (5.5 hrs), deliver and pick up video (1 hr). Many of these jobs should have been done by management. Many others should be done by the caretaker or if there was no caretaker on site at least should have been included in caretaking cost which is part of the total management expense, but rather they were billed to general maintenance and repairs.

Croix Management was advised in writing at the following times of the necessity of correcting the handling of surcharges on supplies and billing of maintenance personnel, with a great deal of telephone communication between these dates.

- -October 10, 1991 - Findings of Supervisory Visit
- -September 24, 1991 - Relay findings of S/O determination with appeal right given to owners

FmHA Farmers Home Administration is an Equal Opportunity Lender
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, D.C. 20250

EXHIBIT C

when were letters written to 7.A.

I believe it is these costs that are causing Croix Management Company's projects M & O costs to be considerably higher than nearly all other management companies operating in the District. Yet, during our recent health and safety inspections we found that apartments were not well maintained, particularly St. Bonifacious, where nearly every tenant we talked to had maintenance complaints.

Croix Management Company responded to the supervisory visit letter, disagreeing on all three points. No progress has been made to resolve this issue. Management's action in these three areas would appear to me to be a case of waste and abuse, but maybe I do not have the right interpretation of waste and abuse. In any case, it appears some higher authority needs to make that determination, if for no other reason than to obtain the cooperation and compliance of Croix Management Company.

On May 3, 1993, the District Director suggested that an OIG investigation could determine if there was improper use of project funds and over compensation of the owner and/or manager. Has an investigation been requested or initiated? Tri-annual supervisory visits are coming up again in August of this year. If OIG is involved we will need to know, so that we do not go out ahead of them or inadvertently cause them any problems. Conversely, if they are not going to be involved, we will need to have a course of action determined prior to making the visits, so that we are assured of reviewing the right things, advising them of the proper compliance issues and requesting appropriate corrective actions.

Your assistance is requested in this matter.

JAMES E. MERRICK
District Loan Specialist

7/14/93

«INCLUDE /usr/workaid/lib/logo/logo1.doc»

November 21, 1996

Croix Management Company
Box 226
412 Bench St.
Taylors Falls, Minnesota 55084

RE: November 4, 1996 meeting in St. Cloud

Dear Marge Alden,

You requested information regarding the reason for postponement of certain routine actions performed by the servicing office (Regional Offices) such as Supervisory Visits, Review of Prepayment requests and Budget Approvals.

Routine servicing actions are often suspended during OIG audits and investigations. State Office responded to our inquiry on the status of doing routine servicing actions such as budget approvals, supervisory visits etc. on May 24, 1996 to say that no supervisory visits should be made until OIG had completed their audit.

We were advised to resume processing of prepayment requests on September 10, 1996 and to proceed with the servicing of accounts managed by Croix on September 30, 1996. Copies of all 3 notices are attached for you information. I then sent Mr. Vitalis my letter of October 1, 1996 noting that the budgets were expected to be reviewed by mid October and that we would be contacting you to schedule supervisory visits and compliance reviews in the near future.

Regarding your question on my involvement in the OIG audit, I stated that I did not request the OIG audit and that is the case. The auditors work completely independently from Rural Development, and I had nothing to do with what they decided to review/investigate/audit nor did I have anything to do with the report that was written or the conclusions/agreements reached by OIG and Rural Development.

I hope this answers the questions you had resulting from the November 4, 1996 meeting. I believe all routine servicing actions are now back on track with budget approvals having been done, supervisory visits have been scheduled and any outstanding management plans and agreements are scheduled to be reviewed by Roger Clapp in the next two weeks.

We look forward to working cooperatively together to accomplish our common goal of providing quality housing for people who need that assistance. I would hope that we can get back to being able to work through the small things by being able to feel free to pick up the phone and get a quick answer or make a small request.

Sincerely,

James E. Merrick
Rural Development Specialist

cc: S/O RRH Section

Attachments

Never gary go ahead & send.

go [illegible]

EXHIBIT D

USDA United States Department of Agriculture

Rural Development [redacted]

December 16, 1996

TO: **Alfreida White**
Office of Inspector General
320 Agribank Building
St. Paul, Minnesota

FROM: **Janice Daley**
State Director

RE: Office of Inspector General (OI
Croix Management
Audit Report No. 04010-0005-Ch

On December 15, 1995 and incorporated in the Audit, Rural Development sent a letter to the OIG with a response to each recommendation. This letter will request the OIG to modify Recommendation No. 1 and accept the actions on others as final actions. Please review the following:

Recommendation No. 1a

Rural Development seeks to have this recommendation modified to show a reimbursement of $ 197.69 for the Riverfront project and $ 170.00 for the Wildwood project for a total of $ 367.69. The State Office reviewed the agent's documentation and added $ 32.69 to Riverfront and $ 20.00 to Wildwood over the Regional Offices' recommendations because the Agency is not allowed to pay for donations to a city or fire departments (check nos. 2747, 2761 and 3308) and call it advertising.

As you know, the methodology of the Agency is to review the audit and offer the agent an opportunity to provide information that explains their actions. The Regional Offices have reviewed documentation provided by the management agent and are satisfied that most items fall within the scope of normal operating business and would not be considered as management/caretaker duties. Furthermore, the National Office has made it very clear that a Management Agent may send an employee to a project and charge a cost that is comparable to what it would cost to have the work performed locally by a contractor. Consequently, the cost of the employee to the agent is not our business. In our opinion, the matter of unsupportable or unallowable expense itmes thus becomes indefensible.

Rural Development is an Equal Opportunity Lender. Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, D.C. 20250

EXHIBIT E

**Rural Development agrees that some of the items noted in the Audit are questionable.** However, the agency must create a consistent policy on certain practices. For example, the Wildwood garage income may be construed to be project income today. However, we will need to determine what agreements were made with the ownership when they were built. Another example would be the replacement cost of community room furniture. Borrowers are required to buy the furniture when the project is built; however, we do not have a clear and concise policy on who pays for its replacement. We intend to begin working on these policies immediately.

**Rural Development also believes that the agent could have documented purchases, expenses and labor charges better.** However, one must keep in mind the materiality of some of the charges and the definitiveness of the same. The management of a project does not lend itself to easy and firm definitions. Some charges may be caretaker items in one project but would be maintenance items in another depending upon the skill and pay level of the caretakers.

**We have made it clear to the Agent that better record keeping is essential and the agent has responded by saying that training will be performed and their accounting system will be upgraded.**

**Finally, we have one more reason to request a modification of the dollar amount to be reimbursed.** We do not believe that the audit or the working papers will be easily defended in an appeal hearing. Rural Development representatives would be asked to defend the working papers and the defense of the audit is very difficult when a third party, the OIG, performed the actual work. It becomes too confusing for all parties to follow and difficult to prove. Especially, if the agent is providing contradictory evidence.

Recommendation No. 1b

**The Regional Offices agree that improvement must be made in the area of properly accounting for inventory.** We have made the agent aware of this and they have agreed to make corrections in their accounting system as evidenced by their submission of a report titled "Franconia Associates, Accounting Systems." We believe this will be an on-going process.

Recommendation No. 1c

**With improvements implemented in the accounting system, we believe that the agent has met this requirement.**

Recommendation No. 1d

**This Recommendation was limited to only the projects audited and is considered as a closed recommendation.**

Recommendation No. 2a

The agent has supplied a satisfactory accounting of the interest earned on the security deposits to the agency.

Recommendation No. 2b

This is an on-going process. The agent was notified of this requirement in a State Office letter dated December 28, 1996. We believe the agent's explanation of the accounting system and improvement of the same will help in that area. Also, the agent stated that calling the Rural Development before posting the entries will be helpful.

Recommendation Nos. 3a and 3b

The Regional Office has been working with Croix Management to come to a clear understanding of what is expected in regards to maintenance. We believe that maintenance has been initiated in the Wildwood project and the Agency will continue to monitor the project until its completion.

We are attaching the information provided by Croix Management regarding Recommendation No. 1. Also, find the narratives of the Regional Rural Development Managers (RRDM) on the audit. Both RRDMs recommend bringing the audit to a closure. The State Office also concurs in this assessment.

In summary, Rural Development requests the OIG to modify Recommendation No. 1 as stated above. The Agency also believes the other recommendations have been successfully addressed. Once the agent reimburses the appropriate accounts for $ 367.69, we will consider the audit as closed.

cc: Regional Offices
-St. Cloud
-Willmar

Agriculture
(612) 290-3842
(612) 290-3085 FAX
(612) 290-3799 TTY

January 2, 1997

TO: Janice Daley
State Director

FROM: Randal Hemmerlin [signature]
Program Director -MFH

COPY

RE: Croix Management Audit Report No. 04010-0005-Ch
National Office Memorandum dated 12-16-96

Attention: Mike Navin

The aforementioned correspondence requests us to submit a report to the OCFO no later than February 28, 1997 regarding the final action on the above referenced audit. If no final action has been reached, then we are to offer an explanation of the reason no final decision did not occur.

Final action has not yet been reached in this audit. The Agency did contact the management agent regarding the recommendations as listed in the audit. The agent consequently provided evidence that contradicts the findings of the OIG audit regarding sums of money that must be repaid to the projects. The Agency reviewed these claims and substantially reduced the amount to be reimbursed by the agent. The Agency submitted the evidence and the reasons for our determination to reduce the amount of the unsupportable expenses to the OIG for their review on December 16, 1996. The OIG is now in the process of reviewing that material and our request to modify Recommendation 1A. The Agency also recommended that closure be brought to all other recommendations in the audit. Hopefully, OIG will respond favorably to the Agency's recommendation and we will then be able to bring closure to the matter.

Find attached a copy of the December 16, 1996 letter that was submitted to the OIG.

P.S. — John Pepper of OIG called & STATED THAT Δs to Recommendations Are to Requested through OCFO. A letter was prepared for S/D signature.
Randal



EXHIBIT F

USDA
United States Department of Agriculture
Rural Development
Marketplace of Waite Park
110 S 2nd St Suite 120
Waite Park MN 56387-1300
320-255-9111
(FAX) 320-255-1455
(TTY) 612-290-3799

January 6, 1997

Sent by fax only

Subject: Croix Management-OIG Audit

To: State Director

ATTN: Randal Hemmerlin

When Croix requested a withdrawal from the reserve account the attached Sears invoice was provided with writing at the bottom showing charges for delivery and disposal. The Sears invoice has notes showing that the refrigerator is for apartment #106 at Oakhurst Apartments, which should be satisfactory. When Patty, of our office, asked Bernie for an actual invoice for the delivery and disposal charge, Marge called back saying that writing it at the bottom of the Sears invoice should be good enough. Marge would not tell Patty who did the work, but rather said if Jim wants something else to put it in writing exactly what I want.

Similar service by Sears to place the appliance uncrated in the apartment is $40. I don't know if 25% higher cost is "comparable and competitive" or if the management should be notified relative to this.

Since items 1c of the OIG audit dealt with just this kind of bookkeeping practice, I thought it necessary to advise you of the situation.

It is my intention to ask Marge, with a copy to Geroge Vitalis, is this type of billing is in accordance with the bookkeeping system that was designed by Mr. Vitalis. It would appear to me that an invoice should denote not only the service provided, but the provider of the service, the place the service was provided and when the service was provided.

Do you have any suggestions of what action should be taken?

JAMES E. MERRICK
Rural Development Specialist

Discussed w/ Merrick + told him to put this whole thing away. No issue - RH 1-21-97

Rural Development is an Equal Opportunity Lender. Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, D.C. 20250

EXHIBIT G

ATLANTA GA 30374

COMMERCL CREDIT CENTRAL
INVOICE COPY 1 OF 1
SE-27-04853-1-1
03-12-96

7% sales tax

CROIX MANAGEMENT
344 BENCH ST B 266
TAYLORS FALLS MN 55084

CUSTOMER NUMBER 27-013333-000 $____________
*Please Detach - Return Top Of Invoice With Payment*

| CUSTOMER NAME | CUSTOMER NO. | DATE | INVOICE NO. |
|---|---|---|---|
| CROIX MANAGEMENT | 27-013333-000 | 03-12-96 | SE-27-04853-1-1 |
| P.O. NUMBER AUTHORIZED PURCHASER | MARGE ALDINE | | |

| QUANTITY | SKU/DESCRIPTION | UNIT PRICE | TOT PRICE |
|---|---|---|---|
| 1 | MARGE 22-62041 F/S RANGE,ELE,30",COIL,WHT,STD, 1-8"/3-6"ELEMTS RQ6 | 301.00 | 301.00 |
| 1 | 46-55022 REFER SXS,20CF,WOW,F/IM,FL,RL, 32-3/4" WIDE NL | 766.00 | 766.00 |
| 1 | 26-64051 DRYER,COIN-OP,ELE,29",WH,5.9CF,5CYC ORDER CHUTE/MONEY BOX 208/240V -58 | 382.00 | 382.00 |
| 2 | 26-86586 COIN CHUTE,ULTRA VERTICAL 8 - TOP LOAD KIT - KEYED ALIKE. (K1780K-AL) | 66.00 | 132.00 |
| 1 | 26-64051 DRYER,COIN-OP,ELE,29",WH,5.9CF,5CYC ORDER CHUTE/MONEY BOX 208/240V -58 PLEASE KEY COIN CHUTES TO GR88 | 382.00 | 382.00 |
| 5 | 22-51348 RG HOOD,VENTED,30",ALM,FAN=2SP/SGL ILTLEV,160CFM,DMP/INC | 33.00 | 165.00 |
| 2 | 22-51648 RG HOOD,VENTED,30",ALM,7" ROUND * | 35.00 | 70.00 |
| | TAX | | 153.88 |
| | TOTAL | | 2,351.88 |

HC
#106
53.62 tax
819.62
#106

50 delivered
25 disposal of old

GRAND TOTAL 2,351.88

***PLEASE CALL THE NUMBER LISTED BELOW REGARDING ANY QUESTION ON THIS INVOICE**

SEARS TELEPHONE NO. 800-359-2000
COMMERCIAL CREDIT CENTRAL GRAND TOTAL DUE ON RECEIPT OF INVOICE
HC0115 (REV 12/22/94)

total 897.62

Croix Management Company

Box 226
344 Bench Street
Taylors Falls, Minnesota 55084
612-465-6841
Metro 462-7770
Fax 612-465-3080

February 18, 1998

USDA Rural Development
Bill Slininger
110 S 2nd St. Suite 120
Waite Park, MN 56387

Dear Bill:

Enclosed are copies of the payment made to Riverfront to settle the OIG audit. I paid in an extra $10 to cover any interest charges Jim may feel should be paid. I appreciate all your effort in settling this matter. You have been great.

Please check on the prepayment application status. I just attended the National CARH mid-year conference and it sounded like most applications were being handled more quickly. If anything more is needed from us, please don't hesitate to call.

Again thanks for your cooperation and assistance. It is nice to have this behind me. It has been a very costly process and as we all discussed without just cause.

Sincerely,

Marge Alden

EXHIBIT H

Croix Management Company

Box 226
344 Bench Street
Taylors Falls, Minnesota 55084
612-465-6841
Metro 462-7770
Fax 612-465-3080

February 18, 1998

USDA Rural Development
Loren Luschen
Box 1013, 316 SW Becker Ave
Willmar, MN 56201

Dear Loren:

Enclosed are copies of the payment made to Wildwood to settle the OIG audit. I know in our conversation you said it could be written off and not paid, however, I fear future retaliation from Jim. It is a small enough amount that I would be more at ease paying it than dealing with any repercusion later. I just want this behind me. I appreciate all your effort in settling this matter. I know you were no part of initiating it and I appreciate all your assistance. I have been hurt and shocked by the process where a federal employee can decide they don't want female management and do such awful things to try to run me out of business. You have no idea how much I appreciate your kind words and confidence.

Again thanks for your cooperation and assistance. It is nice to have this behind me. It has been a very costly process and as we all discussed without just cause.

Sincerely,

Marge Alden

ENC

EXHIBIT I

USDA United States Department of Agriculture

375 Jackson Street
410 Farm Credit Building
Saint Paul, Minnesota 55104
Phone: 612-602-7800
FAX: 612-602-7824

March 24, 1998

CROIX MANAGEMENT
BOX 226
344 BENCH STREET
TAYLORS FALLS MN 55084

Dear Ms. Alden:

We have finally received authorization to proceed with final resolution of the OIG Audit that was conducted in FY 95. We apologize for the lengthy delays in getting to this point.

Recommendation 1A: Requested Croix to repay $17,235 of unallowable expenses. Based on the receipts that were supplied by Croix, the Agency determined that $16,867.31 of the expenses were justified. To close out this section please provide evidence of a deposit from Croix to Riverfront of $197.69 and to Wildwood of $170.

Recommendation 1B: Requested Croix to maintain adequate records to support all expenses charged to the projects. To close out this section out we need to review a sample of the billing statements to see that billings or invoices state what the billing is for(ie. 16 CuFt Whirlpool Refrigerator, or labor to repair faucet in apartment 201, etc.), the quantity (ie. 1 refrigerator, 2 hours labor,etc.), the price per 1 unit and total cost. Please provide a sample of 5 billing statements from Croix for supplies, equipment or maintenance labor for each project. If the billings have the appropriate information, we will be able to close out this section.

Recommendation 3B: Requested Croix to develop a plan for making repairs at Wildwood. The plan was obtained. To close this out a representative from the Buffalo Area Office needs to make a physical inspection of the property to look at the planned repairs. The Area Office will call you to schedule this appointment.

Other Recommendations have been closed out.

Thank you for your cooperation in closing out this audit. If it is possible, we would like the necessary items by March 30, 1998. Please mail your responses to Maryann Erickson, St. Paul.

for Gary DeCramer
State Director

Rural Development is an Equal Opportunity Lender
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington DC 20250

EXHIBIT J

Croix Management Company

Box 236
412 Bench Street
Taylors Falls, Minnesota 55084
651-465-6841
Metro 651-462-7770
Fax 651-465-3080

January 14, 2001

Mr. Obediah Baker
USDA-Rural Development
Washington, DC

Dear Obe:

Thank you for joining us at the meeting with OIG on January 10, 2001 in Washington, DC. We appreciated OIG taking the time to bring us to an understanding of how they had interpreted the rules. We now understand the OIG audit criteria of only looking to actual expenses rather than using any of the other criteria outlined in the 1930-C or any of the other interpretations we have received from Rural Development.

Most of the dollar adjustments made as a result of the OIG audit were made because the specific per hour employee costs, including an overhead and an owner return factor, were not shown to the satisfaction of OIG. Where the costs were adjusted by OIG the fact that work was done or materials provided was not generally in question. However, the amount allowed went to -0- therefore the large size of the OIG adjustment. This also helps explain how the Minnesota office of Rural Development saw the charges as proper and why the large difference between the two agencies.

As we are all aware the body of rules presented in the 1930-C has left the Owners, Managers, State Rural Development, National Rural Development and OIG with conflicting interpretations. As we discussed the differences become apparent where we were provided the letter from Minnesota Rural Development that we met their understanding of the rules except for $300.00 in adjustments. Which was paid thinking that closed the audit. Subsequently we received the letter from the State Director, which was provided to you, accepting the payments and closing the audit.

**EXHIBIT K**

Beginning around 1991 we were instructed by Minnesota Rural Development to provide outside vendor costs for the various trades that would be used for comparable tasks. This has then been compared to our charges and as long as we demonstrated our charges were a lesser charge the test for acceptance was met. This also has been used for major appliance and like charges.

Also we received the letters from Ronnie Tharrington and Chuck Wehrein which supported the Minnesota criteria that as long as total project costs were comparable to other like projects there was not a problem. Our method was financially advantageous to the projects as reviewed in comparison to Rural Development's high and mean levels of like complexes per the states published statistics as indicated in the graphs provided to you.

For the above reasons we have been under the understanding that our process of maintenance charges was being done according to the method prescribed by Rural Development and of benefit to the properties.

In our meeting with OIG three things were very clear

- Their stand is the $17,000 should be paid to the two projects.
- Their audit is a review of the state of Minnesota procedure regarding the IOI.
- The National office has the power to resolve this audit.

We as Owners and Managers are anxious to cooperate with you to reach a solution that works for everyone. This has become very confusing as to whose procedures we are governed by. We understand our mortgage is with Rural Development and have never been privy to OIG's interpretation of the 1930-C. The history of how this has evolved has placed us in the middle of the Minnesota Rural Development and OIG's differences.

Unfortunately this is being used as the major tactic by the State in Minnesota Rural Development in its effort to remove me as manager in Minnesota. All owners I manage for have been threatened with acceleration or similar threats if they don't change management by December 31, 2001. Minnesota Rural Development has further threatened disbarment and suspension of me. This has caused extreme damage to my reputation both as an individual and as a

business and has been very costly to me both in additional expenses and the loss of management.

I would ask that in settling this matter I be given a letter which would remove the suggestion that there has been a major violation. This then removes or dissarms the Minnesota Rural Development office's opportunity to use this to destroy my business.

Time is of essence. This is very critical. Your assistance is greatly appreciated.

*GEORGE E. VITALIS*
**28025 ST CROIX TRAIL**
**SHAFER, MINNESOTA 55074**

**RESIDENCE:(651) 257-0747**
**FAX:(651)-257-0852**

July 18, 2001

Mr. Larry Anderson
USDA Rural Housing Service
1400 Independence Ave. S.W.
Washington, DC 20250

Dear Mr. Anderson;

Enclosed are two letters which involve requests regarding prepayments. I am sending these to you as well as the offices in MN as our experience was not to great on the last two which took 7 years. I would appreciate if you could get these to the proper file in case we need to refer to them in the future.

The letters raise other administrative issues which we are trying to work out in MN and other channels as it is getting real nasty to do business with you folks here.

It is for that reason we are requesting a change in the Taylors Falls building from accepting an incentive package to wanting a prepayment. I would appreciate any guidance on how to make the change as simply as possible. It is real unfortunate but we cannot trust the future.

I hope all is well with you.

Yours truly,

George Vitalis

**EXHIBIT L**

Croix Management Company

Box 236
412 Bench Street
Taylors Falls, Minnesota 55084
651-465-6841
Metro 651-462-7770
Fax 651-465-3080

September 13, 2001

Rural Development
Carl Wagner
Multi-Family Housing Servicing
And Property Management Division
U.S. Dept of Agriculture
Washington. D.C. 20250

Dear Carl:

We have discussed on several occasions as have many owners and managers in Minnesota on the Rural Development situation in our state.

You heard from a group of owners and managers who own and operate the majority of Minnesota's 515 complexes. They weren't happy two years ago and that was only the tip of the iceberg compared to the current status of Minnesota Rural Development. Rural Development in Minnesota is out of control. It is significantly worse now.

I have also discussed with you the threats made to me personally by Rural Development staff to put me out of business and eliminate female management. You are aware of Rural Developments threats and fabrications in the past. They are intent in their vicious selective persecution campaign.

Several years back I met in Washington, D.C. with you and Pat Sheridan. In reviewing some of the letters, you clearly stated Rural Development staff letters were discriminatory. You sent the civil rights team out, however they didn't have time to talk with any of the other managers but I have a copy of a note from the Minnesota state Rural Development file where they stated maybe there is some project discrimination. I am writing to plead for help.

I have not been in touch with you for awhile since I was told if I talked to Washington. Minnesota Rural Development would put me out of business. I have made every possible attempt to work with them and comply with their wishes to no avail. There are many Rural Development employees that are against and aware of this harassment and selection persecution and have apologized and stated they have to do what they are told or will be out of a job.

If no one in your office is able to intercede and contact us we will respectfully have to utilize other alternatives.

If there isn't an immediate and significant change in Minnesota Rural Development the 515 program will sustain serious damage. The legislature, media, and judicial system involvement can only be detrimental to a once good affordable housing program. I can't express strong enough that we need serious intervention.

I understand you have had some medical problems and if this is not an area you can provide assistance and action, please provide the name of the appropriate personnel. Please call or fax within the week on who in Washington is in the proper position or how we should proceed.

I look forward to hearing from you. This is very serious. Some irreparable damage has already occurred. Your prompt consideration and response is greatly appreciated. You have been supportive in the past and I trust you will respond with assistance or advice.

Sincerely,

Marge Alden
Croix Management Company

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Steve Wenzel | **From:** | MARGE ALDEN |
| **Fax:** | 651 602-7825 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | December 20, 2001 |
| **Re:** | Meeting | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

I received your letter dated December 17, 2001 regarding your intent to pursue debarment and suspension proceedings against Croix Management if $17,235 is not paid by December 31, 2001. I have spoken with Obediah Baker at the national office about the issues in Minnesota and he strongly suggested that I meet with you in an attempt to resolve them. I would like the opportunity to have such a meeting, but I also understand from your letter of November 7, 2001 that you are not interested in having any discussions. If you are amenable to holding a meeting in accordance with Mr. Baker's suggestion, please let me know when you are available. I would be able to come to your office in St. Paul on December 26, 27, 28 or 31, 2001

As you know, Croix believes that it settled this matter several years ago with payments made to the projects in accordance with the agency's findings in November, 1996. We look forward to discussing this issue with you further so that we can see if there is any possibility of resolving this matter before you press suspension and debarment proceedings against Croix.

Thank you for your consideration.

Happy Holidays.

**EXHIBIT N**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obidiah Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 2 |
| **Phone:** | 651-465-6841 | **Date:** | December 28, 2001 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

Your contact with the State of Minnesota RD and my fax sent at your suggestion to our State Director, Steve Wenzel has precipitated the following responses.

Steve Wenzel has not contacted me to schedule a meeting. I do not know if he ever received my fax as Jackie Goodnough screens his messages. I called to verify my fax was received by Mr. Wenzel but was told I couldn't talk to him that Jackie would get back to me.

Jackie Goodnough left a message stating there will be no meeting and that they are not interested in talking to us. They do not intend to settle anything. She also sent a fax stating she plans to initiate debarment and suspension . She stated this was at the advice of your office.

Lenee Hoffman said they will not give an extension to the owners I manage property for . The owners were told to change management by the end of the year and RD plans to remove me from management of all 515 properties. RD doesn't need a reason and they don't want to discuss it.

I have complied with everything according to our loan agreement and FmHA regulations. This attack is vicious and discriminatory. It is clearly selective persecution.

I understood your message to say there is nothing your office can do to assist me but you are aware of the deficiencies in MN RD. I know you stated your office is looking into the problems in MN RD, however due to MN RD threats to my owners, I have now lost 135 units of management with the rest of what I manage in the State of MN pending.

If you are unable to intercede, please provide advice on who we can meet with or talk to that has authority to provide assistance and an objective review of what has and is transpiring.

There is a lot of unrest in Minnesota. A lot of owners, managers and RD employees would welcome the opportunity to resolve this travesty in MN. MN was once a leader in the 515 program. We are now the brunt of jokes nationally.

Any assistance or contacts you can provide will be greatly appreciated. I am faxing a copy of the fax I sent to the Mr. Wenzel

Happy New Year
Marge

**EXHIBIT O**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

Croix Management Company

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obediah Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 34 |
| **Phone:** | 651-465-6841 | **Date:** | January 14, 2002 |
| **Re:** | Meeting January 10, 2002 – OIG | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

We were looking forward to hearing from you on Friday, however I know you had a full day. We very much appreciated you taking the time to meet with us on Thursday and I hope you left with an appreciation of the confusion with in the regulation interpretation by the government agencies that we have been dealing with. This dispute between government agencies has created a position which has been very costly and damaging to both my business and reputation.

Please know that we are very willing to work with you to bring this to a reasonable conclusion. If there is anything further we can provide to aide in assisting this process, please don't hesitate to contact me. We look forward to hearing from you.

Marge

**EXHIBIT P**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obe Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | February 21, 2002 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

---

I am faxing you to ask your assistance in either providing a contact or interceding. I don't know where else to turn. MN Rural Development has threatened the last individual owner I manage for that he has to immediately change managers or they will foreclose on his properties. The Duluth office has not given a reason to him or management. They refuse to provide any "just cause" as regulation requires. We have never had a late report, certification or budget. The management plan, agreement and attachments were reviewed line by line with them a year ago. They refuse to sign the agreement and have stated the intention of MN RD is put me out of business. I have been told repeatedly that they don't have to have a reason for what they do.

I understand and am reminded frequently that RD is a good old boys organization but that mentality should not play a part in running a business. What I have been and am being put through is so unfair. I have worked many long hard hours for many years to build up my business and provide superior management. My company has an excellent reputation. To be put out of business by federal employees for their own personal vendetta is wrong. Trying to remove me from management is not going to change the real problem, as you put it , deficiencies in MN RD.

You mentioned in your last taped message that you could do nothing because I had filed an appeal on the debarment issue and when that decision came down you could look at it administratively for policy adjustments. I have not and never did file an appeal on debarment. I am amazed at all the erroneous information being provided to foster the cause. Since there was not a debarment appeal filed, it should permit your involvement.

I placed another call to our State Directors, Steve Wenzel's office today. Barb Nelson told me the state office will not meet with me and do not want to discuss it . There is no one to turn to – no one in charge.

I need some immediate help. I would like to suggest that you request the state to stop any removal action until this can be investigated and immediately allow a transfer for servicing of my properties to another state. I understand that since this is a federal program the state servicing office can easily be

**EXHIBIT Q**

changed. If for whatever reason you feel you can not intercede and provide some assistance, please provide a contact who has the authority to respond.. Do we have an undersecretary yet?

Since I have a RD imposed time frame I need a responds by return fax or call 651 465-6841 today or tomorrow. Whatever assistance or suggestions you can offer, Obe, are appreciated. Thanks

Subj: Re: PRE-TRAC
Date: 02/22/2002 11:50:04 AM Central Standard Time
From: bonnie.smith@mn.usda.gov (Bonnie Smith)
To: MJLhoffman@cs.com

Lenee:

That's the way I understood it too. In fact she said that you should back out (delete) all of the previous timeline screens back to where it asks if the borrower has accepted or rejected the specific incentives. Put "rejected" in the timeline and proceed in PRE-TRAC as if you were going to accept prepayment.

By the way I got a call back from Cynthia this morning. She asked Larry Anderson about our other question. I'm not sure I understood her correctly by here goes:

Once the account is accelerated and foreclosed on the RUP's go away. However, if minorities are affected or tenants will be displaced and the loan is paid in full before foreclosure the remaining years of the RUP's stay or the leases have to be extended (DeWolf). Also, if minorities are affected or tenants are displaced the owner must list the project for sale to a non-profit during the acceleration period. If he fails to sell it to a non-profit during the acceleration period and it goes to foreclosure, then the RUP's disappear. Is this as clear as mud? I'm still not sure I understand it all yet. Apparently this is a new policy, however, I don't see it printed anywhere. I really would like this info to come out in an AN.

Bonnie

MJLhoffman@cs.com wrote:

> Hi Bonnie,
>
> Thanks for the info and for the sympathy from Cynthia. If I get her answer
> right we can now work towards prepayment on the Franconia project that they
> were going to accept the equity loan on. Is that what you get too.
>
>
> Later,
>
> Lenee

——— Headers ———
Return-Path: <bonnie.smith@mn.usda.gov>
Received: from rly-xf02.mx.aol.com (rly-xf02.mail.aol.com [172.20.105.226]) by air-xf04.mail.aol.com (v83.42) with ESMTP id MAILINXF49-0222125004; Fri, 22 Feb 2002 12:50:04 -0500
Received: from willm.mnwillmar.fsc.usda.gov (willm.mnwillmar.fsc.usda.gov [199.154.34.191]) by rly-xf02.mx.aol.com (v83.35) with ESMTP id MAILRELAYINXF26-0222124948; Fri, 22 Feb 2002 12:49:48 -0500
Received: from mn.usda.gov (mnwillmar0d017.mnwillmar.fsc.usda.gov [199.154.34.107])
by willm.mnwillmar.fsc.usda.gov (8.9.3/8.9.3/USDA-ITC $Revision: 1.5 $) with ESMTP id MAA03332
for <MJLhoffman@cs.com>; Fri, 22 Feb 2002 12:05:26 -0600 (CST)
Message-ID: <3C7685A0.8803D0C6@mn.usda.gov>
Date: Fri, 22 Feb 2002 11:53:36 -0600
From: Bonnie Smith <bonnie.smith@mn.usda.gov>
Organization: USDA, RD

**EXHIBIT R**

*GEORGE E. VITALIS*
**28025 ST CROIX TRAIL**
**SHAFER, MINNESOTA 55074**

**RESIDENCE:(651) 257-0747**
**FAX:(651)-257-0852**

March 15, 2002

Mr. Steven Wenzel
USDA, Rural Development
410 Farm Credit Building
375 Jackson Street
St. Paul, MN 55101-1853

Dear Mr. Wenzel;

Thank you for taking the time to meet with me and allow for a review of my concerns as it relates to the current experience of owners and managers of Rural Rental housing funded by your agency. I appreciate your bringing Mike Navin and providing the opportunity to get to know him better.

I look forward to your setting up our next meeting as discussed. Your suggestion of having a form of ombudsman within your agency is very intriguing. As you are aware that could go a long to getting some consistent answers as to how Minnesota is expecting the persons in the field to work with the program.

Enclosed is a copy of a notice sent to each tenant and a letter I sent in response. It outlines a recent experience we have had with the St. Cloud office regarding the1994 prepayment applications for Franconia Associates. The answers to my questions and the processing of the application should be very routine and an ombudsman could be a great help if we experience further difficulty. As you know Jackie Goodnough refuses to have any further discussions with us and I am not sure, but will find out with my letter, if Lennee Hoffman has taken the same position. All I am looking for is taking care of worried tenants and to know the exact status of the application process.

Again, I look forward to our next discussion. I welcome any inquiries you may have should you have any questions. Thank you.

Yours truly,

George E. Vitalis

**EXHIBIT S**

Memo: Regarding phone problems with Steve Wenzel USDA-Rural Development

Date: March 26,2002

From: George Vitalis

This is a summary of events when trying to call Steve Wenzel, the Minnesota Director of Multi-Family Housing in St. Paul. This happened even though on March 11,2002 I had a meeting over lunch with Mr. Wenzel and Mike Navin of his office. This lunch was very cordial and at the end of the lunch I was told we would have a subsequent meeting in his office and that he wanted to continue the dialogue.

The call was placed to his secretary Barb Nelson and the entire conversation was with her. She obviously was uncomfortable but did not stray from saying what she had been instructed to say to me if I were to call for another meeting. It is not clear whether any person who is identified with the CARH State organization would have been treated the same, as my experience was consistent with what had happened to the President and secretary of that organization when they had attempted to talk to Mr. Wenzel.

Upon placing the call I was told that Mr. Wenzel was not available. As the conversation developed it was clear that he would not be available and would not be taking my call under any circumstance.

It was made clear to me after some coaxing that the instructions had come from Jackie Goodnough and I am not sure whether Mr. Wenzel even knows that the screening is going on. Some of the general comments were:

1.) To have continued the conversation I would have had to explain what the call was about. The question was raised as to whether it was a personal call or program related but it was very clear that I would not be going any further with the conversation.

2.) The instruction was that all calls are to go through Jackie Goodnough and none are to be directed to Mr. Wenzel's office without her approval

3.) If the call is to set up a business meeting all meetings are to be held in the office. Mr. Wenzel is not to attend any meetings out of the office such as he had done in going to the CARH meeting or his lunch with me.

4.) To much staff time is being taken up with "this" is a direct quote. I assume any time in which clarification of the program or any attempt to take a position different from Jackie Goodnough is wasting time.

5.) Jackie Goodnough is to set up any meetings and staff is to be present at any and all meetings. Therefore no private meetings with Mr. Wenzel are allowed.

6.) Barb Nelson would not take my request to have Mr. Wenzel call me even though it had been clear from our lunch that I had been invited to do so.

**EXHIBIT T**

7.) Any meeting that would be set up must start with a written agenda that is to be approved by Jackie Goodnough. Then if she accepts the agenda the meeting can go forward. No informal discussions or other non structured meetings are to be set up period.

It is really unfortunate because it was clear from the lunch meeting that Mr. Wenzel was looking at setting up the procedure for dialogue separate from Jackie Goodnough to have what the IRS would call a problem resolution officer. This is really critical as the program is in disarray and looking for a cooperative dialogue with which to move forward.

It is clear from this call that I have no way to talk to Mr. Wenzel again unless it is approved and attended by Jackie Goodnough. Experience shows this to not work.

George Vitalis

March 27, 2002

Rep. James L. Oberstar
8th District
Minnesota

Dear Rep. Oberstar:

We were pleased to have your staff assistant Devan Nelson attend our February meeting. Steve Wenzel RD State Director was also present. We had a very pleasant meeting with him in which we outlined problems with the State Office. He promised to respond. As of this date he has not. Prior to our March 21st meeting I attempted to talk to him and asked about the possibility of taking him to lunch along with our Vice Pres. Rodney Hestekin for an informal visit. This was my first phone call. I was told that Steve would have to be told so he could respond. The next day I was told by a very nice lady Barb Nelson his secretary that she had not been able to pass along our request. She did agree to call me back later in the day. She did call me in late afternoon . She informed me as follows. If MNCARH was involved there will be no meetings scheduled with any staff personnel out of their office. Any and all meetings would have to be held in their office with all staff present. A written request would have to be submitted in advance listing all items to be discussed. She said staff had directed her to give this message to all associated with MNCARH. Also included was a man named George Vitallis. I met him for the first time at our Feb. meeting which Devan also attended. I asked her if staff was spelled Jackie Goodnaugh. She replied that she was just doing her job. Unknown to me at the time our Executive Director Karen Theobald had also called for Steve. She was transferred to Steve's Voice mail and the call was never returned.

Devan was present at our meeting when Steve acknowledged that Jackie did exceed her authority on a regular basis.

We do not know if Steve is aware that we are trying to contact him. He has not kept his promise to get back to us. We do know that Jackie Goodnough is completely out of control and treats people as she desires.

We need help.

Sincerely,

Robert B. Layman

Robert B. Layman, Pres.
MNCARH
22 Sumner Hills Road
Mankato, MN 56001 Ph 507-388-2271

**EXHIBIT U**

*GEORGE E. VITALIS*
**28025 ST CROIX TRAIL**
**SHAFER, MINNESOTA 55074**

**RESIDENCE:(651) 257-0747**
**FAX:(651)-257-0852**

April 11, 2002

Ms. Deven M. Nelson
Staff Assistant
Congressman James L. Oberstar
38625 14th Ave., Suite 300 B
North Branch, MN 55056

Dear Ms. Nelson;

Included with this letter are many samples of letters and other correspondence that provide insight into what we have been describing to you are the problems we encounter in doing business with the USDA Rural Development Rental Housing Program. It is in no way inclusive of all the issues nor does it give all examples of the issues we do have.

It should be noted that most of the employees we encounter are friendly and helpful. The employees that have chosen to remove Croix from management also have problems with many other owners and managers but it has not been taken to the same level of difficulty as Croix is experiencing. As you have seen there is a major problem in Minnesota between the owners/managers and the direction provided by the state office.

A review of the huge amount of papers provided you with this letter can get summarized fairly easily. You will note that the problem that continually comes up is not following the "rules" and therefore being put in the position of being in violation of the program. You will also note the continual requests for a definition of the rules by myself and Marge Alden. In answer to the requests we continually receive letters which contain large amounts of copies from the agencies only real set of rules, the 1930-C. The 1930-C is woefully inadequate in giving a good definition of what is to be followed to meet the program requirements. The other experience that is common is to not receive any answer to the difficult questions and having no place to go for those answers. This leaves each person within RD a wide latitude to intrepret the rules as best they can or to suit their purpose if they choose to be contentious.

There is no consistent application of rules between the 16 offices in Minnesota and that is evidenced by Croix's having annual budgets accepted by some offices and having two of the offices seeing Croix as so bad they are vigorously pursuing removing them from management to put Croix out of business.

There are no objections to Croix management in the areas of tenant care, care of properties(given budget restraints), report submissions not timely or fraud or financial

**EXHIBIT V**

abuse. There is the question of the OIG audit that took place in 1994 which is still not settled and that is a total separate discussion.

One of the problems is there is no place we can go to be heard that would resove issues that come up. Most issues do not need to be problems, rather just a clear definition of what is expected and have it applied on a consistent basis. In Minnesota the state has no facility to resolve problems. I did have one meeting with Steve Wenzel, the state director, which I felt went very well and we discussed that we would do it again. In calling him I was not allowed to talk to him, told that to meet I would have to present an agenda that was acceptable to Jackie Goodnough and maybe it could get scheduled.

Needless to say this process has created a huge financial burden, not only in actual checks written but also in all the time it takes to find a way to get things settled. There is also financial damage done to rhe properties when rent increases are delayed and budgets not accepted. It is necessary to provide maintenance with a plan and that does not wait for three years as has happened in getting budget approval.

I very much appreciate the willingness of Congressman Oberstar and his staff to hear and deal with our side of this story. Anything you can do to get us a level playing field will be greatly appreciated

Yours truly,

George E. Vitalis

George E. Vitalis

Cc: Pat Sheridan, Washington

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Arthur Garcia | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | April 23, 2002 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

First I want to say how much we appreciated the chance to meet with you on April 15, 2002. I greatly appreciate your willingness to review the Minnesota RD situation and what there actions are doing to my company and me personally.

At the time we met I suggested transferring servicing of all properties I handle in MN to Wisconsin. This originally was a suggestion of your attomey since it is a federal program any state can handle servicing.

Time is of the essence. I am requesting I be allowed to immediately proceed with transferring servicing and/or a moritorium be imposed on MN RD to cease harrassment of owners and halt any change of management until this is resolved.

At the demand of RD by threats to owners I fee manage 515's for I have now lost 66% of my business in Minnesota. If your office doesn't intercede this week, I will loose another 19% by the end of the month. This is a total of 85% of my fee management business.

Thank you in advance for your assistance. I am in my office all day today at 651 465-6841. If I don't hear from you today, I will call you tomorrow to discuss any suggestions you may have or answer any questions.

**EXHIBIT W**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Arthur Garcia | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | May 28, 2002 |
| **Re:** | | **CC:** | Michael Neruda & Obidiah Baker |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

I know, according to a message left by Wayne Rogers, that your office is investigating the situation with MN RD and that you are aware that there are some serious deficiencies. It has been six weeks since we met and I don't mean to be impatient but I have now lost 85% of my fee management 515 business in Minnesota. Rural Development continues threatening owners with foreclosure if they don't change management and do whatever they want. Since there is no RD hierarchy structure and no one in charge to talk to, the owners are reluctantly reacting to the threats. They see what MN Rural Development staff have done to destroy my business and the harassment that takes place in Minnesota to owners, managers, and the good Rural Development staff that they are frightened.

I requested at our meeting and in my follow up fax and conversations to have servicing of all complexes I manage handled out of the Wisconsin office. The State Director and Multi-housing coordinator in Wisconsin have agreed and all I need is a letter from Washington authorizing the change in servicing offices. This was originally suggested through a Dept of Agriculture attorney. Since this is a federal program servicing can be handled from any state . All I need is written authorization from Washington. This is an immediate remedy until you have time to continue your investigation and resolve the issues.

I have been served papers at the demand of the Duluth office and will have a court appearance in a few days if this can not be resolved. The RD staff demanded an owner take me to court and waste my time and money or they will foreclose on his 515 properties. This situation is very serious. I have tried to work with Washington and have attempted to keep this out of court and out of the press. I have no were else to turn. Please forward authorization to move everything I am involved with to Wisconsin by return fax or tell me who we in Minnesota can turn to for a level playing field. There are a hand full of RD staff in Minnesota that are destroying the program and credibility of the 515 program and have seriously damaged my company.

Thank you in advance for your assistance.

**EXHIBIT X**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obidiah Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 2 |
| **Phone:** | 651-465-6841 | **Date:** | May 28, 2002 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

---

Welcome back! I am glad to hear you are back and doing well.

The Minnesota Rural Development situation continues to escalate. Since we last talked they have threatened all 515 owners I manage for with foreclosure and the owners have reluctantly pulled 85% of my Minnesota business. This is very serious.

I am requesting a letter from whoever the appropriate staff person is in your office to allow me to transfer the rest of the properties t o Wisconsin for servicing. Since it is a federal program, I have been assured this is a simple procedure letter. Wisconsin is agreeable. I manage property there and have never had a problem with their customer friendly professional staff.

The Minnesota situation is critical. Your immediate response is appreciated. Thanks, Obe.

EXHIBIT Y

BOX 236 TAYLORS FALLS MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obediah Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 690-3444 | **Pages:** | 14 |
| **Phone:** | 651-465-6841 | **Date:** | May 31, 2002 |
| **Re:** | | **CC:** | Arthur Garcia |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

In phone conversation with Wayne Rogers yesterday he requested I fax this to you as he is heading back to Georgia and I was out of my office yesterday with two Rural Development property inspections.

I am faxing the papers I was served for a court appearance. RD threatened the owner with foreclosure of his 515 mortgages if he did not change management. RD further demanded the owner take me to court to "waste my time and money". The enclosed papers are a demand for records based on a RD required change in management because RD refused to sign the Management Agreement and Plan which was in their office many months before the previous one expired. The owner signed the agreement s and we have had several meetings with RD and have reviewed the Plan, Agreement and all attachments line by line. In the taped meeting they agreed everything was fine. RD stated however they were instructed to remove me as a manager so they would not sign the agreements.

With my request to move the servicing to Wisconsin denied because of setting a precedent and the fear of a grand exodus from MN this leaves me in a quandary. I have tried to work with RHS & RD to solicit at a minimum a level playing field and not go the judicial route. If I don't have a RD signed Plan and Agreement in hand prior to June 7, I am in court at RD's insistence incurring more expense and possibly irreparable damage.

Any assistance you can provide prior to that is appreciated.

Have a Good Week end.

EXHIBIT Z

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obidiah Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 720-2080 | **Pages:** | 3 |
| **Phone:** | 651-465-6841 | **Date:** | July 24, 2002 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

The harassment and attempted destruction of my business by Rural Development staff is alive and well. At our meeting in April I was told this would be investigated. In May I was told the report had gone to Mr. Garcia and that you were in charge of handling the situation. I was assured there would be changes in MN RD with in three weeks. It is now July and my business has been severely damaged . I have yet to see a change or hear anything from Washington. Please call me before Monday and let me know what Washington is or can do and if there is any way I can assist in expediting this process.

I am forwarding faxes I sent today to the State Director and to one of the RD regional offices. The RD office is a good office but they are supervised out of Waite Park. I think rather than single me out as instructed, they just aren't responding.

Your assistance and advice is appreciated.

EXHIBIT AA

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Lenee Hoffman | **From:** | MARGE ALDEN |
| **Fax:** | 320 255-1455 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | July 26, 2002 |
| **Re:** | Sunrise River & Riverfront | **CC:** | Steve Wenzel/Obe Baker |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

---

We are in receipt of your April 30, 2002 letter received today. This was previously fully responded to.

1. The budgets have been in your office since October 2000 and 2001. RD needs to be more efficient in processing the budgets. A two year delay is in violation of federal regulations. Management and owners can't be held responsible for RD's lack of performance.

2. The Actual statements were forwarded to your office in February. RD needs to find time to review them.

3. The junior lien is in the state office and has been for a couple of years. Please forward us a signed copy now that you have your MOU with MNHF.

4. Please forward copies of all IOI's submited since April 1994 and the approval documentation provided under regulation. Please forward these with in the week so they are available for our scheduled review.

**EXHIBIT BB**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Steve Wenzel | **From:** | MARGE ALDEN |
| **Fax:** | 651 602-7825 | **Pages:** | 5 |
| **Phone:** | 651-465-6841 | **Date:** | July 29, 2002 |
| **Re:** | | **CC:** | Obe Baker |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

FYI - Why aren't these items being signed off by RD? All our reports have been in on time. We have been told RD was instructed by the state office to not sign any of our reports or agreements and to site us with Serious servicing concerns.

In my previous fax I requested a call prior to the noon meeting today to avoid further complication. I am very disappointed I have not heard from you.

**EXHIBIT CC**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Obe Baker | **From:** | MARGE ALDEN |
| **Fax:** | 202 720-2080 | **Pages:** | |
| **Phone:** | 651-465-6841 | **Date:** | July 29, 2002 |
| **Re:** | | **CC:** | r |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

---

FYI - The games continue in Minnesota. Rural Development refuses to sign off on anything since they are very clear that they intend to eliminate all our management. All reports have been in their offices on time they just refuse to sign off. There is no regulatory reason, it is strictly discriminatory.

I have been told that Washington is aware of the problems and have investigated the deficiencies. I was told two months ago that I would see changes correcting this in three weeks. The attacks by RD continue. I don't know where else to turn. I was informed it was turned over to you to handle. Help, Please.

I

**EXHIBIT DD**

INCLUSION NO

USDA United States Department of Agriculture

Rural Development

110 South 2nd Street
Suite 120
Waite Park, Mn 56387
Phone: 320-255-9111 Ext 4
Fax: 320-255-1455
TDD: 651-602-7830

July 30, 2002

MARGE ALDEN
CROIX MGMT CO
BOX 236
TAYLORS FALLS MN 55084

Re: Franconia Associates - Sunrise River Apts & Riverfront Apts

Dear Ms. Alden:

As per your request in your faxed memo dated July 26, 2002, enclosed are the Identity of Interest forms since 1994.

Sincerely,

Jane Kellner

LENEE HOFFMAN
Multi Family Housing Specialist

Enclosures

**EXHIBIT EE**

USDA Rural Development is an Equal Opportunity Lender, Provider, and Employer
Complaints of discrimination should be sent to:
USDA, Director, Office of Civil Rights, Washington DC 20250-9410

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Art Garcia | **From:** | MARGE ALDEN |
| **Fax:** | 202 720-2080 | **Pages:** | 3 |
| **Phone:** | 651-465-6841 | **Date:** | August 28, 2002 |
| **Re:** | HELP | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

I am faxing the attached fax FYI. It is so frustrating. I filed an appeal because RD demanded the owner change management because we did not have an approved budget which RD refused to approve. The reasons were simple line changes which we complied with and resubmitted the budget five times. Each time there was a new additional change requested. Since there was no where else to go we filed an appeal and mediation. The mediator clearly stated there was no reasoning with Jackie Goodnough and Pat Croatt and referred it to appeal. RD held up the appeal for 13 months. Demanded a management change. Approved the budget we had submitted for the new management and now the need for appeal is being questioned since the budget is approved. These are the types of situations I am subjected to. I have lost the management. I have paid all the mediation and legal fees and still don't have anyone to look at the injustice of the actions of RD.

I appreciated your taking my phone call August 14, 2002. Is anything going to be done in Minnesota regarding the continued harassment? You mentioned I would see some changes. My business has been destroyed by RD staff threats. While I understand that it is a slow process for government to implement changes, in the mean time some stop gap measures could be taken to eliminate the constant threats and destruction and reverse some of their actions while there is still time to minimize the damage.

I assume your talk with Mr. Wenzel has put the wheels in motion for RD to do as much damage as possible before the slow process moves far enough to interfere. Since our phone conversation the Duluth and Waite Park offices have really been on the rampage with vicious attacks. The only change I have seen is moving a good Rural Development employee from multi-family to single family. This is not recognized as a positive change in multi-family.

I don't mean to be so persistent but this is a major issue. It is my business, life, reputation and health that are at stake. I feel like I have been abandoned with no system in place to resolve anything. I have put in several calls and sent faxes to Obe but have not heard from him in many months. Is he okay? Is

EXHIBIT FF

he back working full time? I don't know if he is still suppose to be tracking on this or if someone else is now in charge.

I truly appreciate your understanding of the situation and will work with you in any way possible to effect positive changes and resolution. Your prompt assistance is greatly appreciated.

*GEORGE E. VITALIS*
**28025 ST CROIX TRAIL**
**SHAFER, MINNESOTA 55074**

**RESIDENCE:(651) 257-0747**
**FAX:(651)-257-0852**

September 23, 2002

Gloria Nava, MFH Technician
USDA Rural Development
410 AgriBank Building
375 Jackson Street
St. Paul, MN 55101-1853

Response to Steve Wenzel letter of September 4, 2002

1) Concerns regarding the delivery of the program-
Micro management by RD
Inconsistent application of rules between offices and within offices
No overall direction by the state office
Lack of guidelines for the administration of the program in a written and concise manner
The good people within the program are very frustrated and leaving in any way they can. There is concern for these people and their problems with the current in charge people.
Lack of ability to get questions answered from certain offices in a manner that is consistent and clearly sets out what is expected.
Lack of cooperation in turn around of reports and other requests of offices negatively affecting the ability to manage projects.
Lack of understanding by certain offices of the very forms the program is asking be completed.
Inability to have the state office follow the rules set up in Washington and no process for working out the differences.
No system exists within the state to work out differences so that all managers are getting the same direction or an opportunity to get an answer that has authority that appears consistent with the program directives.
The program has way to much staff which gives them to much time to hassle managers if they so choose. This also results in an extreme waste of time by owners and managers over a continual barrage of issues. The state is well aware of the frustration and growing anger among owners and managers yet we get a letter such as this which will take time to answer. The problem is the answers go no place, will not affect the program, and only provide some program time waster or worse will be used to satisfy someone that there is no problem. That is directly in contradiction to the real status.
It is time to see results in the areas of the way the state is being managed. As owners and managers we are made to feel as though we are the enemy rather than set up a structure of cooperation. The return to owners is set up to provide a return on

**EXHIBIT GG**

investment and is not part of the compensation for our time. The value of the properties to owners is not large enough to pay for the huge amounts of time the RD staff takes to handle the micro management. There is no provision within the program to compensate owners for anything.

The program issues are now resulting in the return to owner being elimated in too many projects and more problems as it goes along.

The overall management structure of the program in the way program structure is established and the management supervision of the employees leaves no accountability for performance. The current state supervision is non performing, everyone knows it, yet there is nothing that is being done to put the proper people in place to insure performance of the program. Everything is all show and no performance.

In summary the main concern is with the way the state is administered.

2) Positive aspects of the program-

The concept of the program is excellent and it has made a difference in many rural towns by providing low cost housing. Unfortunalely the properties are being threatened by the performance of the RD administration.

As the program was initially set up it truly was the most cost effective method of providing low cost housing available. It now is very suspect and has challenges that are very unfortunate.

3) Recommendations-

The issues with program governance should be helped with the new manual, however if the states are left to their own interpretation without dialogue with Washington and the managers it could easily be no better than we currently have which in the MN experience is problematic.

At the Washington level a system of governance of the entire program needs to be established so that there is accountablilty for performance and an organizational structure ensuring that dynasties cannot be set up where a state can ignore the program rules.

At Mn there must be some changes that allow for effective dialogue between the RD and owners/managers which work out problems in a spirit of cooperation. Whatevever changes need be made to the existing staff to make this happen must be done.

Obviously my response is not complimentary of the program as it is administered in MN. I would be willing to meet with anyone who will work towards a meaningful solution so that we can get on to making a living instead of spending time on letters such as this.

Yours truly,

George E. Vitalis

George E. Vitalis

CC: Congressman James Oberstar
Obediah Baker
Marge Alden

*GEORGE E. VITALIS*
**28025 ST CROIX TRAIL**
**SHAFER, MINNESOTA 55074**

**RESIDENCE:(651) 257-0747**
**FAX:(651)-257-0852**

September 23, 2002

Rural Housing Service
Mr. Obediah Baker
Deputy Administrator
Multi Family Housing
14th & Independence Ave SW
Washington DC, 20250

Dear Mr. Baker;

We need to do something about the imfamous OIG audit! Please let me know if you have had the time to put together a plan and how it is to proceed. We have had the suggestion that we go directly to the Secretary of Agriculture and are asking you to provide some guidance as we would like to work through you but feel a real urgency to proceed. If it makes sense to you would you suggest how we can set up such a meeting. We would ask for your presence and someone from the office of Art Garcia as a preliminary to sitting down with OIG again. Please let us know.

Enclosed is my response to the letter received from Steve Wenzel regarding a survey he is conducting. As it is totally business as usual in MN I doubt there is going to be much response from owners and managers as it is viewed as a waste of time to try and make changes through the state office. In the past such efforts seem to never record any of the negatives so am sending a copy of my response for your file in case you get some glowing report or find that there just was no response.

I am not sure if you are aware that a group of employees have filed a grievance regarding the state office. It will be interesting to see how the management will deal with it as I understand it was very pointed to J. Goodnough. It is time for you to take over MN and bring in your HR people to try put things in order.

Thank you in advance for any consideration you can give my request.

Yours truly,

George E. Vitalis

George E. Vitalis

**EXHIBIT HH**

# Facsimile Cover Sheet

George E. Vitalis.
28025 St. Croix Trail,
Shafer, Minnesota 55074

Tel: (651)-257-0747
geovitalis@aol.com
Fax: (651)-257-0852

| | | | |
|---|---|---|---|
| **To:** | Obediah Baker | **Date:** | 1/2/~~02~~ 03 |
| **Company:** | | **From:** | |
| **Phone:** | | **Pages with** | |
| **Fax:** | 202-690-3025 | **cover page:** | 20 |

Dear Mr. Baker;

Attached are the two notices I indicated to your secretary as having received today regarding foreclosure on two properties that are in Franconia Associates which Marge Alden and I own. I really need an answer on whether you are going to be able to help to solve this reasonably and I need an indication of your position ASAP. I apologize to your secretary for having been curt with her just now but my frustration is showing.

We did make the necessary payments to RD on the OIG audit which should settle that matter. I hope your promise of no further problems as made at the mediation holds true.

In the attached paperwork are three reasons for the foreclosure:

1) Failure to provide adequate management – We have asked for their basis for making this claim in the past and have not received an answer in writing so had assumed it was related to the OIG issue. This is the Waite Park office and you are very familiar with the problems we have had with them over the years.

2) Failure to meet reporting requirements – This is very simple all the reports have been put in on a timely basis. Waite Park refuses to sign them therefore the reports are not approved with the resultant reporting requirements not being met. How can we settle this when we have no control.

3) Permitting the encumbrance of the title by allowing a junior lien to be placed against the property without prior written consent – This relates to the funds provided for the improvements through the Home Funds program. When we had originally tried to get the state to sign the necessary lien forms there was a discussion going on between Jackie Goodnough and the MN Hsg Finance Agency's office regarding wording on the lien itself. This took a long period of time to settle during which time we had been told it was up to us to get a form with the proper wording when in fact it was totally out of our control. You are welcome to verify this with MHFA. That was a part of the original delay in processing the forms. As far as the liens relating to these projects

**EXHIBIT II**

all of the forms have been into the necessary offices and they will not act on them. How can we not be in violation when they won't act on the liens.

As you can see the reasons for the foreclosure are problems with the agency and from our perspective we feel totally set up for such a serious action. It is obvious that these rules are only being applied to us for which I believe the term is "selective prosecution".

Please! I need to know if we can count on you for help as we have very little time to respond. If you do not see it as something you can advise us on I need to know that also.

Thank you for any help you can give us.

George Vitalis
Franconia Associates

USDA United States Department of Agriculture

Rural Development

110 S. 2nd St., Suite120
Waite Park, MN 56387
Phone: 320-255-9111
Fax: 320-255-1455
TDD: 651-602-7830

# F A X

**DATE:** January 24, 2003

**TO:** Franconia Associates - Marge Alden & George Vitalis

**CC:** Rodney Jackson - RDM

Scott Knutson - Acting MFH Program Director

**FROM:** Lenee Hoffman - MFH Specialist *Lenee Hoffman*

**RE:** Request for informal Meeting about the Acceleration of Franconia Associates properties in Wyoming and Taylors Falls.

This letter will confirm your appointment for Wednesday, Feb 5, 2003, at 1:00 p.m. in the Waite Park Rural Development office. This appointment is in response to your 2 letters of Jan 13, whereby you have requested an informal meeting to discuss the acceleration of the Franconia Associates properties in Wyoming and Taylors Falls.

Additionally, we will consider that you have previously been provided with the necessary documentation to support the Agency's position. If you feel otherwise, please contact me prior to our scheduled meeting so that you or your representative can schedule a time to further review the case files of the 2 mentioned accounts.

USDA Rural Development is an Equal Opportunity Lender, Provider, and Employer.
Complaints of discrimination should be sent to:
USDA, Director, Office of Civil Rights, Washington, D.C. 20250-9410

**EXHIBIT JJ**

## *University of Minnesota Agricultural Mediation*

Case No. NC 140

Determination Letter Receipt Date: February 13, 2003

Request Receipt Date: March 11, 2003

| | | | |
|---|---|---|---|
| Franconia Associates<br>PO Box 236<br>Taylors Falls, MN 55084 | George Vitalis<br>28025 St Croix Trail<br>Shafer, MN 55074 | Marge Alden<br>c/o Croix Management<br>PO Box 236<br>Taylors Falls, MN 55084 | USDA Rural Development<br>380 S Garfield St<br>Cambridge, MN 55008 |

## Notice of Mediation Session and Appointment of Mediator

A mediation session has been scheduled for:

Date: April 9, 2003 Time: 10:00 a.m.

Location: Chisago Co Ext Office
38694 Tanger Dr
North Branch, MN 55056-9500
(651) 674-4417

The mediator appointed for this case is:

Darwin (Doc) Johnson
1414 36th St SW
Rochester, MN 55902
(507) 252-1870

If you have questions or concerns please contact:

Mary Nell Preisler
Farmer Lender Mediation
Statewide Mediation Coordinator
1526 170th Avenue
Bejou, MN 56516-9736
Phone: (218) 935-5785 Fax: (218)935-9053

3-20-03
(Date)



**EXHIBIT KK**

***University of Minnesota Agricultural Mediation***

Case No. NC 140

Determination Letter Receipt Date: February 13, 2003

Request Receipt Date: March 11, 2003

| | | | |
|---|---|---|---|
| Franconia Associates<br>PO Box 236<br>Taylors Falls, MN 55084 | George Vitalis<br>28025 St Croix Trail<br>Shafer, MN 55074 | Marge Alden<br>c/o Croix Management<br>PO Box 236<br>Taylors Falls, MN 55084 | USDA Rural Development<br>380 S Garfield St<br>Cambridge, MN 55008 |

# SECOND NOTICE – PLEASE NOTE DATE CHANGE

**Notice of Mediation Session and Appointment of Mediator**

A mediation session has been scheduled for:

Date: April 11, 2003 Time: 10:00 a.m.

Location: Chisago Co Ext Office
38694 Tanger Dr
North Branch, MN 55056-9500
(651) 674-4417

The mediator appointed for this case is:

Darwin (Doc) Johnson
1414 36th St SW
Rochester, MN 55902
(507) 252-1870

If you have questions or concerns please contact:

Mary Nell Preisler
Farmer Lender Mediation
Statewide Mediation Coordinator
1526 170th Avenue
Bejou, MN 56516-9736
Phone: (218) 935-5785 Fax: (218)935-9053

3-27-03
(Date)

**EXHIBIT LL**

***University of Minnesota Agricultural Mediation***

Case No. NC 140

Determination Letter Receipt Date: February 13, 2003

Request Receipt Date: March 11, 2003

| | | | |
|---|---|---|---|
| Franconia Associates<br>PO Box 236<br>Taylors Falls, MN 55084 | George Vitalis<br>28025 St Croix Trail<br>Shafer, MN 55074 | Marge Alden<br>c/o Croix Management<br>PO Box 236<br>Taylors Falls, MN 55084 | USDA Rural Development<br>380 S Garfield St<br>Cambridge, MN 55008 |

# THIRD NOTICE – PLEASE NOTE DATE CHANGE

## Notice of Mediation Session and Appointment of Mediator

A mediation session has been scheduled for:

Date: April 11, 2003 Time: 10:00 a.m.

Location: Chisago Co Ext Office
38694 Tanger Dr
North Branch, MN 55056-9500
(651) 674-4417

The mediator appointed for this case is:

Darwin (Doc) Johnson
1414 36th St SW
Rochester, MN 55902
(507) 252-1870

If you have questions or concerns please contact:

Mary Nell Preisler
Farmer Lender Mediation
Statewide Mediation Coordinator
1526 170th Avenue
Bejou, MN 56516-9736
Phone: (218) 935-5785 Fax: (218)935-9053

4-7-03
(Date)

**EXHIBIT MM**

***University of Minnesota Agricultural Mediation***

Case No. NC 140

Determination Letter Receipt Date: February 13, 2003

Request Receipt Date: March 11, 2003

Franconia Associates
PO Box 236
Taylors Falls, MN 55084

George Vitalis
28025 St Croix Trail
Shafer, MN 55074

Marge Alden
c/o Croix Management
PO Box 236
Taylors Falls, MN 55084

USDA Rural Development
380 S Garfield St
Cambridge, MN 55008

# FOURTH NOTICE – PLEASE NOTE DATE CHANGE

## PLEASE NOTE CORRECTED DATE

**Notice of Mediation Session and Appointment of Mediator**

A mediation session has been scheduled for:

Date: **April 18, 2003** Time: 10:00 a.m.

Location: Chisago Co Ext Office
38694 Tanger Dr
North Branch, MN 55056-9500
(651) 674-4417

The mediator appointed for this case is:

Darwin (Doc) Johnson
1414 36th St SW
Rochester, MN 55902
(507) 252-1870

If you have questions or concerns please contact:

Mary Nell Preisler
Farmer Lender Mediation
Statewide Mediation Coordinator
1526 170th Avenue
Bejou, MN 56516-9736
Phone: (218) 935-5785 Fax: (218)935-9053

4-9-03
(Date)

**EXHIBIT NN**

*GEORGE E. VITALIS*
28025 ST CROIX TRAIL
SHAFER, MINNESOTA 55074

RESIDENCE:(651) 257-0747
FAX:(651)-257-0852

May 1, 2003

John B. Meyers
PO Box 4067
Louisville, KY 40204-2727

Dear John;

Enclosed are some samples which I will use in trying to add clarification to some of the concerns I tried to express when you were in MN.

One of the problems is the distinction between management expenses to be paid by the project and those expenses that are a part of the management fee. RD AN No. 3673, which I assume you have so only have included the first page, presents a very thorough analysis of the distinction for these expenses. In MN, where Croix Mgmt is concerned they do not follow this AN. For some time Jackie Goodnough was directing that unless you had a remote office located near the project many of the expenses of verification, direct mailing, phones etc. were not to be a charged to the property but were defined as included in the management fee and thus not re-imbursed to Croix. Marge tried various ways to show these expenses on the annual reports. Finally the only office that followed Jackie was Waite Parke and this is part of the problem in getting approval for annual reports and the challenge Marge has in getting approval. I have taken this up with Larry Anderson and he is very clear the AN is what is to be done and office location is not a valid consideration. This has been explained to MN with much rebuttal discussion which boils down to they apply the MN rules on a "case by case basis" and Washington can rule as they please.

Also included is the MN AN regarding the management fees to be charged and a form from one of the projects Croix manages on how the fee was computed. This is for your information on the MN system.

The second item is the large package of transcript taken from a tape of one of the meetings with three RD persons, Marge, her attorney and myself. This was regarding a property that Croix managed and an attempt to get definitions and understandings on some of the rules. In the end RD forced the owners to change management companies under threat of an extreme servicing action. The issues on the tape are mainly:

a) Not having a satisfactory lien waiver for the home funds project. This was not only an issue with the filing of the proper forms (same issue of having MHFA complete a satisfactory form which had yet to be available) but also included a twist by defining the project at risk because of not being able to operate at a profit(short term) factoring in the payment of the projects portion of the home funds. In other

EXHIBIT OO

words because of needing to pay back monies paid in addition to what was in the reserve the project had been put at financial risk to be viable thus could not have a lien filed for the home funds. This became a no win as there was no way RD was going to accept anything short of a full contribution (not a loan) to the project to cover the temporary short fall. There was much discussion about 10 year plans but that was not the real issue.

b) Industry Interface also is an issue. When the request to switch to Industry Interface Marge jumped right in and got it done. She put in for expenses and got them and was later challenged on not having presented the proper information, therefore she could not be paid, therefore had to pay funds back to the projects. We provided all kinds of information, went through many hours of debate, consulted with Washington and were turned down on everything we tried. The final point they made on why this was turned down was that the rule allowing for the expenses required that the charges be pre-approved in some fashion. It was not clear to me if the rule came out after Marge's charges had been in approved budgets or not but a couple of years later when they were rejected there was no way for pre-approval could be done, thus a big issue. When Marge set up the charges she had incurred a large amount of expenses which included accounting and information system charges which left RD confused when they looked at the expenses incurred. Marge conferred with other managers as to what they had charged and what was accepted and used charges that were less than were being approved for other managers and not necessarily tied to the Croix expenses. Again Croix was held to a different standard.

c) The balance was other items that have continued to be in contention.

Most of the items that have been a problem are satisfied to the point that other offices are approving budgets. Unfortunately two offices have been successful in having projects resign management as a part of the solution. Another part of the solution is for Marge to be penalized on her management fee and in some cases having to refund monies back to properties.

The third item for your information is a package of letters I found in my files. Note they are from three offices at about the same date and almost verbatim, my guess is that more of the same would be found from other offices. If there is any doubt that the attach on Croix is being orchestrated by someone such as Jackie in the state office this series of lettersbecomes pretty compelling proof. Note that two of the offices later were resolved with meetings but Waite Parke is still holding out. In fact one of the offices apologized to Marge for the letter but made it clear she had no alternative but to send it. I included my response to one of the letters but did send about the same letter out on all of them.

The last item is just a fax I sent Rodney Jackson asking for answers to the remote office question to which I did not receive a satisfactory response.

This is some of the background for what will probably come out on the 12th.

Best regards,

George V.

George E. Vitalis

**Marge Alden**

**From:** <Jbmeyers@aol.com>
**To:** <staphanie.White@USDA.gov>; <marge@croixmanagement.com>; <john@johnmeyers.com>
**Sent:** Monday, May 19, 2003 9:54 AM
**Subject:** Franconia Associates Mediation

In re: Franconia Associates
Mediation Efforts

This is to follow up on my analysis of the situation with the acceleration of the Franconia Associates Section 515 RRH loans; the acceleration issues are largely with the Management Agent.

We have proceeded to Mediation instead of going directly to an appeal because I feel the issues can be resolved under USDA Departmental Regulation 4710-001, "Alternative Dispute Resolution" at:

www.usda.gov/ocio/directives/DR/DR4710-001.htm

The Regulation requires that the Agency participate and act in Good Faith (Good faith - An effort to honestly, sincerely, and fully discuss problems and matters in conflict, and to explore solutions to those problems or conflicts).

In my meeting with RD in Minnesota last Monday, May 12, 2003, RD staff walked out after about 15 minutes and later sent word that Minnesota RD is unlikely to participate further in mediation. Even were it to participate, I now have strong concerns it cannot do so in Good Faith because of the years of acrimonious history Franconia and Minnesota RD have.

Therefore I am highly concerned that Minnesota RD (Servicing Offices through State Office) is unwilling and perhaps unable to give Franconia Associates a fair process under the USDA Regulation. (That the Agency would walk out is not an option under the Regulation).

Accordingly, this is to request that you review the situation and consider involving staff from another State or the National Office to participate in the Mediation so that RHS/RD can proceed in accordance with the Regulation. Wisconsin presently works with the Franconia Associates Management Agent; and, Pat Sheridan is familiar with the underlying history of Minnesota RD; each could be brought up to speed very quickly.

Thank you for the opportunity to present this request.

I look forward to your response. I will be pleased to provide further information if you wish.

------------------------------

JOHN B. MEYERS

**EXHIBIT PP**

P.O. BOX 4067
LOUISVILLE, KENTUCKY 40204-0067
TELEPHONE 502.451.2727
FAX 502.451.4744
JOHN@JOHNMEYERS.COM and JBMEYERS@AOL.COM
WWW.JOHNMEYERS.COM

UPS/FEDEX SHIPPING ADDRESS:
PMB # 45
1355 Bardstown Road
Louisville KY 40204-1353

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Jim Oberstar C/O Deven Nelson | **From:** | MARGE ALDEN |
| **Fax:** | 651 277-1235 | **Pages:** | 4 |
| **Phone:** | 651-465-6841 | **Date:** | July 17, 2003 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

The main purpose of our contact is to solicit your assistance in obtaining project or individual Section 8 Vouchers for the senior tenants in two Affordable Housing complexes in Chisago County. These seniors could loose their home in the next couple of weeks unless voucher assistance is provided. In conversation with HUD and MNHF they suggested project based Section 8. The local HRA did not apply for any project based Section 8 so there is none available and there is a two year waiting list for individual vouchers. I was informed that HUD has some set aside for special requests. Your assistance in helping us obtain some assistance for these two senior affordable housing complexes is greatly appreciated. Our tenants are important to us and for that reason we have covered the rental assistance for seven months in the hope that MN Rural Development would obtain leadership that would deal with their staffing issues. As private citizens we can no longer continue to provide rental assistance to these seniors so they can continue to reside in their homes, this is a government responsibility. Rural Development retroactively without notice eliminated the rental assistance for these tenants in January.

As you recall we forwarded volumes of correspondence to you on the blatant discrimination and harassment by Minnesota Rural Development. Due to the structure of the agency the National Office has not been able to effect any positive change in Minnesota RD. Since it is a federal program, at the suggestion of the National office, we were set up to have the servicing handled out of Wisconsin then the National office said because of all the problems with the MN RD office they were afraid of setting a precedent and having a Grand Exodus of all the owners with property in Minnesota.

We were told over a year ago that the State Director was told to remove the Program Director and I understand you were told this had happened. It is an insult to all of our intelligence to think we will fall for the game they have played.. The program director changed her name to her maiden name and is still in the position and still creating an unhealthy climate in the agency with owners, managers and the RD staff. The RD staff themselves have filed many grievances. She was caught breaking into the HR office and tampering with personnel records. In the business world an employee would be immediately dismissed. Nothing has been done. Why don't we have a State Director taking responsibility in Minnesota? If you have any questions on the RD program director position, it is I listed on the MN RD web page

**EXHIBIT QQ**

July 18, 2003

I will forward a chronology of events and some of the letters leading up to the loss of Senior Affordable Housing in Minnesota.

December 31, 2002 Steve Wenzel, State Director forwarded Acceleration notices. "This acceleration of your indebtedness is made in accordance with the authority granted . . ."

January 9, 2003 Certified letters were sent out to all the tenants stating " this letter is being sent to inform you that the owners . . .have defaulted on their USDA Rural Development loan and that Rural Development is proceeding with foreclosure action at this time" THERE HAS NEVER EVEN BEEN A LATE PAYMENT IN THE 25 YEARS OF THE LOAN. Tenants were all upset and we had meetings with them. Tenants from one building sent a letter to your office. This is not only false but very scandalous in a small community.

January 13, 2003 We wrote a letter to Steve Wenzel requesting an informal meeting and information on the reason for the acceleration. They never have provided any regulatory basis for their action. They said it is on a case by case basis and they could foreclose if they wanted to and did not have to provide reason.

January 14, 2003 Received a letter from Steve Wenzel acknowledging receipt of our informal meeting request and stated he was having Rodney Jackson respond.

January 23, 2003 fax to RD, Lenee Hoffman to confirm to set the informal meeting.

January 24, 2003 Informal meeting at RD office. RD said we were not allowed to have an attorney present. We were advised to tape the meeting. Rodney Jackson, RD demanded we not tape the meeting. We turned the tape recorder off and he and LH announced they were not discussing anything with us and the meeting was over. They walked out of the conference room with in 20 minutes of our arrival.

January 28, 2003 Letter from Scott K, RD. All activity toward foreclosure is put on hold until the administrative procedures are exhausted. Activity will resume after appeal rights are complete. However MN RD still refused to reinstate the tenants rental assistance.

February 7, 2003 tenants from one complex sent a letter to your office soliciting help.

February 7, 2003 Fax from owners to RD "from 1955 A we are expecting the RA to continue on the project . . until any appeal or review has concluded""

February 7, 2003 Fax from RD stating we had to complete all their reports and they would collect the mortgage payment but not give the tenants rental assistance.

February 11, 2003 RD letter from LH states " Rental assistance continues at both projects during the appeal process" MN RD staff elected to continue to deny the tenants their rental assistance despite there own letter.

February 11, 2003 hired a consultant to intercede on our behalf

February 13, 2003 Rodney Jackson sent a letter on the review of the Informal meeting and spelling out the internal required Administrative Procedures where we have to have an Informal Meeting if it is not resolved there, the owners have to pay RD for Mediation and then the final Administrative Procedure is an appeal. These are all internal functions by parties related to RD employees or hired. It is not considered by Owners or Managers as a fair playing field. Rural Development calls all the shots. He

states in the letter that the Informal meeting did not resolve anything. He neglects to mention they refused to discuss anything.

March 10, 2003 application completed for mediation

March 11, 2003 check issued to pay RD for mediation

April 7, 2003 Owner letter to RD quoting RD instruction regarding the continuation of Rental Assistance during the acceleration appeal

April 18 Mediation session with hired consultant. RD agreed to two dates to meet where they were to provide a basis for their actions and resolution.

April 23, 2003 letter from SK RD "please consider this as the agency response to your April 7 letter to RD State Director Steve Wenzel. You inquire as to the continuation of rental assistance during your appeal of the acceleration" The regulations read that they are required to continue the RA but MN RD took the Tenants Rental Assistance away

May 12, 2003 the owners, consultant and RD met at Croix Management offices. RD again stated they were not going to discuss anything and walked out again with in fifteen minutes.

May 29, 2003 we again met with the mediator. RD RJ said he was leaving numerous times. The mediator discussed with him the requirement to make a good faith effort to resolve and inform us of their issues. He sited the reasons for RD action was unsigned paperwork by RD. This is nothing that owners have control over. It is totally dependent on the ability and cooperation of MN RD staff. RJ, RD wanted to go back to the first budget submittal rather than the latest. It was agreed he would outline questions or issues in a letter in detail.

We received their letter in June and hand delivered our response with copies of correspondence showing their questions had been previously all answered prior to the June 16 agreed up on date. At the mediation it was scheduled that RD would have until July 1 to complete a response to our packet. They did not respond. I sent a fax in the evening of July 1 offering until after the holidays for receipt of their response and then the other scheduled dates would be moved forward except for the next mediation session.

July 7 we received a fax saying " we will not agree to any modification of the timeframes . ." They still have not forwarded their agreed to July 1 response.

July 14, 2003 we sent a fax stating the modification suggestion was as a courtesy to RD since we still had not received their July 1 submission.

July 17, 2003 we sent a note and copies of the above letters to the mediator and said " I don't know where to go with this mediation if RD is not going to cooperate. Please advise"

We have tried to protect our tenants and proceed according to our contract and regulations. We have made every effort to work with MN RD to no avail. The national RD office has also made efforts to try to encourage MN RD to follow regulations and stop the vicious attacks. They did an investigation and made suggests to the State Director which have not been followed. We have previously contacted your office for assistance. We as owners don't know what else to do. It has been suggested by both some MN RD staff and the National office that we should litigate for the discrimination and harassment that his continued. That will not help the tenants that need rental assistance now.

There are some very serious problems with the structure, responsibility and leadership of USDA RD program in MN. As a result senior tenants are losing their affordable housing in your district.

Any assistance you can provide to obtain Section 8 vouchers on behalf of your constituents would be greatly appreciated.

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Lenee Hoffman | **From:** | MARGE ALDEN |
| **Fax:** | 320 ~~855-9111~~ 358 1455 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | October 16, 2003 |
| **Re:** | Franconia Assoc - Riverfront | **CC:** | Arthur Garcia |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ Please Urgent

It is interesting that when RD Nationally is pushing preservation that your office is forcing properties out of affordable housing. By your imposed time table we will have to meet on Monday. What time can you meet in your North Branch office? We understand that there will be no restrictions to prepay. Please forward the pay off amount and your calculations on how you arrived at your figure in time for review and check issuing.

**EXHIBIT RR**

Croix Management Company

Box 236
412 Bench Street
Taylors Falls, Minnesota 55084
651-465-6841
Metro 651-462-7770
Fax 651-465-3080

VIA FACSIMILE

November 10, 2003

Home Line
3455 Bloomington Avenue
Minneapolis, Minnesota 55407

RE: Franconia

It is unfortunate, if your intent is to work together as you stated, that you didn't go through the appropriate channels of contacting property owners or management to schedule a meeting rather than the inappropriate approach you took. You need to understand that it is illegal to make inaccurate scandalized comments as you made on 11/4/03 at both properties.

We have some serious concerns for our seniors. You upset a lot of the residents and we cannot allow you to solicit at our properties. As you are aware, one of the tenants had a minor heart attack and had to be taken out by ambulance. Any liability arising out of events of 11/4/03 are your responsibility

Both Riverfront and Sunrise River are privately owned property. Trespassing on our property making demands, threatening, and causing distress to our seniors is not only unacceptable but illegal.

On recommendation of counsel, consider this your official notice that you are not to trespass or solicit at any of our properties.

Tenants' leases cover responsibility for their guests and their lease can be terminated if their guests conduct themselves in a loud, boisterous, unruly or thoughtless manner so as to disturb the rights of the other Tenants to peace and quiet. Please don't place any of our tenants in the position of violating their lease.

Since the unauthorized actions of Rural Development, we have financially subsidized the building to protect our tenants. Your threats of legal actions for your organization's personal recognition or purpose will force financial decisions that will not benefit anyone.

I would be happy to discuss this with you personally. If you would like to discuss your organization's goals and if you truly want to work together and help, please contact me to schedule a meeting. Since your representative or her assistant refused to give us their names, we asked a tenant and were told one was Beth.

Sincerely,

Marge
Croix Management Company

**EXHIBIT SS**

EQUAL HOUSING OPPORTUNITY

HOME Line
3455 Bloomington Avenue
Minneapolis, MN 55407

Office Phone: 612/728-5770
Hotline: 612/728-5767
Fax: 612/728-5761

November 10, 2003

Croix Management Company
Ms. Marge Alden
~~412 Bench Street~~
Taylors Falls, MN 55084

Dear Ms. Alden:

Please be advised that this letter is in response to a letter you faxed to our office on Monday, November 10, 2003. In the letter you addressed several concerns that you have with one of our organizers, Beth Kodluboy, as well as a meeting on Tuesday, November 4, 2003. This letter is meant to address your concerns.

Firstly, truth is an absolute defense to either a slander or defamation claim. The information that Ms. Kodluboy gave the residents was true based on what the Rural Housing Development Authority told her. If you are disputing the information that Rural Housing gave, you should address this matter with them.

Secondly, with regard to the trespassing issue, the Minnesota Supreme Court in State v. Hoyt, has ruled that someone given a license (ie., a guest of a resident) to visit the property has a claim of right which is a legal defense to the criminal trespass statute. *See*, State v. Hoyt, 304 N.W.2d 884 (Minn. 1981). In other words, if Ms. Kodluboy, or anyone else for that matter, has a tenant's right to visit, you may not bar her access.

Thirdly, tenants are protected from retaliation under Minnesota Statutes §§ 504B.441 and 504B.285. In your letter you allude to the fact that a tenant may be evicted for the actions of their guests. However, in this case, the tenant would be asserting legal rights they have, primarily to have guests and be informed of their rights. Any adverse action, such as eviction or rent increases, therefore, would be deemed to be retaliatory and illegal under Minnesota law.

Lastly, your statements about financial concerns of the tenants is being addressed in a letter by my colleague, Mr. Birnberg. Thank you for your attention to these matters and please feel free to contact me with any questions you may have.

Sincerely,

Brenda Kiepert-Holthaus

Brenda Kiepert-Holthaus
HOME Line
Housing Attorney
(612) 728-5770 ext. 116

**EXHIBIT TT**

BOX 236 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080

**Croix Management Company**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Brenda Kiepert Holthaus | **From:** | MARGE |
| **Fax:** | 612 728-5761 | **Pages:** | 1 |
| **Phone:** | 651-465-6841 | **Date:** | November 11, 2003 |
| **Re:** | | **CC:** | |

☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Urgent**

You state truth is an absolute defense. The comments made by Beth were not truth. She made some very slanderous remarks. If in fact your claim that her comments were made on the basis of what she was told by Rural Development, she should have checked out the validity before making untrue comments in public. Please contact me with the office and the individual she spoke to at Rural Development and we will be happy to address the issue with them.

Your representative wouldn't even provide her name or any credible back up. She trespassed in our building took over the community room and demanded and threatened tenants. She did not request use of our community room, she did not reserve it and she did not pay for it. When in fear they called the management office she three times demanded we leave our building and threatened litigation.

In accordance with the lease a tenant is not allowed to disturb the rights of other tenants nor are their guests. Doing so is a cause for termination. The unethical, vulgar, threatening, scandalous comments shouted in the community room by your representatives were disturbing to our elderly tenants.

Our elderly tenants do not deserve this treatment by your representative or anyone. One resident was so upset she had a heart attack and even when the ambulance was there Beth and her friend kept on with there tirade. This isn't acceptable or tolerable behavior.

If there is any legitimacy to your club to help tenants, I would suggest you try a friendlier approach and proceed through appropriate channels. Nothing can be gained by threatening tenants to belong to your group and alienating owners and managers. A professional approach along with some consideration of the elderly would go a long way. I offered a sit down meeting where you can explain your groups goals, all it takes is a phone call.

**EXHIBIT UU**

HOME Line
3455 Bloomington Avenue
Minneapolis, MN 55407

Office Phone: 612/728-5770
Hotline: 612/728-5767
Fax: 612/728-5761

November 13, 2003

Marge Alden
Franconia Associates
Box 236
412 Bench Street
Taylors Falls, MN 55084

Dear Ms. Alden:

Several of the tenants have asked HOME Line to do a legal analysis of their rent obligations at Riverfront Apartments in Taylors Falls. I agreed to write you regarding their rights.

I have received a copy of what appears to be the standard form lease in use at Riverfront Apartments. The form has several blanks that must be filled in, and are in the normal course of business going to be filled in differently for each tenant. These include the names of the tenants, the rental amount, and the term of the lease.

The rental amount is filled in in section 2 of the lease. The term of the lease is filled in in section 1. The key sentence in section 2 is the last sentence of the second paragraph; it reads, "No increase in Tenant Contribution to rent will take place due to prepayment of the RHCDS loan during the term of the lease." The rule is repeated in Section 31. As indicated in Section 31, this rule also echos the federal regulations which prohibit rent increases during the term of the lease and which require that the lease be for a one year term. Leases signed after a notice to prepay "may" be for a lesser term.

I understand that such a prepayment has taken place. Thus, each tenant is insulated from a rent increase during the term of her particular lease. This protection arises both under the lease and the federal regulations. Of course, here, the leases and the federal regulations overlap.

I also understand that the leases at Riverfront have been for one year each, although obviously they will vary as to end date depending on when they were signed. Thus the calendar months during which each tenant is protect will vary somewhat from tenant to tenant.

Since the prepayment is occurring subsequent to a default on the USDA mortgage (i.e. Franconia Associates fell behind on its mortgage payments, the USDA declared a default, and subsequently Franconia made prepayment of the mortgage with private funds), the tenants receive extra protection in the form of a 180 window during which rents cannot be raised. This is based on federal regulations about which, I understand, the USDA has alerted both you and the tenants. My information is that this 180 day window ends 180 days after October 20, 2003, effectively protecting all the tenants, regardless their individual lease terms, at least through the April 2004 rent payment.

Some of the tenants report that they were asked to sign a document stating, in pertinent part, "this lease agreement is hereby renewed for a period not to exceed 180 days. During the term of the renewal the gross tenant contribution will be $________." I understand that each blank was filled in with the total amount the tenant had been paying for shelter – i.e. base rent plus utility allowance. For example, a

**EXHIBIT VV**

tenant who had been paying rent to Franconia of $355 and who had a utility allowance of $32 was presented a document with "$387" filled in.

Not having the benefit of legal analysis or time to think, and perhaps under some pressure, some of the tenants may have signed such a document. Of course, to the extent that this document merely restates the 180-day rule, it is fine. That is, the tenant and landlord have simply reasserted federal law – that the tenant's gross contribution, base rent plus utility allowance, will continue as before. To the extent it is meant to mean something else, it would be void as violating federal law.

It would also be of no effect under state law which provides that a lease cannot be altered unless both sides give up something. Lawyers call this the "doctrine of consideration." That is, a contract (for example, a lease) is enforceable only if both parties agree to give up something new. Thus, for example, if a landlord and tenant have a one-year lease at $1000/month, and they sign an agreement to change the rent to $950 with no other agreements, the $950 agreement is of no binding effect because the landlord gave something up and the tenant gave up nothing. Thus, those tenants with leases extending past the 180-day window are protected past April 2004 until the end of the contract per state as well as federal law.

Lastly, I note that Riverfront Apartments is being subsidized during the period November 1999 - November 2004 by federal funds under the HOME Investment Partnerships Act, 42 U.S.C. §12701 et seq (the "HOME" program). The Local Administrator for HOME is the Central Minnesota Housing Partnership ("CMHP"). The HOME regulations include a 5% increase per year rental cap as well as requiring approval from the Local Administrator (page of manual enclosed setting out the rule.) CMHP reports no request for approval from Franconia Associates for Riverfront. Assuming you do make a request, the request will have to be limited to no more than 5% over last year and further be shown to "cover increases in expenses."

If you are approved for a rent increase by CMHP, we would appreciate receiving a copy of your approval. If you could send it to us the same time you alert the tenants per the minimum one month notification under the HOME regulations that would be fine.

This is a longish letter but I hope of some value in explaining why we are advising each tenant to continue paying the same rent at least through April and also through the end of her lease if her lease extends past April. We are also alerting them not to pay any increase of more than 5% prior to December 2004 and only then if they've been notified per the HOME rules.

If you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Paul Birnberg
Senior Housing Attorney
direct phone 612/728-5770,ext. 101

enclosure: HOME manual page

BOX 238 TAYLORS FALLS, MN 55084
651 465-6841 FAX 651 465-3080
651-465-3080

Croix Management Company

# Fax

| | | | |
|---|---|---|---|
| To: | Bonnie Smith | From: | MARGE ALDEN |
| Fax: | 320 235-0984 | Pages: | 2 |
| Phone: | 651-465-6841 | Date: | June 8, 2004 |
| Re: | | CC: | |

☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Urgent

Hi Bonnie

I have attached an e-mail written by you on the restrictive use provisions and foreclosure. In the e-mail you suggest an AN or something in print be available. My question is was there ever an AN or any regulations pertaining to foreclosure sales and what happens to the restrictive use provisions published?

I know you are not working in the multi-family area currently, but since you wrote the e-mail I am addressing it to you.

Thank you in advance for promptly responding. If you have any questions, please don't hesitate to contact me.

Have a Great Day.

EXHIBIT WW

Subj: Re: PRE-TRAC
Date: 02/22/2002 11:50:04 AM Central Standard Time
From: bonnie.smith@mn.usda.gov (Bonnie Smith)
To: MJLhoffman@cs.com

Lance:

That's the way I understood it too. In fact she said that you should back out (delete) all of the previous timeline screens back to where it asks if the borrower has accepted or rejected the specific incentives. Put "rejected" in the timeline and proceed in PRE-TRAC as if you were going to accept prepayment.

By the way I got a call back from Cynthia this morning. She asked Larry Anderson about our other question. I'm not sure I understood her correctly by here goes:

Once the account is accelerated and foreclosed on the RUP's go away. However, if minorities are affected or tenants will be displaced and the loan is paid in full before foreclosure the remaining years of the RUP's stay or the leases have to be extended (DeWolf). Also, if minorities are affected or tenants are displaced the owner must list the project for sale to a non-profit during the acceleration period. If he fails to sell it to a non-profit during the acceleration period and it goes to foreclosure, then the RUP's disappear. Is this as clear as mud? I'm still not sure I understand it all yet. Apparently this is a new policy, however, I don't see it printed anywhere. I really would like this info to come out in an AN.

Bonnie

MJLhoffman@cs.com wrote:

> Hi Bonnie,
>
> Thanks for the info and for the sympathy from Cynthia. If I get her answer
> right we can now work towards prepayment on the Franconia project that they
> were going to accept the equity loan on. Is that what you get too.
>
>
> Later,
>
> Lance

--------------- Headers ---------------
Return-Path: <bonnie.smith@mn.usda.gov>
Received: from rly-xf02.mx.aol.com (rly-xf02.mail.aol.com [172.20.105.225]) by air-xf04.mail.aol.com (v83.42) with ESMTP id MAILINXF49-0222125004; Fri, 22 Feb 2002 12:50:04 -0500
Received: from willm.mnwillmar.fsc.usda.gov (willm.mnwillmar.fsc.usda.gov [199.154.34.191]) by rly-xf02.mx.aol.com (v83.35) with ESMTP id MAILRELAYINXF26-0222124948; Fri, 22 Feb 2002 12:49:48 -0500
Received: from mn.usda.gov (mnwillmar04017.mnwillmar.fsc.usda.gov [199.154.34.107])
by willm.mnwillmar.fsc.usda.gov (8.9.3/8.9.3/USDA-ITC $Revision: 1.5 $) with ESMTP id MAA03332
for <MJLhoffman@cs.com>; Fri, 22 Feb 2002 12:05:26 -0600 (CST)
Message-ID: <3C7685A0.8803D0C6@mn.usda.gov>
Date: Fri, 22 Feb 2002 11:53:38 -0600
From: Bonnie Smith <bonnie.smith@mn.usda.gov>
Organization: USDA, RD

USDA

United States Department of Agriculture
Rural Development

Rural Business-Cooperative Service • Rural Housing Service • Rural Utilities Service
Washington, DC 20250

RD AN No. 3574 (1965-B)
September 26, 2000

TO: State Directors and Rural Development Managers
Rural Development

ATTN: Multi-Family Housing Program Directors/Coordinators

FROM: James C. Kearney
Administrator
Rural Housing Service

SUBJECT: Analysis of Troubled MFH Properties

**PURPOSE/INTENDED OUTCOME:**

The purpose of this Administrative Notice (AN) is to provide guidance in evaluating troubled Multi-Family Housing (MFH) properties to determine the appropriate servicing action and provide a methodology for documenting the decision.

**COMPARISON WITH PREVIOUS ANs:**

This AN replaces AN 3365 (1965-B) dated October 20, 1997.

**IMPLEMENTATION RESPONSIBILITIES:**

It is always the objective of the Agency to encourage the present borrower to properly carry out the responsibilities of their loan obligation documents. When this cannot be accomplished, Agency intervention may be necessary. This intervention may be in the form of meetings, workout agreements, accelerations, suspensions, or debarments. The State Director will evaluate each project on a case-by-case basis to determine the servicing action that is in the best interest of the Government, the tenants and the community.

To achieve appropriate results, all servicing is to be conducted on a case-by-case basis. Not all properties continue to be viable in meeting the objectives of the Rural Housing Service (RHS) MFH program. The following criteria should be used to evaluate and document servicing decisions before they are implemented (see exhibits A and B):

EXPIRATION DATE: October 31, 2001

FILING INSTRUCTIONS:
Preceding RD
Instruction 1965-B

Rural Development is an Equal Opportunity Lender
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, DC 20250

1. Ownership
2. Need
3. Site/Location
4. Building

The analyst must first consider the ***ownership***. This criterion should be reviewed from two viewpoints:

1. Is the present ownership entity still legally operating? Is the ownership entity cooperative and financially solvent?

2. Also, as a part of the ownership element, we must examine the project management. Is competent management being provided?

If the complex is to be successful, the Agency must insist on changes if the answer to either or both of these questions is no.

The second major cornerstone is the ***need***. The Agency must carefully decide if there is currently a need for the complex as is, or if one can be created by modifications to the complex.

The following items must be carefully evaluated in each community.

1. Is there other affordable, decent, safe and sanitary housing available in the market area to meet the needs of the tenants?

2. Is the housing still needed to meet program objectives?
   a) Has the market changed due to changing demographics or local economic conditions?
   b) Is there a need for a different bedroom mix than the subject property has?
   c) In the case of an on-farm Labor Housing loan, is the operator still farming?
   d) Have there been significant vacancies, which were not reduced with aggressive marketing tactics?

The third major cornerstone that must be considered is the ***site***. Is the site well located in a residential area? Environmentally, is the site acceptable? Are there enhancements necessary to bring the site into compliance?

The site is major consideration in the viability of any complex. The following items should be considered in the full evaluation of the site:

1. Has economic obsolescence adversely affected the community?
2. Does the community have adequate medical, transportation, and school system?
3. Is the site itself located in a solid residential neighborhood that is a viable part of the community?
4. Does the site have frontage along at least one-fourth of the perimeter?
5. Does the topography of the site lend itself to optimal accessibility?
6. Does the site have environmental hazards or commercial influences that adversely affect it?

The fourth major element is ***building***. Is the building structurally sound?

1. Are there other obsolescence factors which are economically unfeasible to correct?

   a) Design obsolescence
   b) Poor construction quality and site problems
   c) Environmental hazards
   d) Structural deterioration creating a health or safety hazard

2. A unit-by-unit inspection report with a cost estimate for necessary rehabilitation or deferred maintenance, wheelchair accessibility and obsolescence factors must be completed by RHS and submitted as part of the problem case report. The Marshall & Swift ACCUPRO program is to be used for verifying the cost estimates for needed repairs. The report shall address all project needs to make the project suitable for the program. Cost estimates are to be sufficient to place the property in operation in as new condition if possible.

3. Can the property be rehabilitated to meet current applicable building codes or can an exception to code requirements be obtained from local authorities?

Upon completion of the analysis of the four major items, the following items must be addressed as well:

1. What is the estimated economic useful life of the property after rehabilitation is completed? Will the amortization of the debt, based upon the economic useful life, make rents unaffordable to program eligible tenants? Will the 1 percent rents exceed the conventional market rents? If so, are financial resources available to make the project financially feasible?

2. Compare the total of the existing debt, any prior or junior liens, and estimated rehabilitation costs on a per unit or per square foot basis to the average new construction cost per unit. Total property debt of existing structures, including rehabilitation costs, is not to exceed current replacement (new) construction costs for the proposed repairs to be considered cost-effective rehabilitation. Much of the existing property is utilized in the rehabilitation process, such as land, site improvements, plans, property survey, excavation, concrete, rough carpentry, plumbing and electrical. Consequently, if rehabilitation costs are at or near 60 percent of cost new, extra consideration and options are to be considered and documented prior to proceeding with rehabilitation.

3. Prepare a cash flow analysis, including any additional debt service for rehabilitation and reamortization of existing debt, if appropriate, to compare basic rents based upon the estimated economic useful life after rehabilitation to rents for available (1) new construction, (2) similar existing projects in the servicing jurisdiction, and (3) conventional rents in the community. Determine any estimated increase in cost per unit of rental assistance and compare to the State average.

4. Can tenants rent other comparable suitable and available housing in the community for the equivalent of or less than the basic (one percent) rent after rehabilitation is completed?

When conducting the preceding analysis, it is important to remember that each property is unique. An analysis focusing only on a rent comparison may not take into consideration the unique housing needs of the community or suggest a need to proceed with rehabilitation. Conversely, where it may be possible to meet a documented need more economically through replacement rather then rehabilitation, a decision will be needed to decide the best use of resources.

For properties which are determined to be no longer viable, the State Director must determine whether there is any recovery value to the Government if the property is liquidated through foreclosure action. If there is no recovery value after all costs of liquidation and resale are considered, (net recovery value) the loan may be debt-settled in accordance with RD Instruction 1956-B.

Determination of net recovery value should be based upon the following criteria:

The value of the property, if sold as a conventional unsubsidized property on a non-program basis, should be compared to the total of the (1) liquidation cost, (2) acquisition cost, (3) settlement cost of prior liens, (4) estimated cost to operate during inventory period, (5) cost to correct health and safety violations or environmental problems, and (6) sales cost. An appraisal is to be completed and used as the basis for this comparison and is the key factor for documenting and supporting servicing decisions.

The cost to operate the project during the inventory holding period prior to resale should be based upon typical operating costs, excluding debt payments to the Government, for similar projects in the servicing jurisdiction. The estimated inventory holding period should be based upon previous experience in selling non-program property in the State and the availability of current funding for non-program inventory properties. If your State has not had experience in marketing non-program properties, please contact the MFHPM division in the National Office.

Based upon a careful analysis of the preceding material, the borrower and servicing official should consider alternatives that include:

1. Transfer to an eligible applicant
2. Sale of the property out of the program
3. Payment in full (after the preservation process of RD Instruction 1965-E has been followed and appropriate restrictive provisions, if any, are signed).

Should ownership be unwilling or unable to complete any of the preferred options, the following should be considered:

1. Foreclosure
2. Voluntary conveyance
3. Debt settlement – compromise, charge-off or cancellation
4. Court action such as suing for specific performance

Properties can be transferred during the foreclosure process. However, the foreclosure process should not be stopped until the transferee is determined eligible and the transfer is determined to be feasible and in the best interest of the Government. When a foreclosure process is initiated, further payments from the borrower will not be accepted. However, depending on state law, the borrower may have the right to cure any monetary default.

The property is to be appraised in "as is" condition and as subsidized to determine the amount of the transfer. To arrive at the "as is" condition, the servicing officials are to document in the unit-by-unit inspection report the number of units suitable for subsidy. "Suitable for subsidy" may be a higher standard than "habitable". The State Appraisal Coordinator should instruct the appraiser through the Task Order which units are determined unsuitable for subsidy and provide the appraiser with a list of requirements for each unit which are necessary to make that unit suitable for subsidy. The requirements for returning units to a condition suitable for subsidy may not be the only deferred maintenance that needs to be addressed in determining the "as is" value.

A second "as improved" appraisal will be completed to determine the maximum debt limit. This appraisal should reflect the value of the property when all units are suitable for subsidy. The appraiser should be given plans and specifications for the proposed rehabilitation to use as key documents in the appraisal.

If the scope of work or type or quality of materials relating to the approved rehabilitation is significantly changed after the appraisal is completed, a revised appraisal may be needed to reflect the differences (if those changes affect the value of the rehabilitated property). The scope of work or materials should not be changed after the appraisal has been completed if the purpose is to reduce any necessary additional borrower contribution, particularly if it impacts the value of the collateral property.

If rehabilitation costs exceed the appraised value and the borrower must contribute funds in excess of the required equity contribution in order to make the project feasible, the borrower may not receive a return to owner on this contribution. If the borrower voluntarily contributes additional funds to reduce the amount of any necessary subsequent loan by the Agency, and the total cost is equal to or under the appraised value, the borrower may receive a return to owner on this increased contribution, as long as it meets the conditions outlined in RD Instruction 1944-E, section 1944.215 (n).

If you have any questions concerning these issues, please call the MFHPM Division at (202) 720-1600.

Attachments

Exhibit A

# 515 Analysis Summary

OWNERSHIP

Financially solvent ———▶ Yes ____ No ____

*Describe deficiencies:*

Cooperative ———▶ Yes ____ No ____

*Describe deficiencies:*

Legal entity ———▶ Yes ____ No ____

*Describe deficiencies:*

NEED

Market Study ———▶ Yes ____ No ____

Market Analysis ———▶ Yes ____ No ____

*Describe market conclusion reached:*

SITE

Residential in character ———▶ Yes ____ No ____

Environmentally sound ———▶ Yes ____ No ____

*Describe deficiencies:*

BUILDING

Structurally sound ———▶ Yes ____ No ____

*If the answer is No – or questionable – detail your concerns:*

## 515 Project Problem Case Diagnostic Flow Chart

**Exhibit B**




May 2000

★U.S. GOVERNMENT PRINTING OFFICE: 2000 655-885/61785

USDA

NOV 07 1997

Replaced with AN 3574

RD AN No. 3365 (1965-B)
October 20, 1997

United States Department of Agriculture

Rural Development

Rural Business-Cooperative Service

Rural Housing Service

Rural Utilities Service

Washington, DC 20250

TO: State Directors and District Directors
Rural Development

ATTENTION: Multi-Family Housing Program Directors, Coordinators and Staff Appraisers

FROM: Jan E. Shadburn
Administrator
Rural Housing Service

SUBJECT: Evaluation of Troubled MFH Projects

PURPOSE/INTENDED OUTCOME:

The purpose of this Administrative Notice (AN) is to provide guidance in evaluating troubled Multi-Family Housing (MFH) projects to determine whether they remain in or can be made suitable as MFH program properties, and provide a methodology for documenting the decision and determining appropriate servicing action.

COMPARISON WITH PREVIOUS ANs:

This AN replaces AN 3266 (1965-B) dated July 19, 1996.

IMPLEMENTATION RESPONSIBILITIES:

Many States must make determinations of project suitability and appropriate servicing actions for troubled projects. It is always the objective of the Agency to encourage the present borrower to properly handle the responsibilities of the loan obligations through a reasonable workout agreement. When feasible workout plans cannot be implemented or borrowers are not cooperative in meeting their loan obligations, loans should be forwarded to the State Director as problem cases with a recommendation for proposed liquidation action. The State Director will evaluate each project on a case-by-case basis to determine the servicing action which is in the best interest of the Government and the tenants.

EXPIRATION DATE: October 31, 1998

FILING INSTRUCTIONS:
Preceding RD
Instruction 1965-B

Rural Development is an Equal Opportunity Lender. Complaints of discrimination should be sent to: Secretary of Agriculture, Washington, DC 20250

PRINTED WITH SOY INK

The appropriate servicing actions will vary from case to case. Not all projects continue to be viable in meeting the objectives of the Rural Housing Service (RHS) MFH program. The following criteria should be used to evaluate and document servicing decisions before they are implemented:

1. Analysis to Determine Program vs. Non-Program Properties:

The first determination which should be made by the State Director when a problem case report is received is whether the project can still meet program objectives cost-effectively. For MFH loans, the Servicing Official will document and analyze the following information as part of the problem case report:

a. Is there other affordable, decent, safe and sanitary housing available in the market area to meet the needs of the tenants?

b. Is the housing still needed to meet program objectives? (i.e., Has the market changed due to changing demographics or local economic conditions? Is there a need for 3-bedroom units, but the project is all studio or 1-bedroom units? In the case of an on-farm Labor Housing (LH) loan, is the operator still farming? Have there been significant vacancies which were not reduced with aggressive marketing tactics?)

c. Are there other obsolescence factors which are economically unfeasible to correct, (i.e., design obsolescence, poor original construction quality, environmental hazards, site problems)?

d. A unit-by-unit inspection report with a cost estimate for necessary rehabilitation of deferred maintenance, wheelchair accessibility and obsolescence factors must be completed by RHS and submitted as part of the problem case report. We suggest use of the Marshall & Swift Accupro program to verify the cost estimate for needed repairs. This report should address all project needs to make the project suitable for the Section 515 program.

e. Can the project be rehabilitated to meet current applicable building codes or can an exception to code requirements be received from local authorities?

f. What is the estimated economic useful life of the property after rehabilitation is completed? Will the amortization of the debt, based upon that economic useful life, make rents so high that the property is unmarketable to program eligible tenants?

g. Compare the total of the existing debt, any prior liens, and estimated rehabilitation costs per unit to the average new construction cost per unit. Total project debt of existing structures, including rehabilitation costs, should not exceed replacement (new) construction costs to be considered cost-effective rehabilitation.

h. Prepare a cashflow analysis, including any additional debt service for rehabilitation, to compare basic rents based upon the estimated economic useful life after rehabilitation to rents for available (1) new construction, (2) similar existing projects in the servicing jurisdiction and (3) conventional rents in the community. Determine any estimated increase in cost per unit of rental assistance and compare to State average.

i. Can tenants rent other suitable available housing in the community for the equivalent of the basic rent after rehabilitation is completed?

Based upon the previous analysis and documentation, and before any further servicing actions are taken, the project should be determined either program suitable or non-program suitable. Any property determined program suitable, whose total cost as described in (g) above exceeds the cost of new construction per unit, should be forwarded to the National Office for review and concurrence with this determination.

2. Property Valuation and Restrictive-Use Provisions:

When a property is considered to be non program property and is liquidated through foreclosure action or other debt settlement actions, the property may be released without restrictive-use provisions by requesting an exception to RD Instruction 1965-E, §1965.223, from the Administrator. When this exception is granted the appraiser will be given instructions to value the property as a conventional non-subsidized property without restrictive-use provisions. The encumbering restrictive-use provisions in the loan documents will be nullified by the foreclosure sale or debt settlement unless ownership is continued by the current borrower, and that borrower is currently subject to restrictive-use as part of the original loan obligation or a subsequent servicing action. In such cases, the advice of the Office of the General Counsel (OGC) should be sought for the proper release documents.

3. Analysis to Determine Recovery Value of Lien for Non-Program Properties:

For projects which are determined to be non-program property, the State Director must determine whether there is any recovery value to the Government if the project is liquidated through foreclosure action. If there is no recovery value, after all costs of liquidation and resale are considered, the loan may be debt-settled in accordance with RD Instruction 1956-B.

Determination of net recovery value should be based upon the following criteria:

The value of the property, if sold as a conventional unsubsidized property on a non-program basis, should be compared to the total of the (1) liquidation costs, (2) acquisition cost, (3) settlement cost of prior liens, (4) estimated cost to operate during inventory period, (5) cost to correct health and safety violations, and (6) sales cost. An appraisal should be completed and used as a basis for this comparison and is the key factor for documenting and supporting servicing decisions.

The cost to operate the project during the inventory holding period prior to resale should be based upon typical operating costs, excluding debt payments to the Government, for similar projects in the servicing jurisdiction. The estimated inventory holding period should be based upon previous experience in selling non-program property in the state and the availability of current funding for non-program inventory properties. If your state has not had experience in marketing non-program properties, please contact the MFHPM Division in the National Office.

4. Determination of Appropriate Servicing Solutions:

Based upon the previous analysis, servicing officials will document their recommendations to support which of the following actions is in the best interest of the Government:

a. Foreclosure,

b. Voluntary conveyance, or deed-in lieu of foreclosure.

c. Payment in full (if it is determined that the project is no longer needed to meet the objectives of the program);

d. Negotiated compromise offer (if debt cannot be fully recovered through foreclosure and resale or payment in full);

e. Debt settlement by cancellation as a valueless lien (if a compromise offer is not feasible);

f. Resale as program property with a necessary rehabilitation loan and restrictive-use provisions (if acquired at foreclosure sale); or

g. Resale as non-program property without restrictive-use provisions (if acquired at foreclosure sale).

5. Transfers and Subsequent Loans:

Properties can be transferred during the foreclosure process. However, the foreclosure process should not be stopped until the applicant is determined eligible and the transfer is determined to be feasible and in the best interest of the Government.

The property should be appraised in "as is" condition to determine the amount of the transfer. To arrive at the "as is" condition, the servicing officials should document in the unit-by-unit inspection report the number of units suitable for subsidy. "Suitable for subsidy" may be a higher standard than "habitable." The State Appraisal Coordinator should instruct the appraiser through the Task Order which units are determined unsuitable for subsidy, and provide the appraiser with the list of requirements for each unit which are necessary to make that unit suitable for subsidy. The requirements for returning units to a condition suitable for subsidy may not be the only deferred maintenance that needs to be addressed in determining the "as is" value.

A second "as improved" appraisal will be completed to determine the maximum debt limit. This appraisal should reflect the value of the project after rehabilitation when all units are suitable for subsidy. The appraiser should be given plans and specifications for the proposed rehabilitation to use as a basis for the appraisal.

If the scope of work or type or quality of materials relating to the approved rehabilitation is significantly changed after the appraisal is completed, a revised appraisal may be needed to reflect the differences (if those changes affect the value of the rehabilitated property). The scope of work or materials should not be changed after the appraisal has been completed in order to reduce any necessary additional borrower contribution if it impacts the security value of the project.

If the borrower must contribute funds in excess of the required equity contribution in order to make the project feasible, the borrower may not receive a return to owner on this contribution if it is to offset rehabilitation costs which exceed the appraised value. If the borrower voluntarily contributes additional funds to reduce the amount of any necessary subsequent loan by the Agency, and the total cost is equal to or under the appraised value, the borrower may receive a return to owner on this increased contribution, as long as it meets the conditions outlined in RD Instruction 1944-E, §1944.215 (n).

6. Determining the Government's Bid at Foreclosure Sale:

Restrictive-use provisions may significantly impact the value of the project and affect marketability. Properties can be appraised at actual market value based upon highest and best use of the property if this authority is granted by the Administrator on a case-by-case basis. The highest and best use analysis is documented in the appraisal. Under these circumstances, the Government's bid will be the lesser of either the appraised market value based upon highest and best use, or the outstanding debt against the subject property.

Servicing officials should take an aggressive approach to advertising foreclosure sales and marketing inventory properties. We recommend developing a list of potential buyers who would be interested in purchasing projects at foreclosure sale or as inventory properties. Notices of scheduled foreclosure sales can be sent to interested parties in addition to advertising in newspapers and notifying local real estate agents.

If you have any questions concerning these issues, please call the MFHPM Division at (202) 720-1600.

☆U.S. GOVERNMENT PRINTING OFFICE: 1997 -655-482/61548