# In the United States Court of Federal Claims

Nos. 97-381C & 97-3812C through 97-38129C

(Filed: August 30, 2004)

| | | |
|---|---|---|
| FRANCONIA ASSOCIATES, ET AL, Plaintiffs, v. THE UNITED STATES, Defendant. | * | Rural housing program under section 515 of the Housing Act of 1949; Prepayment right; ELIHPA and the HCDA; Breach of contract; Unmistakability doctrine; Law of the case doctrine; Takings; Expectancy damages; Lost profits; Mitigation; Proximate result; Forseeability; Reasonable certainty; Time of breach; Discounted cash flow; Speculation vs. reasonable approximation. |

## OPINION

*Jeff H. Eckland,* Eckland & Blando, Minneapolis, Minnesota, for plaintiff.

*Shalom Brilliant*, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge:**

"The United States are as much bound by their contracts as are individuals."[1]

"You can check in any time you like, but you can never leave."[2]

Following a remand from the Supreme Court, this contract case is before the court after a trial held in Des Moines, Iowa. Plaintiffs are various property owners that entered into mortgage contracts with an agency of the United States in exchange for providing low- and moderate-income rural housing. While these loan contracts allowed for prepayment, without restriction, Congress, concerned with the loss of rural housing due to such prepayments, subsequently enacted laws that significantly restricted the exercise of this right. Plaintiffs claim that this

---

[1] *The Sinking Fund Cases*, 99 U.S. 700, 719 (1879).

[2] The Eagles (Don Felder, Glenn Frey & Don Henley), *Hotel California* (Asylum Records 1976).

legislation constituted a breach of their mortgage contracts and seek damages on account of that breach. Alternatively, they seek just compensation under the Fifth Amendment, alleging that the passage of this legislation effectuated a taking of their property. Based on the evidence provided and the findings based thereupon, and for the reasons that follow, the court concludes that the legislation in question, indeed, effectuated a breach of the mortgage contracts, entitling most – but not all – of the plaintiffs to damages.

## TABLE OF CONTENTS


**I. Findings of Fact** .......... 03
- A. General Facts Regarding the Plaintiffs, the Section 515 Program and Congress' Modifications Thereof .......... 03
- B. Application of the Legislation to the Plaintiffs .......... 07
- C. The Options Available under ELIHPA .......... 08
- D. Procedural History of this Case .......... 12

**II. Discussion** .......... 13
- A. Liability .......... 13
  - 1. Breach of Contract .......... 14
    - a. *Prima facie* liability .......... 14
    - b. The unmistakability doctrine .......... 20
  - 2. Takings .......... 24
  - 3. Redux .......... 29
- B. Damages .......... 29
  - 1. Mitigation .......... 29
  - 2. Expectation Damages - *Restitutio in Integrum* .......... 37
    - a. Proximate result - *Causa Proxima non Remota Spectatur* .......... 38
    - b. Forseeability - *Providentia* .......... 44
    - c. Reasonable certainty – *Certum Probabiliter Scire* .......... 46
      - i. The calculation period .......... 48
      - ii. Projected revenue .......... 52
      - iii. Expenses .......... 59
      - iv. Discount factor .......... 60
    - d. Other potential adjustments .......... 66
  - 3. Determination of the Amount of Damages .......... 69

**III Conclusion** .......... 69

Fact Appendix A .......... 73
Fact Appendix B .......... 82


.

## I. FINDINGS OF FACT

Based on the record herein, the court finds as follows:

### A. General Facts Regarding the Plaintiffs, the Section 515 Program and Congress' Modifications Thereof.

Plaintiffs currently own and operate properties as affordable housing projects financed by mortgage loans issued by the Farmer's Home Administration ("FmHA"), an agency within the Department of Agriculture, pursuant to sections 515 and 521 of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a (2000). These sections of the Housing Act were "enacted to ameliorate housing shortages for the elderly and other low-income persons in rural areas." *Parkridge Investors Ltd. P'ship v. Farmers Home Admin.*, 13 F.3d 1192, 1195 (8th Cir. 1994). Originally, only non-profit entities could participate in this program, but the complexion of the program changed in 1972, when the FmHA began offering loans to private for-profit owners.

Under sections 515 and 521, the FmHA makes direct loans to private entities to develop or construct rural housing designed to serve the elderly and low- or middle-income individuals and families.[3] Section 515 loans require the borrower, *inter alia*, to execute various loan documents, including a loan agreement, a promissory note, and a mortgage or deed of trust. Each plaintiff in this case entered into a loan agreement with the FmHA, in which it certified that it was unable to obtain a comparable loan in the commercial market. In addition, each plaintiff agreed to various provisions designed to ensure that its project was affordable for persons and families with low incomes, among them, restrictions on the owner's "return on investment," limiting the profit that an owner could earn while in the program to a maximum of eight percent of its "initial investment," *i.e.*, down payment.[4] Other restrictions defined eligible tenants and the rents plaintiffs could charge, as well as requirements regarding the maintenance and financial

---

[3] Since 1994, the program has been entrusted to the Rural Housing Service, known between 1994 and 1996 as the Rural Housing and Community Development Service. That agency was created by the Secretary of Agriculture under authority provided by the Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, Tit. II, § 233, 108 Stat. 3219, as amended by the Act of Apr. 4, 1996, Pub. L. No. 104-127, Tit. VII, §§ 747(b)(3), 753(b)(2), 110 Stat. 1128, 1131; *see also* 7 C.F.R. § 2003.18 (2003) (describing the functional organization of the Rural Housing Service). For convenience, references herein to the FmHA should be understood to include these successor agencies.

[4] For example, an owner who made a $100,000 down payment on a project with a $1,000,000 mortgage, would earn only a maximum of $8,000 per year as long as it remained in the program – regardless of how much equity the owner accumulated over time and how the property's market value increased.

operations of each project. Each loan agreement also specified the length of the loan, which was generally 40 or 50 years.

The promissory notes executed by plaintiffs required payment of the principal on each mortgage in scheduled installments, plus interest. They also contained the following prepayment provision: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." No other provision of the loan documents directly addresses prepayment.[5] This prepayment option served as a major inducement for recruiting property owners into the program: the option not only benefited the program participants, who viewed the program as a way to acquire equity in a building that would eventually be converted to market rents, but also the FmHA, which through these participants was able to provide needed housing. Indeed, consistent with statutory and regulatory requirements, the original contracts in the program required owners to prepay their loans upon FmHA demand as soon as commercial financing on similar terms became available, so that the moneys derived through prepayment could be invested by the agency in other properties. *See* 42 U.S.C. § 1472(b)(3) (1982); 7 C.F.R. § 1865.2(c) (1979).[6]

Over time, however, this funding model began to founder, as the owners prepaying their mortgages far exceeded new entrants in the program. In 1979, Congress found that the increasing number of section 515 participants prepaying their mortgages threatened the continued availability of rural low- and moderate-income housing and amended the National Housing Act

---

[5] FmHA regulations, in existence when plaintiff entered into their contracts and later promulgated, detailed the procedure for submitting and processing prepayment requests. *Inter alia*, owners were subject to a waiting period and were permitted to prepay only if the agency determined that they were able to obtain adequate commercial financing. *See, e.g.*, 7 C.F.R. § 1965.211 (1994) (adequacy of commercial financing); 7 C.F.R. § 1965.90(a) (1989) (180-day waiting period); 7 C.F.R. § 1965.90(a) (1983) (60-day waiting period). If all applicable requirements were met, the agency was required to approve the request, execute the necessary releases, and return the security (*i.e.*, the property) to the owner. 7 C.F.R. § 1866.2 (1978).

[6] Typically, these clauses provided –

> If at any time it shall appear to the Government that Borrower may be able to obtain a loan from a responsible cooperative or private credit source at reasonable rates and terms for loans for similar purposes and periods of time, Borrower will, at Government's request, apply for and accept a loan in sufficient amount to pay this note in full.

Tracking this language, one FmHA promotional brochure proclaimed: "When the financial position of the borrower reaches the point that he can repay or refinance through a commercial lender, the loan contract provides that he shall do so."

to stem the loss of low-cost rural housing due to prepayments. H.R. Rep. No. 96-154, at 43 (1979). Specifically, in the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101, Congress prohibited the FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner agreed to maintain the low-income use of the rental housing for either a 15-year or 20-year period from the date of the loan. § 503(b), 93 Stat. 1134-1135. That requirement could be avoided only if the FmHA determined that there was no longer a need for the low-cost housing or if Federal or other financial assistance provided to residents would no longer be available. *Id*.

In 1980, Congress further amended the National Housing Act to eliminate retroactive application of the Section 515 prepayment changes enacted in the 1979 legislation. Section 514 of the Housing and Community Development Act of 1980, Pub. L. No. 96-399, 94 Stat. 1614, provided that the prepayment restrictions included in the 1979 legislation would apply only to loans entered into after December 21, 1979, the date of enactment of that legislation. 94 Stat. 1671-1672. For loans subject to this legislation, new owners were required to agree to operate their properties as low-income housing for a minimum of 15 or 20 years. *Id*. The 1980 Act also required the Secretary of Agriculture to report to Congress about any adverse effects of the repeal upon the availability of low-income housing. Pub. L. No. 96-399, § 514, 94 Stat. 1671-1672.

After repeal of the 1979 legislation, prepayments by owners under pre-1979 contracts resumed. By 1987, Congress again grew concerned about the dwindling supply of low- and moderate-income rural housing in the face of increasing prepayments of mortgages under section 515.[7] A committee of the House of Representatives found that owners were "prepay[ing] or . . . refinanc[ing] their FmHA loans, without regard to the low income and elderly tenants in these projects." H.R. Rep. No. 100-122, at 53 (1987). In response, Congress passed the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (ELIHPA), which amended the Housing Act of 1949 to impose permanent restrictions upon the prepayment of section 515 mortgages that were entered into before December 21, 1979. That legislation, enacted on February 5, 1988, requires that before FmHA can accept an offer to prepay a mortgage entered into before December 21, 1979 –

> the [FmHA] shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities for not less than the 20-year period beginning on the date on which the agreement is executed.

Pub. L. No. 100-242, § 241, 101 Stat. 1886 (*codified at* 42 U.S.C. § 1472(c)(4)(A)). ELIHPA further provides that, to persuade an owner to keep its property in the program, the FmHA may

[7] In 1986, Congress had passed a temporary moratorium that precluded section 515 prepayments in most cases. The moratorium originally was to expire in 1987, but was extended into 1988 by another temporary measure. *See* 42 U.S.C. § 1437 note.

offer incentives, including an increase in the rate of return on investment, reduction of the interest rate on the loan, and an additional loan to the borrower. § 241, 101 Stat. 1886-1887.

Under ELIHPA, if the FmHA determines after a "reasonable period" that an incentive agreement cannot be reached under the aforementioned provisions, the Secretary "shall" require the owner to offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." Pub. L. No. 100-242, § 241, 101 Stat. 1887 (*codified at* 42 U.S.C. § 1472(c)(5)(A)(i)). If an offer to buy is not made by a nonprofit organization or agency within 180 days, the FmHA may accept the owner's offer to prepay or request refinancing. *Id*. The offer-for-sale to a non-profit requirement does not apply if the FmHA determines that housing opportunities for minorities "will not be materially affected" by prepayment and either: (i) the tenants will not be displaced by prepayment or (ii) there is an "adequate supply" of "affordable" housing in the market area and "sufficient actions have been taken to ensure" that such housing "will be made available" to displaced tenants. *Id*. at § 241, 101 Stat. 1889.

The FmHA promulgated regulations to implement ELIHPA on April 22, 1988, and the regulations became effective on May 23, 1988. 53 Fed. Reg. 13,245 (1988), *codified at* 7 C.F.R. § 1965.90 (1989). These establish a process by which the FmHA considers prepayment requests, including detailed procedures and requirements regarding whether housing opportunities for minorities will be affected by prepayment and whether other housing has been made available for tenants displaced by prepayment. 7 C.F.R. § 1965.90 (1989). In 1993, the FmHA modified its regulations to require that borrowers seeking to prepay be offered incentives not to do so. 58 Fed. Reg. 38,931 (1993), *codified at* 7 C.F.R. § 1965.210, 213 (1994). Under the regulations, the FmHA first "develop[s] an incentive offer," making "[a] reasonable effort . . . to enter into an agreement with the borrower to maintain the housing for low-income use that takes into consideration the economic loss the borrower may suffer by foregoing prepayment." 7 C.F.R. § 1965.210 (2003). In addition, the regulations make clear that the determinations required by 42 U.S.C. § 1472(c)(5)(A) before prepayment can be accepted – regarding the effect on minority housing opportunities, the displacement of tenants, and the supply of affordable housing in the market – will not be made unless and until the FmHA is unable to reach an agreement with a borrower on extending the borrower's participation in the section 515 program. 7 C.F.R. § 1965.215(a) (2003).

In 1992, Congress passed the Housing and Community Development Act of 1992 (the HCDA). Pub. L. No. 102-550, 106 Stat. 3672 (*codified in relevant part at* 42 U.S.C. § 1472(c) (1994 & Supp. V. 1999)). That legislation extended ELIHPA's restrictions to loans that were made from December 21, 1979, through 1989. Pub. L. No. 102-550, § 712, 106 Stat. 3841. Thus, beginning in 1992, loans made after December 21, 1979, but before 1989, were subject to the same provisions of ELIHPA adopted for older complexes.

**B. Application of the Legislation to the Plaintiffs.**

Plaintiffs collectively own 42 multi-family complexes in one or more of the following states: Iowa, Kansas, Minnesota, New Hampshire, North Carolina, North Dakota, South Dakota, Virginia, West Virginia and Wisconsin. As noted above, all these complexes were constructed with financing obtained from the FmHA under the Rural Rental Housing Program. As illustrated in Fact Appendix A, 34 of the complexes were financed by loans executed prior to December 21, 1979 (hereinafter referred to as the "pre-1979 complexes"), with the remaining seven loans being executed (or assumed) thereafter (hereinafter referred to as the "post-1979 complexes").[8] As is likewise illustrated in that chart, various plaintiffs have made formal requests to prepay their mortgages, although some of the prepayments request were made after this lawsuit was filed.

The evidence reveals that the reasons these owners wished to prepay without restriction vary and, in some cases, overlap. In virtually all cases, the projects are in a condition or location that permits profitable sales or conversion to apartments, condominiums or nonresidential uses. In some cases, owners seek to leave the program because Congress has eliminated tax benefits previously associated with low-income housing and they have exhausted the tax benefits that remain. And in many, if not all, instances, the owners would prefer to prepay their mortgages simply to sever their ties with the Federal government, frustrated not only with what they perceive as the overregulation of their properties, but also with Congress' efforts, through statutes such as ELIHPA, to modify unilaterally critical features of the bargains they previously struck with the FmHA. In light of these developments, these owners believe that they can no longer trust the Federal government to honor its obligations, depriving them of the sort of stable long-term relationship they believe is essential to their continued participation in the program.

Based on the record, the court finds that all of the owners would not have signed their contracts absent the prepayment option. In developing their properties, plaintiffs picked

---

[8] In accordance with the 1979 legislation discussed above, either the mortgage or loan agreement for these "post-1979" complexes contained a restrictive use provision that generally reads as follows:

> The Borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in section 515 of Title V of the Housing Act of 1949 and FmHA regulations then extant during this [15 or 20] year period beginning [on the date of the loan]. No person occupying the housing shall be required to vacate prior to the close of such [15 or 20] year period because of early prepayment. The borrower will be released during such period from these obligations only when the Government determines that there is no longer a need for such housing or that Federal or other financial assistance provided to residents of such housing will no longer be provided. A tenant may seek enforcement of this provision as well as the Government.

locations and completed construction with an eye toward converting to market rents in the future. All of the owners of the pre-1979 complexes intended to prepay as soon as the time was ripe, based on their personal circumstances and market conditions. All of the owners of the post-1979 complexes were required to execute a twenty-year covenant in which they agreed not to seek prepayment; each of the owners intended to prepay as soon as that covenant was satisfied and each of those covenants, indeed, has run. Upon prepayment, the owners planned to raise the rents to market levels and use the proceeds for various purposes, including retirement, investment in other ventures and transfers of wealth to their heirs. It appears that the owners each agreed to enter the program in reliance on the prepayment clause, as part consideration for signing the housing agreements.

### C. The Options Available under ELIHPA.

As noted above, under ELIHPA and the HCDA, the FmHA cannot allow prepayment until it has "ma[d]e reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing for at least 20 years." 42 U.S.C. § 1472(c)(4)(A) (2000). The FmHA can offer a variety of incentives under this program, including: equity loans, increased annual return on investment, and additional units of rental assistance to tenants. However, these "incentives" to continue in the program come with a toll charge – the owner has to agree to restrict its property to low-income housing for 20 years (42 U.S.C. § 1472(c)(4)(A) (2000)), at the end of which period the owners must reapply for prepayment, with no assurance that they will be allowed out of the program. Availability of various incentives is subject to annual appropriations and the record indicates that those appropriations have consistently been insufficient, causing incentive requests to accumulate from year to year, leading to a substantial backlog.[9] Indeed, no assurances were

---

[9] At trial, Mr. Laurence Anderson, Director of the Office of Rental Housing Preservation for the Rural Housing Service, admitted that, since fiscal year (FY) 1995, the waiting period for equity loans has been long due to "dramatic cuts" in funding for this part of the section 515 program, as illustrated by the follow chart:

| Fiscal Year | Appropriation (in millions) | Fiscal Year | Appropriation (in millions) |
|---|---|---|---|
| 1989 | $11 | 1996 | $5.03 |
| 1990 | $20 | 1997 | $2.5 |
| 1991 | $23.2 | 1998 | $5.0 |
| 1992 | $24.9 | 1999 | $5.05 |
| 1993 | $24.9 | 2000 | $5.4 |
| 1994 | $27.6 | 2001 | $5.3 |
| 1995 | $4.3 | | |

made to the owners as to when those incentives would actually be received.[10] Finally, the incentive initially offered later can be reduced, evidently even after accepted by the owner: the incentive package must be the "least costly alternative for the Federal Government that is consistent with carrying out the purposes of" the statute, 42 U.S.C. § 1472(c)(4)(C)(ii), and may be reduced in case of negative impact on tenants. In the latter regard, the incentive has to "fit within comparable rents," requiring the FmHA to trim an incentive if an increase in rents would be necessary to fund it. Ex. E § IV(A)(3), (c).

As reflected in Fact Appendix A, six of the plaintiffs agreed to extend the low-income use of their housing in exchange for one or more of the above-discussed incentives. These plaintiffs, however, testified that either they experienced considerable delay in receiving the incentives or the FmHA made adjustments in their benefits that offset some of the value of the incentives. For example, among the four individuals who requested equity loans, one, Mr. Morosani, applied for the loan in 1994, but had not yet received it at the time of trial; another, Ms. Perri, had to wait five years to obtain the loan; and a third, Mr. Wells, was forced to forego approximately $100,000 of the $273,635 equity loan for which he was eligible in order to avoid increasing rents. Several plaintiffs received other forms of incentives: Ms. Perri, for example, was offered an increase in her annual return on Palmyra Park II, up $7,428 for a total return of $9,300 annually, and ten additional units of rental assistance. She testified, however, that the ten additional units of rental assistance were taken back "to cover [the] extra rent increase" and that she did not "always get" the increased annual return on her investment. Other recipients of such incentives testified that they had to spend money on upkeep and improvements to their complexes and did

---

The appropriations for years beginning with FY 1995 was far less than the accumulated, let alone current, demand. To get a better sense of this: in 1999, the average equity loan was for $370,164, suggesting that for $5 million per year, only a dozen or so loans could be made annually. Demand for such loans far exceeded their availability – in 1999, there were over 50 loan requests pending, with the potential for such loans being offered as incentives in an additional 150 or so other pending prepayment requests. While Mr. Anderson testified that the backlog has eased somewhat since 1998 due to changes instituted by the Office of Rental Housing Preservation, created that year, the record suggests that this backlog was reduced not by making loans, but when individuals became frustrated with the delay and either withdrew their prepayment requests or accepted lesser incentives. Certainly, there is no indication that equity loans could be funded if a significant portion of the approximately 4,000 properties eligible for prepayment actually requested them.

[10] One of the plaintiffs, Mr. Roseliep, was advised by FmHA officials that funding for incentives offered to the owners of the 13 properties he managed in Iowa would not be available until seven to eight years after the time of the offer. Indeed, standard language in the letters sent by FmHA offering incentives to owners warned that "[a]ppropriate limitations may restrict available incentives each year. The actual receipt of the preceding incentives may not be forthcoming in the near future . . . . Acceptance of the incentive offer by the borrower will cause the request to be maintained on the waiting list for funding until obligated."

not receive the annual return on investment provided for in their contracts, due to reserve account requirements that specify when an owner is allowed to take his contractual return on investment. Due to the uncertainty owners faced regarding whether they could take their contractual return, and to the limits on their ability to do so, the prospect of a slight increase in the return on investment was not an attractive alternative to the owners.

If an owner rejects an incentive offer, the statute provides that the owner must offer for six months to sell the property to a qualified nonprofit organization or public agency. 42 USC § 1472(c)(5)(A)(i) (2000). The value of the property is determined by an appraiser selected by the owner, an appraiser selected by the agency, and, if necessary, a third, neutral appraiser selected by the other two appraisers. 7 C.F.R. § 1965.216(a) (2003). Specifically, the regulations provide:

> The value arrived at will result from two appraisals. One appraisal will be the appraisal contracted and paid for by FmHA or its successor agency under Public Law 103-354 that was used to establish the incentives previously offered. The second appraisal will be obtained and paid for by the borrower. Both appraisals will be conducted by qualified independent appraisers in accordance with FmHA . . . Instruction 1922-B (available in any FmHA . . . office.
>
> If the fair market values arrived at are within 10 percent of each other, the Servicing Office and the borrower will negotiate to arrive at a mutually acceptable value. If the values differ by more than 10 percent, the independent appraisers will be asked to review their appraisals to determine if the values can be reconciled to within 10 percent. If FmHA . . . and the borrower are unable to negotiate a mutually acceptable value or the appraisers are unable to reconcile their appraisals within 30 days of the completion of the appraisals, the State Office and the borrower will jointly select a third independent qualified appraiser whose appraisal will be binding on FmHA . . . and the borrower . . . . The cost of the third appraisal shall be divided evenly between FmHA . . . and the borrower.

*Id*. The regulations provide that if, 180 days after the owner offered the property for sale to a nonprofit organization or public agency, no qualified purchaser accepted the offer at the appraised fair market value, then the owner may be prepay the loan without restrictions. 7 C.F.R. § 1965.218 (2003) .

As an alternative to this sale option, owners can apply for the so-called “G-4" prepayment option, under which, under certain circumstances, they will be allowed to prepay, but are required to continue to provide low-income housing to existing tenants. *See* 42 U.S.C. § 1472(c)(5)(G)(ii)(I) (2000). For an owner to be eligible for this option, the FmHA has to determine, first, that prepayment would have no material effect on minorities, either at the project or in the market area. Assuming this condition is met, the owner then has to agree to a restrictive-use agreement, which provides, in part –

> No eligible person currently occupying the housing shall be required to vacate prior to the end of the remaining useful life of the project without cause. Rents, other charges, and conditions of occupancy will be established to meet these conditions for these tenants such that the effect will not differ from what would have been, had the project remained in the FmHA program. Existing tenants are protected to ensure that none experience new or increased rent overburden as a result of owner actions until each voluntarily moves from the project. The owner also agrees to keep a notice posted at the project in a visible place available for tenant inspection, for the remaining useful life of the project or until the last existing tenant voluntarily vacates, stating that the project is to be used in accordance with the Housing Act, and that management practices and rental rates will be consistent with those necessary to maintain the project for low- and moderate-income tenants.

The owner also is required to agree and obtain FmHA approval of any changes to rental procedures different from those in place at the time of the prepayment.

The G-4 option generally is viable only if the hold-over, low-income tenants are able to obtain and consistently hold vouchers from the Department of Housing an Urban Development (HUD) to supplement their rents. If such so-called "section 8" vouchers are not obtained or become unavailable, the property owner is left with a commercial mortgage rate, but below market rents, creating immediate cash flow problems. Based on the expected availability of section 8 vouchers, the G-4 prepayment option was accepted by the two owners of thirteen of the properties at issue.[11] Both plaintiffs, however, owned multiple properties and thus were better able to bear the risk that particular tenants would not obtain vouchers. Their actions notwithstanding, in recent years, the section 8 voucher program has received significant funding cuts, increasing the risk of relying upon such vouchers as a means of making the G-4 option viable.

Finally, if the FmHA determines "that housing opportunities of minorities will not be materially affected as a result of the prepayment," that "there is an adequate supply of safe, decent, and affordable rental housing within the market area," and that "sufficient actions have been taken to ensure that the rental housing will be made available to each tenant upon displacement," 42 U.S.C. §§ 1472(c)(5)(G) (ii) and 1472(c)(5)(G)(ii) (II) (2000), it may accept the offer to prepay.

---

[11] The following properties were prepaid under the G-4 prepayment option: Sunrise River, Evergreen Manor of Waukee I & II, Greenway of Altoona I, Prairie Village of Altoona I & II, Prairie Village of Grimes I & II, Prairie Village of Huxley I & II, Prairie Village of Slater I & II and Prairie Village of State Center.

**D. Procedural History of this Case.**

Plaintiffs filed this action in this court on May 30, 1997. The plaintiffs either entered into loan agreements before December 21, 1979 (the pre-1979 complexes), and were, therefore, subject to ELIHPA; or entered into loan agreements after December 21, 1979 (the post-1979 complexes), and were, therefore, subject to ELIHPA's rules via the HDCA. Plaintiffs' complaint alleged that the prepayment provisions of their promissory notes gave them a "contractual right . . . to terminate their contracts by prepaying their [mortgages] at any time at their option." They claimed that ELIHPA "repudiated the contractual right of [plaintiffs] to terminate their contracts at any time at their option." Their complaint sought relief on two theories: breach of contract and a violation of the Fifth Amendment's prohibition against taking property without just compensation.

This court (Judge Gibson) granted the government's motion to dismiss the claims brought by the owners of the pre-1979 complexes, on the ground that they were barred by the six-year statute of limitations in 28 U.S.C. § 2501. This court also, *sua sponte*, dismissed the takings claims of those same plaintiffs, also on statute of limitations grounds. *Franconia Assocs. v. United States*, 43 Fed. Cl. 702, 715 (1999). The Federal Circuit affirmed this dismissal on timeliness grounds. *Franconia Assocs. v. United States*, 240 F.3d 1358 (Fed. Cir. 2001). The Supreme Court, however, reversed, holding that "ELIHPA's enactment . . . qualified as a repudiation of the parties' bargain, not a present breach of the loan agreements." *Franconia Assocs. v. United States*, 536 U.S. 129, 133 (2002). According to the Court, "a breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." *Id*. at 133.[12] On similar grounds, the Court reinstated plaintiffs' takings claims. *Id*. at 149. It remanded this case to the Federal Circuit for further proceedings consistent with its opinion. *Id*. The Federal Circuit, in turn,

---

[12] By way of further exegesis, the Court opined –

> ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach. The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages. . . . Unless petitioners treated ELIHPA as a present breach by filing suit prior to the date indicated for performance, breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due.

536 U.S. at 143. The Court indicated that if a property owner elected to place the United States, as a repudiator, in breach before the performance date, the accrual date for its cause of action would be the date of that election, but that if the property owner opted to await performance, its cause action would accrue as of the time fixed for performance. *Id*. at 144.

remanded the case to this court. *See Franconia Assocs. v. United States*, 47 Fed. Appx. 565 (Fed. Cir. 2002).

The case was set for trial and then, on March 19, 2003, reassigned to the undersigned judge. Trial in this matter was conducted in Des Moines, Iowa, from June 16, 2003, through June 26, 2003. At the trial, the court received over 1,000 exhibits and the testimony of 22 witnesses, including several expert witnesses on damages. On July 16, 2004, in anticipation of issuing this opinion, the court severed the claims of 29 of the 30 plaintiffs (the exception being Franconia Associates), and ordered the clerk to consolidate the new actions with the original action. This opinion deals with all but one of the 30 cases now consolidated; by separate order, the court, today, is dismissing the case involving Dublin Plaza, for lack of jurisdiction, based on evidence that the predecessor to the plaintiff therein failed to comply with the statute of limitations contained in 28 U.S.C. § 2501.

## II. DISCUSSION

The gravamen of plaintiffs' complaint is that, under the express terms of their promissory notes, they were entitled to prepay their mortgage loans, without restriction and at any time, thereby releasing their properties from the considerable financial restrictions associated with the section 515 housing program. They assert that the United States abridged their rights when Congress passed ELIHPA and the HCDA, which place permanent restraints upon the prepayment of their FmHA loans. Plaintiffs assert that these statutes effected both a repudiation of their contracts and a taking of their property in violation of the Fifth Amendment. They claim damages calibrated to the alleged lost profitability or value of their complexes, owing to what they view as their forced continued participation in the rural housing program.

Defendant mounts a vigorous, multi-faceted counterattack on these contentions, with its initial thrust being that ELIHPA and the HCDA did not significantly alter any contract rights that plaintiffs possessed so as to constitute a repudiation of those rights. In this regard, while defendant does not invoke the so-called "sovereign acts" doctrine, it argues that, under the so-called "unmistakability doctrine," the FmHA, acting on behalf of the United States, *sub silentio* reserved the right to modify the statute at any time and to have the amended statute supplant the provisions in plaintiffs' notes. Among its many other retorts to plaintiffs' proof, defendant also asseverates that the losses plaintiffs allegedly experienced are self-inflicted and would not have been experienced had plaintiffs taken advantage of various options that Congress offered when it statutorily modified the prepayment rights.

### A. Liability.

For reasons that soon will become apparent, the court will consider plaintiffs' breach of contract and takings claims *seriatim*.

### 1. Breach of Contract.

#### a. ***Prima facie* liability**.

To determine whether plaintiff's contractual rights were breached, the court first must determine what those rights were. *See San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003). Several interpretational guides mark this decisional path. First, as an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)). Toward that end, contract interpretation "begins with the plain meaning of the agreement." *Gould*, 933 F.2d at 1274; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 458-59 (2001).

The promissory notes at issue could not be much clearer in allowing plaintiffs to prepay at any time, indicating unambiguously that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." In the court's view, the plain meaning of this language controls and gave plaintiffs the unfettered right to prepay their loans at any time. *See Allegre Villa v. United States*, 60 Fed. Cl. 11, 15-16 (2004).[13] Reasonably

---

[13] *See also Parkridge*, 13 F.3d at 1195 ("'Prior to the enactment of [ELIHPA], borrowers of Section 515 loans . . . had the option of prepaying their mortgages at any time and removing their project from the program without restriction.'") (quoting *Lifgren v. Yeutter*, 767 F. Supp. 1473, 1478 (D. Minn. 1991)); *Albany Apartments Tenants' Ass'n v. Veneman*, 2003 WL 1571576 at *9 (D. Minn. Mar. 11 2003) ("Until 1979, borrowers enjoyed an unfettered right to prepay Section 515 loans."). Brushing aside these and other judicial constructions of this language, defendant persists that while the cited provision allowed the plaintiffs to prepay their loan "at any time," nothing in the language precluded the FmHA from imposing substantial conditions upon that prepayment, including those enacted in ELIHPA and the HCDA. In the court's view, this contention not only applies a wooden construction to what is meant by prepaying "at any time," but entirely ignores the fact that the notes also provide that the prepayment may be made "at the option of the Borrower." In the court's view, for the latter phrase to have meaning, the prepayment could not be subject to anything more than perhaps simple procedural requirements (*e.g.*, filing an application and allowing for processing time), and otherwise was without restriction. *See, e .g., Cowden v. Broderick & Calvert*, 114 S.W.2d 1166, 1171 (Tex. 1938) ("at the option of" means "at the discretion of" or subject to the "uncontrolled will" of the optionholder).

construed, this language imposes a concomitant obligation on the FmHA to accept these prepayments and release the respective owner from its obligations under the section 515 program. As the Supreme Court readily observed in *Franconia*, "[i]f [plaintiffs] enjoyed a 'right to prepay their loans at any time,' 240 F.3d at 1363, then necessarily the Government had a corresponding obligation to accept prepayment and execute the appropriate releases." 536 U.S. at 142. The Court further declared that "[a]bsent an obligation on the lender to accept prepayment, the obligation to allow borrowers to prepay would be meaningless," rendering the loan contract "illusory." *Id*.[14] Moreover, that the notes allowed prepayment at any time, without significant restriction, is confirmed by other contract provisions,[15] and was prominently highlighted by the FmHA in promoting the program.[16]

---

[14] This observation was central to the Supreme Court's *ratio dicendi* in *Franconia* that the statute of limitations was triggered not by the passage of ELIHPA, but rather by the government's failure to honor a prepayment request. 536 U.S. at 142-43. "Viewed in this light," the Court stated, "ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach," requiring a plaintiff to file suit only after the Government failed to honor a prepayment request. *Id*. at 143.

[15] For example, the loan agreements at issue made clear that the various covenants restricting the use of the property were effective only "[s]o long as the loan obligations remain unsatisfied." Further, a twenty-year covenant found in every contract made afer 1979 required owners to stay in the program for a period of twenty years – a promise that would have been superfluous had the ability to prepay already been limited as defendant contends.

[16] From 1970 through 1986, Dean Greenwalt held various position with the FmHA, including being Chief of the Multi-Family Housing Services Branch from 1980 to 1985. Mr. Greenwalt and other agency officials made presentations to prospective borrowers at public seminars throughout the country. Regarding the content of these presentations, Mr. Greenwalt recounted –

> Q: . . . The question is, to help you, what did you and other FmHA officials tell prospective borrowers about the prepayment right?
>
> A: What we explained to them was that Farmers Home Administration was essentially considered a lender of last resort, meaning that there wasn't other financing opportunities available to develop this type of program.
>
> We explained to them that we didn't intend for them to be a borrower for 50 years. We expected the loans to be prepaid when other credit would be available. We explained to them that at that point in time the understanding, the concept, was that loans were made out of the Rural Housing Insurance Fund. At such time in

Of course, unlike private contractual undertakings, the contracts here originated in legislation passed by Congress, requiring the court to consider that legislation in construing them. *See, e.g., Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 669 (1985); *Barseback Kraft AB*, 121 F.3d at 1480-81 (construing an agreement in light of the underlying legislation); *Cuyahoga*, 57 Fed. Cl. at 761 (same). Tellingly, the legislative history of the Housing Act reveals that the prepayment option initially constituted a key aspect of the financing of the program, loans for which were made from a revolving fund that was capped by Congress at a specified appropriation level. Prepayments allowed the FmHA to recoup funds from owners who no longer needed them, freeing up money to make loans to the lengthy list of waiting applicants. The creator of this funding mechanism, Congress, on several occasions prior to 1979, admonished the FmHA for not graduating from the program owners who could obtain alternative private financing, stating, in typical fashion, in one report:

> [We] wish to reemphasize to the Administrator of the [FmHA] the necessity for the most careful administration of the 'credit availability' test in order that available federal funds can be conserved for definitely eligible borrowers. We encourage the [FmHA] in the further development of methods for utilizing presently available capital to the maximum extent possible.

H. Rep. No. 88-1703, at 23 (1964); *see also* H. Rep. No. 95-236, at 27 (1977); H. Rep. No. 89-365, at 48 (1965). For decades, then, Congress fully understood and relied upon the fact that under the rural housing program, the owners possessed not only an absolute right, but an obligation, to prepay their loans.[17] Legislative history thereby confirms what the plain language

---

> the future as these loans could be prepaid, the money would be coming back to the Agency to be relent to other borrowers.
>
> Q: And with respect to the idea of prepayment as an expectation of the Agency, what was the expectation as to whether that property would remain at restricted rent levels at prepayment, or would it become conventional market rate housing after prepayment.
>
> A: At that point in time, it was intended that it would be out in the private sector and operate as a conventional project.

Numerous plaintiffs recalled FmHA officials making similar representations. Regarding what the agency thought would happen to tenants if such a conversion occurred, Mr. Greenwalt indicated that the initial belief was "there would have been either additional units built in the community with newer standards, or the income of the population that was being served had increased to the point where they would no longer need the subsidized loans."

[17] *See* S. Rep. No.101-249I, at 299 (1990) ("many owners have a contractual right to prepay their loan (without requiring permission)"); H. Rep. No.100-122I, at 53 (1987) ("owners

of the notes manifests – that the FmHA was required to accept unconditionally any prepayments made by property owners.

When the number of owners seeking to prepay exceeded those willing to enter the program, thereby reducing the available housing stock, Congress knowingly compromised the same prepayment option it had earlier championed – as one legislator put it, "welching" on the deal previously made to induce participation in the program.[18] Contrary to defendant's

---

of FmHA's Sec. 515 low income and elderly rental housing projects may prepay their loan without restrictions"); *id*. at 54 ("Under current law, prepayments of FmHA rental projects that received commitments prior to December 1979, are permitted without condition . . ."). The legislative record also reveals that the FmHA shared this view of the law and the terms of the loan agreements. *See* H. Rep. No. 96-154, at 43 (1979) (the FmHA "believes it must honor requests to prepay or refinance these loans even though the result would be that much needed housing would be lost to the rural low and moderate income housing inventory"); *Hearings before the Subcomm. on Housing and Community Development, House Comm. on Banking, Finance and Urban Affairs*, 100th Cong., 1st Sess. 364 (1987) (hereinafter "1987 Hearings") (testimony of Vance Clark, Administrator FmHA) (under original agreements, "a borrower could repay that loan after 60 days notice to Farmers Home and then was free to operate that project without regard to any previous conditions that may have been agreed with FMHA in that loan agreement"); *id.* at 372 ("there was no statutory restriction on prepayment of FMHA 515 rural rental housing loans made before December 21, 1979"). For its part, defendant repeatedly quotes that portion of H. Rep. No. 96-154, at 43, which stated that "[i]t was the clear intent of Congress that these projects be available to low and moderate income families for the entire original terms of the loan." But, this isolated assertion, reported in support of the 1979 legislation that originally repudiated the prepayment right, is flatly contradicted by the statutory language and the remainder of the extensive legislative history surrounding ELIHPA and the HCDA. It thus is unequal to the revisionist task for which it is offered.

[18] During the debate on the 1980 act that repealed the 1979 legislation's restrictions on prepayment, Congressman Butler stated: "[I]n legal terms this is called . . . an impairment of the obligations of a contract. In layman terms it is called . . . welching. Whatever it is, it is basically unfair." 126 Cong. Rec. H 22650 (1980). In similar vein, during the debate on the 1988 amendment, Senator Heflin stated: "It is the obligation of the U.S. Government to fulfill contractual agreements into which it enters, or, at a minimum, to justly compensate those parties whose contractual rights it abrogates." 136 Cong. Rec. S 26372 (1990). This legislative history was highlighted in *Adams v. United States*, 42 Fed. Cl. 463, 480 (1998); *see also Allegre Villa*, 60 Fed. Cl. at 16-17; *Grass Valley Terrace*, 51 Fed. Cl. at 442. Similar views were expressed by other members of Congress and by FmHA officials in advance of the passage of ELIHPA. *See, e.g.,* 1987 Hearings, *supra*, at 392 (statement of Cong. McKinney) ("It would be easy enough for me to be a demagogue and sit up here and say you can't prepay but that is not the way we do things in America. We signed a contract."); *Hearings before the Subcomm. on Housing and Community Development, House Comm. on Banking, Finance and Urban Affairs*, 99th Cong., 2d

importunings, nothing else in the agreements indicated that the prepayment without restriction option could be limited, *in futuro*, unilaterally by Congress or the FmHA. Defendant points to language in the loan agreements providing that "any loan made or insured . . . will be administered subject to the limitations of the authorizing act of Congress and related regulations." But, were this "subject to" language to mean that the prepayment option could be limited by Congress or the FmHA virtually at will, the same would hold true of all the government's obligations under the agreements, rendering these contracts illusory. To the contrary, defendant's gloss on the quoted language clashes with that part of the loan agreement indicating that it could be modified only "by agreement between the Government and the Partnership,"and of the promissory note stating that it was "subject to the present regulations of the Farmer's Home Administration and to its future regulations not inconsistent with the express provisions hereof." Indeed, on at least two occasions – *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988) and *Parkridge*, 13 F.3d at 1197 – courts have refused to construe the "subject to" language upon which defendant relies as incorporating the FmHA's regulations into the rural housing loan agreements, with the *Parkridge* court specifically concluding that ELIHPA's procedures "are facially inconsistent with the loan agreements," 13 F.3d at 1197. Similar government contract language likewise has been construed not to have the "preincorporation" effect defendant urges.[19] Accordingly, this court finds no indication whatsoever that defendant expressly reserved in the program documents the right to modify the prepayment terms of the agreement.

In sum, not even a microscopic reading of the contract documents can escape the conclusion that plaintiffs had an unfettered right to prepay their mortgages. It follows that the passage of ELIHPA and the HCDA repudiated that right. Those statutes "conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Franconia*, 536 U.S. at 143; *see also* Restatement (Second) of Contracts (hereinafter "Restatement") § 250, Comment b (1981) ("[A] statement of intention not to perform except on

---

Sess. (hereinafter "1986 Hearings") 62 (statement of Eric P. Thor, Assoc. Administrator, FmHA) ("we feel that we cannot overturn the lawful structure of the loans made in good faith by us, and accepted by our borrowers").

[19] *See Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 616-17 (2000) (reference in lease that it was "subject" to certain "future regulations" makes "clear" that catchall provision referring to "all other applicable . . . regulations," must include only statutes and regulations already existing at the time of the contract); *Marathon Oil Co. v. United States*, 177 F.3d 1331, 1337 (Fed. Cir. 1999) ("To read the original contract between the parties as incorporating all future actions, whether by statute or regulation, by one of the parties would raise serious questions about illusory contracts, and perhaps questions of due process and other constitutional concerns."); *see also Winstar*, 518 U.S. at 868.

conditions which go beyond the contract constitutes a repudiation").[20] "[W]hereas under the old scheme FmHA had to accept prepayment from borrowers . . . at any time," the Eighth Circuit observed in *Parkridge*, 13 F.3d at 1196, "under [ELIHPA], FmHA may accept prepayment only at the end of an intricate six-month long (or longer) procedure . . . ."[21] This repudiation ripened into an apparent breach of contract either at the time a request for prepayment was made and not honored or, at the latest, when the complaint in this matter was filed. *Franconia*, 536 U.S. at 142-43; *see also Roehm v. Horst*, 178 U.S. 1, 13 (1900); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); Restatement, § 235(2). However, to determine whether this *prima facie* breach was, in fact, a breach requires this court to consider the government's principal defense against liability here – that, *sub silentio*, the government reserved the right to pass ELIHPA and the HCDA under the so-called "unmistakability doctrine." To this topic, the court now turns.

---

[20] Defendant suggests that the Supreme Court's extensive comments on this subject in *Franconia* were *obiter dicta,* because the issue presented involved only the statute of limitations. To be sure, the Court, in deciding the latter issue, assumed that the loan agreements contained an unrestricted prepayment right. 536 U.S. at 141. This court, however, finds that assumption now to be borne out by the record and, therefore, gives full effect to the Court's repudiation and breach analyses. *See also Allegre Villa*, 60 Fed. Cl. at 17; *Albany Apartments*, 2003 WL 1571576 at *9. Defendant also blithely contends that ELIHPA and the HCDA did not abrogate the prepayment right in the original agreements because they did not expressly state so. But, that most certainly was their effect, which is enough. *See* Restatement, § 250(b) (a repudiation is "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach").

[21] Seizing upon the "six month" reference in *Parkridge*, *supra*, defendant attempts to portray the prepayment procedures under ELIHPA as merely elongating somewhat the process for prepaying a loan. Not so. As described in this court's factual findings, under the new procedures adopted under ELIHPA and the HCDA, the FmHA must first determine whether a prepayment without restriction is allowed; if it is not, the agency must develop a set of incentives to offer the owner in exchange for extending the housing agreement; if those incentives are rejected, the agency may require, or the owner may seek, a sale to a non-profit; and, if that does not work, the FmHA must consider a range of additional options. Each of these steps involves multiple subtasks that can include obtaining comparable rent studies and appraisals, internal agency reviews and even awaiting funding or appropriations. Plaintiff presented evidence that the entire process could take several years and the court finds that estimate to be more consistent with the record than defendant's alternative of six months. Indeed, Mr. Anderson admitted that the prepayment process is "burdensome," "difficult to go through" and "not the easiest thing in the world." And, it should not be overlooked that the end result of this cumbersome process, far more often than not, is that the prepayment request is rejected.

**b. The unmistakability doctrine**.

Under the unmistakability doctrine, the "sovereign power" of the United States "is an enduring presence that . . . remain[s] intact unless surrendered in unmistakable terms." *United States v. Winstar Corp*., 518 U.S. 839, 872 (1996) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Cuyahoga*, 57 Fed. Cl. at 763. Defendant notes that, before this matter was reassigned to the undersigned, Judge Gibson found that this rule of contract construction applied herein and that, in the housing documents, the United States failed to surrender its sovereign powers with the requisite specificity. Defendant argues that this decision is entitled to great deference under the ubiquitous "law of the case doctrine" – that a "'decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983), or, more colloquially, that "a litigant given one good bite at the apple should not have a second." *Perkin-Elmer Corp. v. ComputerVision Corp*., 732 F.2d 888, 900 (Fed. Cir.), *cert. denied*, 469 U.S. 857 (1984).[22] But, this doctrine is not an inexorable command, and must yield where "controlling authority has intervened" or "the earlier decision was clearly erroneous and would work a manifest injustice." *Id*. at 900; *see also Christianson*, 486 U.S. at 817; *Arizona v. California*, 460 U.S. at 618 n.8; *Hughes Aircraft*, 86 F.3d at 1566; *Mendenhall v. Baber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir.), *cert. denied*, 513 U.S. 1018 (1994). While departures from the doctrine under these exceptions occur "very infrequently," *Perkin-Elmer Corp.*, 732 F.2d at 900, such a rare departure is warranted here.

Since Judge Gibson's ruling, it appears that every court to consider the issue has concluded that the unmistakability doctrine is inapplicable where Congress, rather than exercising its sovereign powers, targets its preexisting contractual obligations. *See Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000); *Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796, 802 (2000). Such was the holding of this court in *Cuyahoga*, *supra*, which examined the unmistakability doctrine at length. In that case, this court began by tracing the provenance of the doctrine from its roots in early cases involving the application of the Contracts Clause, U.S. Const., art. I, § 10, cl. 1, through more modern Supreme Court cases. Based on this *tour d'horizon*, this court observed:

> A key then is whether [the allegedly breaching] legislation invokes or embodies the types of sovereign power encompassed by the doctrine – those that 'promote the happiness and prosperity of the community,' . . . or involve the health, morals, safety, or economic needs of the citizenry. . . . If such is the case – where, for example, the challenged legislation represents a general exercise of the taxing or police powers – the unmistakability doctrine readily applies. If it is not – where, for example, the challenged legislation represents a bald 'repudiation' of a

[22] *See also Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1578 (Fed. Cir. 1996) (Bryson, J., concurring); *Centr. Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1580 (Fed. Cir. 1983).

> contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal – the unmistakability doctrine will avail the government naught. It follows, *a fortiori*, that the unmistakability doctrine is not triggered by the passage of just any legislation – contrary to defendant importunings, the power of Congress to pass legislation under Article I of the Constitution is neither coextensive nor coterminous with the doctrine. Rather, the doctrine is more limited – owing those limitations to its historical roots in the Contract clause . . .

57 Fed. Cl. at 769 (citations omitted). Considering the more recent treatment of the unmistakability doctrine in the various opinions in *Winstar*, this court then concluded that "*Winstar* confirms that in deciding whether the unmistakability doctrine applies in a given case, the nature of the legislation alleged to have breached the contract in question is truly pivotal." *Id.* at 773. Ultimately, it determined that "*Winstar*, as well as its progenitors and progeny, teach that the orbit of [the unmistakability] doctrine significantly intersects that of the sovereign acts doctrine – both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government's contractual obligations in an effort to obtain a better deal." *Id*. at 774.[23]

Consistent with this analysis, a number of recent cases specifically hold that the unmistakability doctrine does not shield defendant from liability stemming from the passage of ELIHPA and the HCDA. At the anterior of this phalanx is *Kimberly Assocs. v. United States*, 261 F.3d 864 (9th Cir. 2001), in which the Ninth Circuit opined that "the United States was not acting in a sovereign capacity when it altered its contract[s]" under this legislation. 261 F.3d at 869. It reasoned –

> It is unquestionable that, when it altered the terms of its contract[s] . . . , the government was not acting in a 'public and general' capacity. The provisions of the 1992 amendments to ELIHPA . . . constituted a narrow, targeted piece of legislation aimed at relieving the government from onerous provisions contained in a finite number of specific contracts it had already entered. . . . In the context of federal programs, it appears relatively few loans were affected, perhaps numbering less than 5,000. To prevent enforcement of these private contracts between the third party trustee and the borrowers would be to 'give the

---

[23] In reaching this holding, this court found that there was "no logical limit" to the government's interpretation of the doctrine. 57 Fed. Cl. at 776. "Carried to its logical extreme," this court observed, "the government's position would transform the unmistakability doctrine from a shield into a meat axe that would allow the Congress to reserve the choicest portions of the government's contracts and discard the rest." *Id.* As one example of this directly relevant to this case, this court noted that "if those willing to offer goods or services under a given program were. . . eligible to leave the program, Congress could simply extend the agreements already in force." *Id*.

> Government-as-contractor powers that private contracting parties lack.' *Yankee Atomic Elec.*, 112 F.3d at 1575 (Fed. Cir. 1997). Such a result cannot be countenanced because the government in its private contracting capacity cannot exercise sovereign power 'for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties.' *Id*.

*Id*. at 870. This court has twice embraced *Kimberly*. In *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (2002), it reconsidered a prior opinion, *see* 46 Fed. Cl. 629 (2000), and concluded that ELIHPA and HCDA did not constitute an exercise of sovereign power protected by the unmistakability doctrine. There, it opined that "[t]he impact of ELIHPA and the HCDA legislation fell substantially on the government's contracting partners" and had the "substantial effect of releasing the government from its own contractual obligations." 51 Fed. Cl. at 441-42. More recently, in reaching the same conclusion in *Allegre Villa*, 60 Fed. Cl. at 16-17, this court surveyed the recent jurisprudence on the unmistakability doctrine and surmised that its refusal to apply the doctrine to ELIHPA was not "ground-breaking." *See also Adams*, 42 Fed. Cl. at 472 (holding enactment of ELIHPA and HCDA was not a "sovereign" act).[24]

These cases serve interlocking purposes. First, they lead to the conclusion that the law of case doctrine ought not apply here. While they are not controlling precedent, these cases, together with this court's treatment of the unmistakability doctrine in *Cuyahoga, supra,* persuasively indicate that, with all due respect, the prior ruling herein was clearly erroneous. In the court's view, adherence to that ruling would be manifestly unjust because, *inter alia*, it would lead some plaintiffs to be dismissed from this case – oddly, those not subject to the court's earlier statute of limitations ruling – while leaving others to pursue remedies under the current – and, in the court's view, correct – formulation of the law.[25] *See Agostini v. Felton*, 521 U.S. 203, 236

---

[24] To be sure, the rationale of these cases differs slightly from that enunciated in *Cuyahoga*. In *Allegre Village* and *Grass Valley Terrace*, this court held, as it did in *General Dynamics*, that the unmistakability doctrine applies only where the sovereign acts doctrine applies. In *Cuyahoga*, this court held that while these two doctrines "proceed[] from a common objective – to shield exercises of the lawmaking function that involve sovereign powers . . . [that] nexus is neither historical nor, strictly speaking, rationale-driven." 57 Fed. Cl. at 774 n.31. It went on to explain that "while the doctrines incorporate similar requirements, they proceed from independent lines of authority: the sovereign acts doctrine from early Court of Claims decisions (circa 1865) applying concepts of sovereign immunity; the unmistakability doctrine from early Supreme Court decisions (circa 1830) construing the Contracts Clause." *Id*.

[25] Given his holding on the statute of limitations issue, Judge Gibson's ruling that the unmistakability doctrine applied to the owners of the pre-1979 complexes was plainly *obiter dicta* and would not be binding as to those owners; yet, if defendant is correct, Judge Gibson's ruling would be binding on the owners of the post-1979 complexes, who were not subject to his statute of limitations ruling. Such a result would be both nonsensical and manifestly unjust –

(1997) (refusing to apply law of the case doctrine where there had been a significant change in Supreme Court jurisprudence). Nothing could be more contrary to the sound development of the law in this important area than to hold this – and that this court will not do.

Of course, these same cases also readily demonstrate that the unmistakability doctrine offers defendant no comfort here. In passing ELIHPA and the HDCA, Congress deliberately targeted the FmHA's contractual obligations under preexisting notes in an effort to obtain a better deal than the one it and the FmHA used to induce plaintiffs to enter into the program. *Cuyahoga*, 57 Fed. Cl. at 774; *see also Coast-to-Coast Fin. Corp.*, 45 Fed. Cl. at 802 (unmistakability doctrine does not apply where Congress' act is "designed merely to eliminate an obligation that arose under one of the Government's contractual relationships"). The impact of that legislation fell not substantially, but exclusively on the government's contracting partners, limiting their prepayment rights with the obvious intent of forcing them to remain in the section 515 program. To be sure, as defendant emphasizes, this unilateral modification of a preexisting contractual obligation had a general public purpose – to preserve rural housing stock and prevent tenants from being displaced. But, that is not enough to insulate the particular means Congress selected from a range of available options to effectuate that purpose.[26] So ruled the Supreme Court in *Winstar*, *supra*, where a plurality of Justices held that a statute that likewise served an important public objective, the Financial Institutions Reform, Recovery and Enforcement (FIRREA), was not protected by the unmistakability doctrine. There, the Court noted that the unmistakability doctrine ought not apply to a "governmental object of self-relief," explaining that "[s]uch an object is not necessarily inconsistent with a public purpose, of course, and when we speak of governmental 'self-interest,' we simply mean to identify instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." 518 U.S. at 896; *see also Cuyahoga*, 57 Fed. Cl. at 776; *Centex Corp. v. United States*,

---

particularly, since it appears that Judge Gibson himself had doubts about his unmistakability ruling. He exhibited these when, in the wake of the Supreme Court's decision, he refused to allow defendant to file a summary judgment motion invoking the unmistakability doctrine and instead set this matter down for trial for the owners of both the pre- and post-1979 complexes. Such a trial, of course, would have been unnecessary if the unmistakability doctrine applied here.

[26] Notably, in strenuously opposing this legislation, the FmHA (and the Administration) offered up a range of administrative and legislative alternatives for preserving housing for low-income tenants that would not have restricted the right to prepayment in preexisting contracts. These options included providing incentives to the owners of FmHA projects not to prepay and giving vouchers to low income tenants displaced or threatened with higher rent resulting from the prepayments. *See* 1987 Hearings, *supra*, at 364-65 (testimony of Vance Clark, Administrator, FmHA); 1986 Hearings, *supra*, at 16-19 (1986) (testimony of Eric P. Thor, Associate Administrator, FmHA) (offering similar proposals). These alternatives were supported by various groups who were opposed to repudiating the prior agreements. *See, e.g., id.* at 37 (testimony of Larry Swank, Nat'l Assoc. of Home Builders).

49 Fed. Cl. 691, 710-11 (2002). In the court's view, such a shifting – as in *Winstar* and *Cuyahoga*, accomplished by targeting preexisting contracts – is exactly what occurred here.[27]

Under these circumstances, defendant's assertion that its actions were protected by the unmistakability doctrine does not bear scrutiny. Defendant plainly has rendered its performance under the section 515 contracts impossible and, accordingly, the court finds that the United States is liable to the owners for breach of those contracts. "Understandable as Congress' desire to save money may be," this court previously observed, "the rule for it, like private parties, sometimes is *pacta sunt servanda* – colloquially, 'a deal is a deal.'" *Cuyahoga*, 57 Fed. Cl. at 779.[28]

**2. Takings.**

Plaintiffs alternatively claim that the various amendments to the Housing Act constituted a taking of their property, by regulatory imposition. To be sure, plaintiffs' situation implicates the underlying purpose of the Fifth Amendment, which, in the oft-repeated words of *Armstrong v. United States*, 364 U.S. 40, 49 (1960), is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a

---

[27] Defendant argues that, unlike in *Cuyahoga*, *supra*, there is no evidence here that Congress acted simply to reduce the government's financial obligations. That contention, however, ignores that at least some of the options before Congress – among them, convincing borrowers not to prepay by increasing the amount of their subsidies without increasing the terms of their loans – would have cost additional funds and were not chosen. Moreover, at the same time Congress repudiated plaintiffs' prepayments rights, it slashed funding for new construction under the section 515 program. A General Accounting Office (GAO) study that defendant introduced chronicles that, beginning in 1979, the year in which the prepayment right was first curtailed, Congress began to decrease sharply the effective funding for the section 515 program. *See* GAO, Multifamily Rural Housing: Prepayment Potential and Long-Term Rehabilitation Needs for Section 515 Properties (hereinafter "Multifamily Rural Housing") 4 (2002) ("expenditures for the section 515 program increased throughout the 1970s, peaked in 1979, and fell sharply after that.") Other evidence in the record indicates that the budget for the section 515 program dropped severely, from $900 million in the late 1970s to less $115 million by the mid-1980s. It does not take much to conclude that Congress viewed its efforts to force preexisting borrowers to remain with the section 515 program as a way to save money. Based on these facts, the court rejects defendant's half-hearted attempt to distinguish this case from *Cuyahoga.*

[28] In a last-ditch effort to avoid a determination that there were breaches here, defendant asserts that because it could have exercised its power of eminent domain to condemn plaintiffs' properties, the fact that it instead severely restricted plaintiffs' prepayment rights did not constitute a breach. This assertion, however, suffers from doctrinal bankruptcy. It would accord defendant a right to avoid undesirable contracts coterminous with its power of eminent domain. Defendant neither cites a single case in support of this remarkable proposition, nor even explains this result in terms of some general principle of contract law.

whole." Moreover, it is well-established that "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934).[29] Nonetheless, by dint of the following analysis, the court must reject plaintiffs' takings claim.

The Federal Circuit "has cautioned against commingling takings compensation and contract damages." *Hughes Communications*, 271 F.3d at 1070; *see also J.J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 301 (2003) ( "[a] takings claim has limited application when a claimant has a viable breach remedy"); *Home Sav. of Am., F.S.B. v. United States*, 51 Fed. Cl. 487, 494 (2002) (same). In the *Winstar* context, the refusal to invoke takings principles has been explained as directly resulting from the availability of contract remedies. As Justice Scalia wrote in his concurrence in *Winstar*, "[v]irtually ***every*** contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, – and nothing else.'" *Winstar*, 518 U.S. at 919 (Scalia, J., concurring) (citations omitted) (emphasis in original); *see also Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379-80 (Fed. Cir. 2001). More recently, in *Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002), the Federal Circuit opined that "despite breaching the contract, the government did not take the plaintiffs' property because they retained 'the range of remedies associated with the vindication of a contract.'" *Id*. at 1342 (quoting *Castle v. United States*, 48 Fed. Cl. 187, 219 (2000)). Instead of conferring a right protected from a taking, "the contract promised to either regulate [plaintiffs] consistently with the contract's terms, or to pay damages for breach." *Id*; *see also Baggett Transp. Co. v. United States*, 969 F.2d 1028, 1034 (Fed. Cir. 1992); *Fifth Third Bank of West. Ohio v. United States*, 57 Fed. Cl. 586, 588-89 (2003); *McNabb v. United States*, 54 Fed. Cl. 759, 778-79 (2002).

Yet, other cases analyzing takings claims in analogous breach scenarios have focused not on the nature of the property impacted, but on the nature of the governmental action giving rise to the alleged taking. These decisions spring from the proposition that, in order to effectuate a taking, the government must invoke its sovereign powers for certain purposes. Under this approach, a taking does not arise where the government acts only in a commercial or proprietary capacity or seeks simply to enforce its property rights in court. For instance, in its seminal opinion in *Sun Oil Co.*, 572 F.2d at 818, the Court of Claims held that the denial of permit to install a drilling platform with respect to preexisting lease did not effectuate a partial taking of the lease because the appropriate remedy "must be directed at defendant in its proprietary

---

[29] *See also Bass Enter. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998); *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978); *see generally Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).

capacity and not in its sovereign capacity."[30] Other cases confronting this issue have followed the lead of *Omnia Commercial Co., Inc. v. United States*, 261 U.S. 502, 510 (1923), in which the Supreme Court held that if the government does not appropriate property for "public use," no taking, in the constitutional sense, occurs. These cases have opined that a variety of actions that affirmatively constituted the breach of a government contract did not meet this "public use" or "public good" requirement, so as to trigger the protections of the Fifth Amendment.[31]

---

[30] *See Hughes*, 271 F.3d at 1070 ("takings claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts rather than its sovereign capacity"); *Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000) (finding that defendant's commercial conduct could give rise only to a breach of contract claim; "[r]emedies for violation of any of their lease rights by plaintiffs must be directed at defendant in its proprietary capacity and not in its sovereign capacity"); *Alaska Airlines*, 8 F.3d at 798 (finding that the government's action "were taken in apparent good faith in [its] proprietary capacity, not its sovereign capacity, and therefore did not constitute a taking"); *DSI Corp. v. United States*, 655 F.2d 1072, 1074 (Ct. Cl. 1981) (holding that when the government asserts a "claim of right to the property," it is not exercising "its right as sovereign to acquire property from the rightful owner for the public good" and does not effectuate a taking); *Snyder v. United States*, 54 Fed. Cl. 686, 687-88 (2002) (no taking where government breached contract, quoting *Hughes*, *supra*); *Klump v. United States*, 50 Fed. Cl. 268, 271 (2001) (when the "Government comes down from its position of sovereignty, and enters the domain of commerce . . . [it] removes itself from the ambit of the Fifth Amendment as 'takings claim cannot be based on the Government's acting in its proprietary capacity'") (citations omitted), *aff'd*, 30 Fed. Appx. 958 (Fed. Cir. 2002); *J & E Salvage Co. v. United States*, 36 Fed. Cl. 192, 195 (1996) ("a takings claim cannot be based on the Government's acting in its proprietary capacity"); *Gratz v. United States*, 25 Cl. Ct. 411, 420 (1992) (no taking where government was acting in its "proprietary capacity"); *see also Am. Growers Ins. Co. v. Fed. Crop Ins. Corp.*, 210 F.Supp. 2d 1088, 1094 (S.D. Iowa 2002) ("an underpinning of why takings claims normally do not arise under government contracts is because the government is acting in a 'commercial or proprietary capacity' and not in its sovereign capacity"); *cf. Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983).

[31] *See DSI Corp.*, 655 F.2d at 1074 ("[w]hen the government 'takes' property, it exercises its rights as a sovereign to acquire property from the rightful owner for the public good"); *Mients v. United States*, 50 Fed. Cl. 665, 673 (2001) ("When the Government 'takes' property in the constitutional sense, it exercises its right as sovereign to acquire property from the rightful owner for the public good."); *Janicki Logging Co. v. United States*, 36 Fed. Cl. 338, 346 (1996) ("rather than acting as a sovereign and taking plaintiff's property for public use, the [government] acted in a proprietary capacity as a party to a contract); *J & E Salvage Co.*, 36 Fed. Cl. at 95 ("Not every deprivation of use or control constitutes a taking . . . '[w]hen the government 'takes' property, it exercises its rights as sovereign to acquire property from the rightful owner for the public good.'"); *see also Pi Elec. Corp v. United States*, 55 Fed. Cl. 279, 287 (2003).

Invoking the latter two lines of authority, sometimes interchangeably, courts have readily concluded that passage of legislation targeting the government's obligations under preexisting contracts does not effectuate a taking. In the most compelling example of this, *Home Savings*, *supra*, this court rejected a claim that FIRREA effectuated a taking of plaintiffs' contract rights, as well as other underlying property interests, reasoning:

> Plaintiffs are correct that the Fifth Amendment affords protection to private property, including contract rights. . . . But it is clear that what was missing in cases such as *Sun Oil*, *Castle*, and *Coast* is the same thing that is missing here – an authorized exercise of the government's power of eminent domain. As the Supreme Court explained in *Omnia Commercial Co. v. United States*, 261 U.S. 502, 510, 43 S.Ct. 437, 67 L.Ed. 773 (1923), the government is only liable for a taking if it uses its power to appropriate a contract for public use – *i.e.*, if it steps into the shoes of one of the contracting parties. That is not what occurred here.

51 Fed. Cl. at 494-95. Notably, while *Winstar*-type cases typically involve situations in which the breach of a contract effectuated by FIRREA resulted not only in the loss of contract rights, but the substantial devaluation (in some cases, total loss) of previously-owned property, none of the decided cases have treated the loss of such independent property as either a categorical or regulatory taking. *See, e.g., AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 535 (2003); *First Fed. Savings Bank of Hegewisch v. United States*, 57 Fed. Cl. 316, 318-19 (2003) (citing cases). A contrary ruling, indeed, would have no logical limits and mean that "nearly all Government contract breaches would give rise to compensation under the Fifth Amendment." *Hughes Communications*, 271 F.3d at 1070.[32]

The foregoing analysis resonates in the case *sub judice*, in which the central hypothesis is that the government acted in a proprietary capacity in passing legislation that abridged plaintiffs' prepayment rights. If this is true – and the court holds it is – it follows, *a fortiori*, that defendant, while repudiating its contracts, did not effectuate a taking.[33] Because this conclusion stems from

---

[32] Among other things, adopting plaintiffs' theory would pave the way for the recovery of prejudgment interest that, though a typical component of a just compensation award, is unavailable in a contract action absent a waiver of sovereign immunity. Courts understandably have been hesitant to allow plaintiffs to circumvent the "no interest" rule of *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986), by recharacterizing a breach of contract as a takings. *See Detroit Edison*, 56 Fed. Cl. at 303 (2003) (noting that it is inappropriate to permit a plaintiff "to pursue a takings remedy in order to circumvent the limitations inherent in its contractual relationship with the Government."); *Granite Mgmt. Corp. v. United States*, 55 Fed. Cl. 164, 166 (2003) (same).

[33] As one commentator has explained:

> [I]n a contractual context where the Government is party to an agreement, the Government may act in its proprietary capacity, rather than its sovereign capacity,

the nature of the power invoked by Congress in impacting plaintiffs' property, rather than the nature of the property itself, it applies, with equal force, to plaintiffs' contract rights and the complexes they acquired under the program. As to the former, it remains that when a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking.[34] *See Allegre Villa*, 60 Fed. Cl. at 18-19; *Detroit Edison Co.*, 56 Fed. Cl. at 303. The same holds true as to the complexes themselves – no regulatory taking occurred because the

---

> when it interferes with a party's rights under that agreement. In such a circumstance, the courts determine in which capacity the Government acted at the time of the alleged taking. Courts will only find a taking pursuant to a sovereign act of the Government where the Government intended, even if implicitly, to take a property right. If the Government was exercising contractual rights, or otherwise not invoking or acting pursuant to its sovereign powers, the courts will likely characterize the action as a proprietary action. Thus, any resulting interference with the contract will be subject to a potential breach-of-contract claim, but not a takings claim. In most situations where the Government interferes with a party's rights created by the Government's own agreements, the Government is acting in a proprietary capacity. Courts more often find that interference with those rights constitutes a breach of contract rather than a taking. If the Government, however, successfully invokes the sovereign act defense or otherwise interferes with the contract due to general legislative or administrative actions, its interference may be subject to a takings claim.

Kevin R. Garden, "Fifth Amendment Takings of Rights Arising from Agreements with the Federal Government," 29 Pub. Cont. L.J. 187, 201-02 (2000) (footnotes omitted). Of course, applying the traditional multi-factored formula for a regulatory taking, one might readily conclude that there is no taking here because, since plaintiffs have valid contract-based claims, their expectations with respect to their property interests have not been contravened and the value of those interests (owing to the recovery of contract damages) has not been significantly diminished. *See Castle*, 48 Fed. Cl. at 218; *Janicki Logging Co.*, 36 Fed. Cl. at 346; *see also Westfed Holdings, Inc.*, 52 Fed. Cl. at 152.

[34] Plaintiffs' situation is distinguishable from those encountered by the Federal Circuit in *Cienega Gardens v. United States* ("*Cienega Gardens II*"), 331 F.3d 1319 (Fed. Cir. 2003); *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003), in which the court allowed takings claims to proceed. In both those cases, plaintiffs entered into loan agreements with private lenders that were insured by HUD. The government subsequently restricted the plaintiffs' prepayment right, which the appeals court ruled was a taking. However, because their contracts were with private lenders, the plaintiffs in *Cienega Gardens II* and *Chancellor Manor* were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. Such is not the case here. *See Allegre Village*, 60 Fed. Cl. at 19.

Congress did not appropriate those properties in its sovereign capacity for public use.[35] Accordingly, the court holds that plaintiffs' takings claims are not well-taken.

**3. Redux.**

Based on the foregoing, the court concludes that, in passing ELIHPA and the HCDA, defendant repudiated the FmHA contracts it had with plaintiffs. That repudiation blossomed into a full blown breach of contract upon the later of a specific request for prepayment (a demand for performance) or the filing of this lawsuit. Although, and perhaps because, such breaches occurred, the passage of ELIHPA and HCDA did not effectuate a taking either of plaintiffs' contract rights or the associated properties.

The court must next determine the damages plaintiffs are owed.

**B. Damages.**

Attempting to quantify their breach damages, plaintiffs, at trial, presented expert testimony concerning the loss of cash flow they attribute to being precluded from prepaying their loans without restriction during the duration of those loans. Essentially, these analyses projected the cash flows likely to be generated by converting the properties to commercial use, compared them to what would be realized if the properties remained in the program, and treated the difference as expectation damages. Although defendant disputes various aspects of these calculations, its overarching arguments are that plaintiffs failed to mitigate their damages and inadequately demonstrated that the damages claimed were caused by defendant.

**1. Mitigation.**

Defendant's centerpiece contention with respect to damages, which it repeats in several tactical variations, is that the provisions passed by Congress in eliminating the absolute prepayment right significantly mitigate any damages owed plaintiffs here. For the reasons that follow, this court disagrees.

We begin with common ground – "a non-breaching party generally may not recover damages attributable to that party's failure to take reasonable, non-burdensome steps to avoid its loss." *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002). Damages that the plaintiffs might

---

[35] *See Dureiko*, 209 F.3d at 1359 (breach of lease agreement did not result in taking of underlying property); *Baggett*, 969 F.2d at 1034 (modification of government contract did not effectuate taking of carrier's container space); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 656 (2003) (no takings claim for dimunition in value of electric utility facilities based on government's breach of obligation to begin acceptance of spent nuclear fuel); *Scan-Tech Sec., L.P. v. United States*, 46 Fed. Cl. 326, 341-42 (2000) (contractor could not maintain takings claim based on government's failure to return prototype of airplane security device).

have "avoided without undue risk, burden or humiliation" are hence not recoverable. Restatement § 350; *see also Middleton v. United States*, 175 Ct. Cl. 786, 792 (1966); *Sun Cal, Inc. v. United States*, 25 Cl. Ct. 426, 432 (1992). "Application of this principle," this court has stated, "requires the court to consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." *Koby*, 53 Fed. Cl. at 497. As stated by the Third Circuit:

> Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen.

*In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3rd Cir. 1950); *see also Beckman Cotton Co. v. First Nat'l Bank of Atlanta*, 666 F.2d 181, 184 (5th Cir. 1982); *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (2003); *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *In re Kellett Aircraft*, 186 F.2d at 198-99; *see also Apex Min. Co. v. Chicago Copper & Chem. Co.*, 306 F.2d 725, 731 (8th Cir. 1962). Rather, the burden is on the breaching party to show that reasonable possibilities for mitigation existed and were ignored. *See T.C. Bateson Construction Co. v. United States*, 319 F.2d 135, 160 (Ct. Cl. 1963); *Home Sav. of Am., FSB v. United States*, 57 Fed. Cl. at 729; *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 561-62 (2003); *Robinson v. United States*, 50 Fed. Cl. 368, 370 (2001).

Burnishing this "undue risk and expense" standard, *Williston on Contracts* provides that "almost any risk of considerable loss to the injured person if he attempts to mitigate damages should be considered undue." 11 Samuel Williston, *A Treatise on the Law of Contracts* § 1353 (3d ed. 1968); *see also Brazos Electric Power Coop., Inc. v. United States*, 52 Fed. Cl. 121, 129 (2002). While reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements compensating for the lack of contract performance, such arrangements need not be entered into if they would expose the party to undue risk or significantly compromise its interests. *See* Restatement, § 350 cmts. c & g; *see also Westamerica Mortgage Co. v. First Nationwide Bank*, 1988 WL 76377 at *5 (D. Colo. Jul. 15, 1988). Thus, an injured party is not expected to "'exalt the interests of the defaulter to his own probable detriment.'" *Koby*, 53 Fed. Cl. at 497 (quoting *In re Kellett Aircraft*, 186 F.2d at 199); *see also Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters,* 226 F.3d 535, 554-55 (7th Cir. 2000), *cert . denied*, 531 U.S. 1078 (2001); John Calamari & Joseph Perillo, The Law of Contracts § 14-15 (3d ed. 1987). Accordingly, courts have been reluctant to require parties, under the duty to

mitigate, to deal further with the breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract. *Stanspec Corp. v. Jelco, Inc.,* 464 F.2d 1184, 1187 (10th Cir. 1972); *Campfield v. Sauer*, 189 F. 576, 579 (6th Cir. 1911); *Koby*, 53 Fed. Cl. at 497.[36] In addition, in particular, a plaintiff is not required to mitigate losses by "accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract." *Brazos*, 52 Fed. Cl. at 129; *see also Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 870 (1st Cir. 1982); Restatement, § 350, cmt. e.

Defendant asseverates that when Congress modified plaintiffs' unfettered right to prepayment, it provided suitable substitute transactions. Thus, the property owners could receive one or more of the following incentives in exchange for locking in the low-income use of their properties for twenty years: equity loans, increased annual return on investment, and additional units of rental assistance to tenants. Barring such an agreement, they could sell their complexes to a qualified nonprofit organization or public agency at a fair market value determined by independent appraisers, or perhaps prepay with restrictions under the G-4 option. Finally, the FmHA could still accept an offer to prepay if either no nonprofit entity steps forward to purchase the property after 180 days, or the FmHA determines "that housing opportunities of minorities will not be materially affected as a result of the prepayment," that "there is an adequate supply of safe, decent, and affordable rental housing within the market area," and that "sufficient actions have been taken to ensure that the rental housing will be made available to each tenant upon displacement," 42 U.S.C. § 1472(c)(5)(G) (ii)(II). Defendant claims that it was unreasonable for plaintiffs not to pursue at least one of these courses to lessen the damages owed on the breach of their original contracts. *Per contra*.

For one thing, defendant is simply wrong in suggesting that a reasonable person, acting in like circumstances, would have embraced the alternatives offered by Congress. Like Old Dobbins, defendant all but dons blinders to the fact that Congress here repudiated the original contracts not once, but ***twice***, each time modifying the FmHA contracts to suit its purposes. During this same general period, Congress also saw fit to alter other low-income housing contracts, limiting the prepayment provisions in some HUD agreements and modifying the rent increase provisions in others.[37] Frustrated by these developments, various plaintiffs testified that

---

[36] *See also Cain v. Grosshans & Petersen, Inc.*, 413 P.2d 98, 102 (Kan. 1966) ("[A]n innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement."); *Coppola v. Marden, Orth & Hastings Co.*, 118 N.E. 499, 500 (Ill. 1917) (purchaser has no duty to pay in cash when credit terms are material part of the contract); Charles J. Goetz & Robert E. Scott, The Mitigation Principle: Toward A General Theory of Contractual Obligation, 69 Va. L. Rev. 967, 993 n.57 (1983).

[37] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub.L. No. 105-65, § 201(c)(1), 111 Stat. 1364 (1997); Pub.L. No. 104-204, § 201(g), 110 Stat. 2893 (1996); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub.L. No. 103-327, 108 Stat. 2298, 2315 (1994); Low-Income

they were unwilling to enter into any other agreements with the FmHA, fearful that Congress subsequently would modify those deals to its advantage, as well. That impression certainly is not unreasonable, given the legislative record here. Nor should it be unexpected. The Supreme Court long ago observed that if the United States repudiates its obligations, it bears "all the wrong and reproach the term implies." *Sinking Fund Cases*, 99 U.S. at 718. Among those implications is that defendant cannot reasonably expect plaintiffs to risk a ***third*** repudiation of their contracts, particularly while defendant still claims impunity for the first two.[38] Colloquially speaking, the law of mitigation does not require plaintiffs to play the role of the credulous Charlie Brown to the FmHA's priggish Lucy, in recreating the Schulzian football-kicking scenario that always finds poor Charlie on his back.[39]

Indeed, many of the "incentives" and other options offered by Congress under ELIHPA are either feckless, fruitless or just plain risky Some of these options, such as the equity loans, have historically been underfunded, with appropriations consistently lagging behind requests.[40] As a result, the handful of plaintiffs who elected to pursue equity loans lamented their decisions almost immediately – one, for example, was still waiting for his loan more than a decade after it was promised; another waited five years. Other ELIHPA options pose considerable risks to plaintiffs' economic well being, threatening to increase, rather than diminish, their losses. For example, while Congress, under the G-4 option, authorized certain property owners to convert their facilities to commercial financing, it requires them to allow existing tenants to remain at reduced rents. Such an arrangement generally is viable, however, only if the hold-over low-

---

Housing Preservation and Resident Home Ownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990); Reform Act of 1987, Pub.L. No. 101-235, §801, 103 Stat. 2057-2059 (1987); *see also Cuyahoga*, 57 Fed. Cl. at 756-57 (discussing several of these amendments).

[38] *See* Arthur L. Corbin, Corbin on Contracts (hereinafter "Corbin"), § 1043 at 274 (1964) (noting that cases requiring a plaintiff to deal with a defaulting defendant "should depend, to some extent, upon the reason causing the defendant to commit a breach and also upon the manner in which it was committed").

[39] In the extended version of this Peanuts classic, Charlie's sister, Sally, looks down at her supine brother and asks, "You're not in love with Lucy, are you big brother?" "I should hope not," Charlie replies from the ground. Sally then sighs, "I've discovered that love makes us do strange things." "So does stupidity," replies the still dazed Charlie.

[40] Mr. Anderson testified that "the agency has been operating under limited funds for a number of years now . . . [and] we don't have the loan money." Indeed, in 1995, the FmHA announced publicly, in an administrative notice, that, in regards to prepayment requests, it was experiencing a processing backlog and limited funding. *See also* Richard M. Price, "Prepayment of Section 515 Affordable Housing Mortgage Loans," 14-APR Prob. & Prop. 15, 17 (noting "[t]he prepayment program has proven difficult to administer" and that the FmHA "is short on funding").

income tenants are able to obtain and consistently hold HUD section 8 housing vouchers, themselves subject to annual appropriations and sparsely and intermittently available due to chronic underfunding. If those vouchers are not obtained or later become unavailable, the owner is left with a market rate loan and below market rents, hardly a Keynesian formula for success. Likewise fraught with risk is the statutorily-authorized (or compelled) sale of the affected housing to a nonprofit entity at a price to be determined by appraisals. Most owners correctly perceived this as committing to sell their property before knowing the price and with no assurance that they would realize the value at which the property would be freely sold in a fluctuating open market.[41] Indeed, the regulations governing this program leave considerable doubt as to whether what the FmHA means by "fair market value" is what is usually meant by that term.[42] And, of course, this sale option provides nothing to an owner that, for whatever reasons, does not want to sell its property.[43]

---

[41] As this court observed in *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 77 (1997), such appraisals inevitably reflect the appraiser's "own experience, subjective judgments, and speculative assumptions." By comparison, when the government appropriates property under the Uniform Relocation and Assistance and Real Property Acquisition Policies Act of 1970, the amount it offers pursuant to an appraisal may be rejected by the owner, who is given the right to establish the true market value in a court proceeding. *See* 28 U.S.C. § 1491 (2000); 42 U.S.C. § 4654 (2000). No similar judicial review mechanism exists here. The price set by this appraisal methodology, moreover, is to remain fixed for at least six months, thereby posing an additional downside for an owner in an appreciating real estate market.

[42] While the regulations for determining fair market value, at one point, adopt the traditional "highest and best use" standard, they elsewhere limn that the complex should be evaluated as "unsubsidized conventional housing." *See* 7 C.F.R. § 1965.216(a) (2003); *see also* 7 C.F.R. § 1965.202(d). More significantly, under the FmHA's instructions for transferring properties, it appears that while the appraisal values the property "as is," that is, without any needed rehabilitation work, the prior owner is required to fund the rehabilitation work prior to transferring the property to a nonprofit entity. *See* RD AN No. 3767. In such circumstances, the net proceeds received by an owner upon a transfer obviously do not reflect the appraised fair market value of the complex. Mr. Anderson admitted that the regulations and instructions could lead to this result, but asserted that the program was not actually administered this way. In the court's view, however, it was not unreasonable for plaintiffs to view this matter otherwise.

[43] Some owners indicated that they built their complexes with the intent of passing them to the heirs; in other circumstances, a sale was deemed inadvisable because the owners had fully depreciated their property, leaving them a zero cost basis, and, therefore, they stood to incur, upon a sale, significant capital gains liability. The latter point was emphasized in a 2002 GAO report that defendant introduced at trial – "While these owners enjoyed the write-off benefits associated with the tax savings, their current tax burden can significantly reduce the remaining proceeds. As a result, some owners are staying in the program to avoid the tax consequences." GAO, Multifamily Rural Housing, *supra*, at 10.

At trial, defendant attempted to blunt the force of these concerns and deficiencies by serving up a many-colored splendor of palliatives, regulatory assurances and liberal legal interpretations that, as far as the court can tell, were all of recent vintage. Defendant thus contended, *inter alia*, that an owner could rescind an offer to sell to a non-profit entity if it did not like the price set by the appraisal process and, remarkably, that owners who converted to commercial financing under the G-4 option could pay low-income tenants a stipend to leave their property. These assertions, apart from being somewhat gratuitous, are not supported by the relevant statutory and regulatory provisions.[44] And they apparently do not track how the FmHA

---

[44] Two examples of this are striking: First, Mr. Anderson testified that although the price decided upon by the appraisers was binding, by offering his or her property for sale to a nonprofit agency, an owner did not become obligated to sell at that price, but could withdraw from the process. On cross-examination, however, he admitted that the option to withdraw was not described in the regulations and that he could not remember the name of any owner who had begun the sale process and was allowed to withdraw. In fact, the assertion that an owner could back out of a sale to a nonprofit ignores the mandatory terms – "shall require" – the statute uses in requiring the FmHA to conduct such a sale if incentives are rejected, 42 U.S.C. § 1472(C)(5)(A)(i) (2000). Complementary mandatory language is employed throughout the regulations and instructions implementing this requirement. *See* 7 C.F.R. § 1965.216(b) (2003) ("Once the fair market value of the project has been established, the borrower is to attempt to market the project to nonprofit organizations and public agencies. The following actions are to take place . . .").

Mr. Anderson also claimed that owners electing the G-4 option and converting to commercial financing, could pay low-income tenants to move out. He, however, readily admitted that there is no indication of this in any of the regulations or instructions involved, stating:

> We don't advertise it, but basically if a borrower wants to provide incentives for a tenant to move out so they can replace that tenant with a tenant who can pay full market rent, there's nothing within the G-4 restriction or within our regulations that would prevent the borrower from pulling $500 out of his pocket and paying the tenant.

Contrary to this statement, the instructions indicate that the whole purpose of the G-4 restrictions is to ensure "the housing will continue to be affordable to the protected population of tenants" and further provide that "[p]riority for tenants entering the project after prepayment must continue for those tenants in the lowest income category in the protected population" RD Instr. 1965-E, §1965.209. Other provisions in these instruction state that existing tenants must "leave voluntarily" and "choose to vacate of their own will," and warn that any modification of prior tenant leases must not be "contrary to the intent of this regulation." *Id*. at §§ 1965.209, 1965.215(c)(1)(ii); *see also* 42 U.S.C. § 1471(g) (2000) (requiring the rural housing program to be carried out so as to avoid "the involuntary displacement of families"). Indeed, after blithely

has run the program since ELIHPA and the HCDA were passed: indeed, there is not the slightest reliable indication in the record that the FmHA ever reduced any of these salvific principles to regular practice. Among the rosiest of defendant's assumptions is that plaintiffs would have been allowed to prepay had they simply asked correctly (or, vice versa, appealed the FmHA's denial of their prepayment request). But, other than the self-serving testimony of FmHA officials, there is absolutely no indication that any of the properties would have met the new regulatory requirements for prepayment and, conspicuously, defendant fails to identify any particular complex for which this would hold true.[45] At all events, the halcyon picture defendant now paints fails to account for the fact that the established standard for evaluating the reasonableness of mitigation efforts is "from the perspective of 'one viewing the situation at the time the problem was presented.'" *Koby*, 53 Fed. Cl. at 1198 (quoting *In re Kellett Aircraft*, 186 F.2d at 198). Here, the suspicions that most plaintiffs harbored from the start were not only reasonable *ab initio*, but prescient.

To cinch matters, it should not be overlooked that by electing any of the alternatives offered by Congress, plaintiffs could have severely compromised their ability to seek any damages under the original contracts. Although, perhaps for tactical reasons, defendant has not pursued this theory here (lest it undercut its mitigation claims), a plaintiff's acceptance of any of these options could well have been construed as abandoning its rights under the first contracts via some rescission, compromise, or accord and satisfaction. Thus, a decision to abandon contract rights can be conveyed through a formal agreement of rescission or through the acts and conduct

---

offering up this option in his direct testimony, Mr. Anderson, on cross-examination, admitted that paying off a tenant to leave might violate the G-4 restrictions and lead to the filing of a lawsuit.

[45] *See Cienega Gardens v. United States* ("*Cienega Gardens I*"), 265 F.3d 1237, 1242 (Fed. Cir. 2001) (noting that one commentator had described the comparable post-ELIHPA HUD option to prepay as a "fiction") (quoting Sheldon P. Winkelman, "Low-Income Housing Preservation and Resident Ownership Act of 1990," 73 Mich. B.J. 1160, 1161-62 (1994)); Bruce C. Ramsey, *et al.*, "The Cranston-Gonzalez National Affordable Housing Act – an Overview," 28 Real Prop. Prob. & Tr. J. 177, 224 (1993) ("Actual prepayment by an owner will be just as difficult to achieve now as it was under the 1987 Housing Act. Although, in theory, the 1990 Home Ownership Act allows an owner to prepay its mortgage, in reality the 1990 Act forces owners to elect whether to continue to operate their projects as affordable housing or to sell to purchasers who will continue such operation."). In making its counter argument, defendant emphasizes that over the past four years, 118 properties were allowed to prepay without restriction. But, the record indicates that in 2002, there were 3,772 properties that would have been eligible to prepay under the original prepayment provisions and that only 32 of those properties, or 0.85 percent, were actually allowed to prepay without restriction (the remainder prepaid under the G-4 option). Accordingly, without proof that the properties in question somehow were different from the norm, available statistics suggest that prepayment without restriction under the new regulations is a remote possibility, indeed.

of the parties indicating such an intent. *See Nebco & Assocs. v. United States*, 23 Cl. Ct. 635, 642 (1991); *Montana Bank of Circle, N.A. v. United States*, 7 Cl. Ct. 601, 610 (1985); *see also* Restatement §§ 279 & 283, cmt. a. When a party engages in acts inconsistent with the existence of a contract, including acquiescing in a repudiation of the contract by the other party, courts have found an objective intent to abandon despite the party's assertion of subjective intent to the contrary.[46] Although no case flatly indicates that invocation of the statutory alternatives here could trigger this result, the case law generally is such that those plaintiffs who decided, often on the advice of counsel, not take this course were certainly acting reasonably. These plaintiffs were "not obligated to risk surrendering [their] rights under the first contract[s] in order to minimize defendant's damages." *Koby*, 53 Fed. Cl. at 499; *see Teradyne*, 676 F.2d at 870; *Stanspec Corp.*, 464 F.2d at 1187; *Campfield*, 189 F. at 579-80.

Based on the foregoing, the court finds that those plaintiffs who refused to elect one of the alternatives Congress offered acted reasonably. As such, they did not fail improperly to mitigate their damages here. Defendant has not proven otherwise and its affirmative defense on this count, therefore, must fail.

But, what of the plaintiffs who actually received incentives in exchange for extending their housing agreements? As noted, defendant has not argued that these actions amounted to a rescission; nor does this court view the fact that a few individuals elected these incentives as indicating that the plaintiffs who did not were unreasonable.[47] Nonetheless, the net value, if any, attributable to these incentives must be subtracted from the damages owed to these individuals to the extent it lessens the amount of the actual loss here. *See LaSalle Tallman Bank, FSB v. United States*, 317 F.3d 1363, 1372 (Fed. Cir. 2003) (damages must be reduced by loss avoided as result

---

[46] *See Koby*, 53 Fed. Cl. at 498-99; *Avemco Ins. Co. v. N. Colo. Air Charter, Inc.*, 38 P.3d 555, 565 (Colo. 2002) ("the subjective intent of [a party] not to rescind is immaterial when that [party] has acted in a manner that demonstrates an objective manifestation of consent to the rescission intended by the [other party]."); *Minnesota Ltd., Inc. v. Pub. Utils. Comm'n of Hibbing*, 296 Minn. 316, 208 N.W.2d 284, 286 (1973) ("A repudiation of a contract by one party, acquiesced in by the other, is tantamount to a rescission."); *but see Pino v. Union Bankers Ins. Co.*, 627 So.2d 535, 538 (Fla. Dist. Ct. App. 1993) ("unilateral announcement of rescission accompanied by a tender of the premiums to the insured does not evolve into an accord and satisfaction when the hapless insured deposits the check").

[47] For example, some plaintiffs accepted incentives because, under the statute and regulations, they believed that rejection would lead to a "forced sale" of their property to a nonprofit entity. Others accepted loans from the FmHA because, due to the restrictions imposed under the program, that was the only available way to finance needed maintenance and improvements. Still others accepted incentives only after being informed by FmHA officials that they could not prepay under any circumstance and thus had no other alternative. None of these situations suggest that the owners who were unwilling to further contract with an agency that had twice repudiated their contracts and who perceived that the options offered to them were fraught with risk, acted unreasonably.

of substitute transaction);*United States v. City of Twin Falls*, 806 F.2d 862, 873-74 (9th Cir. 1986) (contract damages to non-breaching party are properly offset by gains after breach because contract damages seek only to "fairly compensate the injured party for his loss"). This result derives not from the rule of ***avoidable*** consequences, mind you, but rather of consequences ***avoided*** – as the Restatement observed, "[i]f [the injured party] arranges a substitute transaction that he would not have been expected to do under the rules on avoidability . . . , his damages are similarly limited by the loss so avoided." Restatement, § 347, cmt. e; *see also* 3 Dan B. Dobbs, Law of Remedies: Damages, Equity, Restitution (hereinafter "Dobbs") § 12.62(2) (2d ed. 1993). In the court's estimation, plaintiffs' damage model adequately accounts for the value of any offsetting cash flows actually received from the defendant, requiring no further adjustments by this court.[48]

**2. Expectation Damages – *Restitutio in Integrum*.**

Turning to plaintiffs' damages claim: "The general rule in common law breach of contract cases," the Federal Circuit has often stated, "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed," *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), in other words, to give them "the benefits [they] expected to receive had the breach not occurred." *Glendale*, 239 F.3d at 1380 (citing Restatement, § 344(1)(a)). The Federal Circuit has further elucidated – "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Id*. (citing Restatement, § 347); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002). To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that: "(1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Energy Capital*, 302 F.3d at 1325; *see also Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001); *Chain Belt Co. v. United States*, 115 F.Supp. 701, 714 (Ct. Cl. 1953).[49]

---

[48] For example, in the case of owners who elected the G-4 option, plaintiffs' model assumed that within six years there would be a total conversion of the respective complexes to market rents and thus does not seek damages after that point. Plaintiffs did not make a corresponding adjustment to their model for those individuals who received equity loans – but for good cause. In the court's view, no adjustment was required because these individuals, in exchange for receiving these low interest loans, agreed to restrict their rents for at least twenty more years.

[49] In some settings, the Federal Circuit has collapsed the foreseeability and proximate result prongs of this analysis. For example, in *Hughes*, *supra*, the court stated: "the damages must have been foreseeable at the time the parties entered the contract, which requires that they

Nonetheless, care must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery. As such, "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also* Restatement § 352, cmt. a ("[d]amages need not be calculable with mathematical accuracy and are often at best approximate"). "'It is enough,'" the Federal Circuit has taught, "'if the evidence adduced is sufficient to enable a court . . . to make a fair and reasonable approximation.'" *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (quoting *Specialty Assembling & Packing Co., Inc. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966)); *see also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1303 (Fed. Cir. 2002). Accordingly, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery . . . ." *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)); *see also Glendale Federal Bank, FSB v. United States*, at *9 (Fed. Cir. Aug. 9, 2004).

Defendant seeks to preclude plaintiffs from recovering the profits they arguably would have earned had they been allowed to prepay their mortgages in accordances with their original contract rights. It argues that plaintiff can neither prove that such damages were caused by the defendant's breach nor demonstrate, with sufficient certainty, the amount thereof. As will be seen, it is important to analyze, under the tripartite standard outlined above, each of defendant's claims separately, as they apply to the specific proof adduced with respect to each of the 41 complexes still 7in question. And while there are similarities in the circumstances that exist and existed at many of the complexes, there are also differences – differences that lead to the conclusion that while most of the plaintiffs here provided adequate proof of lost profits, some did not.

### (a) Proximate result – *Causa Proxima non Remota Spectatur.*

Plaintiffs must first show that defendant's breach produced damage "inevitably and naturally, not possibly or probably." *Ramsey v. United States*, 101 F.Supp. 353, 357 (Ct. Cl. 1951) (citing *Myerle v. United States*, 33 Ct. Cl. 1, 26-27 (1897)).[50] On this point, the Federal

---

'be the natural and proximate result of the breach.'" 271 F.3d at 1066 (quoting *Locke v. United States*, 283 F.2d 521, 526 (Ct. Cl. 1960)). Although this approach more closely tracks that adopted by certain leading commentators, *see* Corbin, § 1007, the court, nonetheless, will analyze the factors separately, recognizing the potential for some overlap.

[50] Although early cases in this circuit and the predecessor Court of Claims discussing this requirement refer to it as requiring that damages be the "proximate result" of the breach, there does not appear to be any appreciable difference between what is meant by "proximate result" and the more prosaic "proximate cause."

Circuit has advised that lost profits are a "just and proper item of damages to be recovered against the delinquent party upon a breach of the agreement . . . if the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." *Energy Capital*, 302 F.3d at 1328; *see California Fed. Bank*, 245 F.3d at 1242; *Wells Fargo v. United States*, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996). Sometimes distilled to require proof that the breach was a "substantial factor" in the loss of profits, this standard requires a showing that there was a "direct causal relationship" between the breach and such losses. *See Bluebonnet Sav. Bank*, 266 F.3d at 1356; *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 125 (2004); *Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 514-15 (2004) (citing numerous cases).[51]

The court finds that, in most instances, plaintiffs' lost profits were the direct result of defendant's failure to permit them to exercise their prepayment option, preventing them from converting their properties to commercial use. In particular, on the weight of the evidence offered, the court finds that, at the point damages began to accrue, most of the plaintiffs either had the ready means or a reasonable prospect of financially accomplishing prepayment and, in fact, would have prepaid their mortgages and converted their properties to commercial use, had they been allowed to do so without restriction. Documentary evidence of this includes letters from various banks offering or committing to provide alternative financing to the plaintiffs, as well as formal appraisals of the properties. Indeed, it appears that most plaintiffs were readily assured commercial financing because they either had substantial equity in their complexes to secure such a mortgage (frequently, in the hundreds of thousands and, sometimes, in the millions of dollars) or had appraisals that indicated that the value of their properties would surge if converted to commercial housing. Many of these documents were included in formal applications requesting prepayment that were sent to the FmHA. In other cases, plaintiffs either had prepaid other properties they owned or were consistently able to make sizeable extra payments of principal, accelerating the amortization of their loans. Testimony and evidence on this issue was essentially unrebutted and, as indicated in Fact Appendix A, at least one category of such evidence covered most of the properties at issue.

Most – but not all. For four of the complexes in question – Rolling Hills, Scenic Valley, Eastwood and Fox Ridge II – the record is essentially devoid of any indication that their owners had the capacity to prepay at any point prior to trial. As to these properties, there is neither a

---

[51] Some cases distinguish between "transaction causation" and "loss causation." Transaction causation is "but-for" causation – conduct by the breach party but for which the injured party would not have entered into the transaction. Loss causation incorporates the requirement that the injured party's losses be the proximate result of the breach. *See, e.g., First Nationwide Bank v. Gelt Funding Corp*. 27 F.3d 763, 770 (2d Cir. 1994). These cases make clear that "but-for" causation is not adequate to prove that a loss was proximately caused by a breach. *Id*; *see also Ambassador Hotel Co., Ltd. v. Wei-Chuan Invest.*, 189 F.3d 1017, 1027 (9th Cir. 1999); *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 762-763 (7th Cir. 1998), *cert. denied sub nom., Estock Corp v. Movitz*, 525 U.S. 1094 (1999).

commitment letter or correspondence from financial institutions indicating a willingness to provide commercial financing; appraisals or other documents indicating that the plaintiff's equity position in the complex was favorable; FmHA prepayment requests with the associated documentation; nor any other indication that the financial status of the complex or that of its owners was such as reasonably to assure prepayment. To be sure, in each of these instances, the owners testified that they had an intent to prepay. But, without some objective indication that these owners had the financial wherewithal, either based upon their personal wealth or the value of the security represented by their complex, to effectuate a prepayment, it cannot be said that these plaintiffs received diminished profits as the result of the repudiation of the prepayment clause. The fact that such evidence was provided as to the other complexes does not give this court license to take the fact-finding equivalent of a Kierkegaardian leap of faith and provide these plaintiffs with what might well be a windfall. Each of the cases here must stand on its own factual footing. Indeed, the evidence produced as to the prepayment capacity of the other complexes only serves to highlight the failure of proof as to the four properties in question.

For those plaintiffs who demonstrated the capacity to prepay,[52] there is every indication that the conversion of their complexes would have been profitable – the record demonstrates that each of their complexes is well-maintained and in desirable locations and that there was demand for renting them as commercial apartments.[53] In a number of instances the FmHA formally determined, as a precondition to offering incentives, that a particular complex could successfully be converted to conventional use.[54] In other instances, particular plaintiffs actually accomplished that conversion, albeit with the G-4 restrictions. Moreover, while the specific amount of profits remains to be determined below, the record supports the conclusion that the commercial rents potentially realizable from these properties exceeded the capped rents under the program to such

---

[52] For convenience, the court will hereinafter often refer to these plaintiffs as the "remaining plaintiffs" and to their complexes as the "remaining properties" or "remaining complexes."

[53] At the parties' request, the court toured a number of the affected complexes in the greater Des Moines area.

[54] In this regard, the FmHA's instructions provided that prior to offering incentives or pursuing a sale to a non-profit entity, the agency must "determine whether the project is feasible in the conventional market, and, if so, to what degree." RD Instruction 1965-E, Ex. E, Parts II.D.1 & III. Regarding this analysis, Mr. Anderson candidly admitted –

> When the appraisers are appraising for a sale to a non-profit, or when we are making incentive loans, they are looking at a market-rate property. The assumption is, the owner is going to sell that and operate it without restrictions in the rental market, and nine times out of ten, that's a higher value than as a restricted, subsidized property.

a degree that increased profitability was reasonably certain.[55] Lastly, the record amply shows that the limitations on prepayment imposed by the breaching provisions of ELIHPA and the HCDA were a "substantial factor" in causing each plaintiff to lose the additional profits that would have been otherwise produced.

To counter this evidence, defendant relies heavily upon its damages expert, Dr. Hamm, who testified that, for most of the complexes in question, prepayment was either disadvantageous or impossible. But, with one exception,[56] Dr. Hamm failed to provide a complex-by-complex rebuttal to the evidence presented by plaintiffs, even though the FmHA, under its regulations, presumably had evaluated the prepayment potential of every property that had formally requested prepayment. *See* 7 C.F.R. § 1965.211-12 (1997). Instead, he attempted to extrapolate from a 2002 GAO study which found that "[i]f the statutory requirement covering loans made before December 15, 1989, were changed to allow prepayment without restriction after 20 years from the date of the loan, we estimate that prepayment could be an option for the owners of 3,872, or about 24 percent, of the 16,366 section 515 properties." GAO, Multifamily Rural Housing, *supra*, at 8. While, in one breath, Dr. Hamm readily conceded that this study did not provide definitive evidence as to whether any particular property could prepay, he, in the next, wielded the study essentially for that purpose, asseverating, based thereupon, that many of the complexes in question could not or would not successfully prepay. A careful review of this report, however, reveals that, like Pelion and Ossa, it bears none of the weight that Dr. Hamm piled upon it.

First, as even Dr. Hamm realized, the report makes clear that within the 16,366 properties reviewed were 6,137 for which prepayment was statutorily barred because the loans were made after December 15, 1989 – excluding these, the GAO's percentage of properties likely to prepay immediately jumps to 37.8 percent (3,872 out of 10,171 properties). Next, in suggesting that the remainder of the pre-1989 loans would or could not prepay, the GAO (and, in turn, Dr. Hamm) relied on three indicia. *Id*. at 9-10. However, the first of these – that many section 515 properties are owned by nonprofit or public organizations whose basic mission is to provide affordable housing – applies to none of the complexes here. Indeed, had the GAO considered only privately owned properties, its prepayment percentage would undoubtedly been much higher. The second and third factors identified by the GAO – that prepayment is unlikely where there is a high dependence on FmHA housing assistance or local population declines in the 1990s – apply to many of the remaining complexes *sub judice*. But, again, unlike Dr. Hamm, the GAO made no pretense that the mere presence of these indicia would foreclose an owner from prepaying; their presence, in the GAO's view, merely made that event less likely. Given this, it made no sense for Dr. Hamm to rely upon these indicators to project the likelihood of prepayment in the face of

---

[55] In reaching this finding, the court relies upon its findings in other parts of the opinion including, in particular, part II.B.2.ii, *infra*, and Fact Appendix B.

[56] Ironically, the only complex for which defendant provided a detailed rebuttal of the evidence that a property was suitable for repayment is Dublin Plaza. That case, however, is being dismissed today due to a violation of the statute of limitations.

specific evidence that the particular properties involved could and would prepay.[57] *See generally*, *Hart v. Sec'y of Dept. of Health & Human Serv.*, 60 Fed. Cl. 598 (2004) (rejecting the inappropriate use of probabilistic statistics). Indeed, Dr. Hamm uncritically assumed that the indicia identified by the GAO were valid, even though he knew that the same agency had, years before, predicted, with equal sureness, that absent the passage of what became ELIHPA, up to ***70 percent*** of section 515 borrowers would prepay.[58] To say the least, the court believes that Dr. Hamm's testimony on this point proves too much.

Nor is it sufficient to argue, as defendant repeatedly does with rhetorical ferocity, that plaintiffs' losses were caused not by defendant's breach, but rather by "the choices that plaintiffs made among the alternatives presented to them by the Government." In this regard, defendant further asserts that "[t]he evidence does not establish that plaintiffs could not have chosen differently, that they cannot still choose differently, or that they will not in fact choose differently in the future, thus avoiding much if not all of the losses estimated by plaintiffs' experts." These claims, however, are nothing more than a rewarmed hash of the mitigation theories rejected above, reasserted here, under the causation heading, in a transparent attempt to sidestep the limitations that led to the demise of defendant's mitigation defense. Having failed to prove that plaintiffs acted unreasonably in failing to elect one of the substitute transactions offered by ELIHPA, defendant now, in the guise of enforcing the causation requirement, would have plaintiffs prove a series of negatives – that they could not have lessened their losses by choosing any of the options offered by Congress. The decisional law, however, demonstrates that, as between the concepts of causation and mitigation, these contentions sound only under the latter doctrine, the contours of which have been carefully charted by the courts to avoid placing exactly the sort of burdens on injured parties that defendant would assign here. *See, e.g.*, *In re Kellett Aircraft Corp,* 186 F.3d at 199.

While "in the workaday world, the conceptual distinctions between damage, 'duty' to minimize, mitigation, and proximate cause are frequently blurred," R.F. Martin, "Burden of Proving Value of Relief from Performing Contract in Suit Based on Defendant's Breach Preventing or Excusing Full Performance," 17 A.L.R. 2d 968, § 2(a), the fact is these concepts have distinct purposes and definitions. In order to prove that losses were "proximately caused" by defendant's breach, plaintiffs need not show that they might have avoided or minimized such

---

[57] Indeed, the owners of a number of the properties that, under the GAO factors, were unlikely to prepay have, in fact, prepaid under the G-4 restriction option.

[58] *See, e.g.*, GAO, "Rural Rental Housing: Cost Information on FmHA's Section 515 Program and Other Housing Options" 86 (Aug. 1987) (noting a Congressional Budget Office estimate that approximately 70 percent of the section 515 loans issued in 1983 would prepay after twenty years); GAO, "Rental Housing: Potential Reduction in the Privately Owned and Federal Assisted Inventory 27 (June 1986) (estimating potential reduction in FmHA portfolio); see also GAO, "Rural Rental Housing: Impact of Section 515 Prepayments on Tenants and Housing Availability" 30-35 (Feb.1988) (noting that proximity to cities of 50,000 persons or more was indicative of likelihood to prepay).

losses or that defendant's conduct was the "sole" cause of their damages. *See Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004); *Westfed Holdings*, 55 Fed. Cl. at 553.[59] Rather, they must only show that the breach was a "substantial factor" and that the damages flowed "inevitably and naturally" therefrom. *Bluebonnet*, 266 F.3d at 1356; *Long Island*, 60 Fed. Cl. at 90; *Ramsey*, 101 F. Supp. at 357. Thus, plaintiffs need not show that each dollar claimed was entirely unaffected by outside events. *Citizens,* 59 Fed. Cl. at 514-15. By comparison, where instead the question presented involves an injured party's failure to act to lessen damages, the issue does not involve proximate causation, but rather mitigation. *See Deere & Co. v. Reinhold*, 2000 WL 486607 at *8 (E.D. Pa. Apr. 24, 2000). As one leading commentator has summarized, "[a]lthough the injured party's own failure to avoid a loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation, but of a limitation under a 'mitigation' rule." III. E Allen Farnsworth, Farnsworth on Contracts (Farnsworth) § 12.1 at p.149 (2d ed. 1998); *see also id.* at § 12.12 at p. 228.

Were these distinctions untrue, "the doctrine of mitigation of damages would lose much of its significance," *Willems Indus. Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961). Indeed, in every case, a breaching party could simply recast its mitigation defense in causation terms and thereby avoid the hurdles imposed by the established case law. Under this scenario, such a party would never be called upon affirmatively to plead, let alone prove, mitigation, and instead would benefit from a pervasive causation defense not subject, like mitigation, to the bounds of reasoned decisionmaking. A breaching party simply could spin out a tangled web of damage-reducing hypothetical events in hopes that the injured party would become ensnared in failing to disprove at least one of them. Perhaps not surprisingly, defendant has not directed this court to a single case that supports the creation of such a serious incongruity between mitigation and causation principles. The few federal cases that have addressed this issue do not do so,[60] and state cases rejecting this approach are legion. *See, e.g., AAS-DMP Mgmt., L.P. Liquidating Trust*

---

[59] *See also Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 232 (4th Cir. 2004) ("establishing loss sufficient to prove liability . . . does not require a plaintiff to prove that defendant's [conduct] was the sole cause of plaintiff's loss"); *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 154 (2d Cir. 1999) ("it is unnecessary . . . to demonstrate that a defendant's breach is the sole cause of an injury to recover for the entire injury).

[60] An example is *Long Island Savings Bank*, *supra*, where this court held that the government could not raise actions taken by the bank subsequent to the passage of FIRREA to demonstrate that the statute did not proximately cause the bank to lose profits. The court noted that "[t]he government's position . . . might affect the amount of lost profits that are recoverable, but it does not constitute a full defense." 60 Fed. Cl. at 93. The court thereby declined to consider these arguments in the context of causation, holding instead that the "burden is on the government to show that the bank's actual efforts at mitigation were unreasonable." *Id.* at 93; *see also FDIC v. Mijalis*, 15 F.3d 1314, 1327-28 (5th Cir. 1994) (defendants barred from arguing mitigation could not alternatively argue that FDIC's decisions following takeover of their bank "proximately caused" the damages in question).

*v. Acordia NW, Inc.*, 63 P.3d 860, 865 (Wash. App. 2002); *City of Seattle v. Blume*, 947 P. 2d 223, 260 (Wash. 1997); *Moura v. Pullieri*, 669 A.2d 1243, 1245-46 (Conn. App. 1996); *Wiese-GMC, Inc. v. Wells*, 626 N.E. 2d 595, 599 (Ind. App. 1993); *Erie v. Five Point Motors*, 57 Cal. Rptr. 516, 522 (Cal. App. 1967) ("We conceive a substantial difference between what a plaintiff has actually done and what he could have done with the exercise of reasonable diligence and effort."). This court finds these cases persuasive and thus finds unpersuasive defendant's attempts to addle the concepts of mitigation and causation.

In sum, the court finds that plaintiffs' lost profits were not, as defendant argues, "remote and consequential," *Wells Fargo*, 88 F.3d at 1021. Those profits do not derive from what the courts have defined as "independent and collateral undertakings," but rather would have "accrued and grown" from the timely termination of those agreements, "as the direct and immediate results of [their] fulfillment." *Energy Capital*, 302 F.3d at 1328; *see also Cal Fed*, 245 F.3d at 1349. As such, plaintiffs have met the "proximate result" requirement for proving lost profits.

**(b) Forseeability – *Providentia*.**

As to the second requirement, forseeability, the Restatement (Second) of Contracts provides that a "[l]oss may be forseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Restatement § 351(2); *see also Bluebonnet*, 266 F.3d at 1355; *Chain Belt Co.*, 115 at 714; *Home Sav. of America*, 57 Fed. Cl. at 726. Expounding on this standard, one leading commentator has stated that, in order to be foreseeable, "the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach." 5 Corbin, § 1012 at 88; *see also* Restatement, § 351, cmt. a ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.").[61] In this regard, the remaining plaintiffs need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable. *See Landmark Land Co., Inc. v. United States*, 256 F.3d

---

[61] The fountainhead for the rule that lost profits deriving from a breach of contract must be foreseeable is the historic case of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854); *see* 1 Robert L. Dunn, Recovery of Damages for Lost Profits (hereinafter "Dunn") § 1.8 (5th ed. 1998). While this rule, as enunciated by Justice Holmes in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543 (1903), originally considered whether there was a "tacit agreement" between parties regarding the likelihood of receiving damages in the form of lost profits, the modern permutation thereof, exhibited in innumerable cases, is now decidedly objective in scope and employs a reasonable person standard. *See* Restatement, § 351, cmt. a. Under this standard, "the party who breaches a contract can only be held responsible for such consequences as may be reasonably supposed to be within the contemplation of the parties at the time the contract was made." *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 (Fed. Cir. 1986); *see also Am. Capital Corp. v. United States*, 59 Fed. Cl. 563, 576 (2004).

1365, 1378 (Fed. Cir. 2001); *see generally N. Helex Co. v. United States*, 524 F.2d 707, 714 (Ct. Cl. 1975).

Here, it was reasonably foreseeable, at the time the program agreements were executed, that plaintiffs would stand to lose profits if they were unable to invoke unqualifiedly their prepayment rights. Virtually all of the evidence presented at trial confirms that the government should have known – and, in fact, knew – about the profit expectations that led plaintiffs to agree to the housing contracts. The testimony of numerous witnesses (most notably, Mr. Greenwalt, former chief of the FmHA's Multifamily Housing Services Branch) confirms that FmHA officials worked diligently to plant those expectations in the minds of potential program participants by repeatedly touting the ability of borrowers to convert their properties to commercial use. As discussed above, they encouraged such conversions because they served to recycle the program's limited funds into new properties for which commercial financing was unavailable. In addition, for many complexes, FmHA officials knew, at the time the loans were executed, that various features in the building designs that they approved, such as air conditioning, courtyards and masonry, were being incorporated with an eye towards maximizing the future commercial profitability of the property. Consequently, it was reasonably foreseeable that entrants into the program would, as plaintiffs clearly did, adopt the profit motivation urged by the agency and that the ability to obtain such profits, therefore, would become "an essential part of the *quid pro quo"* of the contracts. *Winstar*, 518 U.S. at 921 (Scalia, J., concurring).[62]

Further confirmation of this may be found in the legislative history of ELIHPA. For example, in 1986, an FmHA official noted that for many properties it had become "profitable to prepay the loan after, say 5 years, and sell or convert the housing for occupancy by the general public instead of maintaining it as low-income apartments." 1986 Hearings, *supra*, at 17 (statement of Eric P. Thor, Assoc. Administrator, FmHA). These sentiments were echoed in 1987, when the then administrator of the FmHA testified before a House subcommittee that – "[v]arious factors, as I am sure you are aware, including tax incentives and extension of loan eligibility to limited profit entities, made it profitable to prepay the loan after a few years and

---

[62] Indeed, when former FmHA official Greenwalt was asked whether prospective borrowers expressed concerns regarding prepayment, he answered:

> They were concerned because they wanted to know that they could get out. Most of the properties were being developed by limited partnerships. General partners were generally much senior to me, and their concern was always what's going to happen to our property? Do we have to keep it in the program? In 50 years, we probably won't be here. Their intention was always okay, we can take it out of the program. There isn't a penalty. There isn't any additional requirements. We explained no, there wasn't.

In sum, Mr. Greenwalt confirmed that the prepayment clause was a "very important term" of the contract.

then sell or convert the property to general occupancy with no low income tenants." 1987 Hearings, *supra*, at 364 (statement of Vance Clark); *see also* H.R. Rep. 122(I) at 54 (noting that "profit-taking motives" were causing owners of FmHA housing to prepay and that such commercial use was resulting in rent increases of "more than 60 percent"). To be sure, these statements were made after the loans in question were executed. But, taken together with hawking representations made by FmHA officials in marketing the program to potential borrowers, they reinforce the notion that a reasonable person would have foreseen, at the time the agreements were entered, that the effect of abrogating the prepayment clause would be to deny plaintiffs profits from the conversion of their properties.

In short, the record as a whole amply demonstrates that, at the time the loans in question were executed, FmHA officials clearly foresaw that the borrowers intended to use the prepayment clause to convert their properties to commercial use and thus defendant must be deemed reasonably to have foreseen that the subsequent imposition of significant limitations on the prepayment rights would cause borrowers to lose the profits associated with that conversion. Accordingly, the lost profits in question were, in the ordinary course of events, forseeable as a probable result of the breach in question.

**(c) Reasonable certainty – *Certum Probabiliter Scire*.**

Finally, the fact that plaintiffs would have made additional profits, absent the breach, must be "definitely established, and [there must be a] basis on which a reasonable estimate of the amount of the profit can be made." *California Fed. Bank, FSB*, 245 F.3d at 1349 (quoting *Neely*, 285 F.2d at 443). Under this standard, absolute certainty is not required because "'the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.'" *Energy Capital*, 302 F.3d at 1327 (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996) (quoting *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 330 (Ala. 1987)).[63] Although, a court will not permit a plaintiff to recover damages under this standard based on "'mere speculation or guess,'" *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (quoting *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988)), the plaintiff need only provide some reasonable basis upon which to estimate damages. *See Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. 2003); *see also Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 561 (1941) ("Certainty as to the amount [of damages] goes no further than to require a basis for a reasoned conclusion.").[64] As to this analysis, the Federal Circuit has made

---

[63] *See generally*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (where harm committed "is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts").

[64] In other cases involving lost profits, the courts have clarified that there is a "distinction between proof of the fact of damages, which must be established with at least reasonable

clear that the court "'may act on probable and inferential as well as direct and positive proof.'" *Energy Capital*, 302 F.3d at 1329 (quoting *Locke*, 283 F.2d at 524); *see also id.* (court may rely on "reasonable inferences").

"Fixing lost profits damages with reasonable certainty requires careful examination of the nature and reliability of the statistical proof." *Travellers Intern., A.G. v. Trans World Airlines*, 41 F.3d 1570, 1579 (2d Cir. 1994). In the case *sub judice*, plaintiff's statistical evidence essentially was designed to show that, unfettered by the restrictions of the rural housing program, each of the complexes would have generated greater profits. As stated in his report, plaintiff's damages expert, Dr. George Karvel, selected the relevant time period for conducting this analysis as "the period beginning on the date that each plaintiff intended to prepay its mortgage (at which time it would have begun charging market rents) and ending on the date that each plaintiffs' mortgage will mature (at which time each plaintiff will actually be able to begin charging market rents)." By way of further explaining his discounted cash flow method, Dr. Karvel's report stated:

> This approach projects the income and expenses for each property as a market-rent property in order to calculate the cash flow of the property over the . . . period. The market rent cash flow is then compared to the allowable return as restricted rent property. The resulting difference represents the cash flow lost by each plaintiff as a result of being unable to prepay his or her mortgage as of the intended prepayment date, and instead being able to charge market rents only when his or her mortgage reaches maturity.

Toward these ends, Dr. Karvel's report contains two sets of yearly balance sheets and income statements for each property – one projecting the profitability of the complexes under the program, the other projecting that profitability assuming the complexes had been converted to commercial use.

It is beyond peradventure that the discounted cash flow method employed by Dr. Karvel is typically used by economists, appraisers and damage experts and, if properly executed with the appropriate factual predicates, would establish the lost profits owed the remaining plaintiffs with the certainty required by the law. Defendant freely admits as much and numerous cases so hold. *See Palmer,* 311 U.S. at 557-58; *Energy Capital*, 302 F.3d at 1328-34; *Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000); *see also Sure-Trip, Inc. v. Westinghouse Eng. & Instr. Serv. Div.*, 47 F.3d 526, 531 (2d Cir. 1995)*; Blackmun v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1163 (D.C. Cir. 1986); *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 76 (1997),

---

certainty, and the amount of damages, which may be estimated, provided it is not merely speculative." *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) (involving Lanham Act violation); *see also Samaritan Inns*, 114 F.3d at 1235; *Chain Belt*, 115 F. Supp. at 714; *Neely*, 285 F.2d at 443; Dunn, §1.6 (citing numerous cases). In the court's view, these cases are consistent with the views expressed by the Federal Circuit in *California Fed Bank*, *supra*.

*rev'd on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998). Fundamentally, Dr. Karvel's discounted cash flow methodology depends, for its accuracy, on four features: the endpoints of the relevant time period for calculating the damages, the revenue that would be generated by the given facility during that period, the corresponding costs associated with generating that revenue, and a factor for discounting the stream of income that would be produced. In addressing these features *seriatim*, defendant raises a bevy of objections regarding the accuracy of the assumptions upon which Dr. Karvel relied and the numbers which he produced. The court will address these objections, in turn.

**(i) The calculation period.**

As to the first of the aforementioned factors – the endpoints of the relevant time period – defendant objects to the assumptions employed by Dr. Karvel in setting the initiation and termination of the damages period.

As a general rule, "[t]he time when performance should have taken place is the time as of which damages are measured." *Reynolds v. United States*, 158 F. Supp. 719, 725 (Ct. Cl. 1958). In a breach of contract action, that date ordinarily corresponds to the time of the breach. *See Energy Capital*, 302 F.2d at 1330; *Estate of Berg v. United States*, 687 F.2d 377, 380 (Ct. Cl. 1982). Whether this rule holds true in the case of a repudiation apparently is an issue of first impression in this circuit. Drawing analogies to U.C.C. § 2-713, which indicates that time for measuring damages for a breach is when the injured party "learns of the breach," some cases hold that the measure of damages for a repudiation should be at the time the injured party learns of the repudiation. *See, e.g., First Nat. Bank of Chicago v. Jefferson Mortg. Co.*, 576 F.2d 479, 490 (3rd Cir. 1978); *Ralston Purina Co. v McFarland*, 550 F.2d 967, 971 (4th Cir. 1977). However, the prevailing rule – and the one that makes most sense to this court – instead measures damages in the case of a repudiation by focusing on when performance was due.[65] In the court's view, damages for a party suffering a repudiation should not be fixed any earlier than when that party decides to elect a remedy, which is essentially what happens when, rather than waiting for a repudiation to be cured, it either demands performance or files suit.

For the alpha point for the pre-1979 complexes, Dr. Karvel assumed that the breach occurred not upon the earlier of a specific request for prepayment or the filing of this lawsuit, but rather on the date that a given plaintiff would have exercised its termination were it not for the repudiation. There are at least two problems with this theory. First, the case law does not support the notion that, in the case of a repudiation, one can establish a breach based upon an

---

[65] *See Cosden Oil & Chem. Co. v. Karl O. Helm Aktiengesellsschaft*, 736 F.2d 1064, 1072-73 (5th Cir. 1984); *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 156 n.51 (6th Cir. 1983); *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1226-27 (10th Cir. 1977); Dobbs § 12.16(5) at 383 (the "time performance was due seems to be the best date for figuring market damages in anticipatory repudiation cases"); 1 James J. White & Robert S. Summers, Uniform Commercial Code § 6-7 (4th ed. 1995).

unexpressed intent to request performance. Besides demanding performance or filing suit, the only other circumstance that can be deemed to trigger a breach is a "material change of position taken in reliance on the repudiation." Restatement (First) of Contracts § 318, cmt. d (1932); *see also Income Props./Equity Trust v. Wal-Mart Stores, Inc.*, 33 F.3d 987, 990 n.3 (8th Cir. 1994); *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 604 (6th Cir. 1988). Indeed, strictly speaking, the filing of a complaint causes a breach to arise because it is viewed as effectuating such a material change of position. *See Canderm Pharmacal Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 604 (6th Cir. 1988); *Commonwealth Edison Co. v. Decker Coal Co.*, 612 F. Supp. 978, 982 (N.D. Ill. 1985). Here, however, there is no evidence that, in advance of filing suit, any of the owners who failed to demand performance otherwise materially changed their positions in reliance on the repudiation.

Second, plaintiffs' assertion that, as to owners who did not request prepayment, the breach occurred earlier than the filing of suit conflicts with what it argued before the Supreme Court in asserting that the statute of limitations in these cases had not run. On brief before that Court, plaintiffs plainly argued that their claims arose no earlier than when formal prepayment requests were made. Thus, for example, they contended that "given the fact that ELIHPA continued to compel the agency to . . . [accept prepayments] in certain circumstances, it was certainly reasonable for petitioners to defer suit until they decided to exercise their termination option, submitted a request to the agency, and obtained a decision." *Franconia Assocs. v. United States*, No. 01-455, Brief for Petitioners, 2002 WL 315418 at *27 (Feb. 19, 2002). They further asserted that "[u]nder the doctrine of anticipatory repudiation, petitioners' contract claims did not accrue upon the enactment of the legislation by Congress, but rather when the agency, applying the new restrictions set forth in the statute, breached its contractual obligation by refusing to accept petitioners' prepayment requests." *Id.* at *18. The Supreme Court unmistakably credited these assertions in holding that plaintiffs' suit was not time barred under 28 U.S.C. § 2501, for if a breach could arise earlier than an actual request for performance, the Court would have been unable to determine whether plaintiffs' suit was timely filed. As such, were plaintiffs' position on this issue not erroneous as a matter of law, this court would be compelled to reject their position, nonetheless, under the doctrine of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.") (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

Based on the foregoing analysis, as well as the findings incorporated in Fact Appendix A regarding the specific dates of various prepayment requests, the court finds that, for plaintiffs who owned the pre-1979 complexes and did not file prepayment requests prior to the filing of the instant suit, the alpha date that should have been employed by Dr. Karvel in his calculations is the date this suit was commenced. For plaintiffs who owned the pre-1979 complexes and actually made prepayment requests prior to the initiation of this lawsuit, the alpha point should be the date of the request, rather than the date of any earlier-formed intent to prepay. As such,

the court finds that the beginning points of the discounted cash flow analyses should be adjusted for the listed properties as follows:

| Property | Plaintiff's Breach Date | Actual Breach Date |
|---|---|---|
| R.C. Getty<br>R.C. Mo<br>R.C. Pierre<br>R.C. Springs | July 1992 | May 1997 |
| Pine Needle | June 1992 | December 1993 |
| Riverfront | June 1992 | August 1994 |
| Sunrise River | June 1992 | August 1994 |
| Evergreen Manor of Waukee I & II<br>Prairie Village of Grimes I & II | May 1993 | May 1997 |
| Greenway of Altoona I<br>Greenway of Newton I<br>Prairie Village of Altoona I & II<br>Prairie Village of Huxley I & II<br>Prairie Village LaPorte City I<br>Prairie Village of Slater I & II<br>Prairie Village of State Center | May 1993 | May 1997 |
| Pine Tree Lane | December 1995 | May 1997 |
| Casa Grande I<br>Casa Grande II<br>Rancho Verde | June 1993 | May 1997 |

For the post-1979 complexes, Dr. Karvel set the alpha point for his calculations in the month that the restrictive use clause for the given property expired. These dates are unaffected by the foregoing analysis and, in the court's view, are supported by the record.

It remains to determine when the discounted cash flow analyses should terminate – the omega points. As reflected in Dr. Karvel's calculations, plaintiffs claim that this omega point generally should be the date their respective mortgages are satisfied, after which there will be no

restrictions on the commercial use of their complexes.[66] Not so, defendant retorts, again contending that this analysis ignores the possibility that an individual plaintiff might sooner avail itself of one of the options offered by ELIHPA, opting to receive an incentive in exchange for extending the housing agreement; selling their property to a non-profit entity, prepaying with restrictions or, perhaps, even being allowed to prepay without restrictions. But, like limp doggerel, defendant's position on the ELIHPA options is no more legally sonorous on this, its third recapitulation.

In addressing defendant's mitigation and causation claims, the court already has found that each of the options cited by defendant has major drawbacks and is unlikely to be invoked by any of the plaintiffs. Truncating the damages calculations based on the assumption that one of these alternatives, nonetheless, will be elected in the future would be tantamount to adopting, via a bank shot, defendant's mitigation arguments. The record does not support this result – indeed, some of the options offered under ELIHPA are so unlikely to be pursued as to make it no less likely that Congress might react to a decision by this court and statutorily prohibit any of the plaintiffs from taking advantage of the ELIHPA options in the future.

Beyond the weaknesses in defendant's recast mitigation arguments, which do not disappear upon repetition, there are two other reasons why this court declines to view the options offered under ELIHPA as precluding plaintiffs from relying on a discounted cash flow method. First, cases adopting the discounted cash flow method of calculating lost profits generally ignore events subsequent to the breach. As noted by one leading commentator, "[o]ne effect of a market damages measurements . . . is to ignore later events, whether they are favorable to the plaintiff or unfavorable." Dobbs, § 3.8(2) at p. 379; *see also id*. at §3.3(3); *LaSalle*, 317 F.3d at 1373 (a "'claim accrue[s] at once in the theory of the law and it does not inquire into later events'" (quoting *Southern Pacific Co. v. Darnell Taenzer Lumber Co.,* 245 U.S. 531, 533-34 (1918)).[67]

---

[66] As discussed above, plaintiffs claim a shorter damages period for properties that converted to commercial use under the G-4 option.

[67] This rule particularly holds true where the event that occurs is unrelated to the wrong causing the injury, and thus applies, for example, to certain post-trial events involving Franconia Associates that were the subject of a motion to supplement the record filed by defendant. *See LaSalle*, 317 F.3d at 1373 ("The general rule is . . . that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong"). This is not to say that *ex ante* observations are unhelpful in validating assumptions in projecting income. As the Supreme Court indicated in *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933), "[e]xperience is . . . available to correct uncertain prophecy," and is thus a "book of wisdom that courts may not neglect." Indeed, at various points in this opinion, this court has relied upon subsequent events to validate assumptions employed in calculating cash flows here. Defendant, however, would have this court modify the stream of those flows based upon events that have not occurred and, in the court's estimation, are unlikely to occur. Neither *Sinclair* nor its progeny require this.

Accordingly, if, in the context of mitigation, it is unreasonable to assume that these options would be invoked, they simply fall out of the damages equation – a contrary ruling, indeed, would mean that proof in this case would never close. Second, this result is in accord with "[t]he principle . . . that the plaintiff should not be made to pay for unwanted benefits, directly or by a reduction in a recovery otherwise due." Dobbs, § 3.8(2) at p. 378.[68] While this "officious intermeddler" principle is applied most often to prevent a tortfeasor from forcing a benefit on an injured party, *see* Restatement (Second) of Torts § 920, cmt. f (1979), logic suggests that it also should hold true in breach of contract actions, where, as in torts, the goal of damages is to make the injured party whole. And, it certainly should apply to the unfunded and dysfunctional options that were foisted upon plaintiffs here.

Accordingly, the court holds that the termination point employed by Dr. Karvel in his discounted cash flow analyses are supported by the record and should be employed, as is.

**(ii) Projected revenue.**

Regarding the second critical prong of Dr. Karvel's cash flow method – the projected revenue of the complexes under the alternative scenarios – it is noteworthy, at the outset, that while most of the complexes did not have a record of operating as a commercial property, they were not new or fledgling businesses and thus had a record of past performance from which comfortably to predict income. *Cf. Merlite Indus., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir. 1993) ("An established business often is in a good position to offer evidence of past experience as a reasonable basis from which [to] determine lost profits with the requisite degree of certainty."). In this regard, this case is no different than others holding that the ability to recover lost profits based on the extension of an existing business is not barred by a *per se* rule of disallowance, but rather hinges on the quality of the evidence presented. *See Energy Capital*, 302 F.3d at 1326-27; *see also Ind. Bus. Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 703 (8th Cir. 1997) ("While the general rule requiring proof of expected profits with reasonable certainty places a greater burden upon a newly established business, it does not mean a new business can never recover lost profits."); *Mid-Am. Tablewares, Inc.*, 100 F.3d at 1366 ("[T]he weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a

---

[68] Professor Dobbs gives the following examples of this rule:

> If the plaintiff wants her land maintained as a swampy nature preserve, the fact that it is worth more after the defendant tortiously drains it seems to be of no consequence, and the defendant should have no credit. If the plaintiff was fraudulently led to go on a cruise because of a representation that bathrooms were accessible for handicapped persons, her damages are not to be reduced by the value of an unwanted 'benefit' in the form of assistance from stewards in reaching the bathroom.

*Id*. (citing cases).

business as 'unestablished,' 'existing,' or 'new' particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits.") (quoting *Super Value Stores, Inc. v. Patterson*, 506 So. 2d 317, 327-30 (Ala. 1987)); *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 993-94 (2d Cir. 1991).[69] As will be discussed, the evidence persuades the court that the remaining plaintiffs have established, with reasonable certainty, the projected revenue stream associated with the hypothetical conversion of their complexes to commercial use, albeit with some adjustments.

Recall that Dr. Karvel's basic methodology was to compare the discounted cash flows that plaintiffs would earn under the program (the restricted model) with the discounted cash flows that they would have earned had they been allowed to prepay their mortgages and convert their properties to market-rate operations (the unrestricted model). Determining the revenue for the restricted model is relatively straightforward because it is based largely on a given plaintiff's current operations. To ascertain the revenue in the unrestricted model, however, Dr. Karvel had to determine the hypothetical rent that would have been realized from the conversion and commercial operation of the complexes. *See Cienega*, 38 Fed. Cl. at 76 ("In order to arrive at a reliable figure for damages from an income analysis, one must examine market rent figures, which directly affect gross income."). For those complexes that actually converted to commercial use under the G-4 option, Dr. Karvel used the actual rents realized. For the other complexes, Dr. Karvel used what the FmHA refers to as a "note-rate rent," a defined concept that the agency employs in administering various aspects of the section 515 programs.[70] Consistent

---

[69] In its post-trial briefs, defendant argues – albeit in a minor key – for a similar *per se* disallowance rule. The modern weight of authority, however, rejects the notion that lost profits for even a new business are not recoverable as a matter of law. In this regard the Restatement, § 352, comment b provides:

> However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, cost or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.

*See also* U.C.C. § 2-708, cmt. 2. Citing the Federal Circuit's opinion in *Energy Capital*, *supra*, a leading commentator has likewise observed that "[t]he development of the law has been to find damages for lost profits of an unestablished business recoverable when they can be adequately proved with reasonable certainty," observing further that "[w]hat was once a rule of law has been converted into a rule of evidence." Dunn § 4.3, at 345-46; *see also* Todd R. Smyth, Annotation, "Recovery of Anticipated Lost Profits of New Business: Post-1965 Cases, 55 A.L.R. 4th 507 (1987) (citing additional cases).

[70] Prior to a 1993 amendment of its regulations, the FmHA referred to note-rate rents as "market rents." *See* Final Rule, 58 Fed. Reg. 40862 (Jul. 30, 1993) (*codified at* 7 C.F.R. pts.

with the methodology employed by the FmHA, *see, e.g.*, 68 Fed. Reg. 32872, 32893 (June 2, 2003), Dr. Karvel set the note-rate rent for a given complex at a level designed to yield sufficient revenues to cover debt service payments, operating expenses and an eight percent return on the owner's initial equity investment in the property. In calculating revenue flows for particular years, Dr. Karvel then adjusted that rent for inflation.

Defendant correctly observes that there is no assurance that a given property owner could, in setting rents, cover its expenses, including debt service, and still receive a positive return on its investment – quite obviously, not every building in the country is profitable. However, the note-rate rents were used by the FmHA in analyzing the feasibility of allowing particular complexes to convert to commercial use. While, based on their use by the FmHA, Dr. Karvel suggested that the note-rate rents independently track the market rents for the areas in question, he compared those rents to what he believed were other surrogates for market rents, including: (i) the rents derived from comparable properties analyzed by plaintiffs' appraiser, Mr. Gorowsky;[71] (ii) the

1930, 1944, 1951 & 1965).

[71] At trial, Mr. Gorowsky described his approach to obtaining rent information from comparable properties as follows:

> First we called the property itself, the subject property. . . . We talked to the property manager, and we asked her what are the other properties that are close in proximity to her that are market based that she was aware of and that their property . . . competed with. . . .
>
> In addition to that, we did our own search on the [I]nternet or the Yellow Pages for apartment properties, and we identified some of those same properties and some additional ones. Then we started making phone calls to those properties and inquiring. First we would ask are they market based or are they subsidized properties. If they were subsidized properties we wouldn't go any further because we were looking for market comparables. Once we found out that they were market based then we'd ask questions about the type of units, how many bedrooms, the different number, how many units were there, what were the amenities, what was included, utilities, heat, other amenities such as garages, washer-dryer hookups, air conditioning, heat included or not included, so that we could understand the proximity of those properties, the amenities and the number of units to get a good sense of comparability.

In conducting these surveys, Mr. Gorowsky used the market areas employed by HUD in setting its fair market rents and also considered when the comparable properties were built or renovated, whether they had vacancies, the types of tenants (*e.g.*, elderly or family), the overall size of the complex and data from various industry surveys. Defendant objected to the fact that Mr. Gorowsky did not visit each of the properties he used as comparables, but it is notable that, in

actual market rents that have been achieved at the Iowa properties that have prepaid subject to G-4 restrictions; (iii) data indicating what FmHA found were market rents for two of the properties at issue, Sunrise River and Fall River I; and (iv) the "fair market rents" issued for the relevant areas by HUD. A list of these figures, broken out for the various apartment configurations (*e.g.*, one bedroom, two bedroom), is contained in Fact Appendix B.

In the court's view, the four surrogates identified by Dr. Karvel are critical because, like vectors yielding a cross-product on a graph, they, in combination, provide a stronger indication of market rents than any one of them supplies alone. As to the first of these surrogates, Dr. Hamm soundly criticized Mr. Gorowsky's selection of comparable properties, suggesting that the comparables he selected were of greater quality than the complexes *sub judice*. But, Dr. Hamm is neither a certified appraiser nor particularly experienced in real estate valuation. Moreover, except for focusing on the distances between the comparables and the subject properties, he provided little, by way of specifics, to explain why the comparables selected by Mr. Gorowsky were inappropriate. Because of the gaps in his experience, the court finds Dr. Hamm's largely conclusory testimony regarding plaintiffs' appraisals inadequate to overcome the probative value that the court attaches to Mr. Gorowsky's findings.[72] Much the same can be said of the next two surrogates for fair market rents offered by plaintiffs – the actual market rents that have been achieved at the Iowa properties and the studies done of Sunrise River and Fall River I. In the court's view, these indicators, which defendant largely left unchallenged, serve both to establish

setting its fair market rents, HUD also regularly employs phone surveys, suggesting that the methodology employed by Mr. Gorowsky is not unusual.

[72] For example, while Dr. Hamm criticized Mr. Gorowsky's determination as to which properties were in the same or comparable markets as the subject properties, there is no indication that his criticisms are anything that an appraiser would find significant or material. Further, while Dr. Hamm argued that Mr. Gorowsky's failure to adjust the comparable rents to reflect differences between the comparables and the subject property rendered his analysis "haphazard," he seemingly ignored the fact that the purpose of Mr. Gorowsky's calculations was only to verify the reasonableness of the note-rent rate employed by Dr. Karvel in his calculations. In performing this task, Mr. Gorowsky chose from among a number of properties those he believed represented the best comparables to the subject properties.

It is worth noting, at this point, that whole passages of Dr. Hamm's expert report read more like an advocate's brief than an expert's report, leading the court to discount many of the assertions made therein. *See also Westfed Holdings, Inc.*, 55 Fed. Cl. at 575 (also affording Dr. Hamm's testimony "little weight"); *S. Cal. Fed. Sav. & Loan v. United States*, 57 Fed. Cl. 598, 630 (2003) (rejecting Dr. Hamm's testimony because it did not specifically address plaintiff's proof); *see generally Exxon v. United States*, 45 Fed. Cl. 581, 613 (1999), *aff'd, in part, rev'd in part, on other grounds*, *sub nom., Exxon Mobil Corp. v. United States*, 244 F.3d 1341 (Fed. Cir. 2001) ("Such bland and conclusory opinion testimony "'carries its own death wound.'") (quoting *Sternberger v. United States*, 401 F.2d 1012, 1016 (Ct. Cl. 1968) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 161 F.2d 798, 800 (5th Cir.1947)).

the fair market rents for the particular complexes involved and to bolster plaintiffs' overall case as to the remaining complexes.

Perhaps because they offer the broadest coverage, defendant reserves its heaviest barrage for plaintiffs' use of HUD "fair market rents" or FMRs as a surrogate for market rents. It claims that those rents are not used by HUD for this purpose – an assertion that is correct, but ultimately unavailing. Under section 8(c)(1) of the Housing Act, HUD uses FMRs for a variety of purposes, among them, to determine standard payment amounts for its housing voucher program, the initial renewal rents for some expiring project-based Section 8 contracts, and the initial rents for certain housing assistance payments (HAP) contracts. HUD's regulations explain how FMRs are calculated thusly:

> Fair Market Rents (FMRs) are estimates of rent plus the cost of utilities, except telephone. FMRs are housing market-wide estimates of rents that provide opportunities to rent standard quality housing throughout the geographic area in which rental housing units are in competition. The level at which FMRs are set is expressed as a percentile point within the rent distribution of standard quality rental housing units in the FMR area. FMRs are set at the 40th or 50th percentile rent – the dollar amount below which the rent for 40 or 50 percent of standard quality rental housing units falls. The 40th or 50th percentile rent is drawn from the distribution of rents of all units that are occupied by recent movers. Adjustments are made to exclude public housing units, newly built units and substandard units.

24 C.F.R. § 888.113(a) (2003). These regulations further emphasize that HUD "uses the most accurate and current data available to develop the FMR estimates and may add other data sources as they are discovered and determined to be statistically valid." *Id.* at § 888.113(e).[73] Using this method, HUD annually estimates FMRs for 354 metropolitan areas and 2,350 nonmetropolitan counties.

To be sure, FMRs do not correspond precisely to the rents that the market would bear at any particular complex. But keeping the vector analogy above in mind, to suggest, as Dr. Hamm did, that these rents do not predictably correlate to actual rents in the marketplace is to ignore their method of calculation and purpose. In fact, HUD depends upon these figures in calibrating many of its programs to what the market will bear – from setting housing allowances for low-income families renting at commercial properties, to developing the construction budgets for HUD-sponsored properties. If anything, the FMRs appear to provide a conservative, *i.e.*, low estimate of local rents, and thereby offer reasonable assurances that rents below these figures do not significantly exceed market rents. Over the years, HUD has made similar representations on

---

[73] The record indicates that HUD typically uses three sources of survey data: (i) information from the decennial Census; (ii) an American Housing Survey conducted by the Bureau of Census for HUD; and (iii) random digit dialing telephone surveys conducted by HUD contractors. *See* 24 C.F.R. § 888.113(e)(1) (2003).

several occasions, announcing in 2002, for example, that it "sets FMRs to assure that a sufficient supply of rental housing is available to participants in the voucher program," and that "[t]o accomplish this objective, FMRs must be both high enough to permit a selection of units and neighborhoods and low enough to serve as many families as possible." Notice of Proposed Fiscal Year (FY) 2003 Fair Market Rents, 67 Fed. Reg. 36306 (May 23, 2002); *see also* Fair Market Rents for Section 8 Existing Housing; Amendments to Method of Calculating, 60 Fed. Reg. 42222 (Aug. 15, 1995) (FMRs calibrated to pay gross rent of housing of a "modest (non-luxury) nature"). Legislative committee reports[74] and cases,[75] spanning a considerable period of time, echo these sentiments and reemphasize, sometimes via criticism, that, if anything, FMRs historically tend to understate the market. Moreover, many of these observations were made during the 1980s and early 1990s, when FMRs were pegged to the 75th percentile of local rent distribution. *See* 24 C.F.R. § 880.103(d)(2) (1985); *Nat. Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997). Indeed, recently, HUD increased many of its FMRs from the 40th to the 50th percentile of local rent distribution, apparently conceding that the 40th percentile understated certain market rents. *See* Fair Market Rents: Increased Fair Market Rents and Higher Payment Standards for Certain Areas, 65 Fed. Reg. 58, 873 (Oct. 2, 2000) (*codified at* 24 C.F.R. § 888 (2003).

---

[74] *See* S. Rep. 102-28(I) at 303 (1991) ("Critics of the HUD construction requirements for cutting costs say that they are so stringent that some of the new buildings are too poorly constructed to last the 40-year term of the mortgages;" further noting that the FMRs can result in "inadequate housing"); S. Rep. 101-249(I) at 291 (1990) (same); S. Rep. 101-316 at 134 (1990) ("During the previous Administration, the . . . FMRs were consistently set at inadequate levels. According to one study, as many as 80 percent of the 363 fair market rent areas were experiencing difficulty in developing projects within the FMR limits. In 66 of those areas, projects were virtually impossible to construct."); *see also* 147 Cong Rec. S13,945-01 (daily ed. Dec. 20, 2001) (statement of Sen. Snowe) ("Such rents are often well below the actual comparable market rent."); 145 Cong. Rec. H8807-08 (daily ed. Sept. 27, 1999) (statement of Cong. Lazio) ("Unfortunately, while FMRs are supposed to serve as the guidelines for setting subsidy levels, they are oftentimes a very poor reflection of the actual market rents for comparable units for the area. . . . Instead, these artificial rent levels essentially serve as a form of federal rent control over the assisted housing inventory – necessary as an upper limit on the federal government's financial exposure, but not necessarily an accurate portrayal of each market."); 140 Cong. Rec. 19498 (1994) (statement of Sen. Bingaman) (complaining that a proposal to drop the FMRs to the 40th percentile would "dramatically reduce[] the available suitable housing for subsidized tenants" in New Mexico).

[75] *See Cienega I*, 265 F.3d at 1242 (survey showing, for subject properties, that shift from FMRs to market rents would increase rents between 15 and 78 percent); *Nat'l Leasing Hous. Ass'n,* 105 F.3d at 1425 (FMRs "approximate the fair market value of the rental property for the local area"); *see also Cuyahoga*, 57 Fed. Cl. at 779 (reviewing the legislative history of the HUD statutes and concluding that in seeking to calibrate rent increases to the FMRs, Congress was attempting to lower the rents on HUD facilities).

In the instant case, Dr. Karvel did not rely on the vintage FMRs that were based on the 75th percentile of local rent distribution, nor on the newly-minted ones based on the 50th percentile. Rather, he employed FMRs based upon the 40th percentile of that distribution – the lowest level employed by HUD over the last 25 years. The court finds that these figures provide a conservative estimate of the actual rents that would be paid at commercial properties for the areas in question. Overall, it thus appears that the methodology employed by Dr. Karvel determined, with reasonable certainty, that the revenue produced from the unrestricted model would exceed that derived from the restricted model and, except as indicated below, reasonably approximated the amounts thereof. Again, this finding is not based solely upon the probative weight of the FMRs themselves, but also on the reinforcing quality of the other indicia of market value upon which plaintiffs rely, including the comparables that were studied by Mr. Gorowsky. By contrast, defendant did not introduce any studies or other evidence to suggest that the figures employed by Dr. Karvel somehow systematically overstated true market rents. *See LaSalle*, 317 F.3d at 1374 ("when damages are hard to estimate, the burden of imprecision does not fall on the innocent party"); *Elec. and Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (noting that the amount of damages need not be "ascertainable with absolute exactness or mathematical precision.").

Nonetheless, as indicated in Fact Appendix B, the note-rate rents selected by Dr. Karvel for certain bedroom configurations at certain properties significantly (and, in some cases, considerably) exceed all of the indicia of market value that he employed.[76] While plaintiffs suggest that these properties were more desirable than the comparables selected by Mr. Gorowsky, their evidence in this regard is sketchy, leading the court to surmise that plaintiffs have not provided an adequate proof as to why these higher rates are sustainable. The court, therefore, determines that the 2002 rents for these properties should be set at the FMRs for the locales involved, as follows:

| **Complex** | **Configuration** | **Note Rate** | **Adjusted Rate** |
|---|---|---|---|
| Dogwood Glenn | One Bedroom | $600 | $326 |
| Dogwood Glenn | Two Bedroom | $664 | $418 |
| Rancho Verde | One Bedroom | $516 | $344 |
| Rancho Verde | Two Bedroom | $552 | $443 |

[76] In the case of various of the complexes in Iowa, the rent employed by Dr. Karvel exceeded all the indicia, but corresponded to the actual rent being received at these complexes under the G-4 option. The court has not adjusted these figures.

**(iii) Expenses.**

Defendant also contests the accuracy of the third component of plaintiffs' cash flow model – the expenses associated with generating the above revenue. Dr. Karvel projected these costs, tailoring his analysis to each complex and relying on historical data and actual operating statistics of a kind previously relied upon by each plaintiff in operating their businesses. For each complex, this data was reported on a FmHA annual budget form, known as FmHA 1930-7. Dr. Karvel examined the individual expenditures and projected that, upon the hypothetical conversion of a complex to commercial use, certain expenses would increase, while others (primarily those relating to compliance with section 515 reporting requirements) would decrease. *See Cienega*, 38 Fed. Cl. at 77 (similarly finding that certain auditing and reporting requirements were higher inside, than outside, the HUD housing program). As a double-check, he and Mr. Gorowsky compared the ratio of adjusted operating and maintenance expenses to the projected gross income for each property using benchmarks provided by the Institute of Real Estate Management (IREM), "a recognized industry data source." *Id.* at 77.[77] Their goal was not to produce precise estimates of each individual cost component for a given complex, but rather to yield an overall expense figure that they believed was reasonably certain. Dr. Karvel then assumed that the expenses would grow at a rate of 2.5 percent per year, a figure that Mr. Gorowsky verified was conservative (*i.e.,* the expenses projected generally were higher than industry standards).

Defendant's primary concern is that, in his unrestricted model, Dr. Karvel used the 1995 operating expenses as the baseline for his model, despite the availability of more recent information. But, for the most part, defendant did not even attempt to show that the projections made using these expenses were unreasonable. Accordingly, the fact that Dr. Karvel did not use the most recent data is irrelevant. Defendant, however, asserts that Mr. Gorowsky's analysis of the plaintiffs' 2002 operating expense budgets shows that, for at least some complexes, costs were higher than Dr. Karvel's projections. The record, however, reveals that most, if not all, of

---

[77] The IREM annually publishes statistics about the operating characteristics of multi-family housing broken down by regions and types of buildings (*e.g.*, low-rise, garden) throughout the United States. For purposes of his comparison, Dr. Karvel compared the ratio of expenses to income to the data from the IREM, which indicated that the traditional ratio for such expenses was between 40 and 50 percent. Where it appeared that the ratio for a given property was higher than this benchmark, Dr. Karvel examined the individual expenditures and made adjustments; where the complex's ratio was consistent with this benchmark, Dr. Karvel made no adjustment. Mr. Gorowsky analyzed the expenses in two ways. First, for all the complexes, he compared the projected expenses for 1999 to the IREM figures, and then, for post-1979 complexes, compared the projects expenses for such properties for 1998, 1999, 2000 and 2001, to the actual expenses for each property for those years. On the basis of these analyses, Mr. Gorowsky endorsed Dr. Karvel's projections as being reasonable and, indeed, slightly conservative. *See Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667-68 (5th Cir. 1974) (using "yardstick" approach, court may estimate profits by relying on statistics from similar businesses); Farnsworth, *supra* at § 12.15 (same).

these discrepancies related either to the inclusion of isolated capital expenditures in the operating expense budget (*e.g.*, roofing costs) or the overstatement of certain expenses (*e.g.*, management fees) that, though consistent with the historical expenses of the properties, did not correlate to expenses that would be incurred in the unrestricted model.[78] The record demonstrates that once corrections are made for these items, the alleged deficiencies essentially disappear. Defendant has not shown that these adjustments were inappropriate – indeed, every indication is that any capital expenditures that would be necessary in the unrestricted model (*e.g.*, replacing a roof), would be mirrored in the restricted model, essentially netting out of the comparison.

Accordingly, the court finds that, in deriving cash flows under his unrestricted model, Dr. Karvel properly estimated the operating expenses for the complexes in question.

**(iv) Discount factor.**

As noted, the relevant date for determining plaintiffs' damages is the date of the breach. In these circumstances, the future damages that would have arisen after that date must be discounted, *inter alia*, to convert future dollars to an equivalent amount in present dollars. *See Energy Capital*, 302 F.3d at 1330; *see also Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 490 (1916). Defendant argues that this discounting should relate back to the date of the breach (*ex-ante* discounting), while the remaining plaintiffs contend that it should occur only back to the date of any judgments rendered herein (*ex-post* discounting). In the court's view, plaintiffs generally are correct.

The Supreme Court has aptly recognized that discounting is a "rough and ready" approximation and counseled against a search for "delusive exactness." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546, 552 (1983). Nonetheless, in *Energy Capital*, *supra*, the Federal Circuit provided guidance on how to discount expectancy damages, such as lost profits, stating:

> In many cases, the appropriate date for calculation of damages is the date of breach. . . . That rule does not apply, however, to anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract. In those circumstances, damages are measured throughout the course of the contract. To prevent unjust enrichment of the plaintiff, the damages that would have arisen after the date of judgment ("future lost profits") must be discounted to the date of judgment. *See Northern*

[78] On this point, Dr. Karvel testified that while a 17.5 percent management fee may be appropriate for a FmHA property, a more typical management fee for a commercial property would be between 4 and 5 percent of gross effective income, *i.e.*, the actual revenue collected from a property factoring in, for example, collection losses. He also indicated that several of the expenses separately covered in FmHA properties (*e.g.*, legal expenses and office supplies) would be subsumed within the management fee for a commercial property.

> *Helex Co.*, . . . . Discounting future lost profits to the date of judgment merely converts future dollars to an equivalent amount in present dollars at the date of judgment; it is not an award of prejudgment interest and does not violate sovereign immunity.

*Energy Capital*, 302 F.3d at 1330. Defendant contends that this *ex post* rule applies only where the damages accrue "over the course of the contract" that the injured party had with the government and not where damages are produced, as here, after the hypothetical termination of that contract. But, this assertion is little more than *ipse dixit* as defendant cannot explain why it should make any difference whether the lost profits come from the hypothetical completion of the same government contract, as opposed to the reasonably forseeable continuation of some extended enterprise.

In fact, the rationale for not discounting post-breach damages hypothetically arising prior to the date of judgment and for discounting post-judgment damages to the date of judgment, primarily recognizes that "the purpose of an award of damages is to provide a fund that, with principal and interest, will yield plaintiff an amount equivalent to its loss." Dunn, § 6.25. This basic principle, and not some arcana of damages calculation, is what drove courts, in cases like *Energy Capital*, to discount future lost profits to the date of judgment, but not to discount lost profits that should have been received prior to the date of judgment. As this court explained in *Citizens Fed. Bank*, 59 Fed. Cl. at 524, "[t]he court [in *Energy Capital*] reasoned that to prevent unjust enrichment to plaintiff, future damages must be discounted because discounting converts future dollars to an equivalent amount in today's dollars." Likewise, in *Energy Capital*, 47 Fed. Cl. 382, 416 n.40 (2000) , *aff'd in relevant part*, 302 F.3d 1314 (Fed. Cir. 2002), this court observed that "[d]iscounting is based on the premise that a dollar possessed today is worth more than a dollar paid tomorrow. When the Plaintiff is not seeking 'tomorrow's dollars,' discount is not necessary."[79] Consistent with this rationale, in *Northern Helex, supra,* the case on which *Energy Capital* principally relied, the court discounted the portion of the lost profits that the company would have earned from the date of judgment to the completion of the contract, but did not discount the lost profits attributable to the period from the breach through the date of the judgment. *Northern Helex*, 634 F.2d at 564.[80] The same result generally should obtain here.

---

[79] *See also LaSalle Talman Bank*, 45 Fed. Cl. 64, 108-09 (1999), *aff'd in relevant part*, 317 F.3d 1363 (Fed. Cir. 2003); *Purina Mills, L.L.C. v. Less*, 295 F. Supp.2d 1017, 1047-48 (N.D. Iowa 2003) ("the portion of the total damage award that represents future damages must be discounted to present value. The damages accruing from the date of the . . . repudiation . . . , through the date of the judgment . . . is not reduced to present value, but is awarded outright").

[80] *Estate of Berg*, *supra*, is not to the contrary. That case did not involve a contract that would have yielded a future income stream to the plaintiff, but rather, a breach of an agreement to redeem bonds at par value. 687 F.2d at 379. Because that agreement obligated the government to pay a fixed amount prior to trial, there was no need for the *Berg* court to conduct any present value analysis at all. Accordingly, *Berg* has no bearing on discounting future profits.

There is a bit of a complication, however: if the court does not discount the prejudgment lost profits to the date of breach, how does it account for the risk that those profits might not have been realized? And if such risk is to be accounted for via a discount calculation, at what rate? As will be seen, both these issues are more readily answered by first considering the proper rate for discounting the post-judgment lost profits.

In *Energy Capital*, *supra*, the Federal Circuit indicated that the appropriate discount rate to be applied to future lost profits is a "question of fact." 302 F.3d at 1332; *see also Monessen SW Ry. Co. v. Morgan*, 486 U.S. 330, 341 (1988); Dunn, § 6.25. Providing guidance on how this rate should be derived, the court stated "[w]hen calculating the value of an anticipated cash flow stream pursuant to the [discounted cash flow] method, the discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk." *Energy Capital*, 302 F.3d at 1333; *see also* Richard A. Brealey and Steward C. Myers, Principles of Corporate Finance 244 (6th ed. 2000) (when valuing an anticipated cash flow, "if the cash flow is risky, the normal procedure is to discount its forecasted (expected) value at a risk-adjusted discount rate"). In accordance with the decisional law, the appropriate discount rate, therefore, must reflect risk, in order to take into account the return the market would demand were an investor called upon to invest capital in the same venture.[81] "The higher the risk, the higher the rate of return an investor would require." *Energy Capital*, 302 F.3d at 1331 n.6. Consistent with these views, Dr. Karvel testified that risk was a "major component" of his discount rate and reflected "a variety of categories" of risk among them, "management risk, business risk, general economic risk, [and] interest rate risks."[82]

In the case *sub judice*, Dr. Karvel discounted the post-trial lost profits in the restricted model at 11 percent and those in the unrestricted model at 11.5 percent. Dr. Hamm testified that the half percentage point spread between these two rates was too modest – he believed that an appropriate discount rate for the restricted model was 6 percent (roughly 100 basis points above the risk-free rate) and that a comparable rate for the unrestricted model should be 15 percent.

---

[81] *See E. Minerals Int'l, Inc. v. United States*, 39 Fed. Cl. 621, 626-27 (1997) ("discount rate represents the rate of return an investor would require in order to risk capital on the project."); *see also, e.g., Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 327 (7th Cir. 1992) ("A computation of damages that ignores the differences in risk between earnings in a volatile occupation and a judicial award of a lump sum equal to the present value of those earnings is unsound."); *In re Lambert*, 194 F.3d 679, 681 (5th Cir. 1999) ("The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved."); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir. 1985) (same).

[82] By way of further explanation, Dr. Karvel indicated that market risks involved things like the location of the property and the demographics of the surrounding area, including shifts in population growth and employment. At least some of these risks are the same whether a given property is in the FmHA program or viewed as operating in a commercial market.

As for the discount rate on the restricted model, the court believes that Dr. Karvel's rate of 11 percent more closely tracks the risks associated with running a housing complex restricted by the section 515 program. Dr. Karvel convincingly testified that the extraordinarily low rate of return associated with the relatively small cash flows of the complexes in the section 515 program would lead investors to demand a premium for loaning funds in a comparable market scenario. Dr. Hamm did not disagree with this premise. Dr. Karvel also indicated that market investors would exact a healthy premium based upon the fact that defendant had twice repudiated its contracts under the program, testifying that investors would "take into account and question whether that payment would continue . . . given . . . the breach of the plaintiffs' agreement." While the latter discount might seem unusual, it is important to recognize how this case differs from the ordinary breach of contract action: normally, in calculating damages, the breach scenario involves the loss of a contract or contract rights, while the non-breach scenario assumes their retention. Here, the situation is reversed – under the breach scenario, one must calculate the risk premium associated with ***continuing*** the contract post-breach. In those circumstances, the court believes that it is fair and appropriate to find that the market would, in calculating the latter risk premium take into account the fact that there had been two prior repudiations.[83] Accordingly, the court finds that Dr. Karvel's 11 percent discount rate for the restricted model is supported by the evidence in this case.

The court reaches a different conclusion, however, with respect to the discount rate that Dr. Karvel used for the unrestricted model, which the court believes inadequately reflects the risks associated with converting the complexes to commercial use and running them as such. On this point, both Dr. Karvel and Dr. Hamm relied, in varying degrees, upon the Korpacz Real Estate Investor Survey, which bills itself as "the industry's standard source of up-to-date capitalization and discount rates." The evidence suggests that Dr. Karvel's results track the portion of the survey that involved institutional grade apartment properties in unleveraged, *i.e.*, all cash, transactions – the average of which was 11.51 percent. *See* Korpacz Real Estate Survey, Second Quarter 1999 at 6.[84] The Survey defines "institutional-grade real estate," as follows:

---

[83] In arguing against this, Dr. Hamm relied on the fact that investors continue to enter into the section 515 program. But, as plaintiffs' stress, a significant portion of that participation may derive from several factors external to the merits of the program, such as the special tax benefits that Congress has provided to developers of low-income rental housing. 26 U.S.C. § 42 (2000) (providing a "low-income housing credit"). Moreover, in his testimony, Dr. Hamm did not account for the fact that at least some, and perhaps many, of the new entrants were nonprofit or public entities whose *raison d'etre* is to promote low-income rural housing and who, therefore, are less concerned about the financial risks associated with their participation.

[84] Dr. Karvel testified that, in setting his discount rates, he primarily relied upon a database from the American Council of Life Insurers, from which he observed the "prevailing interest rate nationally that was being granted for multi-family housing." His report, however, does not disclose these statistics and the court views the Korpacz statistics as the best reference point from which to derive the appropriate discount rates here.

> Institutional-grade real estate is 'brochure quality.' It is located in a major market or submarket that is recognized in the institutional investment community. The property is impressive, has 'street appeal.' The physical characteristics of institutional-grade real estate include large size; high-quality construction; above-average architectural design, configuration, and layout; modern mechanical systems, sprinklers, heat and smoke detectors, and alarms; good amenities; and in some areas and property types, good adjacent parking. The property is in excellent condition and is less than 10 years old or has an effective age of less than 10 years. In general . . . the property has low leasing risk, proven stable occupancy, a preponderance of financially strong tenants, and good long-term growth potential.

*See* Korpacz Real Estate Survey, Special Report on Institutional – Grade Real Estate, Second Quarter 1994 at 1. While the record suggests that plaintiffs' properties have some of these features, on the whole, they do not meet the definition of "institutional-grade real estate" based, in particular, on their age and location. As such, it appears that they more closely resemble what the Korpacz Survey termed "noninstitutional-grade properties," for which the average discount rate was 13.01 percent. *See* Korpacz Real Estate Survey, Second Quarter 1999 at 6. Moreover, other tables in the Survey indicate that leveraged transactions, financed by some form of loan representing approximately 50 percent of equity, were treated as slightly riskier than all cash transactions, commanding an additional premium of, on average, 0.94 percent.

While the mortgages on some of the complexes here conceivably might have been prepaid using cash, the record suggests that most, if not all, of the properties more likely would have been converted to commercial use through a second loan. Indeed, Dr. Karvel assumed this in calculating the note-rate rents, all of which apparently include a component for debt service. Accordingly, based on the foregoing, the court rejects Dr. Karvel's 11.5 percent discount rate and instead finds that the appropriate rate for the unrestricted model should be 14 percent – 13 percent for non-institutional grade properties, plus one percent because each of these properties likely would be converted through a leveraged transaction. This rate is within the range that Dr. Hamm testified was appropriate for the unrestricted model.

Turning back to the questions posed above, in the court's view, to be consistent, the risk portion of the discount rate applied to post-judgment lost profits must also be applied to the lost profits claimed between the time of the breach and judgment. Contrary to plaintiffs' claims, the Federal Circuit's decision in *Energy Capital* does not foreclose this approach – indeed, it all but compels it. Thus, in explaining why some discount rates can be "risk-free," the court noted that "in some cases the calculation of the anticipated stream of lost profits may be adjusted for risk prior to discounting." 302 F.3d at 1334 n.9. Specifically, the court observed that there are two ways to "account for risk when calculating the value of a stream of anticipated profits." *Id.* Under the first of these, anticipated profits are reduced to account for risk prior to being discounted to present value; under the second, the anticipated profits are not reduced for risk,

which instead is reflected in a risk-adjusted (higher) discount rate. *Id.*[85] These comments suggest that, while the court need not reduce to present value the post-breach, pre-judgment lost profits, it must, to be consistent with the first methodology outlined by the Federal Circuit in *Energy Capital*, still reduce those anticipated profits to account for risk, at least in a case such as this, where a hypothetical transaction is involved.[86] Failing to do so threatens to convert a probabilistic outcome into a certainty equivalent, likely overcompensating the injured party. *See* Michael I. Krauss & Robert A. Levy, "Calculating Tort Damages for Lost Future Earnings: The Puzzles of Tax, Inflation and Risk," 31 Gonzaga L. Rev. 325, 365 (1996); Myer, *et al.*, "Loss of Business Profits," *supra* at 331-32.[87] Moreover, while one might reasonably argue that this risk

---

[85] As noted in an article relied upon by the Federal Circuit:

> CPA expert witnesses frequently testify in court about damages assessments when a plaintiff alleges future economic losses because of a defendant's wrongdoing. Some CPA experts project the plaintiff's hoped-for income stream, modify those losses to a realistic expectation by factoring in future risks and then discount the adjusted future losses to a present value at a risk-reduced, relative low discount rate. Other experts project the hoped-for-but-lost amounts and then apply a higher discount rate that already incorporates risk or uncertainty to determine the present value.

Robert L. Dunn & Everett P. Harry, "Modeling and Discounting Future Damages," 193 J. Acct. 49 (2002) (cited at 302 F.3d at 1334 n.9).

[86] Such a risk discount might not need to be applied if the lost profits were known with a high degree of certainty. As an example, one articles poses a situation where a plaintiff has a contract to sell a defendant a fixed number of units of product at a fixed price, where the cost of the product and associated incremental costs were all fixed. In this case, damages are derived readily by simply multiplying the units not sold by the margin (selling price less known costs). *See* James E. Meyer, Patrick Fitzgerald & Mostafa Moini, "Loss of Business Profits, Risk, and the Appropriate Discount Rate" (hereinafter "Loss of Business Profits"), 4-WTR J. Legal Econ. 27, 31 (1994).

[87] Plaintiffs cite various cases that suggest the court should consider events subsequent to the breach in estimating damages. *See, e.g., Sinclair Ref. Co.*, 289 U.S. at 697; *Georgia-Pacific Corp. v. United States*, 640 F.2d 328, 337 n.5 (Ct. Cl. 1980). But, as noted previously, these cases only indicate that the subsequent events may be used to test the reasonableness of assumptions used in projecting damages. Morever, plaintiffs fail to identify any subsequent events that actually would eliminate any of the risks associated with the hypothetical transaction in question. Accordingly, the court is not, as plaintiffs suggest, applying a pure *ex ante* approach that ignores subsequent events; rather, it is simply concluding that none of the subsequent events cited by plaintiff impact the analysis. That this court cannot award prejudgment interest does not alter this result – this court is not empowered to "fudge" the discount calculation to provide that which Congress, on sovereign immunity grounds, has denied.

is already factored into determining whether, by a preponderance of the evidence, various lost profits would be realized, the Federal Circuit essentially rejected this approach in *Energy Capital* because, in reversing this court's use of a risk-free discount rate, it discounted, for similar types of risks, the lost profits projected to be earned post-judgment. 302 F.3d at 1334. Moreover, it is apparent that Dr. Karvel did not factor risk into his calculation of the cash flows, but was satisfied instead to reflect it, if at all, in his discount rate.

So what rate should be employed for discounting the post-breach, pre-judgment lost profits here and how should that calculation be performed? Although this is somewhat *terra incognita*, logic suggests several things. First, a risk factor should be applied only to the post-breach, pre-judgment cash flows associated with the unrestricted model as the risks associated with the restricted model, which is not a hypothetical, were eliminated with the passage of time. Second, for this purpose, the rate that ought to be applied to the unrestricted model should equal the total discount rate for that model less the present value (or risk-free) portion thereof, a simple subtraction that yields the portion of the rate attributable to risk. Based upon the record, the court concludes the present value portion of the discount rates established above is 5 percent and that the risk component of the discount rate for the unrestricted model thus is 9 percent (14 percent less 5 percent).[88] Finally, logic suggests that this 9-percent factor should not be compounded; rather, because the only purpose of this calculation is to discount a given annual flow of the unrestricted model for risk, the court finds that this factor should be applied only on an annualized, simple basis.

**(d) Other potential adjustments**.

Although defendant and Dr. Hamm raise other minor issues, most of these were not discussed in enough detail, either at trial or in defendant's post-trial briefs, to amount to anything more than quibbling. A few of these issues, however, were presented with enough specificity to require discussion.

The first involves Dr. Karvel's use of a 5 percent vacancy rates, which he derived using his experience with real estate, industry data based on surveys of operating properties, and his review of the historical rates at the complexes involved. *See* Korpacz Real Estate Survey, Second Quarter 1999 at 53 (providing a survey of ten-year estimates of vacancy rates); George Karvel, Real Estate Principles and Practices 373 (9th ed. 1991) (indicating that a 5 percent vacancy rate is "standard"). Dr. Hamm argued this rate was understated, theorizing that the conversion of certain complexes to market housing, and the resulting increase in rents, would negatively impact vacancy levels. That theory, however, was not supported by any authority or market studies and seemingly presumed that there was an adequate supply of substitute housing

[88] The court recognizes that, theoretically, some of the risks that would be associated with years already occurring would be diminished (*e.g.*, the risk that the property would be heavily damaged in a natural disaster) as compared to the same risks in future years. Plaintiffs, however, have provided no factual basis for this court to make such fine distinctions.

at lower prices – for many of the complexes, a view contradicted by the FMHA's findings in disapproving various prepayment requests here. Dr. Hamm's theory was flatly rejected by Dr. Karvel, who asserted that the demand for rural housing in these areas was relatively inelastic. Based on Dr. Karvel's superior knowledge of real estate matters, this court does not find Dr. Hamm's contrary assertions persuasive.[89] Moreover, while defendant showed that the vacancy rate at a few properties sometimes exceeded 5 percent, those same properties, at other periods, had vacancy rates very close to or below that figure; and the record demonstrates that generally most properties had vacancy rates well below that figure. Overall, defendant failed to undercut plaintiffs' showing that, on average, over an extended period of time, the vacancy rate employed by Dr. Karvel was a reasonable approximation.[90] And that approximation is all the more acceptable, given the adjustments the court has made in discounting further Dr. Karvel's cash flows for risk.

Another remaining issue is whether the expenses for the complexes should be increased to reflect the additional property taxes that defendant claims will be owed upon their conversion to commercial use. Dr. Karvel opined that converting plaintiffs' complexes to market rent would not significantly increase their property tax assessments because the two most common methods for assessing the value of property – the market and cost approaches – were not sensitive to the profitability of the property. Dr. Hamm, however, postulated that increased profitability could generate higher property taxes in locales in which assessors employed the income approach to

---

[89] *See* Korpacz Real Estate Survey, Second Quarter 1999 at 32 ("People always needs a roof over their heads, a fact that drives the apartment investment market"); *see generally Associated Enters., Inc. v. Toltec Watershed Improvement Dist.*, 410 U.S. 743, 751 n.3 (1973) (Douglas J., dissenting) (noting that "the demand for rental housing is price inelastic" in urban areas and "there is no reason why it may not also be true in rural areas, as well"); Daniel E. Wenner, Note, Renting in Collegetown, 84 Cornell L. Rev. 543, 565 (1999) (housing in smaller towns may reflect "inelastic demand" because "housing is a necessity rather than a luxury").

[90] On this point, Dr. Karvel explained that –

> I don't pretend that in any particular year that the vacancy is going to be exactly five percent. What I know from education and experience is that over this 30 year span of time, it's reasonable to expect that I'm going to average five percent. The trouble is in some years it might be two or three percent vacancy. In other years, depending on economic changes locally, it might be eight or nine. It's not only a convention in property management. It's a convention in appraisal as well, and it's the objective by which managers judge their own performance against this five percent standard.

Appraisals were performed by MAI certified appraisers for eight of the properties in question to be included in a request for prepayment; notably, each of these also employed a five percent vacancy rate.

valuation and asserted that this method is employed, for example, in Iowa. However, Dr. Karvel, who, as noted, has much more experience with real estate, indicated that the income method was rarely employed, thus making it unreasonable to assume that it would be employed here. His views are buttressed by information provided at the website Dr. Hamm cited in support of his claims. That website, sponsored by the Iowa State Association of Assessors, indicates that the "most important method" for assessing property values is to look for recent comparable sales. Iowa State Ass'n of Assessors, http://63.224.190.121/cgi-bin/public.cgi?path=duties.html. It also suggests that the "income method" of assessment is rarely used, stating that method "is the most complex of the three approaches because of the research, information and analysis necessary for an accurate estimate of value." *Id*. Providing further indication that use of the income method is limited, the website notes that it "requires thorough knowledge of local and national financial conditions, as well as any developmental trends in the area of the subject property being appraised since errors or inaccurate information can seriously affect the final estimate of value." *Id*. In the court's view, this information does not controvert, but rather bolsters Dr. Karvel's approach, which the court also adopts based upon his superior knowledge of real estate matters.[91]

The last issue raised by defendant requiring a ruling involves the timing and cost of converting the complexes to market-rate properties. Based on his expertise with real estate, Dr. Karvel assumed that following the hypothetical prepayment of the section 515 loans, the owners would complete the process of converting to market rents by January of the following year. Dr. Hamm contends this assumption is arbitrary because it neither depends upon the market-readiness of each property nor the characteristics of the local housing market. This court, however, has redetermined the contract breach dates for a number of the complexes in question and for every complex save one – Pine Needle – adoption of Dr. Karvel's convention would allow for at least five months, and, in most cases, seven months for the owners to accomplish the hypothetical conversion of their properties to market rates. With this adjustment, Dr. Karvel's convention appears reasonable and generally should be employed in redetermining the damages herein. However, in the case of Pine Needle, in which the breach occurred in December of 1993, the conversion should be deemed to occur six months later, or by June of 1994.[92]

---

[91] Dr. Karvel's assumptions were further borne out by Mr. Gorowsky, who examined the property tax histories of the seven Iowa properties that actually converted to commercial rates under the G-4 option. Mr. Gorowsky found that the property tax assessments for these properties had not dramatically changed.

[92] Similar adjustments must be made for the conversion of three other properties that were unaffected by the court's previous breach analysis. Thus, for Palmyra I, Palmyra II and Falls River Meadows I, Dr. Karvel correctly employed the following breach dates: November, 1993; September, 2002; September 1994, respectively. In each of these instances, Dr. Karvel assumed that the conversion would occur the following January. Instead, the court finds that the conversion of Palmyra I, Palmyra II and Falls River Meadows I would have occurred in May of 1994; March of 2003; and March of 1995, respectively.

Based upon the record, the court does not believe that any further adjustments in Dr. Karvel's calculations are warranted.

**3. Determination of the Amount of Damages**.

In the normal course of events, this opinion would conclude with a listing of the specific dollar figures owed particular plaintiffs. As to the four for which evidence of prepayment capacity is lacking – Rolling Hills, Scenic Valley, Eastwood, and Fox Ridge II – only nominal damages may be awarded, which requires this court, under controlling precedent, to dismiss the respective complaints. *See Severin v. United States*, 99 Ct. Cl. 435, 443 (1943). For the remaining properties, while this court has found that Dr. Karvel's basic approach and most of his premises are valid, it also has made adjustments to several of the key calculations that he employed (*e.g.*, the time periods for his calculations, the market rents for certain properties and the application of various discount factors). Anticipating that there might be such adjustments, the court attempted to obtain electronic versions of the computerized spreadsheets used by the parties in calculating their damage estimates. Defendant provided an electronic version of its program, but, for reasons that remain unclear, plaintiffs represented that their program could not be provided to the court in a fashion that would allow it to modify various cells contained therein. As the court understands it, however, defendant's analysis was not intended to be comprehensive, but was only designed to demonstrate the impact of particular adjustments on plaintiffs' damage figures.

Accordingly, while the damage calculations employed by Dr. Karvel must be modified in accordance with the findings and conclusions reached herein, the court is ill-positioned to develop its own spreadsheets to cover each of the complexes still involved here. Accordingly, the court will, in the first instance, allow the parties to recalculate the damages owed various plaintiffs in accordance with this opinion. Toward that end, the court prescribes below a procedure, patterned after that outlined in Rule 155 of the Tax Court's Rules of Practice Procedure, for determining the damages herein. Should this procedure ultimately not prove fruitful, the court will request that the chief judge appoint a special master to either modify the parties' spreadsheets or develop the court's own spreadsheets, to allow for the accurate determination of damages. *See* RCFC 53. Should such an appointment prove necessary, the court will require the parties to share the cost thereof equally (assuming that both parties are found to have pursued the prior damage recalculation in good faith).

## III. CONCLUSION

Based on its findings, this court concludes that defendant breached its contracts with plaintiffs. For the four properties identified above, the lost profits sought by plaintiffs were not proximately caused by this breach as insufficient evidence has been provided to demonstrate a capacity for prepayments. As to the remaining thirty-seven properties, the court finds that the lost profits sought by plaintiffs on account of those breaches were proximately caused by the breach, were foreseeable and can be calculated with reasonable certainty. In particular, the court

finds that had the plaintiffs owning these complexes been allowed to prepay their mortgages, they would have done so and realized additional profits.

A few concluding words are warranted.

Does determining the amount of lost profits here involve some degree of speculation? – undeniably, but only because the apparent dichotomy between "reasonable approximations" and "speculation" is misleading and demonstrably false. As Justice Black once observed, damages "are bound to be 'speculative' and 'conjectural' to some extent," *Simpson v. Union Oil Co. v. Cal*., 396 U.S. 13, 16 (1969). Does determining those lost profits require the court to assume that reasonable factual premises which hold true today will be predictably valid in the future? – absolutely, but no more so than in employing other well-accepted cash flow methodologies, such as the income approach to valuing a going concern. As Justice Holmes once explained, "all values, as the word is used by the law, . . . depend[] largely on more or less certain prophecies of the future," *Ithaca Trust Co. v. United States,* 279 U.S. 151, 155 (1929). So when does one pass from the realm of permissible speculation and projections into that of intolerable guesswork and largesse? The answer, of course, depends upon the record of a case, but the overarching objective is to ascertain whether the approximations and assumptions used to set the amount of damages are anchored to the facts, consistent with sound economic theory and ultimately will produce reasonable results. Catch phrases and shibboleths aside, that is what this court has endeavored to do. *See Locke*, 283 F.2d at 524-25. Various cases, indeed, hold that, based upon a finding that damages are foreseeable, courts may employ the so-called "jury verdict" method of determining plaintiffs' damages. *See Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1376 (Fed. Cir. 2004); *Specialty Assembly & Packing Co. v. United States*, 355 F.2d 554, 572-73 (Ct. Cl. 1966).[93] If that is so, certainly the law must countenance the sort of reasonable approximations that underlie the much more detailed analysis reflected in plaintiffs' damages methodology and, in turn, this court's findings based thereupon.

---

[93] According to the Federal Circuit –

> The 'jury verdict method' is 'most often employed when damages cannot be ascertained by any reasonable computation from actual figures.' *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed.Cir.1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995). 'Before adopting the jury verdict method,' the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of damages.' *Id.*

*Hi-Shear*, 356 F.3d at 1376; *see also Bluebonnet*, 266 F.3d at 1357 ("We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages – but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation.").

To approach the calculation of damages with either the unbounded zeal of a pedantic schoolmaster or the talismanic precision of a Swiss-trained watchmaker is to erect artificial barriers to recovery. Indeed, were this court to adopt the overweening level of proof demanded by defendant, it would be the rare case, indeed, if any, in which any expectation damages were awarded, essentially giving defendant license to breach certain types of contracts largely with impunity. "As it should be," defendant essentially contends; "not so," the law responds. While defendant's solipsistic approach does not directly implicate Congress' waiver of sovereign immunity, it does so indirectly, clashing with the sentiments underlying Judge Cardozo's oft-quoted statement that "[t]he exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced." *Anderson v. Hayes Constr. Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29-30 (1926).[94] One looking for further evidence of this need go no farther than the report accompanying the 1860 legislation that greatly expanded the jurisdiction of this court's predecessor, in which Congress observed that the government's "obligations to pay its debts and perform its contracts is quite as imperative as those which rest upon other parties amenable to the laws." H.Rep. 513 at 2 (1860). The same report continued that "when the government enters into a contract," "its rights, duties, and obligations are to be adjudged and considered in all respects and in all places precisely as if it were a private party; and when it approaches the altar of justice, and submits its rights to the jurisdiction of civil judges, it comes, in all respects, as an ordinary suitor. There is no law for the citizen, in respect to obligations of a pecuniary character, which the government is not bound to observe . . . ." *Id*. at 4-5. Hewing to these precepts, the proper role of the court here is to weigh the evidence, determine liability and the existence of damages with reasonably certainty, but then reasonably approximate, based upon the record, what would make plaintiffs objectively whole – nothing more and nothing less suffices.

At this juncture, this court need go no further, except to note that the excellence of the lawyering exhibited by both sets of counsel in this case has both simplified – and complicated – this court's task.

As noted, the court will withhold entry of judgments for the purpose of permitting the parties to submit computations pursuant to the court's determination of the issues, showing the correct amount of the judgments to be entered in the particular cases. Toward that end, the following procedure shall be employed:

1. On or before October 15, 2004, the parties shall file a status report proposing the amount of judgment that should be entered in each of the consolidated cases herein.

---

[94] Justice Frankfurter once expressed similar views: "Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it." *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955).

2. Should the parties agree regarding any or all of these proposed judgment amounts, they shall so indicate. For such proposed judgments, the parties should assume that the judgments would be entered on November 1, 2004. Agreeing to the entry of such judgment neither signifies agreement with this court's findings and conclusions nor waives any arguments or rights the parties might otherwise have, nor, in particular, impacts upon any party's right to an appeal.

3. If the parties disagree as to any of the proposed judgments, they shall, in the filing described in paragraph 1, submit competing proposals for those judgments, together with an explanation as to why they believe their proposal more accurately tracks this court's findings and conclusions. For such proposed judgments, it should be assumed that the judgments would be entered on November 29, 2004.

4. On or before November 12, 2004, the parties may file a response to any of the unagreed proposed judgments offered by the other party.

5. This process shall not be employed to reargue or seek reconsideration of any of the points resolved by this court's findings and conclusions.

6. Should this process not result in one or more judgments being able to be entered, this court may seek the appointment of a special master under RCFC 53(a).

**IT IS SO ORDERED**.

/s Francis M. Allegra
Francis M. Allegra
Judge

FACT APPENDIX A[95]

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Riverfront (MN) | 9/20/1974 | Yes (8/94)[96] | Equity loan $491,501; 8 additional units of rental assistance; increase in annual return to $5,736. | | | Equity loan $491,501; 8 additional units of rental assistance; increase in annual return to $5,736 – plaintiff later rejected incentives. | | | No | | $210,000 loan at interest rate of 10% for 20-year amortization and 3-year balloon (not to exceed 70% of the value at appraisal); $190,000 loan at 8% for 24 months (not to exceed 70% of the value at appraisal), $950 fee. |
| Rolling Hills (MN) | 11/3/1977 | No | | | | | | | No | | No testimony or documentation indicating an ability to prepay; no prepayment request; one common partner with Riverfront and Sunrise River, but no indication of ability to prepay based upon that. |

[95] Dublin Plaza, the case of which is being dismissed today by separate order, is not included in this chart.

[96] In its request for prepayment, plaintiff noted that "consideration would be given to an equity buy out and a continuation of the project status as is."

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Scenic Valley (WI) | 4/5/1979 | No; plaintiff sought an equity loan, but was told to complete prepayment request; record does not reveal such a request. | | | | | | | No | | No testimony or documentation indicating an ability to prepay; no prepayment request on record; a letter dated July 20, 1994, indicates that one partner "may" be able to get a private mortgage; one common partner with Riverfront and Rolling Hills, but no indication of ability to prepay based upon that.. |
| Sunrise River (MN) | 3/20/1978 | Yes (8/94)[97] | Equity loan $378,077; 5 additional units of rental assistance; increase in annual return of $5,198. | | | Rejected incentives, accepted G-4 prepayment w/restrictions to protect current residents | | | No | | $260,000, 10% for 20 years w/ 3 year balloon (not to exceed 70% of appraised value); $205, 000, 24 months 8.25% (not to exceed 70% appraised value) $1,025 fee |
| Eastwood | 7/26/1982[98] | Yes (10/99) | No | | | Rejected any restrictions before filing formal prepayment application. | | | No | | No testimony or documentation indicating an ability to prepay; no prepayment request. |

[97] In its request for prepayment, plaintiff noted that "consideration would be given to an equity buy out and a continuation of the project status as is."

[98] Plaintiff assumed a 1/25/1980 loan.

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| RC Getty | 5/19/1975 | No | | | | | | | No | | Application of reserve funds to remaining balance of mortgage, would leave only $8,000 to be repaid, which could be refunded out of personal funds. |
| RC Mo | 3/26/1975 | No | | | | | | | No | | Application of reserve funds to remaining balance of mortgage, would leave only less than $50,000 to be repaid, which could be refunded out of personal funds. |
| RC Pierre | 3/26/1975 | No | | | | | | | No | | Appraisal suggesting that equity in the property exceeded $1 million. |
| RC Springs | 4/22/1975 | No | | | | | | | No | | Appraisal suggesting that equity in the property exceeded $1 million. |
| Casa Grande I | 2/24/1975 | Yes (2/03) | General incentive package offered. | | | All rejected. | | | No | | For Casa Grande I & II - $1,250,000 to $1,400,000, 10 years, amortization 30 years, interest rate 1.8% over 10 year treasury bond rate at time rate locked. |

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Casa Grande II | 1/16/1976 | Yes (2/03) | General incentive package offered. | | | All rejected. | | | No | | For Casa Grande I & II - $1,250,000 to $1,400,000, 10 years, amortization 30 years, interest rate 1.8% over 10 year treasury bond rate at time rate locked. |
| Rancho Verde | 7/14/1977 | Yes (2/03) | General incentive package offered. | | | All rejected. | | | No | | $450,000 to $500,000, 10 year term, 30 year amortization, 1.8% over 10 year treasury bond rate at time rate locked. |
| Beechwood (NH) | 5/11/1977 | Yes (6/01) | None in the record. | | | | | | No | | Bank planned loan $1,312, 000, 20 years, at 5 year treasury bill plus 2.5%. |
| Deer Run (NH) | 11/3/1976 | Yes (6/01) | None in the record. | | | | | | No | | Bank planned loan $610,000 20 years, at 5 year treasury bill plus 2.5%. |
| Pine Tree (NH) | 12/2/1975 | Yes (6/01) | None in the record. | | | | | | No | | Letter from bank indicating interest in providing alternative financing, 5 year loan at 1-1.5% above prime for up to 75% of appraised value. |

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Evergreen Manor of Waukee I (IA) | 6/23/1975 | Yes (7/98)[99] | G4 prepay with restrictions.. | | | G4 prepay with restrictions, closed. | | | No | | Proposal from bank offering 75% of value, 15 year amortization and 7 year balloon, fixed 8.5%, later received another commitment letter offering various rates, depending on the term. |
| Evergreen Manor of Waukee II (IA) | 8/27/1976 | Yes (7/98) | G4 prepay with restrictions.. | | | G4 prepay with restrictions.. | | | No | | Proposal from bank offering 75% of value, 15 year amortization and 7 year balloon, fixed 8.5%, later received another commitment letter offering various rates, depending on the term. |
| Greenway of Altoona I (IA) | 12/6/1978 | Yes (8/99) | G4 prepay with restrictions.. | | | G4 prepay with restrictions.. | | | No | | Commitment letter from bank with several rates, depending on term. |
| Greenway of Newton I (IA) | 8/23/1978 | Yes (8/99) | G4 prepay, withdrawn because too much time had passed. (no closing b/c no acceptance of restrictions). | | | | | | No | | Commitment letter from bank with several rates, depending on term. |
| Prairie Village of Altoona I (IA) | 5/22/1975 | Yes (8/99) | G4 prepay with restrictions.. | | | G4 prepay with restrictions.. | | | No | | Commitment letter from bank with several rates, depending on term. |

[99] The cover letter accompanying the request to prepay for Evergreen Manor of Waukee I & II, Prairie Village of Grimes I & II, Greenway of Altoona I, Greenway of Newton I, Prairie Village of Altoona I & II, Prairie Village of Huxley I & II, Prairie Village of LaPorte City I & II, Prairie Village of Slater I & II, and Prairie Village of State Center indicated that they intended to accept incentives instead of prepayment. Later, the borrowers indicated they would not accept incentives and instead sought prepayment.

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Prairie Village of Altoona II (IA) | 8/27/1976 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter from bank with several rates, depending on term.. |
| Prairie Village of Grimes I (IA) | 7/26/1977 | Yes (7/98) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter for $336,500 or 75% appraised value, 8.5% fixed rate, 15 year amortization w/7 year balloon. |
| Prairie Village of Grimes II (IA) | 8/17/1978 | Yes (7/98) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter. |
| Prairie Village of Huxley I (IA) | 5/4/1976 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter from bank with several rates, depending on term |
| Prairie Village of Huxley II (IA) | 5/23/1978 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter. |
| Prairie Village of LaPorte City I (IA) | 11/23/1977[100] | Yes (8/99) | G4 prepay, not closed because refused to accept restrictions. | | | | | | No | | Commitment letter from bank with several rates, depending on term. |
| Prairie Village of LaPorte City II (IA) | 12/12/1979[101] | Yes (8/99) | G4 prepay, not closed because refused to accept restrictions. | | | 1985 loan consolidated with that for La Porte I (8% per annum return on investment, 15 year restriction) | | | No | | Commitment letter from bank with several rates, depending on term. |
| Prairie Village of Slater I (IA) | 5/4/1976 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions.. | | | No | | Commitment letter from bank with several rates, depending on term. |

[100] The record indicates that the mortgage, signed on 7/17/1980 carried a 20 year restrictive use clause.

[101] The record indicates that the mortgage, signed on 7/17/1980 carried a 20 year restrictive use clause.

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Prairie Village of Slater II (IA) | 5/30/1978 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter |
| Prairie Village of State Center (IA) | 6/1/1976 | Yes (8/99) | G4 prepay with restrictions. | | | G4 prepay with restrictions. | | | No | | Commitment letter from bank with several rates, depending on term |
| Greenway of Altoona II (IA) | 9/9/1981 | Yes (1/00) | G4 prepay, prepay request withdrawn because too much time passed. (Maybe because no acceptance of restrictions). | | | | | | No | | Commitment letter. |
| Prairie Village of Adel (IA) | 10/22/1979 | Yes (1/00) | G4 prepay, prepay request withdrawn because too much time passed. | | | | | | No | | Commitment letter. |
| Prairie Village of Parkersburg (IA) | 5/23/1979 | Yes (1/00) | G4 prepay, no closing b/c no acceptance of restrictions. | | | | | | No | | Commitment letter. |
| Pine Needle (NC) | 1/24/1979 | Yes (12/93) | Equity loan of $581,275 (subject to availability); 8 additional units of rental assistance; increase in annual return to $13,424 (increase of $7,299) (all subject to appropriation limitations). | | | Equity loan $581, 275, 8 additional units, increase in annual return to $13,424. | | | No | | Letter from bank indicating "interest" in providing financing and an overview of "normal" terms and conditions. |
| Palmyra Park I (WI) | 1/11/1978 | Yes (11/93) | Equity loan of $249,750 (subject to appropriation limitations). | | | Equity loan of $249,750. | | | No | | Commitment letter, $335,000, 8.5% fixed rate, 20 year term. |
| Palmyra Park II (WI) | 7/28/1982 | Yes (11/93) | Increased return on investment of $7,428 for total of $9,300; 10 units of rental assistance units. | | | Re-amortization agreement 3/1/1996–payment schedule modified so that plaintiff could pay outstanding balance of loan ($347,607) in monthly installments of $2,035.75 for 50 years instead of $5,011/month. New agreement had 20 year restriction on leaving the program. Return on investment increased by $7,428 for total of $9,300, 10 additional units of rental assistance. | | | No | | Commitment letter, $368,000, 8.5% fixed rate, 20 year term. |

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Fox Ridge II (WV) | 6/12/1979 | No; sent letter "exploring possibility" but did not submit application. | | | | | | | No | | No evidence of ability to prepay; commitment letter for Dublin Plaza, owned by same individuals, is dated October 19, 1987, well before the period in question. |
| Timberbrook (MN) | 2/25/1982 | Yes, but application incomplete (8/91). | | | | | | | No | | Draft application for loan and tax returns indicating positive cash flow for complex; plaintiff was health care administrator and member of the board of directors of a bank. |
| Dogwood Glen (KS) | 6/10/1981 | Yes (10/99) | No definitive action taken. | | | | | | No | | Prepayment application indicating substantial positive cash flow as commercial rate property; owned by same plaintiff who owned Valley View Village. |
| Valley View Village (KS) | 10/26/1978 | Yes (10/99) | No definitive action taken. | | | | | | No | | Prepayment application revealing substantial positive cash flow as commercial rate property; plaintiff made significant extra payments of principal – loan originally scheduled to be paid off in 2030 to be fully amortized in 2008. |

| | | | Incentives Offered | | | Incentives Accepted | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Loan Date | Prepayment Request (Date) | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Increased Rate of Return | Reduced Interest Rate | Additional Loan | Sale to non-profit initiated/ completed | Prepayment authorized | Ability to Prepay |
| Falls River Meadows I (WI) | 11/22/1976 | Yes (9/94) | Equity loan (unspecified amount) up to 90% of appraised value (contingent upon availability of funds) up to $176,515, 2 additional units of rental assistance. | | | Equity loan (ultimately ended up being $176,515), 2 units of rental assistance. | | | No | | Commitment letter, $201,000, prime plus 1% rate, 25 year amortization. |

# FACT APPENDIX B[102]

| Complex (One Bedroom Apartment) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Riverfront | 402 | 713 | 550 | - | 400 | - |
| Rolling Hills | 387 | 346 | 350 | 350 | 250-275 | - |
| Scenic Valley | 457 | 343 | 550 | - | 400 | - |
| Sunrise River | 457 | 713 | 620 | 625 | 620-630 | - |
| Eastwood | 407 | 292 | - | - | 275 | 400-450 |
| RC Getty | 349 | 363 | 460 | 340 | 281 | - |
| RC Mo | 364 | 371 | - | - | 460 | - |
| RC Pierre[103] | 367 | 375 | 350 | 350 | 360 | - |
| RC Springs[104] | 373 | 363 | 400 | 310 | 300 | - |
| Casa Grande I | 400 | 344 | - | 349 | 520-550 | - |
| Casa Grande II | n/a | 344 | - | 349 | 520-550 | - |
| Rancho Verde | 516 | 344 | - | 325 | 400 | 425 |
| Beechwood | 514 | 520 | - | 700 | - | 790 |
| Deer Run | 535 | 540 | 630 | 475-495 | - | - |
| Pine Tree | 535 | 520 | - | 700 | - | 790 |
| Evergreen Manor of Waukee I & II[105] | 505 | 525 | 495-500 | - | 535 | - |

[102] For comparison, note rate rents have been adjusted to 2002, assuming an increase or decrease of 2.5 % per year, as appropriate, unless otherwise indicated; all other figures from 2002.

[103] Adjusted; originally note rate rent for 1991.

[104] Adjusted; originally note rate rent for 1993.

[105] Unadjusted average of market rents from Evergreen Manor rent rolls for years 2000-2003.

| Complex (One Bedroom Apartment) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Greenway of Altoona I | n/a | 525 | 500 | 515 | 560-570 | - |
| Greenway of Newton I | n/a | 358 | 360-390 | - | 450 | - |
| Prairie Village of Altoona I & II[1] | 530 | 525 | 500 | 515 | 560-570 | - |
| Prairie Village of Grimes I & II[2] | 476 | 525 | 535 | 455-485 | 455-485 | - |
| Prairie Village of Huxley I & II[3] | 471 | 446 | 445 | - | - | - |
| Prairie Village of LaPorte City I[4] | 473 | 438 | - | 350 | 400 | - |
| Prairie Village of Slater I & II[5] | 461 | 446 | - | - | - | 445 |
| Prairie Village of State Center[6] | 413 | 385 | - | 425 | 400 | - |
| Greenway of Altoona II | n/a | 525 | 500 | 515 | 560-570 | - |
| Prairie Village of Adel[7] | 461 | 525 | - | 525-635 | 530 | - |
| Prairie Village of LaPorte City II[8] | 472 | 438 | - | 350 | 400 | - |

[1] Adjusted; originally average of restricted rents from Prairie Village of Altoona I & II rent rolls for 2001.

[2] Adjusted; originally average of market rents from Prairie Village of Grimes I and II rent rolls for 2000.

[3] Adjusted; originally average of market rents from Prairie Village of Huxley I & II rent rolls for 2001.

[4] Adjusted; originally average of market rents from Prairie Village of Slater rent roll for 2001.

[5] Adjusted; originally average of market rents from Prairie Village of Slater rent roll for 2001.

[6] Adjusted; originally average of market rents from Prairie Village of State Center rent roll for 2001.

[7] Adjusted; originally average of market rent from Prairie Village of Slater rent roll for 2001.

[8] Adjusted; originally average of market rent from Prairie Village of Slater rent roll for 2001.

| **Complex (One Bedroom Apartment)** | **Note Rate** | **HUD Rate** | **Comparable # 1** | **Comparable # 2** | **Comparable # 3** | **Comparable # 4** |
|---|---|---|---|---|---|---|
| Prairie Village of Parkersburg[1] | 461 | 349 | - | - | 355 | - |
| Pine Needle | n/a | 445 | 495 | 475 | 515-575 | 595 |
| Palmyra Park I | 402 | 390 | - | 450 | 400 | 475 |
| Palmyra Park II | 464 | 390 | 400 | 450 | 475 | - |
| Fox Ridge II | n/a | 334 | - | 310-335 | - | - |
| Timberbrook[2] | 448 | 466 | 410 | 462 | 475 | - |
| Dogwood Glen | 600 | 326 | 450 | 450 | 400-415 | - |
| Valley View Village | 402 | 326 | 450 | 450 | 400-415 | - |
| Fall River I | 376 | 350 | 500 | - | 560 | - |

1 Adjusted; originally average market rent from Prairie Village of Slater rent roll for 2001.

2 Adjusted; originally note rate rent for 1992.

| Complex (Two Bedroom Apartments) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Riverfront | 433 | 912 | 550-650 | 650 | - | - |
| Rolling Hills | 412 | 438 | 425 | 370-400 | 325 | - |
| Scenic Valley | 487 | 444 | 550-650 | 650 | - | - |
| Sunrise River | 481 | 912 | 720-740 | 700-725 | 740-750, 850 | - |
| Eastwood | 424 | 377 | 350 | 350 | 325-350 | - |
| RC Getty | 378 | 455 | 475 | 434 | 340 | - |
| RC Mo | 383 | 455 | 400 | 425 | 475 | - |
| RC Pierre[1] | 395 | 497 | 415-455 | 370-425 | 425 | - |
| RC Springs[2] | 397 | 455 | - | 400 | 400-500 | - |
| Casa Grande I | 427 | 448 | 450-490 | 449 | 620-685 | - |
| Casa Grande II | 445 | 448 | 450-490 | 449 | 620-685 | - |
| Rancho Verde | 552 | 443 | 450-490 | - | - | - |
| Beechwood[3] | 532 | 692 | 700 | 850 | 635 | 865 |
| Deer Run[4] | 552 | 710 | 700-760 | 550-600 | 650-675 | - |
| Pine Tree[5] | 550 | 692 | 700 | 850 | 635 | 865 |

[1] Adjusted; originally note rate rent for 1991.

[2] Adjusted; originally note rate rent for 1993.

[3] 2002 note rate rent for large 2 bedroom set at $549 and for extra large 2 bedroom at $571.

[4] 2002 note rate rent for large 2 bedroom set at $566.

[5] 2002 note rate rent for large 2 bedroom set at $573.

| Complex (Two Bedroom Apartments) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Evergreen Manor of Waukee I & II[1] | 543 | 649 | 535-555 | 750 | 575 | 525 |
| Greenway of Altoona I[2] | 564 | 649 | 600 | 550 | 625-640 | - |
| Greenway of Newton I[3] | 577 | 453 | 425-475 | 515 | 525 | - |
| Prairie Village of Altoona I & II[4] | 610 | 649 | 600 | 550 | 625-640 | - |
| Prairie Village of Grimes I & II[5] | 570 | 649 | 575 | 495-535 | 495-535 | - |
| Prairie Village of Huxley I & II[6] | 521 | 527 | 480-520 | 490 | 525 | - |
| Prairie Village of LaPorte City I[7] | 525 | 547 | 310 | 400 | 450 | 375 |
| Prairie Village of Slater I & II[8] | 512 | 527 | 525 | 460 | 450 | 480-520 |
| Prairie Village of State Center | n/a | 482 | 400 | 475-500 | - | - |
| Greenway of Altoona II[9] | 547 | 649 | 600 | 550 | 625-640 | - |

1 Unadjusted; average market rents from Evergreen Manor rent rolls for years 2000-2003.

2 Adjusted; originally average of market rents from Greenway of Altoona I rent roll for 2001.

3 Adjusted; originally average of market rents from Greenway of Altoona I for 2000.

4 Adjusted; originally average of restricted rents from Prairie Village of Altoona I & II rent rolls for 2001.

5 Adjusted; originally average of market rents from Prairie Village of Grimes I and II rent rolls for 2000.

6 Adjusted; originally average of market rents from Prairie Village of Huxley I & II rent rolls for 2001.

7 Adjusted; originally average of rents from Prairie Village of Slater rent roll for 2000.

8 Adjusted; originally average of market rents from Prairie Village of Slater rent roll for 2001.

9 Adjusted; originally average of market rents from Greenway of Altoona I rent roll for 2003.

| Complex (Two Bedroom Apartments) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Prairie Village of Adel[1] | 512 | 649 | 525 | 565-780 | 585-610 | - |
| Prairie Village of LaPorte City II | n/a | 547 | 310 | 400 | 450 | 375 |
| Prairie Village of Parkersburg[2] | 512 | 437 | 450 | 350 | 425 | - |
| Pine Needle | 441 | 580 | 575-590 | 600-690 | 665-705 | |
| Palmyra Park I | 440 | 505 | 570-580 | - | 500 | - |
| Palmyra Park II | n/a | 505 | 500 | - | - | 578-580 |
| Fox Ridge II[3] | 445 | 389 | 450 | 440-480 | 505 | - |
| Timberbrook[4] | 489 | 581 | 440 | 590 | 500 | - |
| Dogwood Glen[5] | 664 | 418 | 565 | 550 | 525 | - |
| Valley View Village | 467 | 418 | 565 | 550 | 525 | - |
| Fall River I | n/a | 459 | 635-665 | 650-675 | 625 | - |

1 Adjusted; originally average of market rent from Prairie Village of Slater rent roll for 2001.

2 Adjusted; originally average market rent from Prairie Village of Slater rent roll for 2001.

3 2002 note rate rent for large 2 bedroom apartments set at $463.

4 Adjusted; originally note rate rent for 1989.

5 2002 note rate rent for large 2 bedroom apartments set at $732.

| Complex (Three Bedroom Apartments) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Riverfront | n/a | 1,233 | - | - | - | - |
| Rolling Hills | n/a | 548 | 450-475 | - | - | - |
| Scenic Valley | n/a | 556 | - | - | - | - |
| Sunrise River | n/a | 1,233 | - | - | - | - |
| Eastwood | n/a | 509 | - | - | 375 | - |
| RC Getty | n/a | 602 | - | - | - | - |
| RC Mo | n/a | 602 | - | - | - | - |
| RC Pierre | n/a | 654 | 500 | 500 | 475 | - |
| RC Springs | n/a | 602 | - | - | 600 | - |
| Casa Grande I | n/a | 592 | 485, 575 | - | 745-775 | - |
| Casa Grande II | n/a | 592 | 485, 575 | - | 745-775 | - |
| Rancho Verde | n/a | 588 | 575 | - | - | - |
| Beechwood | n/a | 895 | - | - | - | 906 |
| Deer Run | n/a | 960 | 840 | - | - | - |
| Pine Tree | n/a | 895 | - | - | 906 | 895 |
| Evergreen Manor of Waukee I & II | n/a | 841 | - | - | 630 | - |
| Greenway of Altoona I[1] | 772 | 841 | - | - | 750 | - |
| Greenway of Newton I[2] | 772 | 566 | - | 650 | - | - |
| Prairie Village of Altoona I & II | n/a | 841 | - | 750 | - | - |

[1] Adjusted; originally average of market rents from Greenway of Altoona I rent roll for 2001.

[2] Adjusted; originally average of rents from Greenway of Altoona I rent roll for 2000.

| Complex (Three Bedroom Apartments) | Note Rate | HUD Rate | Comparable # 1 | Comparable # 2 | Comparable # 3 | Comparable # 4 |
|---|---|---|---|---|---|---|
| Prairie Village of Grimes I & II | n/a | 841 | 630 | - | - | - |
| Prairie Village of Huxley I & II | n/a | 728 | - | - | 725 | - |
| Prairie Village of LaPorte City I | n/a | 728 | - | - | - | - |
| Prairie Village of Slater I & II | n/a | 728 | 725 | - | - | - |
| Prairie Village of State Center | n/a | 611 | - | - | - | - |
| Greenway of Altoona II[1] | 717 | 841 | - | 715 | | |
| Prairie Village of Adel | n/a | 841 | 600 | 665-915 | - | - |
| Prairie Village of LaPorte City II | n/a | 728 | - | - | - | - |
| Prairie Village of Parkersburg | n/a | 556 | - | - | - | - |
| Pine Needle | 548 | 756 | - | - | - | 780-795 |
| Palmyra Park I | n/a | 654 | - | - | - | - |
| Palmyra Park II | n/a | 654 | - | - | - | - |
| Fox Ridge II | n/a | 500 | 550-600 | 525-550 | 635 | - |
| Timberbrook | n/a | 745 | - | - | - | - |
| Dogwood Glen | n/a | 539 | - | 595 | 675 | - |
| Valley View Village | n/a | 539 | - | 595 | 675 | - |
| Fall River I | n/a | 601 | - | - | - | - |

[1] Adjusted; originally average of market rents from Greenway of Altoona II rent roll for 2003.