**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

FRANCONIA ASSOCIATES, a
Limited Partnership, et al.,

Plaintiffs,

**File No. 97-381C**
**Judge Francis M. Allegra**

v.

THE UNITED STATES,

Defendant.

---

**MOTION FOR ATTORNEYS' FEES, EXPENSES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT**

---

Jeff H. Eckland
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
700 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 305-4444
Facsimile: (612) 305-4439

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** .......... ii

**INDEX TO ATTACHMENTS** .......... v

**BACKGROUND** .......... 2

I. PLAINTIFFS' QUARTER-CENTURY ORDEAL WITH THE FEDERAL GOVERNMENT .......... 2

II. PLAINTIFFS' ARDUOUS ROAD TO RECOVERY .......... 6

**DISCUSSION** .......... 11

I. APPLICANTS ARE ENTITLED TO RECOVERY UNDER EAJA .......... 11

A. Applicants Have Submitted a Proper and Timely Application .......... 11

B. Applicants are Qualified "Prevailing Parties" Under EAJA .......... 13

C. The Government's Actions Were Not Substantially Justified .......... 15

II. APPLICANTS HAVE PRESENTED AN ACCURATE AND DETAILED ACCOUNTING OF THE FEES AND COSTS TO WHICH THEY ARE ENTITLED .......... 18

A. Applicants' Calculation of Attorneys' Fees .......... 19

B. Applicants' Calculation of Expenses .......... 22

**CONCLUSION** .......... 24

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Allegre Villa v. United States*, 60 Fed. Cl. 11 (2004) ....................................8

*Baldi Bros. Constr. v. United States*, 52 Fed. Cl. 78 (2002)................................12,13,22

*Bazalo v. West*, 150 F.3d 1380 (Fed. Cir. 1998)..................................................12

*Beta Sys., Inc. v. United States*, 866 F.2d 1404 (Fed. Cir. 1989) .........................18

*Blum v. Stenson*, 465 U.S. 886 (1984) ...............................................................19

*Branstad v. Veneman*, 232 F. Supp. 2d 945 (N.D. Iowa 2002) ............................15

*California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724 (1999).........20, 21, 24

*CEMS, Inc., v. United States*, __ Fed. Cl. __, 2005 WL 950495
(Apr. 22, 2005).....................................................................................................21

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005)...........................8

*Chiu v. United States*, 948 F.2d 711 (Fed. Cir. 1991)..........................................15

*Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796 (2000)....................8

*Community Heating & Plumbing Co. v. Garrett*, 2 F.3d 1143 (Fed. Cir. 1993)..11

*Conoco, Inc. v. United States*, 35 Fed. Cl. 309 (1996) ........................................8

*Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751 (2003)..............8

*Defenders of Wildlife v. Administrator, EPA*, 700 F. Supp. 1028
(D. Minn. 1988) ...................................................................................................20

*Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612 (2005) ......................16, 20, 23

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002)...................................4, 7, 17

*Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004) ...............................*passim*

*Gavette v. Office of Personnel Management*, 808 F.2d 1456 (Fed. Cir. 1986) ....18

*General Dynamics v. United States*, 47 Fed. Cl. 513 (2000)................................8

*Gopher Oil Co. v. Union Oil Co.*, 757 F. Supp. 998 (D. Minn. 1991) .................20

*Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (Fed. Cl. 2002)..............8

*Hensley v. Eckerhart*, 461 U.S. 424 (1988) .........................................................18, 19

*INS v. Jean*, 496 U.S. 154 (1990) ........................................................................15, 18

*Kimberly Assocs. v. United States*, 261 F.3d 864 (9th Cir. 2001) ........................8

*KMS Fusion v. United States*, 39 Fed. Cl. 593 (1997).........................................23, 24

*Levernier Constr., Inc. v. United States*, 947 F.2d 497 (Fed. Cir. 1991)..............18

*Libas, Ltd. v. United States*, 314 F.3d 1362 (Fed. Cir. 2003) ..............................11, 12, 18

*Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505 (2003).................................21

*Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*,
837 F.2d 465 (Fed. Cir. 1988)..................................................................................16

*Melkonyan v. Sullivan*, 501 U.S. 89 (1991) ..........................................................12

*Meyer v. Sullivan*, 958 F.2d 1029 (11th Cir. 1992) ..............................................21

*Minneapolis Star & Tribune Co. v. United States*, 713 F. Supp. 1308
(D. Minn. 1989) ........................................................................................................20

*Naporano Iron & Metal Co. v. United States*, 825 F.2d 403 (Fed. Cir. 1987).....18

*Oliveira v. United States*, 827 F.2d 735 (Fed. Cir. 1987)....................................23

*PCI/RCI v. United States*, 37 Fed. Cl. 785 (1997)...............................................23, 24

*Pierce v. Underwood*, 487 U.S. 552 (1988).........................................................15

*R.C. Constr. Co. v. United States*, 42 Fed. Cl. 57 (1998) ....................................23, 24

*Resolution Trust Corp. v. FSLIC*, 34 F.3d 982 (10th Cir. 1994) ..........................5

*Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 2005 WL 956955
(Fed. Cir. 2005)........................................................................................................14

*Scarborough v. Principi*, 541 U.S. 401, 124 S. Ct. 1856 (2004)..........................11, 12

*Scherr Constr. Co. v. United States*, 26 Cl. Ct. 248 (1992)................................14

*United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111
(E.D. Cal. 2001)..........................................................................................8

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)..........................................3

**Statutes, Regulations and Rules**

28 U.S.C. § 2412 (2000)..........................................................................*passim*

Pub. L. No. 1-0-121 §§ 232(b)(1), 110 Stat. 847, 863-64 (1996)........................21

Pub. L. No. 96-153, 93 Stat. 1134 (1979).........................................................4

H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess. 3317.......4

Minnesota Rules of Professional Conduct, Rule 1.5 ..........................................20

Rules of the United States Court of Federal Claims, Rule 54(d)(1)....................2

**Other Materials**

Grateful Dead (R. Hunter, J. Garcia, B. Weir, and P. Lesh),
Truckin', *American Beauty* (Warner 1970) ......................................................2

Belden & Wiener, HOUSING IN RURAL AMERICA (1999)....................................3, 4

**INDEX TO ATTACHMENTS**


Affidavit of Jeff H. Eckland, with exhibits ........................................................ A

Affidavit of Thomas Costello, with exhibits ...................................................... B

Affidavit of Marilyn Graham, with exhibits....................................................... C

Affidavit of David Hodges, with exhibits........................................................... D

Affidavit of James Levy, with exhibits............................................................... E

Affidavit of George Morosani, with exhibits...................................................... F

Affidavit of Phoebe J. Perri, with exhibits ......................................................... G

Affidavit of Donald Stordahl, with exhibits ....................................................... H

Affidavit of David Tucker, with exhibits............................................................ I

Affidavit of Brian Wells , with exhibits.............................................................. J

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FRANCONIA ASSOCIATES,
a Limited Partnership, et al.,

Plaintiffs,

**Case No. 97-381C**
**Judge Francis M. Allegra**

v.

THE UNITED STATES

Defendant.

## MOTION FOR ATTORNEYS' FEES, EXPENSES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT

Plaintiffs hereby submit this motion requesting fees, expenses and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2000), incurred by plaintiffs Evergreen Manor Associates; Marilyn Graham; Greenway of Altoona Associates Phase I, L.P.; Greenway of Altoona Associates Phase II, L.P.; Greenway of Newton Associates Phase I, L.P.; David A. Hodges, Sr.; Phoebe J. Perri; Pine Needle Apartments, L.P.; Prairie Village of Adel Associates, L.P.; Prairie Village of Altoona Associates, L.P.; Prairie Village of Grimes Associates, L.P.; Prairie Village of Huxley Associates, L.P.; Prairie Village of LaPorte Associates, L.P.; Prairie Village of Parkersburg Associates, L.P.; Prairie Village of Slater Associates, L.P., Prairie Village of State Center Associates, L.P.; R.C. Getty Apartments, R.C. Mo Apartments; R.C. Pierre Apartments, R.C. Springs Apartments; Timberbrook Properties, L.P.; Tucker Properties II, L.P.; and Brian E. Wells (collectively, the "Applicants")[1] in connection with this action.

[1] While the plaintiffs seeking recovery of fees and costs are referred to herein as "Applicants," other references are made to the "plaintiffs" in this action generally. In addition, references are made herein to the parties' Joint Stipulation of Facts ("JSF"),

In support of this motion, Applicants are submitting contemporaneously herewith (1) the affidavit of Jeff H. Eckland, attorney of record for plaintiffs, with attachments; and (2) affidavits on behalf of each of the Applicants, with attachments. Applicants are also filing with the Court this date the Bill of Costs form required by Rule 54(d)(1) of the Rules of the United States Court of Federal Claims.

## BACKGROUND

*"What a long strange trip it's been."*[2]

## I. PLAINTIFFS' QUARTER-CENTURY ORDEAL WITH THE FEDERAL GOVERNMENT

The thorny history of dealings between plaintiffs and the federal government goes back to the late 1970s and early 1980s. During that time, each plaintiff entered into a real estate transaction with the Farmers Home Administration ("FmHA") of the U.S. Department of Agriculture. The deal between the parties, typically reflected in a Loan Agreement, Mortgage and Promissory Note, required the owners to construct rental housing in rural areas of the United States using a loan from the agency. Those contracts, in no uncertain terms, granted the plaintiffs the right to pay off their government mortgages, upon which they would be freed of the government's restrictions on the use of their properties. *See* JSF ¶ 7 ("Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."); *Franconia Assocs. v.*

---

Joint Exhibits ("JX"), plaintiffs' exhibits ("PX"), defendant's exhibits ("DX"), and the trial transcript, referred to by volume and page number (e.g., II/555).

[2] Grateful Dead (R. Hunter, J. Garcia, B. Weir, and P. Lesh), Truckin', *American Beauty* (Warner 1970).

*United States*, 61 Fed. Cl. 718, 730 (2004) ("The promissory notes at issue could not be much clearer in allowing plaintiffs to prepay at any time . . . .").[3]

As the Court held, the agency induced owners into the program using this promise of prepayment as the proverbial carrot at the end of the stick:

> Virtually all of the evidence presented at trial confirms that the government should have known – and, in fact, knew – about the profit expectations that led plaintiffs to agree to the housing contracts. The testimony of several witnesses . . . confirms that FmHA officials worked diligently to plant those expectations in the minds of potential program participants by repeatedly touting the ability of borrowers to convert their properties to commercial use.

61 Fed. Cl. at 752; *see also id.* at 722-23 ("This prepayment option served as a major inducement for recruiting property owners into the program: the option not only benefited the program participants, who viewed the program as a way to acquire equity in a building that would eventually be converted to market rents, but also the FmHA, which through these participants was able to provide needed housing). The right to prepay thus served as "'an essential part of the quid pro quo' of the contracts." *Id.* at 752 (*quoting United States v. Winstar Corp.*, 518 U.S. 839, 921 (1996) (Scalia, J., concurring)).

The government attracted owners into the program in this manner with apparent disregard for the long-term budgetary consequences of its actions. *See* Belden & Wiener, HOUSING IN RURAL AMERICA 118 (1999) (explaining that the agency reported to Congress in 1979 that it had "acted without sufficient foresight in 1972 when it

---

3 The only cash flow that an owner could receive while subject to the restrictions of the program was a nominal annual return representing 8% of their initial down payment on the property. JX 103 at 5. Even this meager return has been unavailable to many plaintiffs for substantial periods of time. *See* IV/646; IV/867-77, 889; IV/947; V/1177; *see also* DX 42 at 34-35 (defendant's expert report, documenting 15-20% denial of annual return; II/470-71 (characterizing nonpayment of annual return reported by defendant's expert as "substantial default rate").

authorized provision of subsidized loans to limited-profit sponsors"). In other words, the agency "opened the front door to limited-profit borrowers without closing the back door." *Id.* at 116-17. Thus, as many owners took the expected action of prepaying their government loans, Congress found itself compelled to take immediate action to curtail owners from exercising their rights. *See* H.R. Rep. No. 100-122(I), 1987 U.S.C.C.A.N., 100th Cong., 1st Sess., v.5, 3317, 3351 (foretelling potential loss of 500,000 to 1,000,000 units in various government housing programs and concluding that there was "no simple solution" to this "very serious problem").

Notwithstanding the crystal clear terms of the parties' agreements, the government passed statutes in 1988 and 1992 that the Supreme Court and this Court found to be a direct repudiation of the owners' prepayment rights. 536 U.S. at 143; 61 Fed. Cl. at 732 (finding that "not even a microscopic reading of the contract documents" could avoid the conclusion that the government repudiated the plaintiffs' contract rights). Congress took this action despite the agency's own concerns, first reported to Congress in 1979 and later confirmed in 1987, that it was obligated to honor the owners' contract rights. *See* 61 Fed. Cl. at 732 n.17 (quoting legislative history).[4] The abundant legislative history cited by the Court in its decision – which while directly relevant to this motion is far too extensive to restate herein – overwhelmingly confirms that the

[4] By the time Congress was through, it actually had repudiated the contract rights of Section 515 owners *three times*: through the 1988 and 1992 legislation and through an earlier statute passed in 1979. *See* Pub. L. No. 96-153, § 503, 93 Stat. 1134 (1979). Unlike its later renunciation of the owners' prepayment rights, Congress apparently recognized the inequity of its actions and promptly repealed the 1979 statute in 1980. *See* Belden & Wiener at 117 (noting that during the debates over the 1979 legislation, some members of Congress "argued that owners' property rights were paramount – that retroactivity was a breach of contract and unconstitutional").

government's actions constituted a knowing disregard for plaintiffs' rights. *See, e.g.*, *id.* at 732 (holding that "Congress knowingly compromised the same prepayment option it had earlier championed – as one legislator put it, 'welching' on the deal previously made to induce participation in the program").

The Court held that in taking these actions, Congress "deliberately targeted the FmHA's contractual obligations . . . in an effort to obtain a better deal than the one it and the FmHA used to induce plaintiffs to enter into the program." *Id*. at 736. The evidence also established that the government's motivation in curtailing the owners' rights was less than noble: it wanted to save money. *Id.* at 736 n.27 ("It does not take much to conclude that Congress viewed its efforts to force preexisting borrowers to remain with the section 515 program as a way to save money.").

As if the government's willful repudiation of plaintiffs' rights was not enough, the agency's implementation of the resulting "prepayment prevention program" imposed a rash of new problems and challenges on plaintiffs. For example, while the legislation promised certain "incentives" to those who agreed to re-up for an additional twenty years, many plaintiffs had to wait for years and years before seeing the agency follow through on its offer. *E.g.*, PX 621; II/615-16. In one case, an owner had been waiting for an "equity loan" from the agency for more than a decade at the time of trial. PX 596; I/294; *see also* 61 Fed. Cl. at 743 & n.40 (recounting various budgetary constraints that resulted in processing delays by the agency). Another owner, who did eventually receive an equity loan after waiting for years, established that the amount he actually received represented only a small portion of his true equity in his property. PX 749; PX 819.

In addition, the very process plaintiffs were required to follow simply to request permission to prepay proved to require a substantial and unreasonable commitment of time and resources. *See, e.g.,* I/244; III/792-93; VI/1292; III/783-84; V/1134, 1165; V/1212; IV/897-98; VI/1279; PX 276; VII/1605-1607 (L. Anderson testifying that "it is difficult to go through the preservation process. I have to be frank. It's not the easiest thing in the world" and acknowledging that "there was a lot of inconsistency" in the agency's implementation of the process). In the case of each of the plaintiffs, the end result of that process was simply an affirmation of the fact that they would never be able to realize the benefits to which their contracts entitled them. *See* Plaintiffs' Post-Trial Brief at 41-42. The defects and inequities in the agency's prepayment prevention program led the Court to characterize the options made available to plaintiffs as "either feckless, fruitless, or just plain risky." 61 Fed. Cl. at 742.

In sum, the underlying actions of the government at issue in this case involve decades of mistreatment, knowing disregard for the rights of its contractors, and conduct generally unfitting of the United States government. *See* 61 Fed. Cl. at 732 n.18 (quoting legislative history from 1987 hearings) ("'It would be easy enough for me to be a demagogue and sit up here and say you can't prepay but that is not the way we do things in America. We signed a contract.'").

**II. PLAINTIFFS' ARDUOUS ROAD TO RECOVERY**

Plaintiffs commenced this action on May 30, 1997. Throughout the course of the litigation, the government compounded its earlier wrongs by taking unreasonable and unwarranted positions in its attempts to thwart plaintiffs' claims. The government's common theme through every phase of the case has been that, regardless of the

importance of plaintiffs' contract rights or the severity of their damages, the government should be afforded special treatment that would immunize it from liability.

The government's initial attempt to avoid liability without regard to the merits was its assertion that the claims of the majority of plaintiffs were time-barred. In making this argument, the government initially took the odd position that although it was obligated to *allow* owners to prepay, it never had an obligation to *accept* prepayment requests from owners – notwithstanding the unambiguous terms of the contract. When the case reached the United States Supreme Court, however, defendant reversed course and instead asserted that the rules governing accrual of claims against private parties simply did not apply to claims against the government. *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002). The Supreme Court, however, unanimously rejected defendant's attempt to fashion a "special accrual rule for suits against the United States." *Id*. at 145. In so holding, the Court found that the unprecedented accrual standards advocated by defendant "would seriously distort the repudiation doctrine in suits brought under the Tucker Act." *Id*. at 146.[5]

Thus, after years of procedural and jurisdictional battles, plaintiffs' unanimous Supreme Court victory finally permitted their claims to go forward. The case was then

---

[5] At the oral argument before the Supreme Court, Justice O'Connor noted the oddity of the government's position:

> [T]he Government should want to have some rules out there that would encourage it to be able to deal with people on a commercial basis in some areas. You might want to be able to buy certain things from the private sector or to engage in loan agreements. And to adopt the kind of proposal you're making discourages anyone from dealing with the Government. *It's a very peculiar rule.*

*Franconia Assocs. v. United States*, No. 01-455, oral argument (April 15, 2002) (emphasis added).

tried in Des Moines, Iowa from June 16, 2003 through June 26, 2003. The trial covered the claims of thirty-one separate plaintiffs. In presenting their case, plaintiffs introduced over 800 exhibits and presented the testimony of seventeen fact and expert witnesses.

Before, during, and after trial, the government's defense of its conduct continued to center on the theme that, regardless of the merits of plaintiffs' claims, the government should not be held responsible for the consequences of its actions. The government's primary argument on liability was that it was wholly immune from liability by virtue of the so-called "unmistakability doctrine." By the time of the Supreme Court's remand, however, the legal foundation for the government's argument had virtually disintegrated, with two federal appellate courts and numerous other decisions from this and other courts having squarely rejected the government's position.[6] The Court thus concluded that the government's unmistakability argument "does not bear scrutiny" and represented a departure from the fundamental principle that "'a deal is a deal.'" 61 Fed. Cl. at 737.

The government also made the specious claim that plaintiffs' contracts never really entitled them to prepay at any time *without restrictions*, and thus left the government free to impose unilateral limitations on prepayment after the fact. The Court rejected this "wooden construction" of the contract terms, and looked to the "plain

---

[6] *See Kimberly Associates v. United States*, 261 F.3d 864, 869 (9th Cir. 2001); *Resolution Trust Corp. v. FSLIC*, 34 F.3d 982, 984 (10th Cir. 1994); *United States v. Westlands Water Dist*., 134 F. Supp. 2d 1111, 1151 (E.D. Cal. 2001); *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (Fed. Cl. 2002); *General Dynamics v. United States*, 47 Fed.Cl. 513 (2000); *Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796, 803 (2000); *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 335 (1996). Subsequent decisions have resoundingly confirmed these rulings. *See Centex Corp. v. United States*, 395 F.3d 1283, 1307 (Fed. Cir. 2005); *Allegre Villa v. United States*, 60 Fed. Cl. 11, 16-17 (2004); *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751, 763 (2003).

meaning" of the contract to conclude that it "gave plaintiffs the unfettered right to prepay their loans at any time." *Id*. at 730 & n.13. Finally, as a "last-ditch effort" to escape liability, defendant pointed to the fact that it could have used its power of eminent domain to confiscate plaintiffs' properties rather than breaching their contracts. The Court did not agree:

> This assertion, however, suffers from doctrinal bankruptcy. It would accord defendant a right to avoid undesirable contracts coterminous with its power of eminent domain. Defendant neither cites a single case in support of this remarkable proposition, nor even explains this result in terms of some general principle of contract law.

*Id.* at 737 n.28.[7]

The government's arguments on damages were of a similar ilk. Defendant's "centerpiece contention" was that plaintiffs should have mitigated their damages by taking one of the statutory options offered by the government in connection with its repudiation of plaintiffs' rights. *See id.* at 742. The Court likened defendant's suggestion that plaintiffs should enter into a new deal with the government after the government had repudiated the parties' original contract to the "Schulzian football-kicking scenario that always finds poor Charlie on his back." *Id.* at 742; *see also id*. ("Like Old Dobbins, defendant all but dons blinders to the fact that Congress here repudiated the original contracts not once, but ***twice***, each time modifying the FmHA contracts to suit its purposes.") (emphasis in original). The Court described the government's remaining contentions in this regard – including the notion that owners could have paid tenants off

[7] Plaintiffs also asserted Fifth Amendment takings claims as an alternative theory of liability. *See* 61 Fed. Cl. at 718. The Court agreed that "plaintiffs' situation implicates the underlying purpose of the Fifth Amendment," but held that because plaintiffs succeeded on their contract claim, they could not recover on a separate takings theory as well. *Id*. at 737, 740.

to cause them to vacate their housing – as being marked by "liberal legal interpretations" and "self-serving testimony of FmHA officials." *Id.* at 743. Finally, in rejecting the bulk of the government's myriad attacks on plaintiffs' damages analysis, this Court found that the government's proffered expert lacked experience in key subject matter, offered conclusory testimony, and acted more like an advocate than an unbiased expert. *Id.* at 759 & n.72.

After the close of the trial and extensive post-trial briefing, the Court issued its opinion on liability and damages on August 30, 2004. *See Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004). As detailed above, the Court dismissed the government's arguments on liability and approved all material elements of plaintiffs' damages analyses. Based on certain refinements to plaintiffs' damages calculations ordered by the Court, the parties submitted on October 29, 2004 a Joint Status Report containing revised damages calculations totaling approximately $13 million. The Court then issued judgments reflecting those amounts on December 30, 2005. *See* Order and Opinion of Dec. 17, 2004; Judgments dated Dec. 30 and 31, 2004.

The government then appealed the judgments entered in favor of all the plaintiffs who recovered damages to the United States Court of Appeals for the Federal Circuit.[8] Before its opening brief was due, however, the government moved to dismiss each of the appeals on or about May 5, 2004. *See* Orders of Federal Circuit dated May 5 and May 6,

---

8 The claims of six plaintiffs were not appealed to the Federal Circuit: one plaintiff that was dismissed on statute of limitations grounds, four plaintiffs whom the Court held failed to prove causation of damages, and one plaintiff whose claims were the subject of a post-judgment motion by defendant.

2005 (granting motions to voluntarily dismiss appeals). The Federal Circuit duly dismissed the appeals and issued mandates accordingly. *Id.*

Plaintiffs' eight-year battle and twenty-five year ordeal with the federal government now has nearly come to a close. Their battle, however, was not an easy one; nor was it without sacrifice. As the final chapter to their saga, plaintiffs now request recovery of the attorneys' fees, costs and expenses to which they are entitled under the Equal Access to Justice Act.

## DISCUSSION

### I. APPLICANTS ARE ENTITLED TO RECOVERY UNDER EAJA.

The Equal Access to Justice Act is designed to remove legal fees and expenses as a barrier that otherwise would prevent small businesses and individuals from challenging unreasonable government action. *See Scarborough v. Principi*, 541 U.S. 401, 124 S. Ct. 1856, 1861 (2004); *Community Heating & Plumbing Co. v. Garrett*, 2 F.3d 1143, 1145 (Fed. Cir. 1993). An award of attorney's fees and expenses is mandatory where the prevailing party meets EAJA's requirements and the government fails to prove that its losing position was "substantially justified." 28 U.S.C. § 2412(d)(1)(A)-(B); *Scarborough*, 124 S. Ct. at 1862; *Libas, Ltd.*, 314 F.3d at 1368 (holding that the "trial court must award attorney's fees" when the requirements of the statute are satisfied).

#### A. Applicants Have Submitted a Proper and Timely Application.

To establish entitlement to an EAJA award, an applicant need only: (1) show that each plaintiff is a prevailing party; (2) show that each plaintiff is financially eligible to receive an award; (3) state the amount sought together with an itemized account of time expended and rates charged; and (4) allege that the government's position lacked

substantial justification. 28 U.S.C. § 2412(d)(1)(B); *Scarborough*, 124 S. Ct. at 1862; *Libas, Ltd v. United States*, 314 F.3d 1362, 1368 (Fed. Cir. 2003). Once the applicant makes this showing, the burden then shifts to the Government to prove that its position was substantially justified or that special circumstances make an award unjust. *Libas, Ltd.*, 314 F.3d at 1365. An EAJA award is mandated where, as here, the Government cannot meet its burden. *Id.*

This motion for attorney's fees, expenses and costs is complete and has been timely filed. An EAJA application must be filed within 30 days of a final and non-appealable judgment. 28 U.S.C. §§ 2412(d)(1)(B) & (d)(2)(G); *Melkonyan v. Sullivan*, 501 U.S. 89, 96 (1991). This Court's Judgment in each case issued on December 30, 2004, and the Government timely appealed each Judgment. On May 5, 2005, the Court of Appeals granted the Government's motion to voluntarily dismiss its appeals. The Mandate also issued that day, rendering each Judgment final and not appealable. Because the thirtieth day after judgment falls on Saturday, June 4, this application must be – and has been – filed no later than Monday, June 6, 2005.[9]

Applicants are submitting contemporaneously herewith the following materials in connection with their application: (1) the affidavit of Jeff H. Eckland, attorney of record for plaintiffs, together with attached spreadsheets detailing the fees and expenses incurred in this matter, which explain the methodology applied to calculate the recoverable

---

[9] Notably, a timely application may later be amended to cure deficiencies in the initial submission or to supply additional documentation. *See, e.g.*, *Scarborough*, 124 S. Ct. at 1865-70 (holding that application may be amended to cure initial failure to allege that Government's position lacked substantial justification); *Bazalo v. West*, 150 F.3d 1380, 1383-84 (Fed. Cir. 1998) (holding that amendment after 30-day filing period cured initial failure to establish applicant's financial eligibility); *Baldi Bros. Constructors v. United*

amounts; and (2) affidavits on behalf of each of the Applicants, together with supporting documentation, establishing that they meet the statute's financial eligibility criteria. Applicants are also filing this date a Bill of Costs form as required by Rule 54(d)(1) of the Court's rules.

**B. Applicants are Qualified "Prevailing Parties" Under EAJA.**

Each applicant won a judgment on the merits, with damages, on its breach of contract claims against the Government. On December 30, 2004, this Court issued Judgment for each applicant, as summarized below:

| Applicant | Properties | Damage Award |
|---|---|---|
| Evergreen Manor Assocs. | Evergreen Manor of Waukee I & II | $169,870 |
| Marilyn Graham | Casa Grande I<br>Case Grande II<br>Rancho Verde | $537,337<br>$588,731<br>$247,625 |
| Greenway of Altoona Assocs. Phase I, L.P. | Greenway of Altoona I | $150,987 |
| Greenway of Altoona Assocs. Phase II, L.P. | Greenway of Altoona II | $482,069 |
| Greenway of Newton Assocs. Phase I, L.P. | Greenway of Newton I | $1,067,326 |
| David A. Hodges, Sr. | Beachwood<br>Dear Run<br>Pine Tree Lane | $676,354<br>$489,957<br>$618,662 |
| Phoebe J. Perri | Palmyra Park I<br>Palmyra Park II | $375,883<br>$179,517 |
| Pine Needle Apts., L.P. | Pine Needle | $1,047,472 |
| Prairie Village of Adel Assocs., L.P. | PV of Adel | $516,535 |
| Prairie Village of Altoona Assocs., L.P. | PV of Altoona I & II | $287,770 |
| Prairie Village of Grimes Assocs., L.P. | PV of Grimes I & II | $68,184 |
| Prairie Village of Huxley Assocs., L.P. | PV of Huxley I & II | $88,636 |
| Prairie Village of LaPorte City Assocs., L.P. | PV of LaPorte City I<br>PV of LaPorte City II | $887,428<br>$224,858 |
| Prairie Village of | PV of Parkersburg | $793,924 |

---

*States*, 52 Fed. Cl. 78, 88 (2002). Applicants therefore reserve their right to supplement their application, if necessary, in order to cure any perceived or alleged deficiency.

| | | |
|---|---|---|
| Parkersburg Assocs., L.P. | | |
| Prairie Village of Slater Assocs., L.P. | PV of Slater I & II | $82,319 |
| Prairie Village of State Center Assocs., L.P. | PV of State Center | $119,020 |
| R.C. Getty Apts., G.P. | RC Getty | $307,744 |
| R.C. Mo Apts., G.P. | RC Mo | $491,869 |
| R.C. Pierre Apts., G.P. | RC Pierre | $857,774 |
| R.C. Springs Apts., G.P. | RC Springs | $385,384 |
| Timberbook Props., G.P. | Timberbrook | $469,098 |
| Tucker Props., L.P. | Valley View Village | $278,248 |
| Tucker Props. II, L.P. | Dogwood Glen | $30,262 |
| Brian E. Wells | Fall River I | $285,857 |
| **Total:** | | **$12,806,700** |

*See* Judgments in Case No. 97-381 and consolidated cases (entered December 30, 2004); *see also Franconia Assocs.*, 61 Fed. Cl. at 769-70 (holding government liable for breach of contract and awarding Applicants lost profits). Because each Applicant "obtained an enforceable judgment on the merits" against the Government, each is a prevailing party under EAJA. *See Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 2005 WL 956955, *8 (Fed. Cir. 2005).

In addition, each Applicant has demonstrated that it satisfies the financial eligibility criteria set forth in EAJA. To be eligible for an award under the statute, an applicant must establish that it qualifies as either (1) an individual whose net worth did not exceed $2,000,000 when the action was filed, or (2) an owner of a business which had a net worth of $7,000,000 or less and had 500 or fewer employees when the action was filed. 28 U.S.C. § 2412(d)(2)(B). "Net worth, for the purposes of the EAJA, is calculated by subtracting total liabilities from total assets." *Scherr Constr. Co. v. United States*, 26 Cl. Ct. 248, 251 (1992).

All of the Applicants satisfied these requirements on both May 30, 1997, the date that the original complaint in this matter was filed, and June 25, 1997, the date that many

of the Applicants were added to this action through plaintiffs' First Amended Complaint. *See* Attachments B through J hereto. In particular, on those dates, each Applicant was either an owner of a business with a net worth of less than $7,000,000 and fewer than 500 employees, or an individual with a net worth of less than $2,000,000. *Id.* Most of the Applicants are limited partnerships that hold no assets other than the properties at issue in this suit and have few, if any, employees. *See* Attachments B, D, E, F and I hereto. The remaining applicants qualify as eligible individuals and/or owners of businesses under EAJA. *See* Attachments C, G, H and J hereto; *see also Branstad v. Veneman*, 232 F. Supp. 2d 945, 952 (N.D. Iowa 2002) (individually named plaintiff qualified as owner of sole proprietorship under 28 U.S.C. § 2412(d)(2)(B)(ii)). Thus, all of the Applicants are eligible for recovery under the statute.

**C. The Government's Actions Were Not Substantially Justified.**

The protracted history of this case leaves no doubt that the government lacked a substantial justification for its actions – including both the conduct that gave rise to the suit and the positions taken by defendant throughout the litigation. To be substantially justified, the government's position must be "justified to a degree that would satisfy a reasonable person." *Pierce*, 487 U.S. at 565. In making this determination, the Court must "look at the entirety of the government's conduct and make a judgment call whether the government's overall position had a reasonable basis in both law and fact." *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991). As a result, this Court must make a "single finding" as to substantial justification, which serves as a "one-time threshold for fee eligibility." *INS v. Jean*, 496 U.S. 154, 160 (1990).

Importantly, the "substantial justification" inquiry encompasses not only the government's litigating position before the Court, but also its prelitigation conduct. 28 U.S.C. § 2412(d)(2)(D) (defining "position of the United States" as meaning "in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based"); *Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612, 619 (2005); *see also Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 837 F.2d 465, 466 (Fed. Cir. 1988) ("This court has defined "substantially justified" to require that the government show that it was clearly reasonable in asserting its position, including its position at the agency level, in view of the law and the facts").

The record makes clear that the government cannot meet its burden to show that its actions were substantially justified. The evidence, as outlined above and detailed in the Court's decision, establishes that:

- The government induced plaintiffs to enter into the Section 515 program using the promise of prepayment and conversion to market rents as a major incentive.
- That right was set forth in unqualified terms and served as the "quid pro quo" of the parties' deal.
- Many plaintiffs relied on their right to convert their properties to market uses as a key component of their retirement planning.
- The government knowingly repudiated the plaintiffs' critical right to prepay and be freed of the program's regulatory restrictions.
- The government repudiated the contracts of Section 515 owners three times before it was through.
- The repudiating legislation was specifically targeted at the owners' contracts and represented an attempt by the government to "get a better deal."

- Many members of Congress expressed grave concerns about the propriety of the government's repudiation.

- The agency itself believed that it was obligated to honor the plaintiffs' contract rights.

- The government's action was motivated by a desire to save money.

- Plaintiffs, some of whom have passed away and most of whom are well into their retirements, where forced to remain in the program against their desires.

- While stranded in the program, many plaintiffs failed to receive any cash flow from their properties whatsoever for substantial periods of time.

- The government's "prepayment prevention program" was fraught with delays and inequities and imposed a multitude of risks and burdens on the plaintiffs.

- Defendant pursued a series of frail and unfounded arguments in defense of its conduct, some of which required plaintiffs to appeal all the way to the United States Supreme Court, where they obtained a unanimous decision permitting their claims to go forward.

- Defendant's primary defense to liability, the unmistakability doctrine, had been soundly rejected by a strong line of cases from various trial and appellate courts by the time of the Supreme Court's remand.

- Defendant injected into the case numerous other novel and unsupportable legal arguments, including "liberal legal interpretations" and suggestions that plaintiffs make cash payments to tenants to induce them to vacate their homes.

- The testimony of the sole fact witness who testified on defendant's behalf was found to be self-serving and lacking in credibility.

- The expert witness proffered by the government lacked qualifications in key areas and at times took on the role of an advocate.

- Applicants recovered nearly $13 million in damages.

*See supra* at 2-11; *Franconia Assocs. v. United States*, 536 U.S. 129 (2002); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004)

These examples highlight the unreasonableness and inequity of the government's conduct at every stage, from its underlying actions to its litigation positions, and from

liability to damages. As a result, the government cannot meet its burden under EAJA to establish that its actions were substantially justified. *See Libas, Ltd.*, 314 F.3d at 1365; *Gavette v. Office of Personnel Management*, 808 F.2d 1456, 1465-66 (Fed. Cir. 1986) (quoting legislative history stating that "it is particularly appropriate to place the burden on the government to prove the reasonableness of its actions").

Accordingly, Applicants have satisfied all of the requirements for obtaining attorneys' fees and costs under EAJA. The only issue that remains is the quantification of their recovery.

## II. APPLICANTS HAVE PRESENTED AN ACCURATE AND DETAILED ACCOUNTING OF THE FEES AND COSTS TO WHICH THEY ARE ENTITLED.

The Supreme Court has held that "where a plaintiff has obtained 'excellent results,' his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1988). That is the case here. To establish the recoverable amount, the plaintiff need only submit standard billing records identifying the work performed and costs incurred. *Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed. Cir. 1987) (holding that "contemporaneous records of the attorney's time and usual billing rates, as well as a breakdown of expenses, are necessary in order to determine the reasonableness of the charges."); *see also Beta Sys., Inc. v. United States*, 866 F.2d 1404, 1406 (Fed. Cir. 1989) (noting that plaintiff need only provide typical billing records).

The recovery permitted by EAJA includes both fees incurred before this action was filed in May 1997 and those incurred in preparing and filing this application. *See Jean*, 496 U.S. at 157 (EAJA application); *Levernier Constr., Inc. v. United States*, 947 F.2d 497, 501 (Fed. Cir. 1991) (legal and factual research preparatory to litigation). In

addition, because of the interrelated nature of the legal and factual issues presented in this case, plaintiffs are an entitled to an award of fees and costs for all recoverable time and disbursements related to this action, including those devoted to unsuccessful claims or issues. *See Hensley v. Eckerhart*, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."). In this case, all of plaintiffs' claims involved a common core of facts and stemmed from the same government action.

The attached Affidavit of Jeff H. Eckland ("Eckland Aff.") explains the detailed methodology applied to arrive at the amounts claimed by Applicants herein. *See* Attachment A hereto. The affidavit also contains two lengthy exhibits identifying the specific fees and costs incurred in connection with this matter. *Id.*

**A. Applicants' Calculation of Attorneys' Fees**

With respect to the calculation of fee awards, EAJA provides:

> The amount of fees awarded under this subsection shall be based on prevailing market rates for the kind and quality of the services furnished, except that . . . attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

28 U.S.C. § 2412(d)(2). Thus, the calculation of fees is determined in the first instance by looking to prevailing market rates. *See, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 896-96 (noting that "reasonable billing rate" is based on "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation). The attached detail of fees therefore identifies the standard hourly rates for all of the attorneys who worked on this matter upon the date of each time entry. Eckland

Aff., Ex. A.[10] Applicants have also included fees for time spent by paralegals, which also is recoverable under EAJA. *Id.*; *see Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612, 626 (2005) (awarding expenses for paralegal fees); *California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 734 (1999) (same). The hourly rates claimed for all attorneys and staff reflect the prevailing market rates in Minneapolis, Minnesota for services of the type and quality performed in this case.[11] Based on the actual billing rates for the attorneys and staff involved, the total value of the services rendered on this case is $3,182,112. *See* Eckland Aff., Exhibit A.

The hourly rates for nearly all of the attorneys and staff who worked on this case, however, exceed the $125 per hour cap set by the EAJA. 28 U.S.C. § 2412(d)(2); *see* Eckland Aff. Ex. A. The statute provides, however, that the hourly cap may be increased if "the court determines that an increase in the cost of living . . . justifies a higher fee." *Id.* Because the cost of living has increased since the fees were incurred, the Applicants are entitled to a cost of living adjustment ("COLA") to enhance EAJA's $125 hourly rate cap for fees incurred from 1997 to date.

---

[10] Jeff H. Eckland, who has served as the attorney of record for all plaintiffs in this action at all relevant times, was a partner at the law firm of Faegre & Benson LLP from the commencement of this action until August 3, 2004, and has been a partner with the law firm of Eckland & Blando LLP from August 4, 2004 until the current date. The attached documentation of fees and expenses includes the work performed by both law firms.

[11] The regular hourly rates for attorneys from Faegre & Benson LLP have been approved by federal courts as reasonable. *See, e.g., Gopher Oil Co. v. Union Oil Co.*, 757 F. Supp. 998, 1011 (D. Minn. 1991); *Minneapolis Star and Tribune Co. v. United States*, 713 F. Supp. 1308, 1313 (D. Minn. 1989); *Defenders of Wildlife v. Administrator, EPA*, 700 F. Supp. 1028, 1032 (D. Minn. 1988). Since these cases were decided, the firm's normal hourly rates have been adjusted to reflect increases in the general cost of legal services. In addition, the factors taken into account by both Eckland & Blando LLP and Faegre & Benson LLP in determining the fee for a particular matter are consistent

Such an enhancement "justifiably offsets the decrease in the value of the $125.00 rate due to inflation." *CEMS, Inc., v. United States*, __ Fed. Cl. __, 2005 WL 950495, *14 (Apr. 22, 2005); *see also California Marine Cleaning*, 43 Fed. Cl. at 733. Thus, to benefit from a COLA, an applicant need only "request such an adjustment and present a basis upon which the adjustment should be calculated." *Id.* (citations omitted); *see also Meyer v. Sullivan*, 958 F.2d 1029, 1035 n.9 (11th Cir. 1992) ("The Supreme Court has implied that a cost-of-living adjustment under the EAJA is next to automatic.").

Because EAJA was amended in March 1996 to increase the hourly fee rate from $75 to $125, March 1996 is the proper basis to employ for the COLA here. *See Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505, 519 (2003).[12] "The endpoint of the COLA calculation is the date the services were rendered." *Id.* In this case, the applicable COLA for each year is determined by multiplying the basic EAJA rate of $125 by the consumer price index for urban consumers ("CPI-U") in Minneapolis/St. Paul (where counsel is located), and then dividing the product by 151.9, which was the CPI in the Twin Cities for 1996. *See, e.g., CEMS, Inc.*, 2005 WL 950495, **14-15. Based on the annual CPI-U's in the Twin Cities for 1997-2004, the hourly rate for attorneys' fees should be enhanced as follows to account for the COLA, if this Court declines to adjust the rate for a "special factor":[13]

---

with, and in fact are derived from, Rule 1.5 of the Minnesota Rules of Professional Conduct.

[12] Because the $125 cap applies to all civil actions commenced on or after March 29, 1996, it applies even to fees incurred before that date. *See* Pub. L. No. 1-0-121 §§ 232(b)(1), 233, 110 Stat. 847, 863-64 (1996). In other words, the pre-March 1996 statutory cap of $75 plays no role here and should not be applied to fees incurred in 1995 and early 1996.

[13] This Court may take judicial notice of the relevant CPI data. *See California Marine*, 43 Fed. Cl. at 734. CPI information is available online at: http://www.bls.gov/cpi/.

- 1997: $127.88 ($125 x 155.4/151.9);
- 1998: $130.27 ($125 x 158.3/151.9);
- 1999: $134.38 ($125 x 163.3/151.9);
- 2000: $140.47 ($125 x 170.1/151.9);
- 2001: $145.24 ($125 x 176.5/151.9);
- 2002: $147.79 ($125 x 179.6/151.9);
- 2003: $150.35 ($125 x 182.7/151.9);
- 2004: $154.62 ($125 x 187.9/151.9); and
- 2005: $155.69 ($125 x 189.2/151.9).

The attached detail of fees quantifies the value of the hours expended in connection with this matter by applying the adjusted EAJA rates set forth above. Based on those hourly rates, the total amount of fees claimed by Applicants in this case totals $1,879,785.

**B. Applicants' Calculation of Expenses.**

EAJA provides that the prevailing party is entitled to recover "the reasonable expenses of expert witnesses, [or] the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case." 28 U.S.C. § 2412(d)(2); *see also Baldi Bros. Constr. v. United States*, 52 Fed. Cl. 78, 85-87 (2002) (awarding expert fees and expenses). As a result, plaintiffs are entitled to recover the reasonable costs, including witness fees and expenses, associated with their retention of George R. Karvel, Ph.D., and the development of plaintiffs' damages model.

---

Because Minneapolis CPI data for the first half of 2005 will not be available until August, the applicants have used the most recent CPI data (from the last half of 2004) for fees incurred this year.

Dr. Karvel holds the Arnold and Leonard Mikulay Distinguished Chair on Real Estate at the College of Business of the University of St. Thomas in Minneapolis. PX 763 at Tab A. Dr. Karvel reviewed the raw data, developed and applied the damages model, drafted an extensive expert report, and testified at both deposition and trial. The costs associated with Dr. Karvel's work are recoverable because it was "necessary for the preparation of the [plaintiffs'] case." 28 U.S.C. § 2412(d)(2); *Baldi Bros.*, 52 Fed. Cl. at 85-87. Indeed, this Court relied extensively on Dr. Karvel's testimony and endorsed plaintiffs' damages model with only minor modifications. *See Franconia Assocs.*, 61 Fed. Cl. at 746-71. Thus, the attached detail of costs includes the fees charged by Dr. Karvel for his work in this matter. *See* Eckland Aff., Ex. B.

A prevailing party also is entitled to recover "expenses routinely incurred by attorneys, assuming they are documented and reasonably necessary to prosecution of the claim." *R.C. Constr. Co. v. United States*, 42 Fed. Cl. 57, 63-64 (1998). In addition, "[w]hen evaluating a claim for expenses, the 'quantum and method of proof of each allowable expense is discretionary with the trial court.'" *PCI/RCI v. United States*, 37 Fed. Cl. 785, 791 (1997) (quoting *Oliveira v. United States*, 827 F.2d 735, 744 (Fed. Cir. 1987)); *KMS Fusion v. United States*, 39 Fed. Cl. 593, 606 (1997) (same). The attached detail of costs therefore includes other routine expenses that were incurred in connection with this case, including: (1) travel, lodging and meals; (2) electronic legal research; (3) photocopying, printing and binding; (4) telephone and facsimile; and (5) postal and other delivery services.

Each of these categories of cost is fully recoverable under EAJA. *See Filtration Dev. Co.,* 63 Fed. Cl. at 626 (awarding expenses for photocopying and binding,

messenger and courier services, computer research, telephone, travel, hotel and meals); *Baldi Bros. Constr. v. United States*, 52 Fed. Cl. 78, 85-89 (2002) (travel, delivery, facsimile, and copying); *Cal. Marine Cleaning, Inc.*, 43 Fed. Cl. at 734 (taxi fares, and copying); *R.C. Constr.*, 42 Fed. Cl. at 63-64 (copying, facsimile, messenger services, computer research, and office services); *KMS Fusion v. United States*, 39 Fed. Cl. 593, 605-06 (1997) (copying, delivery and local travel); *PCI/RCI v. United States*, 37 Fed. Cl. 785, 791 (1997) (computer research, photocopying, postage, telephone and travel). Accordingly, the total amount of costs and expenses recoverable by Applicants totals $1,196,457.[14]

## CONCLUSION

For the reasons set forth above, Applicants respectfully request that the Court grant this Motion for Attorneys' Fees, Expenses and Costs and award Applicants $1,879,785 in fees and $1,196,457 in expenses and costs, for a total recovery of $3,076,242, pursuant to the Equal Access to Justice Act.

Dated: June 6, 2005

Jeff H. Eckland
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
700 Lumber Exchange
10 South Fifth Street
Minneapolis MN 55402
Tele: 612-305-4444
Fax: 612-305-4439

---

[14] Plaintiffs are also filing this date a Bill of Costs pursuant to Rule 54(d)(1) seeking $104,500 in taxable costs. If those costs are awarded, then Applicant's recovery sought herein under EAJA should be reduced by a commensurate amount.